UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:24-CV-20207

GUSTAVO HERNANDEZ,

     Plaintiff,

v.

HYPOWER, LLC,

     Defendant.

_____/

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS PARTIAL MOTION FOR SUMMARY JUDGMENT

Defendant, HYPOWER, LLC ("Hypower"), by and through the undersigned counsel, states the following Undisputed Material Facts in support of its Partial Motion for Summary Judgment against, Plaintiff, GUSTAVO HERNANDEZ ("Plaintiff"):

## Statement of Undisputed Material Facts

1. **On July 22, 2022, Hypower extended an offer of employment to Plaintiff for the Foreman position ("Foreman"), with a start date of August 8, 2022.**

   - *See* Signed Offer Letter, attached as **Exhibit "A."**

   - *See* Plaintiff's Dep., 62:2-18, attached as **Exhibit "B."**

2. **On July 22, 2022, Plaintiff signed an acknowledgment that he had read and received a copy of Hypower's Employee Handbook ("Handbook"), and understood the Handbook's contents ("Acknowledgement").**

   - *See* Plaintiff's Dep., 63:9-64:4, at Exhibit "B."

   - *See* Acknowledgment, attached as **Exhibit "C."**

3. **The Handbook provides that nothing in the Handbook or any other policy, practice, procedure, or benefit constitutes a contract of any type.**

- *See* Handbook, at 2, attached as **Exhibit "D."**

4. **An employee who is terminated for cause is not entitled to any unused paid time off ("PTO").**

- *See* Handbook, at 2, at Exhibit "D."

- *See* Plaintiff's Dep., 78:21-79:8, at Exhibit "B."

- *See* Plaintiff's Interrogatory Answers, attached as **Exhibit "E."**

- *See* Corp. Rep. Dep., 70:11-16, attached as **Exhibit "F."**

5. **On January 5, 2024, Plaintiff was terminated for-cause, as a result of his insubordinate behavior during a safety meeting.**

- *See* Corp. Rep. Dep., 12:13-25, at Exhibit "F."

- *See* Termination Form, attached as **Exhibit "G."**

- *See* 01.05.2024 Correspondence, attached as **Exhibit "H."**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 11th day of February 2025, a true and correct copy of the foregoing has been furnished by electronic filing with the Clerk of the court via CM/ECF, which will send notice of electronic filing to all counsel of record.

> COLE, SCOTT & KISSANE, P.A.
> *Counsel for Defendant*
> Esperante Building
> 222 Lakeview Avenue, Suite 500
> West Palm Beach, Florida 33401
> Telephone (561) 612-3454
> Facsimile (561) 683-8977

Primary e-mail: jillian.strasser@csklegal.com
Secondary e-mail: emma.mccarthy@csklegal.com

By:   /s/ *Jillian Strasser*
      JILLIAN STRASSER
      Florida Bar No.:  113611
      EMMA L. MCCARTHY
      Florida Bar No.:  1048504

# EXHIBIT A



Dear Gustavo Hernandez,

We are very pleased to extend to you our offer of employment with HYPOWER, LLC. (the "Company").  The details of this employment offer are:

**Position:  Foreman 2**

**Starting Date:** Upon successful completion of a drug and background check, your start date will be on or before **8/8/2022.**

**Base Location: Jobsite (T.B.D)**

**Starting Hourly Rate of Pay: $ 32.00**

**Health Benefits/Other:** *See Hypower's Employee Handbook for benefits summary.*

**The Company PTO policy for the construction hourly workforce will be as follows:**

- 0 hours paid PTO from hire date until December 31st of that same year.
- 40 hours paid PTO starting on January 1st after your hire date. This is available for the calendar year, and then again each year thereafter

**This Is a Full Time, Hourly Non-Exempt Position.**

In addition to the compensation described above, you will also be eligible for participation in the Company's benefits programs, subject to the applicable plans policies.  More information on the benefit plans are listed in the Benefits Summary attached.  Please read this summary thoroughly and direct any questions regarding benefits administration and eligibility to me and I will have Kathy Weissman, our benefit provider's administrator, contact you with the details.

Please note that this employment offer is contingent on the following items:

1. Successful completion of background checks and a drug screening test. (Medical center information and location for these tests are included in this package.) Your start date will be contingent on receipt of these test results by the company.
2. Your Submission of satisfactory proof of your identity and your legal authorization to work in the United States. If you fail to submit this proof (original documents) within 3 days after your start date, federal law prohibits us from hiring you.

You represent that you are not bound by any employment contracts, restrictive covenants or other restrictions preventing you from accepting employment with the Company as described herein or carrying out your responsibilities for the Company, or which are in any way inconsistent with any of the terms of this letter. You also

represent that you will not improperly use or disclose, in connection with your employment by the Company, information obtained from others, which you know to be confidential or proprietary, including information from prior employment or consulting arrangements. Any misrepresentation made by you in connection with these representations may result in your immediate termination.

Employment at HYPOWER, LLC., is at-will and may be terminated by either you or the Company at any time with or without cause. This letter does not create a contract of employment for any specified term. Similarly, nothing in this letter shall be construed as an agreement, expressed or implied, to provide you with any compensation or benefit beyond the end of your employment other than what is expressly stated above.

I am pleased to extend this offer of employment to you. This is an exciting time for HYPOWER, LLC. and we look forward to you joining our team.

If you are in agreement with the terms of this offer of employment, please acknowledge by providing your digital signature below and click on the "Accept" this offer button. Add any comments, if applicable and click on "Submit Response" button to finalize.

Sincerely:

Jeff Emerson

Hypower LLC.,

Accepted by Applicant (Type Name):  Gustavo Hernandez

Digital Signature (Sign Acknowledgement):

Candidate Comments:
I need to took with Mr Adam Johnson, and Mr Alsides Fleites about to increase my salary, thanks for this oportunity.
Candidate Response Date: 7/22/2022 11:26:16 AM

# EXHIBIT B

```
                                              Page 1

 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                    MIAMI DIVISION
 3              CASE NO. 1:24-cv-20207-JEM
 4
 5    GUSTAVO HERNANDEZ,
 6            Plaintiff,
 7    vs.
 8    HYPOWER, LLC,
 9               Defendant.
      _____/
10
11
12                    9150 South Dadeland Boulevard
                      Miami, Florida
13                    December 31, 2024
                      Tuesday, 10:01 a.m.
14
15
16
17
18
               V I D E O T A P E D
19
               D E P O S I T I O N
20
                       of
21
               GUSTAVO HERNANDEZ
22
          Taken on behalf of the Defendant
23      pursuant to a Notice of Taking Deposition
24                     - - -
25    Job No. CRCC7058447
```

```
                                              Page 2
 1        APPEARANCES:
 2            FAIRLAW FIRM, by
              PATRICK BROOKS LAROU, ESQ., of counsel
 3            135 San Lorenzo Avenue, Suite 770
              Coral Gables, Florida   33146
 4            brooks@fairlawattorney.com
              Attorneys for Plaintiff.
 5
              COLE, SCOTT & KISSANE, P.A., by
 6            JILLIAN STRASSER, ESQ., of counsel
              222 Lakeview Avenue, Suite 500
 7            West Palm Beach, Florida   33401
              jillian.strasser@csklegal.com
 8            Attorneys for Defendant.
 9        Also Present:
              Victor Fuentes, Videographer
10            Linda Dunlap, Interpreter
11
12
                    I N D E X
13
14   WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
     Gustavo Hernandez
15   (By Ms. Strasser)   4            124
     (By Mr. LaRou)           115             128
16
17                  EXHIBITS
18   DEFENDANT'S       DESCRIPTION          FOR I.D.
19   Exhibit 1     Complaint filed 1-18-24      57
                   U.S. District Court
20
     Exhibit 2     Offer of Employment         61
21                 2-2-24
22   Exhibit 3     Offer of Employment         62
                   Foreman 2
23
     Exhibit 4     Policy Acknowledgement:     63
24                 Employee Handbook
25
```

Page 3

1                    EXHIBITS (Continued)

2     DEFENDANT'S          DESCRIPTION              FOR I.D.

3     Exhibit 5      Employee Handbook              64

4     Exhibit 6      Employee Earnings History      80

5     Exhibit 7      Timesheets                     84

6     Exhibit 8      Timesheets                     89

7     Exhibit 9      Plaintiff's Response to        99

                     Defendant's First Set of

8                    Interrogatories

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                 Page 4
 1              THE VIDEOGRAPHER:  Good morning.  We are
 2    now on the video record.  My name is Victor Fuentes,
 3    videographer on behalf of Veritext Legal Solutions.
 4    This is the video deposition of Gustavo Hernandez in
 5    the matter of Gustavo Hernandez versus Hypower, LLC.
 6              Today's date is December 31, 2024, and the
 7    time is 10:01 a.m.  At this time, Counsel, please
 8    state your appearance for the record and after the
 9    court reporter is going to swear in the interpreter
10    and then the witness.
11              MR. LAROU:  Good morning.  Brooks LaRou on
12    behalf of the Plaintiff, Gustavo Hernandez.
13              MS. STRASSER:  Good morning.  Jillian
14    Strasser on behalf of the Defendant, Hypower LLC.
15              (Linda Dunlap was duly sworn to truly and
16    faithfully interpret all questions posed to the
17    witness and all answers given by the witness.)
18    Thereupon:
19                   GUSTAVO HERNANDEZ
20    was called as a witness and, having been duly sworn,
21    was examined and testified through the interpreter as
22    follows:
23                   DIRECT EXAMINATION
24    BY MS. STRASSER:
25         Q.   Good morning, sir.
```

```
                                                        Page 5
```

 1        A.    Good morning.

 2        Q.    How are you this morning?

 3        A.    Fine, thank you.

 4        Q.    Will you please state your full name and

 5   spell your last for the record.

 6        A.    Gustavo Hernandez.  My name last is

 7   H-e-r-n-a-n-d-e-z.

 8        Q.    Do you have a middle name, sir?

 9        A.    No.

10        Q.    Have you ever gone by any other name?

11        A.    No, but I'm registered with a second

12   surname.

13        Q.    And what is that surname?

14        A.    Fernandez, with an "F."

15        Q.    When you say "registered," what do you

16   mean?

17        A.    That appears on my identification and on my

18   U.S. citizenship.

19        Q.    And just so I'm clear, is Fernandez --

20   where does that go in your name on the registration?

21        A.    It's Gustavo Hernandez Fernandez.  I use

22   both surnames.

23        Q.    Gustavo Fernandez Hernandez.  Is that

24   correct?

25        A.    No.  Hernandez comes first and Fernandez

Page 6

```
 1    comes afterwards.
 2         Q.   Got it.  Okay, thank you.
 3              And what is your date of birth, sir?
 4         A.   ██████████████
 5         Q.   Have you ever been deposed before?
 6         A.   (In English)  No, it's my first time.
 7         Q.   So there are some ground rules.
 8         A.   Okay.
 9         Q.   One person speaks at a time.  I'm going to
10    ask that you provide audible answers and not nod your
11    head or say uh-huh or something else.
12         A.   Okay.
13         Q.   If you don't understand one of my
14    questions, please let me know.  If you don't let me
15    know I'm going to believe that you understood the
16    question and answered based on that understanding.
17         A.   Okay.
18         Q.   If you need a break at any time please let
19    us know.  At times your counsel might object to the
20    form of the question.  If you hear him say "form,"
21    you can still answer the question unless he tells you
22    not to answer.
23         A.   Okay.
24         Q.   Do you have any questions?
25         A.   No.
```

Page 7

1        Q.    Are you mentally capable of testifying here
2    today?
3        A.    Yes.
4        Q.    Are you under the influence of any
5    medication that would impair your ability to
6    remember?
7        A.    No.
8        Q.    Before coming here this morning how did you
9    prepare?
10        A.    Well, how did I prepare?  Well, with all of
11    the evidence that I have and all of the information
12    that I gathered while I was working at Hypower.
13        Q.    What specifically did you review?
14        A.    Well, specifically the two Complaints that
15    I filed with my attorney.  One case was for
16    discrimination and another time for which I
17    understand I should have been paid and I was never --
18    I never received payment for that time period.
19        Q.    That latter action, that is a federal case.
20    Is that your understanding?
21        A.    My question is why would that be a federal
22    case.
23        Q.    Is your wage claim filed in federal court?
24    Is that your understanding?
25              THE WITNESS:  Has this been presented in a

Page 8

1  federal court?

2      Q.   (By Ms. Strasser)  He can't answer your

3  questions at this time.

4      A.   I really don't know whether or not it has

5  been presented at a federal court level, but I

6  believe so.  Is there some other kind of court that

7  isn't federal?

8      Q.   I can't answer your questions either, but

9  we'll go through the documents and hopefully we'll

10 have an understanding, we'll get on the same page and

11 have an understanding.

12          I see you brought an envelope of papers

13 with you this morning?

14     A.   Yes.

15     Q.   Can you tell me what's in that folder?

16     A.   Yes.  The summer months of 2023 I filed a

17 complaint to two inspectors of the U.S. Labor

18 Department.  The investigators came to the project.

19 That was the port project.  They spoke to me as the

20 foreman to see if everything was proper and correct

21 or if there was some sort of complaint.

22          They were asking me how much I was being

23 paid.  That is to me as the foreman as well as to the

24 electricians, how much we were being paid by the hour

25 and whether or not we were being paid overtime,

```
                                                   Page 9
 1    et cetera.

 2            I mentioned to them that we were working

 3    extra time every day in the mornings.  Electricians

 4    were working 42 and-a-half hours a week and the

 5    foremen were working 45 hours and that other half

 6    hour in the morning to the electricians and that

 7    other hour to the foreman was not being paid.  We

 8    were only getting paid for 40 hours a week.

 9        Q.   We'll get there.  I understand those are

10    your allegations.

11            What I'm asking you right now, can you read

12    to me what documents you have in that folder?

13        A.   These are some of the e-mails sent to the

14    U.S. Department of Labor.

15        Q.   Have you produced those documents to my

16    office?

17        A.   No.

18        Q.   Why not?

19        A.   My attorney recommended I not continue on

20    with this case -- I'm sorry, with the U.S. Labor

21    Department -- that I should allow them to do their

22    job.

23        Q.   Moving forward, I don't want you to tell me

24    what conversations you had with your counsel,

25    including any advice that they gave to you.  Since
```

1   you brought it up when you just mentioned your

2   counsel, were you referring to Mr. LaRou?

3        A.   Yes.

4        Q.   How many e-mails do you have there in front

5   of you?

6        A.   (In English)  There are maybe two e-mails.

7             THE STENOGRAPHER:  Excuse me.  Do you want

8   the record to reflect when he is speaking in English?

9             MS. STRASSER:  Yes, please.

10        Q.   (By Ms. Strasser)  What else is in that

11   folder then?

12             THE WITNESS:  Sorry.

13             THE INTERPRETER:  I will ask him either to

14   turn it off or put it on silent.

15             (Discussion in Spanish.)

16        Q.   (By Ms. Strasser)  So you said there are

17   two e-mails to the U.S. Department of Labor.

18   Correct?

19        A.   (In English)  Yes.

20        Q.   And What else is in that folder?  It looks

21   like there are more than two documents in there.

22        A.   Phone numbers of the people with whom I

23   spoke and the assistant contact person for the

24   Department of Labor in Miami-Dade County, the names

25   and phone numbers of the investigators for the United

```
 1   States Department of Labor with whom I spoke both by
 2   phone and in person.
 3        Q.   When we take a break I'm going to ask to
 4   make a copy of those documents if that's okay with
 5   your counsel.
 6             MR. LAROU:  I'll have to take a look at
 7   them first.  I've never seen them.
 8        A.   What happened, when I filed the complaint
 9   to the U.S. Department of Labor it went to an
10   investigator.  What happens is that investigator was
11   changed to a different case and he told me that one
12   of his colleagues was going to follow my case and
13   open it up and follow it, but that never happened.
14             So I asked the U.S. Department of Labor
15   what had happened with my case.  They sent me a
16   series of responses which I have gathered together to
17   be able to show them to a judge should that ever
18   become necessary.
19        Q.   Understood.  Once I take a look at those we
20   will have a better, more intelligent conversation
21   about it because I don't know specifically what is in
22   there.
23        A.   Okay.
24        Q.   For now I have a little bit more
25   administrative things to cover before we get there.
```

Page 12

```
1              What is your current address, sir?
2         A.   It's  ████████████████████████████
█  ████████████████████████████
4         Q.   And how long have you lived there?
5         A.   Since 2019.  I am the homeowner.
6         Q.   Does anyone else own that home with you?
7         A.   (In English)  My wife.
8         Q.   What is your wife's name?
9         A.   Concepcion Cambeiro.
10        Q.   Can you spell that for me, please.
11        A.   C-a-m-b-e-i-r-o, C-o-n-c-e-p-c-i-o-n.
12        Q.   Have you ever been married to anyone else?
13        A.   No.
14        Q.   How long have you and Ms. Concepcion been
15   married?
16        A.   Well, over 20 years.  All together we have
17   been together since 1999.
18        Q.   Did you get married in the United States?
19        A.   No, in Cuba.
20             (In English)  In 2001.
21        Q.   Does anyone else live at  ████████████████
22   ██████████████  (sic) with you and your wife?
23        A.   No.
24        Q.   Do you have children?
25        A.   No.
```

Page 13

```
 1        Q.   Do you own any other properties?
 2        A.   No.
 3        Q.   Where did you live prior to the ████
 4   address?
 5        A.   At an apartment we rented in Sweetwater.
 6        Q.   Is that in Florida?
 7        A.   Yes.  Sweetwater City is in Miami-Dade
 8   County.
 9        Q.   Do you know the address of that apartment?
10        A.   ████████████████████████████
11        Q.   Did you own or rent that apartment?
12        A.   We rented.
13        Q.   Rented?
14        A.   Rented.
15        Q.   How long did you live at that apartment?
16        A.   Four years.
17        Q.   Where did you live before that apartment?
18        A.   In Spain.
19        Q.   Where in Spain?
20        A.   Well, when I came back here I was still --
21   when I first -- just before I came here I was living
22   in Barcelona.  I was there from 2007 to 2015, in
23   Barcelona.
24        Q.   And where did you live before Barcelona?
25        A.   In Madrid.  I lived there from 2002 to
```

Page 14

```
 1    2007.
 2         Q.   Where did you live before that?
 3         A.   In Cuba.
 4         Q.   From what years?
 5         A.   From 1978 to 2002.
 6         Q.   So you were born in Cuba?
 7         A.   Yes.
 8         Q.   Are you a U.S. citizen?
 9         A.   Yes.
10         Q.   When did you obtain your citizenship?
11         A.   In 2022.  January, 2022.
12         Q.   And how long have you been married to
13    Ms. Concepcion?  You said about 20 years?
14         A.   Well, since 2001.
15         Q.   And what does she do for work?
16         A.   My wife is a case manager for Medicaid.
17         Q.   Where at?
18         A.   In Miami-Dade County.
19         Q.   What is your highest level of education,
20    sir?
21         A.   I'm an electrical engineer in Cuba.  I do
22    not carry a professional engineer's license from the
23    United States.
24         Q.   Do you have a license in Cuba?
25         A.   No.  They don't have licenses in Cuba like
```

Page 15

1   they do here.

2       Q.   So you said you were an electrical engineer

3   in Cuba.  What did you have to do to become that?

4       A.   I had to study at the university for a

5   university degree.

6       Q.   Did you receive a degree at a university?

7       A.   Yes.

8       Q.   In electrical engineering?

9       A.   That's correct, and before entering the

10  university I did a four-year technical degree as an

11  electrical technician.

12      Q.   And where did you receive that technical

13  degree?

14      A.   Well, from the school where I studied.

15      Q.   What was the school called?

16      A.   The Gomez Brothers or Hermanos Gomez.

17      Q.   Do you have any kind of certificate from

18  that facility?

19      A.   I don't have one for the university, but I

20  do have the one as the technician.

21      Q.   From The Gomez Brothers?

22      A.   Yes.  It's a combination equivalency here

23  of an electrical technician and high school.

24      Q.   Do you have a GED?

25      A.   Yes.

Page 16

1          Q.    From where?

2          A.    What I have is an equivalency recognition

3   which was done by the company.

4               THE INTERPRETER:  And I'm sorry the

5   interpreter is having a hard time understanding the

6   name of the company.

7               (Discussion in Spanish.)

8               THE INTERPRETER:  He can look it up on the

9   Internet.  Is that all right?

10              MS. STRASSER:  That's fine.

11              THE INTERPRETER:  I'm understanding Joseph

12  and something.  Sorry.

13         A.    Josef Silny & Associates.

14         Q.    (By Ms. Strasser)  When did you receive

15  that recognition?

16         A.    The first year that I was here in the

17  United States.  I needed that to prove I had at least

18  the equivalent of a high school degree and at the

19  Miami-Dade County Electrical Board so that I could

20  get a license as journeyman electrician.

21         Q.    I'm sorry, as a what electrician?

22         A.    Journeyman.  I currently have two

23  certifications here in the United States or licenses

24  here in the United States, one as a journeyman

25  electrician and the other one as an electrical

Page 17

1    inspector.

2         Q.   You said you received the recognition that

3    is equivalent to a high school diploma from Josef

4    Silny & Associates when you came to the United

5    States.  Correct?

6         A.   Correct.

7         Q.   And that was in 2015 or when about?

8         A.   It must have been around 2016.

9         Q.   Do you recall when specifically you moved

10   to the United States?

11        A.   I believe that it was October 18, 2015.

12        Q.   When you lived in Cuba did you work?

13        A.   Yes, as an electrician, and I got my

14   electrical engineering degree for a special course

15   made for workers.

16        Q.   Where did you get that degree from?

17        A.   It's called CUJAE and it stands for Centro

18   Universitario Jose Antonio Echevarria.

19        Q.   When did you receive that engineering

20   degree or electrical engineering degree?

21        A.   I finished it at the beginning of 2002.

22        Q.   And where did you first start working?

23        A.   My first job was in Spain.  As soon as I

24   finished my degree I left for Spain with my wife.

25        Q.   Where did you work in Spain?

Page 18

1          A.    I always worked as an electrician in
2    electrical companies always.
3          Q.    What was the name of the company that you
4    first worked at?
5          A.    Meba Electrical Installations.
6          Q.    What was your title?
7          A.    Electrician.
8          Q.    And you worked there from 2002 until when?
9          A.    Maybe like 2003.  I mean I was with that
10   company for a year and then I changed to a different
11   one.
12         Q.    Before we get there, how much did you make
13   per hour at Meba Electrical Installations?
14         A.    Well, you get paid a salary in Spain.  You
15   don't get paid by the hour.
16         Q.    What was your salary?
17         A.    I was making about 1,400 euros a month.
18         Q.    And you said you were there about a year
19   and then went to a new job.  Where did you start a
20   new job at?
21         A.    The other company is called Montajes
22   Aguero.
23                MS. STRASSER:  Can you spell that for us,
24   please?
25                THE INTERPRETER:  A-g-u-e-r-o.

Page 19

```
 1              THE STENOGRAPHER:  Wasn't there another
 2   word?
 3              THE INTERPRETER:  M-o-n-t-a-j-e-s.
 4       Q.   (By Ms. Strasser)  What position did you
 5   hold at that company?
 6       A.   Foreman electrician.
 7       Q.   And what did you make annually at that job?
 8       A.   Yearly?
 9       Q.   Or monthly, whatever is easier.
10       A.   Well, monthly I was making approximately
11   1,500 euros.
12       Q.   How long did you work there?
13       A.   Until 2007.  I was there from 2003 to 2007.
14       Q.   Why did you leave that company?
15              MS. STRASSER:  Can we ask him to silence
16   his phone, please.
17              (Discussion in Spanish)
18              THE INTERPRETER:  It's on silent now.
19       Q.   (By Ms. Strasser)  Thank you.
20       A.   My family and I moved from Madrid to
21   Barcelona.
22       Q.   In 2007.  Correct?
23       A.   Yes.
24       Q.   How come you moved from Spain to Barcelona?
25              THE INTERPRETER:  Madrid.
```

Page 20

```
 1        Q.    (By Ms. Strasser)  Madrid to Barcelona, I'm
 2   sorry.
 3        A.    Because it's a better climate there and
 4   Madrid is a very damp and cold climate.
 5        Q.    What was your first job in Barcelona?
 6        A.    Also as an electrician.
 7        Q.    With what company?
 8        A.    Electro Gala, G-a-l-a.
 9        Q.    What did you make per month at
10   Electro Gala?
11        A.    Around 1,800 euros a month.
12        Q.    How long did you work there?
13        A.    From 2007 to 2010.
14        Q.    Why did you leave?
15        A.    The company ended up closing up as a result
16   of the crisis that happened in 2008.  It slowed down
17   little by little and eventually they had to shut down
18   the whole company.
19        Q.    Were you laid off?
20        A.    Well, the company declared bankruptcy, so
21   we were all laid off.
22        Q.    So the answer is yes?
23        A.    Yes.
24        Q.    Where did you go for your next job?
25        A.    I started working for myself.  In Spain you
```

Page 21

```
 1    don't have to create a company to do so.  All you
 2    have to do is declare yourself to be working
 3    autonomously with their social security.
 4         Q.   What did you do as far as work for
 5    yourself?
 6         A.   Electrical installations.
 7         Q.   And how long did you do that on your own?
 8         A.   From 2010 until 2015.
 9         Q.   And that's when you moved to the United
10    States.  Correct?
11         A.   Correct.
12         Q.   How much did you make per month working for
13    yourself?
14         A.   Approximately I was making approximately
15    19,000 a year.  19,000 euros, sorry.
16         Q.   When you moved to the United States where
17    did you move to?
18         A.   Here to Miami to the City of Sweetwater.
19         Q.   When did you get your first job in the
20    United States?
21         A.   In January of 2013 when I got my work
22    permit.
23         Q.   Where did you receive that from?
24         A.   Well, supposedly it was from the work
25    offices because I went there and I registered there
```

Page 22

1    and I did everything and requested everything you can

2    get when you're on immigration parole and they gave

3    me the work permit that would allow me to work until

4    I actually got my residency.

5         Q.   So from the U.S. Government.  Correct?

6         A.   Yes.

7         Q.   And where did you first work when you moved

8    to Sweetwater?

9         A.   At a company called Solares Electrical.

10        Q.   Can you spell that for us, please.

11        A.   S-o-l-a-r-e-s Electrical.

12        Q.   And when did you start working there?

13        A.   In the year 2016.

14        Q.   And what did you work as?

15        A.   As an electrician.

16        Q.   Was that your title, electrician?

17        A.   Yes.

18        Q.   And who did you report to?

19        A.   To the project foreman.

20        Q.   Did he have a name?

21        A.   Tony Plasencia.

22        Q.   Are you able to spell his last name for us?

23        A.   P-l-a-s-e-n-c-i-a.

24        Q.   How much did you make per hour with Solares

25    Electrical?

Page 23

1      A.    $15 an hour.

2      Q.    Were you required ---

3      A.    My first year here I worked as an assistant

4  to the electrician because I still had not obtained

5  my journeyman's license.

6      Q.    So while you were working with Tony you

7  were working as an assistant.  Am I understanding you

8  correctly?

9      A.    As an electrician's assistant, yes.

10     Q.    How long did you work with Tony?

11     A.    The entire time that I was working for

12  Solares.  That would be all of the years 2016 and

13  2017.

14     Q.    Why did you leave Solares?

15     A.    Because I was offered more money at a

16  different company.

17     Q.    So you resigned?

18     A.    Yes.

19     Q.    Which company did you go to next that

20  offered you more money?

21     A.    Bryant Electrical.

22     Q.    Do you recall when you started with Bryant

23  Electrical?

24     A.    At the beginning of 2018.

25     Q.    How long did you work there?

Page 24

1      A.    From the beginning of 2018 to the end of

2   2021.

3      Q.    What position did you work in?

4      A.    Foreman electrician.

5      Q.    Were you still working as an assistant at

6   that point?

7      A.    No.  I had already gotten my journeyman's

8   license and I could now work as a foreman.

9      Q.    Where did you receive the journeyman

10   license from?

11      A.    From the Miami-Dade County Board.

12      Q.    What did you have to do to receive that

13   license?

14      A.    I had to pass a test.

15      Q.    Was that exam in person?

16      A.    Yes.

17      Q.    How many hours?

18      A.    Around three hours.

19      Q.    Did you have to do anything else to receive

20   that license?

21      A.    Well, I applied to the board and I also had

22   to explain to them why it was that I thought that

23   after only being in the United States for a year I

24   should be able to apply for my journeyman's license

25   and that was based on my years of studies as well as

Page 25

1    my years of experience.

2         Q.    And when did you receive that journeyman's

3    license?

4         A.    In 2017.

5         Q.    Did you pass the exam on the first try?

6         A.    Yes.  Yes, and I had already passed the

7    course that prepares you for the journeyman's license

8    exam at Miami-Dade College.

9         Q.    When did you pass that course?

10        A.    I took the course from August, 2016 until

11   April, 2017.

12        Q.    Did you have to attend that course in

13   person?

14        A.    Yes, every day from Monday through Thursday

15   from 6:00 to 10:00 p.m.

16        Q.    How much were you making per hour at Bryant

17   Electrical?

18        A.    When I started I was making $22 per hour.

19        Q.    Did you receive an increase in your pay

20   over time?

21        A.    Yes.  They raised my salary every year.

22        Q.    When you left Bryant Electrical what were

23   you making per hour?

24        A.    $27 per hour.

25        Q.    Why did you leave Bryant Electrical?

Page 26

1       A.    Well, because they offered me a better job,

2    they offered me more freedom -- well, a better

3    opportunity to grow as a foreman at a different

4    company.

5       Q.    What company?

6       A.    Pacman Electric.

7       Q.    Pac-Man like the game?

8       A.    P-a-c-m-a-n, Pacman Electrical.

9       Q.    When did you start at Pacman Electrical?

10      A.    Towards the end of 2021.

11      Q.    How long did you work there?

12      A.    Approximately six months.

13      Q.    So you left in 2021?

14      A.    No.  I started there in 2021 and I left

15   there in May of 2022.

16      Q.    Got it, thank you.

17            And what was your position at Pacman

18   Electrical?

19      A.    Foreman electrician.

20      Q.    Did you hold any other titles while there?

21      A.    No.

22      Q.    And how much did you make per hour?

23      A.    $27 an hour.

24      Q.    Who did you report to at Pacman?

25      A.    Well, I was the project foreman.

Page 27

 1          Q.    Did you have a superintendent above you?

 2          A.    (In English)  Yes, yes.

 3          Q.    And who was that person?

 4          A.    (In English)  His name is Noel.  I don't

 5    remember the last name.

 6                (In Spanish)  But the superintendent was

 7    never at the project.

 8          Q.    How many people did you supervise at

 9    Pacman?

10          A.    Between 15 and 20 people.

11          Q.    Why did you leave Pacman Electrical?

12          A.    Well, first of all they told me once I

13    finished the first project with them and proved to

14    them my value, that I would get a salary increase and

15    bonuses, but when I finished the first project that

16    never happened.

17                It's an excellent company, but they told me

18    that at that point in time they were not able to

19    fulfill the promises they had made to me during my

20    job interview.

21          Q.    Did they say why?

22          A.    Yes.  It was because the company was

23    growing.  At that point in time they had to build

24    another warehouse, build more offices, and they were

25    taking on a lot of projects and the money they would

Page 28

```
 1   have spent on giving me a salary increase was
 2   something they needed in order to continue to grow.
 3        Q.   And when you left Pacman you were still
 4   making $27 per hour?
 5        A.   (In English)  Yes.
 6        Q.   Did you quit or were you fired?
 7        A.   No, no, I left.
 8        Q.   Where did you work next?
 9        A.   At Hypower.
10        Q.   How did you come to learn of Hypower?
11        A.   How did I start working there?
12        Q.   Yes.
13        A.   Well, I applied at the Hypower office and
14   they sent me to a staffing.
15        Q.   A staffing company?
16        A.   Yes.
17        Q.   Do you recall when that was, when you went
18   to the Hypower office?
19             THE INTERPRETER:  I did not understand,
20   Counselor.  Was it when?
21        Q.   (By Ms. Strasser)  Do you recall when you
22   went to the Hypower office?
23        A.   In the month of April, in April, 2022.
24        Q.   They sent you to a staffing company.  Do
25   you remember what the name of that staffing company
```

Page 29

1   was?

2        A.   QLM.   All Hypower employees start at that

3   staffing company.

4        Q.   So you applied with QLM.   Correct?

5        A.   No.   I requested the job at Hypower.

6        Q.   What position?

7        A.   Foreman electrician.

8        Q.   Did you have an interview at Hypower?

9        A.   Well, a lady by the name of Lily asked me

10  some questions.

11       Q.   Was that in person?

12       A.   That's to say she asked me some questions

13  about my experience, et cetera.

14       Q.   Was that questioning in person?

15       A.   No, by phone.

16       Q.   And at some point you got the job?

17       A.   Yes.

18       Q.   At the time you applied to Hypower did you

19  still have your journeyman's license?

20       A.   Yes, and I still have it today.

21       Q.   Do you have any other licenses in the

22  United States or certifications?

23       A.   As an electrician and I have a license as

24  an inspector.

25       Q.   That is given to you by Miami-Dade County?

Page 30

1          A.    No, the State of Florida.

2          Q.    When did you receive that license?

3          A.    This year, 2024.

4          Q.    What month?

5          A.    In the month of December.

6          Q.    So very recently?

7          A.    Yes.  I had already been working with a

8     temporary electrical inspector license for ten

9     months.  That is to say they will give you a

10    temporary license for a period of two years and then

11    you have two years to pass the electrical inspector's

12    exam.

13         Q.    And you passed that exam in December

14    of 2024.  Correct?

15         A.    Correct.

16         Q.    Was that exam done in person?

17         A.    No, it's an online test.

18         Q.    What does it consist of?

19         A.    It's all electrical questions about the

20    electrical code.

21         Q.    Did you pass it the first time?

22         A.    Yes.  Yes, I did a four-month course and

23    passed that at the same school where I had done the

24    course for the journeyman electrician and I had the

25    same professor.

Page 31

1        Q.    That's Miami-Dade College?

2        A.    (In English)  It's the Miami-Dade School

3    Board at Flagler Street and 25th Avenue.

4        Q.    And at some point you left Hypower.

5    Correct?

6        A.    No.  They fired me.

7        Q.    Why did they fire you?

8        A.    No, apparently I couldn't work for them

9    because since I filed a complaint about Raul Gonzalez

10   and they did not agree with that complaint, then they

11   fired me.

12       Q.    We'll talk about that in a little bit.

13             Have you ever been convicted of a crime,

14   sir?

15       A.    No.

16       Q.    Have you ever been charged with a crime?

17       A.    No, never.

18       Q.    Where are you currently working, as we sit

19   here this morning?

20       A.    I am working for a company called CAP

21   Government that has contracts with Miami-Dade County

22   and Broward County to provide services of electrical

23   inspectors and electrical plan inspectors.  I

24   personally work as an electrical inspector for the

25   school board and for Miami-Dade College and Broward

Page 32

1    College.

2         Q.    How long have you worked at CAP Government?

3         A.    Since February 26th of 2024.

4         Q.    Did you work somewhere between Hypower and

5    CAP?

6         A.    Yes.  I worked for an electrical company

7    called Meisner Electric.

8         Q.    Was that after you were fired from Hypower?

9         A.    Correct.

10        Q.    When did you get the job at Meisner?

11        A.    A week after I was fired from Hypower.

12        Q.    What was your title at Meisner Electric?

13        A.    Foreman electrician.

14        Q.    And who did you report to at Meisner?

15        A.    (In English)  I don't remember the name

16   exactly.

17             (In Spanish)  I reported to a

18   superintendant, but I don't remember the exact name.

19             (In English)  He's an American man.  I

20   don't remember exactly what his name is.

21        Q.    And how long did you work at Meisner?

22        A.    Well, it wasn't even two months.

23        Q.    How come?

24        A.    Because I got a call from CAP Government

25   saying that I had been chosen for one of the

Page 33

1   positions they had, that I would be working as an

2   electrical inspector and plan examiner.

3          Q.   And what were you making at Meisner?

4          A.   $36 an hour.

5          Q.   What were your hours at Meisner?

6          A.   Meisner, from 7:00 to 3:30.

7          Q.   Is that normal construction work hours?

8          A.   No, every company has its own schedule.

9          Q.   Is it true that it also depends on the

10  project?

11         A.   On the project, yes.

12         Q.   You said while you were working with

13  Meisner you received a call from CAP Government.

14  Correct?

15         A.   Yes.

16         Q.   When did you get that call?

17         A.   Around the middle of the month of February.

18         Q.   Am I correct in my understanding that you

19  had applied for a position there prior to February

20  of 2024 or the middle of February, 2024?

21         A.   That's correct.  I had applied at CAP

22  during the month of September, 2023.

23         Q.   While you were still working at Hypower.

24  Correct?

25         A.   Yes.

Page 34

1       Q.   How come you were applying for jobs while
2   you were still at Hypower?
3       A.   Because to be able to work as an electrical
4   inspector or as a plan examiner, the county gives a
5   lot better working conditions than working as an
6   electrician.  This is a normal kind of process where
7   electricians with a lot of electrical knowledge go on
8   to work as electrical inspectors or plan examiners.
9       Q.   Is the pay better?
10      A.   Yes.
11      Q.   What do make an hour at CAP?
12      A.   At this point in time $37 an hour.
13      Q.   What are your hours at CAP?
14      A.   Well, I work eight hours a day, but it's
15  sort of a free kind of schedule.  A start working
16  about 5:30 in the morning and finish at 2:00 to 3:00
17  in the afternoon or whenever the eight hours have
18  been completed.
19           We're not allowed to work overtime unless
20  the client has specifically requested it.  That is to
21  say, for example, if I want to go take a full hour
22  lunch at mid-day to go out and eat I can do that.  I
23  have a lot of freedom with my schedule.
24      Q.   Understood.  Who do you report to at CAP?
25      A.   To my building official, whose name is

```
                                                    Page 35
 1    Pedro Martinez.
 2         Q.   Is that his title, building official?
 3         A.   Building code official, yes.
 4         Q.   Did you resign from Meisner or were you
 5    fired?
 6         A.   Yes, I resigned.
 7         Q.   Are you currently working anywhere other
 8    than CAP?
 9         A.   No.
10         Q.   Since moving to the United States have you
11    done any kind of independent work like you did in
12    Spain?
13         A.   No.
14         Q.   Have you ever been involved in any other
15    lawsuit, sir?
16         A.   No.  It's the first time nor have I ever
17    been in a situation where I wasn't paid for an hour
18    of work nor have I ever been discriminated against
19    before simply because of the place where I had been
20    born.
21         Q.   Let's talk about that.  We are here today
22    because you are suing Hypower.  Correct?
23         A.   Yes.
24         Q.   Before you applied the job did you know
25    anyone working there?
```

Page 36

1      A.    Hypower, yes, I knew many electricians.

2      Q.    Who did you know?

3      A.    Abel Casanova, Asmildo Cruz.

4      Q.    Can you spell that?

5      A.    A-s-m-i-l-d-o  C-r-u-z.

6            There are others I have known from other

7   companies I have worked for, but I didn't know their

8   names.

9      Q.    What were their positions?

10     A.    Electricians.

11     Q.    And you were offered the job, right, at

12  Hypower?

13     A.    Well, I was the one who had gone to the

14  company and applied.

15     Q.    Right, and you were offered the job that

16  you applied for.  Correct?

17     A.    Yes.

18     Q.    And while you were working at Hypower you

19  reported to two jobsites.  Correct?

20     A.    That's correct.  I only worked on two

21  projects.

22     Q.    One of those, the first one, was Palmer

23  Lakes.  Correct?

24     A.    Correct.

25     Q.    How much did you make per hour at that

Page 37

```
 1   project?
 2        A.   I started marking $32 an hour.
 3        Q.   While at Palmer Lakes who did you report
 4   to?
 5        A.   To the superintendent.
 6        Q.   What was his name?
 7        A.   Alcides Fleitas.
 8        Q.   How often did you interact with Alcides
 9   during your time at Palmer Lakes?
10        A.   Every day.  He was always at that project.
11        Q.   Did you get along with Alcides?
12        A.   Yes.  He's a very good person.
13        Q.   While at that project did you have any
14   issues with any of the other employees?
15        A.   No, never.
16        Q.   Where was the Palmer Lakes project located?
17        A.   It's very close to Miami International
18   Airport.  It's practically right on the Miami River.
19        Q.   What was your are schedule at Palmer Lakes?
20        A.   I would work there from 6:00 in the morning
21   3:30 in the afternoon.
22        Q.   Was that everyone's schedule?
23        A.   No.  The electricians would start at 6:30,
24   but we foremen had to go in 30 minutes before that.
25        Q.   I want to back up a little bit.
```

Page 38

```
 1           When you were placed at Palmer Lakes you
 2    were told to go there by who?
 3      A.    The office, the Hypower office.
 4      Q.    The Hypower office or was it someone at
 5    QLM?
 6      A.    Well, yes, QLM always asks Hypower where
 7    the electricians need to be sent and Hypower told me
 8    that I needed to go to Palmer Lakes.
 9      Q.    Who at Hypower told you that?
10      A.    Alcides Fleitas.
11      Q.    So you spoke to Alcides prior to reporting
12    to your first day on the job at Palmer Lakes.  Am I
13    understanding?
14      A.    That's correct, QLM gave me Alcides' phone
15    number and told me that I should call him.
16      Q.    When you spoke to Alcides he told you to
17    report to Palmer Lakes at what time?
18      A.    At 6:00 in the morning as a foreman and
19    electricians at 6:30.
20      Q.    How did you communicate with Alcides, was
21    it over the phone, via text, e-mail?
22      A.    (In English)  In person.
23           (In Spanish)  Normally we would meet and we
24    would always talk in person.  Now sometimes if it was
25    a very big project we would also talk by phone, but
```

Page 39

```
 1    normally we would speak in person.
 2         Q.    Did you and Alcides ever send text messages
 3    back and forth?
 4         A.    We may have.
 5         Q.    Have you produced those text messages to my
 6    office?
 7         A.    No.
 8         Q.    How come?
 9         A.    I'm sorry.  Are you asking me to send the
10    text messages to what office?
11         Q.    To my office.  I asked you if you produced
12    them to my office.
13         A.    No, I don't have those text messages
14    because all of the messages were sent from the
15    Hypower phone.
16         Q.    You never used your personal cellphone to
17    communicate with anyone at Hypower?
18         A.    No.  The personal number, no.
19         Q.    At some point you moved -- you left the
20    Palmer Lakes project.  Right?
21         A.    Yes.  Mr. Aaron (sic) Johnson told me that
22    because of the good work I had done on that project,
23    that he wanted to send me to a federal job.  I told
24    him, "but my job at Palmer Lakes hasn't finished yet,
25    I still need to be there several more months," but he
```

Page 40

1   said he needed me more at the other project.

2       Q.   And what was that other project?

3       A.   MSC port project.  It's a new cruise

4   terminal that they're building at the port.

5       Q.   In Miami?

6       A.   In the Port of Miami.

7       Q.   And so Adam Johnson told you that he would

8   be moving from Palmer Lakes to MSC.  Do you recall

9   when you started that new project?

10      A.   It was the week before I started at the

11  port.

12      Q.   How did he communicate that to you?

13      A.   He told me that in person.

14      Q.   Where at?

15      A.   At the Palmer Lakes project.  He went

16  there.  He visited there.

17      Q.   And earlier you said Aaron Johnson, is that

18  correct, or is it Adam Johnson?

19      A.   Adam Johnson.  I don't really know how his

20  name is said, if it's Aaron or Adam Johnson.  At that

21  point in time he was the supervisor of the company.

22  At this point in time he is a vice-president of the

23  company.

24           THE INTERPRETER:  If we can take a five

25  minute break at some point it would help.

Page 41

```
 1              MS. STRASSER:  We can take a break.  Let's
 2    go off the record.
 3              THE VIDEOGRAPHER:  We are going off the
 4    video record.  The time is 11:16 a.m.
 5              (Thereupon, a recess was taken.)
 6              THE VIDEOGRAPHER:  We are back on the video
 7    record.  This is Media 2.  The time is 11:28 a.m.
 8         Q.   (By Ms. Strasser)  Okay, Mr. Hernandez,
 9    during the break did you talk to anyone about your
10    testimony?
11         A.   No.
12         Q.   And before the break we were talking about
13    you moving from Palmer Lakes to MSC.  Do you recall?
14         A.   Correct.
15         Q.   I think you told me that Mr. Adam Johnson
16    called you and said he needed you at the MSC project.
17    Right?
18         A.   Correct.
19         Q.   I think I misspoke.  He came to the Palmer
20    Lakes project and told you there that you would be
21    moving to the MSC project.  Correct?
22         A.   That's correct.  He visited the project at
23    Palmer Lakes and he told me and some electricians
24    that were working there that starting on the
25    following Monday we would start at a different
```

Page 42

1    project, at MSC, which was a much larger project than

2    Palmer Lakes.

3         Q.   Do you recall what day that was, what day

4    of the week?

5         A.   No.  No, I don't remember what day of the

6    week that was, no.

7         Q.   Did he give you any other information about

8    your movement from Palmer Lakes to MSC?

9         A.   Well, he congratulated me on all the work

10   we got done at Palmer Lakes.  He told me that he was

11   very pleased me and he told me because of the all the

12   positive information that Alcides Fleitas had given

13   to him about me he was considering me as a possible

14   superintendent at Hypower.

15             He also asked me if I knew any other

16   foremen with experience similar to mine, if so, to

17   please recommend them because he was very pleased

18   with everything I had produced.

19        Q.   How often did you interact with Adam

20   Johnson?

21        A.   Maybe ever couple of months whenever he

22   would visit the project.

23        Q.   Did you ever talk to him on the phone?

24        A.   By phone, no, but on text message on

25   several occasions.

Page 43

1      Q.    Was that from your work phone as well?

2      A.    Always.

3      Q.    Did Adam tell you when to report to the MSC

4   project?

5      A.    He told me that I needed to be at that MSC

6   project the following Monday and that I was to report

7   to Raul Gonzalez.

8      Q.    Did he tell you what time you needed to be

9   there?

10     A.    No.  Adam Johnson did not, no.

11     Q.    How did you know when to show up on Monday,

12   then?

13     A.    Because I called the project and spoke with

14   Raul Gonzalez.

15     Q.    What was Raul's title?

16     A.    Project superintendent, the same job that

17   Alcides Fleitas had at Palmer Lakes.

18     Q.    How soon after talking to Adam did you call

19   Raul, approximately?

20     A.    The Friday before that, that is to say the

21   last Friday working ---  It's the Friday before the

22   week before I was going to start working at the port.

23          I spoke with both Raul Gonzalez and with

24   Raidel Herrera, who was another foreman that was

25   working at that project that I knew from before.

Page 44

1      Q.   Did you speak with both of those gentlemen
2    on Friday?
3      A.   I believe so.
4      Q.   Tell me about your conversation with Raul.
5    Strike that.
6            Who did you call first?
7      A.   First I spoke with Raidel Herrera.
8      Q.   What did you and Raidel discuss?
9      A.   Where should I park, I mean where was the
10   workers' parking, and what was the schedule that was
11   worked at that project.
12     Q.   What did Raidel tell you?
13     A.   He explained to me where the parking was
14   and since it was the first day if I didn't get there
15   until 7:00 in the morning that was okay, that Raul
16   Gonzalez would tell me what was the schedule I needed
17   to be reporting on.
18     Q.   Was there a different parking situation at
19   each jobsite?
20     A.   To work at the port we had to park
21   downtown.
22     Q.   So the answer is "yes"?
23     A.   Could you please repeat the question.
24     Q.   Sure.  Was the parking situation different
25   at each jobsite?

Page 45

1          A.    That's right because normally on a jobsite

2     there is no parking.  This situation was at the port

3     and since there is so little parking there the

4     construction company ---

5               THE INTERPRETER:  Interpreter needs

6     clarification.

7               (Discussion in Spanish)

8          A.    Fincantieri Construction rented parking

9     space downtown.

10         Q.    (By Ms. Strasser)  Can you spell that?

11         A.    F-i-n-c-a-n-t-i-e-r-i, Fincantieri

12    Construction.

13         Q.    And that client was a client of Hypower.

14    Correct?

15         A.    No.  That's the company that's the general

16    contractor for the project.

17         Q.    Got it.

18         A.    They subcontracted Hypower to do the

19    electrical installations.

20         Q.    Understood.  And so Fincantieri supplied

21    the parking for that project, for the MSC project.

22    Correct?

23         A.    That's correct.  They provided to all of

24    the workers at the port for all of the different

25    companies.

Page 46

1    Q.   What did Raidel tell you specifically about
2    where to park at the MSC project?
3    A.   He told me that at the project there at the
4    port you could not park.  We were required to park in
5    Downtown Miami and get on one of the buses rented by
6    Fincantieri Construction to take us to the worksite
7    and take us back at the end of the day.
8    Q.   Did he give you any other options?
9    A.   No, because at the port, what is actually
10   the island of the port, there were some parking
11   places out there, but if we wanted to park there we
12   would have to pay for it out of our own pockets.
13   Q.   Right.  So he did give you another option,
14   but you would have to pay for it yourself.  Correct?
15   A.   Correct.
16   Q.   And what option did you choose?
17   A.   The one that most of the people working on
18   the port project chose, which was to park downtown.
19   Q.   And take the bus?
20   A.   Yes.
21   Q.   And did Raidel give you any additional
22   information about where to get on the bus, when to
23   get on the bus, et cetera?
24   A.   No, no.  No, all of that information was
25   given to me by Raul Martinez.

Page 47

1      Q.   So you got off the phone with Raidel and
2  you called Raul.  Correct?
3      A.   Yes.  I called Raul to ask him what time I
4  should be there.
5      Q.   And what did Raul tell you?
6      A.   That I should try to get there as early as
7  possible on the first day, and once you get here you
8  need to meet with me, and he said once you do that
9  you have to meet here with me and I'll give you the
10 schedule for the project, I'll give you a card to be
11 able to park downtown and all that other information.
12     Q.   When you say he told you that he would give
13 you a card to park downtown, what specifically did he
14 tell you about that?
15     A.   Well, Fincantieri Construction, that is to
16 say we went to the offices of Fincantieri
17 Construction and they made a photocopy of my ID.
18 They assigned me a worker's number and gave me a card
19 so I would be able to park in the parking area.
20     Q.   I want to make sure I am understanding.
21 You were given a card to park in Fincantieri's
22 parking lot and from there you got on the bus?
23     A.   No, on the first day I went to the project
24 in my own car.
25     Q.   And you parked at the MSC project?

Page 48

1          A.    (In English)  Yes, on the first day.

2          Q.    Who told you to do that?

3          A.    Raul Gonzalez.

4          Q.    Did Raul tell you anything about what your

5     schedule would be at the MSC project?

6          A.    Yes.  He told me that the electricians had

7     to be there at 6:30 in the morning and that foremen

8     had to be there half an hour earlier.

9          Q.    And it's your testimony that that is also

10    what you were told for the Palmer Lakes project?

11         A.    Correct.

12         Q.    What was your pay rate at MSC?

13         A.    Well, MSC is a federal project, so I was

14    making about $53 an hour.

15         Q.    So that was a promotion from Palmer Lakes.

16    Correct?

17         A.    Correct.

18         Q.    And you told me that is because Adam

19    thought you did a great job at Palmer Lakes.

20    Correct?

21         A.    Correct, and of the $53, approximately $43

22    were on my payroll and the other $10 went into what

23    is called a contractor plan, which is similar to a

24    401(k).

25         Q.    And that was set up for you through

Page 49

1   Hypower.  Correct?

2        A.   What was created?

3        Q.   The 401(k).

4        A.   Well, I had no choice on the matter.  For

5   all of the employees that were of Hypower that worked

6   on a federal plan, having the contractor plan is a

7   requirement.

8        Q.   So that's required by federal law.

9   Correct?

10       A.   (In English)  I don't know.

11       Q.   At the MSC project how often did you

12   interact with Raul?

13       A.   Daily.

14       Q.   Did you have anyone reporting to you at

15   MSC?

16       A.   Yes, all of the electricians that were

17   working on my team.

18       Q.   How many?

19       A.   There were times when I would ---  It would

20   depend.  There were some times I would have five or

21   six, other times ten.

22       Q.   So you reported to Raul and you had between

23   five and ten people reporting to you.  Correct?

24       A.   Correct.

25       Q.   Outside of yourself was there anyone else

Page 50

1    reporting to Raul?

2         A.   All of the foremen on the project.

3         Q.   Did you get along with Raul?

4         A.   (In English)  Yes.

5         Q.   Did you ever have any issues with him?

6         A.   At the beginning when we started working

7    together we got along well.

8         Q.   At some point did that change?

9         A.   (In English)  Yes.

10        Q.   When?

11        A.   Yes.  It started when he started making

12   comments in front of me.  He started saying things

13   like all Cuban workers are a bunch of shit and the

14   only thing that comes out of their mouth is a bunch

15   of bullshit and that in order to get a Cuban to work

16   you have to yell at them all the time and I said

17   that's not true and that's a form of discrimination,

18   to discriminate against someone just because of the

19   place of birth.

20        Q.   Do you know where Raul was born?

21        A.   Yes.

22        Q.   Where?

23        A.   He told me that he was born in Puerto Rico.

24        Q.   How many other individuals outside of

25   yourself were Cuban on that jobsite?

Page 51

1      A.   Most of the project.  There were only three

2   Americans working on the project, one foreman and two

3   electricians, and he separated them completely from

4   all the others that were working on the projects and

5   the treatment that he gave them was completely

6   different from the treatment that he gave the rest of

7   the workers on the project.

8      Q.   How were they treated differently?

9      A.   Well, for example, I never heard him yell

10  at those American electricians.  As far as the

11  American foreman whose name is Daniel Fisher, he was

12  never told that he had to be there at 6:00 in the

13  morning as all of the other foremen did.  He would

14  come in at 7:00 or 8:00 in the morning and he would

15  leave at 2:00 in the afternoon, which was the same

16  time that Raul Gonzalez left.

17     Q.   Would you and Raul speak in Spanish or

18  English?

19     A.   In Spanish.

20     Q.   What language would Raul speak to the

21  American individuals in?

22     A.   In English.

23     Q.   Were you able to understand what he was

24  saying to them?

25     A.   Yes.

Page 52

1      Q.   You understand English?

2      A.   Yes.

3      Q.   Can you write in English?

4      A.   Yes.

5      Q.   Do you speak fluent English?

6      A.   Well, when I have to speak it a little.

7           (In English)  I can speak English with an

8      American person.  I don't have your fluency, but I

9      understand, I can write, and I can talk in a

10     conversation about electricity or about my job, I can

11     talk perfectly with another person.

12     Q.   Are you able to understand my questions

13     today in English?

14     A.   (In English)  The majority of them, yes.

15     Q.   At the MSC project were there any other

16     employees you worked with that you didn't get along

17     with?

18     A.   No.

19     Q.   You said at some point Raul changed and

20     started saying derogatory comments about Cubans.

21     Right?

22     A.   Yes.

23     Q.   Do you recall when that was?

24     A.   When I had been on the project for about a

25     month, and that's when he started doing it in front

Page 53

1   of me and I had already been warned by the other

2   electricians that had been on the job before I

3   started working there that the kind of treatment he

4   was giving them was completely humiliating.

5          Q.    Who told you that?

6          A.    For example, Humberto Figueroa, Alexis

7   Sosa, Pedro Arias, and a young fellow by the name of

8   Kevin.  He was only about 19 or 20 years-old, no

9   older than that.

10         Q.    What did these individuals tell you?

11  Let's start with Humberto.

12         A.    All of them in general said the same thing,

13  that he would yell at them and that he would insult

14  them.

15                He would say that the Cubans are lazy, that

16  they spend the whole day talking shit among

17  themselves rather than working and then after I had

18  been working on the project for a month I had

19  confirmed that all of those complaints were true,

20  which is why at that point in time I decided to send

21  a text message to Mr. Adam Johnson asking him --

22  because I told him that it was impossible for me to

23  work -- I asked him to change me to a different

24  project because I said it was impossible for me to

25  continue to work on a project with a person that

Page 54

1    would continue to say that kind of insult.

2         Q.   Do you know when that was?

3         A.   It was in the month of March, 2023.

4         Q.   What did Adam say in response?

5         A.   At that point in time he said he didn't

6    have any other project he could move me to.  He asked

7    me to stay on the project for a few days and that we

8    would speak in person.

9              He called Raul.  He spoke to Raul about the

10   complaint I had made.  Raul called me into his office

11   and he tried to explain to me why he was like that

12   with the Cubans.  I told me that he worked for many

13   years with Cubans and he said that this was the only

14   way he would ever get a high level of production out

15   of Cubans.

16        Q.   You said he called you into his office.

17   Where was that at?

18        A.   It was a trailer at the project site.

19        Q.   At MSC?

20        A.   Yes.

21        Q.   Was anyone else there with you?

22        A.   No, it was just him and me.

23        Q.   How long was your conversation?

24        A.   (In English)  15 minutes.

25        Q.   And what did you say in response to his

Page 55

1    explanation?

2         A.   I told him I didn't agree.  I told him most

3    of the people that were working there on the project

4    belonged to the best group of workers at Hypower and

5    that they were sent there precisely because of their

6    good qualities as workers because since it was a

7    federal project, electricians make practically double

8    what they would get on a regular project.

9         Q.   Anything else?

10        A.   No.

11        Q.   If what did Raul say in response?

12        A.   He told me that he could help me to become

13   a superintendent at Hypower, but that if I wanted his

14   support in becoming a superintendent, that I was

15   going to have to yell at the workers and yell at them

16   so that they would produce better or more.

17        Q.   Was that the end of your conversation?

18        A.   Yes.

19        Q.   You didn't say anything in response to his

20   suggestion?

21        A.   I told him I'm not going to do that, that's

22   not going to happen.

23        Q.   Did you call Adam and tell him what had

24   happened between you and Raul?

25        A.   No.  Adam Johnson came to the project about

Page 56

1   two weeks later and I spoke with him in person.

2         Q.   How come you didn't call him in between

3   that time?

4         A.   Because I had already asked him to change

5   me off that project.

6         Q.   Did you send him a text after you had that

7   conversation with Raul and say I still can't get

8   along with him, I need to be moved?

9         A.   No.  Raul told me he was going to respond

10  to Adam Johnson by e-mail.

11        Q.   Did you reach out to Adam and ask him if he

12  had heard from Raul?

13        A.   No.

14        Q.   So you continued to work for two weeks

15  until Adam showed up at the project site.  Correct?

16        A.   Correct.

17        Q.   And you didn't go to anyone else at Hypower

18  and complain about Raul.  Right?

19        A.   At Hypower it was just with Adam Johnson,

20  just with him.

21        Q.   So the answer is "yes."  Correct?

22        A.   That was "yes" to what?

23        Q.   You didn't complain to anyone else at

24  Hypower besides Adam?

25        A.   Correct.

1          MS. STRASSER:  I am going to show you

2     Defendant's 1.

3          (Thereupon, the document referred to was

4     marked for identification as Defendant's Exhibit

5     No. 1.)

6     Q.   (By Ms. Strasser)  Take a second and look

7     at this document and let me know if you recognize it,

8     please.

9          MS. STRASSER:  For the record, this is an

10    eight-page document titled "Complaint."  It was filed

11    on January 18, 2024 in the United States District

12    Court, Southern District of Florida.

13    A.   Yes, this is one of the Complaints filed by

14    my attorneys.

15    Q.   (By Ms. Strasser)  Did you review this

16    document before it was filed on January 18th of this

17    year?

18    A.   Yes.

19    Q.   In Paragraph 5 on the second page you

20    allege that any and all conditions precedent to

21    filing this lawsuit occurred and/or was satisfied by

22    Plaintiff.

23          Do you see that?

24    A.   Well, yes, I see it.

25    Q.   That is your allegation.  Right?

Page 58

1      A.   Yes.

2      Q.   Do you know what that means?

3      A.   I have an idea of what it means.

4      Q.   What is the idea of what it means?

5      A.   Well, the notion that I have is that my

6   attorneys -- well, the other ones that I hired to

7   help me -- what I'm saying is that they helped me to

8   get -- they're helping me to recover the money for

9   the time I worked for which I was never paid and also

10  on a second matter because of me being fired because

11  of discriminatory action against Cubans.

12     Q.   I understand that's your overall

13  allegation.  What I'm asking is do you know what it

14  means in Paragraph 5?

15     A.   Yes.

16     Q.   What conditions precedent have occurred?

17     A.   I'm sorry, we have two different cases

18  here.  What conditions about for which case?

19     Q.   This is your Complaint, so I'm asking you

20  what you mean by Paragraph 5.

21     A.   Okay.  The conditions are that I was

22  working 45 hours a week.

23     Q.   How many?

24     A.   45 hours a week, but I was only being paid

25  for 40 hours a week.

Page 59

1          The second matter was that I should not

2     have been fired because I filed a

3     complaint -- because I should not have been fired

4     because of a complaint that I filed with Hypower

5     because of the discriminatory actions of a

6     superintendent at Hypower about something that I

7     considered to be a crime.

8          Hypower's answer to that was simply to fire

9     me.  They never investigated the matter.  Nobody

10    called me to ask me questions about the accusations

11    that I was making, not even human resources did.

12         Q.   You said you made a complaint with Hypower.

13    What are you referring to?

14         A.   That day before I was fired I sent an

15    e-mail.  I sent it to several different people.  For

16    example, I sent it to the project manager at the port

17    whose name is Ivan Lopez.  I also sent it to the

18    company vice-president, Adam Johnson.  I also sent it

19    to the owner of the company, Bernard Paul, to the

20    general supervisor, Mario Luaces.  I also sent it to

21    the foreman for the entire project at the port for

22    Fincantieri, whose name is Angel Valle.

23         I was reporting all of the irregularities

24    that I had already mentioned on several different

25    occasions with Raul Gonzalez and with Ivan Lopez and

Page 60

1   nothing had changed.

2        Q.   When did you send that e-mail?

3        A.   The day before I was fired.

4        Q.   And back to the Complaint, which we've

5   marked as Exhibit 1, in Paragraph 6 you write

6   "Plaintiff retained the undersigned counsel and

7   agreed to pay a reasonable fee for all services

8   rendered."  Do you see that?

9        A.   Yes.

10       Q.   What is that fee?

11       A.   Well, when I spoke with Mr. Brian

12  Pollock ---

13       Q.   Hold on.  Don't tell me about any

14  discussions you had with Mr. Pollock.  I just want to

15  know what the fee is, what the number is.

16       A.   It's a percentage of the amount of money

17  that Hypower owes me or for the amount that comes out

18  because of the discrimination case.  They told me if

19  that if they don't win the case they will not charge

20  me anything.

21       Q.   So it's a contingency agreement.  Is that

22  correct?

23       A.   Yes.

24       Q.   As we sit here today, have you paid

25  anything to Mr. LaRou's firm?

Page 61

1       A.   No.

2       Q.   When you first began working at ---  Give

3   me one second.  Strike that.

4            MS. STRASSER:  I am going to show you what

5   we will mark as Exhibit 2 to this deposition.

6            (Thereupon, the document referred to was

7   marked for identification as Defendant's Exhibit

8   No. 2.)

9       Q.   (By Ms. Strasser)  Let me know if you

10  recognize this document, sir.

11      A.   They sent me this document because I was

12  like under a three-month test period when working

13  through the staffing company.  Once they told me I

14  passed that test period, they were very pleased with

15  my work, then they switched me over to the staff at

16  Hypower and they sent me this e-mail, welcome to

17  Hypower, et cetera.

18      Q.   This was an offer of employment.  Correct?

19      A.   (In English)  I don't know.

20      Q.   Well, it says, "We are pleased to extend

21  the following offer of employment to you."  Correct?

22      A.   Yes.  That's correct, and then after they

23  sent me this e-mail they sent me another one which

24  was the contract that I had to sign.  This was

25  approximately in the month of August, 2023.

Page 62

1           No, I'm sorry, 2022.

2           MS. STRASSER:  I will show you what we will

3    mark as Exhibit 3 to this deposition.

4           (Thereupon, the document referred to was

5    marked for identification as Defendant's Exhibit

6    No. 3.)

7      Q.   (By Ms. Strasser)  Is this the document

8    that you were just referring to?

9      A.   Yes.

10     Q.   And it says your start date is on or before

11   August 8, 2022.  Correct?

12     A.   Where is the date?

13     Q.   Right under "Position."  It says "Foreman"

14   and then it says "starting dates, August 8, 2022."

15          Do you see that?

16     A.   No.

17     Q.   It's at the top half of the page.

18     A.   Okay, yes.

19     Q.   It says the starting hourly rate of pay is

20   $32 per hour.  Right?

21     A.   That's correct and shortly thereafter

22   because of my good work they increased me to $35 an

23   hour.

24     Q.   Who provided you with that increase?

25     A.   Alcides Fleitas.

Page 63

1          Q.   Where is Alcides from?

2          A.   Cuba.

3          Q.   On the second page of this document we have

4     marked as Exhibit 3, that is your signature.

5     Correct?

6          A.   Yes.

7               MS. STRASSER:  For the record, this

8     document is Bates stamped Hypower 302 to 303.

9          Q.   (By Ms. Strasser)  When you began working

10    at Hypower did they give you a handbook to review?

11         A.   Yes.

12         Q.   How did you receive that handbook?

13         A.   They gave it to me the first day that I

14    started working at the staffing, the staffing that

15    works for -- that belongs to Hypower.

16         Q.   Did they give you a physical copy?

17         A.   Yes.

18              MS. STRASSER:  I show you what we will mark

19    as Exhibit 4 to this deposition.

20              (Thereupon, the document referred to was

21    marked for identification as Defendant's Exhibit

22    No. 4.)

23         Q.   (By Ms. Strasser)  Let me know if you

24    recognize this document.  The top is titled "Policy

25    Acknowledgement:  Employee Handbook."  It looks like

Page 64

1    you electronically read and signed and understood the

2    contents of the handbook on July 22, 2022.

3            Do you see that?

4        A.   Yes.   Correct.

5            MS. STRASSER:   For the record, this

6    document is two pages.   It is Bates stamped Hypower

7    310 to 311.

8        A.   (In English)   In fact, I have the books

9    here, both here with me.

10       Q.   (By Ms. Strasser)   Those are the handbooks

11   that you received?

12       A.   (In English)   Yes, the safety handbook and

13   employee handbook.

14           MS. STRASSER:   I am going to show you a

15   copy that I have of the handbook that we will mark as

16   Exhibit 5 to this deposition.

17           For the record, this is Bates stamped

18   Hernandez 08 through 55.

19           (Thereupon, the document referred to was

20   marked for identification as Defendant's Exhibit

21   No. 5.)

22       Q.   (By Ms. Strasser)   Does this appear to be

23   the handbook that you received in July of 2022?

24       A.   It looks like it, but what I received is

25   what I have with me here.

Page 65

1        Q.   Let's look at Page 34 of 48 of this
2    document I just handed you.
3              THE INTERPRETER:  Are you talking about the
4    Bates stamp or manual number?
5              MS. STRASSER:  The page number, it says
6    Page 34 of 48.  It's right above the Bates stamp in
7    the right corner.
8        Q.   (By Ms. Strasser)  Are you there?
9        A.   Uh-huh.
10       Q.   And I'm looking specifically at the section
11   titled "Compensation & Time Off."
12       A.   Okay.
13       Q.   Do you see under "Payment of Wages" it
14   says, "Employee should review their pay stubs for
15   errors.  If you find an error, report it to the
16   payroll department immediately.  If there has been an
17   erroneous overpayment or underpayment, Hypower will
18   correct it as soon as possible."
19             Is that your understanding of the policy
20   related to your payment for the hours that you
21   worked?
22       A.   Yes.
23       Q.   When you received your paychecks did you
24   check for errors?
25       A.   Always.

Page 66

1          Q.   You never noticed any errors during your
2     employment with the company.  Correct?
3          A.   Yes, I noted that they were only paying me
4     for 40 hours.
5          Q.   And who did you complain about that to?
6          A.   To the superintendents, to Raul Gonzalez
7     and Alcides Fleitas.
8          Q.   What specific checks did you tell them you
9     had a problem with?
10         A.   I asked them the same question that the
11    electricians asked me, why if electricians have to be
12    on the job at 6:30 and finish at 3:30, why are we
13    getting paid for only eight hours if we worked
14    another 30 minutes.
15         Q.   I understand that's your allegation today,
16    but I'm asking something a little different.
17              You received checks from Hypower.  Correct?
18         A.   It was a direct deposit to my account.
19         Q.   How often did you receive a direct deposit?
20         A.   Weekly.
21         Q.   Okay.  And when you received that weekly
22    deposit did you ever take that stub or that check and
23    say to Alcides or Raul there's an issue with this pay
24    for this week?
25         A.   Yes.

Page 67

1          Q.    When?

2          A.    When I was working at the Palmer Lakes

3    project and when I was working at the MSC project.

4          Q.    How many times?

5          A.    Once with Alcides and on several occasions

6    with Raul Gonzalez.

7          Q.    Did you ever bring a specific check to

8    either of them and say "I was not paid for the hours

9    that I worked"?

10         A.    Yes.  Well, I didn't show them my bank

11   statement, no.  I told them I'm working an extra five

12   hours a week and I'm only getting paid for 40 hours.

13   Why?  And electricians are working 42 and-a-half

14   hours a week and only getting paid for 40 hours a

15   week.  Why?

16         Q.    How long were you working from Palmer

17   Lakes?

18         A.    (In English)  From May 22 to February 23.

19               (In Spanish)  That is to say from May 22 to

20   February 23.

21         Q.    So about eight months.  Right?

22               Nine months?

23         A.    Nine months.

24         Q.    So that's about 36 weeks.  Right?

25         A.    Approximately.

Page 68

1          Q.    Nine times four is 36.  Right?

2          A.    But a month has more than four weeks in it.

3          Q.    So it's approximately at least 36 weeks.

4    Right?

5          A.    Okay.

6          Q.    And during those 36 weeks or so, give or

7    take, you only went to Alcides once regarding one

8    check.  Right?

9          A.    I was only working with Alcides for about

10   five months because Alcides left the company

11   complaining of the abusive treatment that Hypower had

12   dealt to him.  He abandoned the project without

13   finishing it.

14         Q.    That's not my question, though.  I'm asking

15   you did you only tell Alcides once during the 36 or

16   so weeks you were there that you had an issue with

17   your check?

18         A.    In the five months or so that I worked with

19   Alcides I spoke with him one time on this matter.

20         Q.    So the answer is "yes"?

21         A.    Yes.  And the first three months that I was

22   working at Hypower I was working through a staff

23   agency, not through Hypower.

24         Q.    Did you go to the staffing agency and say

25   hey, I received this check and it doesn't match the

Page 69

1   hours that I worked?

2        A.   Yes.

3        Q.   Who at the staffing agency did you tell?

4        A.   Yes, I spoke with a lady there, the one

5   that was taking care of us there, I can't think of

6   her name right now, but she was the one who would

7   speak to us and she suggested that I speak with

8   Alcides Fleitas.

9        Q.   And you said you talked to Alcides once.

10  Right?

11       A.   Yes.

12       Q.   What did he tell you?

13       A.   He told me not to worry about it.  He said,

14  "Look, I know what's happening at Hypower.  I'm not

15  going to fire an electrician who doesn't want to be

16  here at 6:30 in the morning, don't argue with people

17  who don't want to come in at that time."

18            He said, "Look, for the ones that want to

19  come in early at 6:30 in the morning and help us to

20  set up all of the tools and materials and things like

21  that, that's fine, but for the ones that want to come

22  in at 7:00 in the morning, no problem with that."

23            He said, "Look, I know this isn't the

24  correct thing to do.  Therefore, I'm not going to

25  make it mandatory.  So the one that wants to come in

Page 70

1   early and help us out, then we thank them for doing

2   that, but the ones that want to come in at 7:00 and

3   just do their eight hours, that's fine.

4         Q.   And that's what Alcides told you.  Right?

5         A.   Yes.  So I never had any kind of a problem

6   with any of the electricians when I was working with

7   Alcides because they didn't want to come in at

8   6:30 in the morning when they didn't start making

9   money until 7:00.

10        Q.   And you're claiming that you showed up

11  every day at 6:00 even though Alcides told you you

12  could come in at 7:00 because other people were too.

13  Is that your claim?

14        A.   No.

15        Q.   You just said that Alcides said you could

16  come in at 7:00 because others are.  Right?

17        A.   No.  No, because remember I was a foreman,

18  not an electrician.  What he said was that if an

19  electrician -- what Alcides said was if an

20  electrician didn't come until 7:00 in the morning,

21  that that was okay with him.

22        Q.   And how many electricians were there at

23  Palmer Lakes?

24        A.   (In English)  Totally all together about

25  50.

Page 71

1        Q.   And how many foremen were there?

2        A.   (In English)  Six or seven.

3             (In Spanish)  Six or seven foremen.

4        Q.   And so the 50 or so electricians could show

5   up at 7:00 and you are claiming that you had to show

6   up at 6:00.  Correct?

7        A.   Yes.

8        Q.   What would you do at 6:00 in the morning

9   without all of those the other electricians those?

10        A.   The electricians were supposed to come in

11   at 6:30, but they weren't going to be required to do

12   so.

13        Q.   My question is what would you do at 6:00 in

14   the morning with only a couple of people there at the

15   jobsite?

16        A.   I had to organize the work that was going

17   to be done that day.  Say look, these are all the

18   jobs we want to get done today, these are the number

19   of people I need for each one of these jobs, and

20   these are the materials that we're going to need

21   today and we're going to need these Hypower

22   instruments or tools.

23        Q.   So you would get to the jobsite and you

24   would decide what needed to be done that day.  Is

25   that what you're telling me?

Page 72

1    A.   Yes.

2    Q.   So there was no physical labor for you to

3    do at 6:00 a.m.  Right?

4    A.   Well, for me there was not any kind of

5    physical labor at any time because I was the foreman.

6    Q.   On the way into work you couldn't have

7    thought of what you needed to do that day?

8         I guess I'm just not following the logic.

9    A.   No, I'm thinking about driving.

10   Q.   Let's talk about how you kept your time

11   each day.  You were required to keep your time.

12   Right?

13   A.   Correct.

14   Q.   How did you record your time?

15   A.   I made a note of it on the Hypower tablet.

16   It's called Timesheet Application.  The only kind of

17   schedule I was allowed to write down was from 7:00 to

18   3:30.

19   Q.   You are saying in that application you

20   could only record a start time of 7:00 a.m.  Is that

21   your testimony?

22   A.   That's correct.  That's correct, and the

23   question I was always asking Alcides and Raul

24   Gonzalez is why if electricians have to be starting

25   at 6:30 and 7:30, why do we have to say we start at

Page 73

1    7:00?  Why?

2        Q.   And it's your testimony that you never

3    recorded a start time starting before 7:00 a.m. while

4    you were working at Hypower.  Correct?

5        A.   Correct.  They did not allow me to.

6        Q.   When you say that they did not allow you

7    to, I just want to make sure I understand.  You were

8    told you couldn't or you were physically not able to

9    enter a time before 7:00 a.m. in the application?

10       A.   No, the two superintendents with whom I

11   worked told me that I could not put down a start time

12   other than 7:00 in the morning on the application.

13       Q.   So you never did.  Right?

14       A.   At the port, yes.

15       Q.   You never did at the port is what you're

16   saying?

17       A.   Yes, when I started working at the port I

18   started writing down the actual work schedule that I

19   was working and then Raul Gonzalez would change it.

20       Q.   Again, just so I'm clear, you were able to

21   record time before 7:00 a.m. if you wanted to.

22   Correct?

23       A.   No.  No, no, my start time for going in to

24   work was 6:00 in the morning, not 7:00.  And the

25   electricians were starting at 6:30 in the morning,

Page 74

1    not 7:00 in the morning.

2         Q.   At any point in time during your employment

3    at Hypower did you enter a start time in the

4    application before 7:00 a.m.?

5         A.   Yes.

6         Q.   When?

7         A.   The first day that I worked at the port.

8         Q.   Just that first day?

9         A.   Because Raul Gonzalez told me -- called me

10   and said I had to put down 7:00 in the morning.

11        Q.   I think we are misunderstanding.  What I am

12   asking you, did you ever enter 6:00 a.m. as a start

13   time on any of your timesheets while you were

14   employed with Hypower?

15        A.   Yes.

16        Q.   So you didn't have to put 7:00?

17        A.   I was required to put down 7:00 in the

18   morning.

19        Q.   But you could, you were able to, you were

20   physically able to write 6:00 or 6:30 or, for

21   instance, 9:00 a.m. if you got there late as a start

22   time.  Correct?

23        A.   Yes.

24        Q.   Were you responsible for recording anyone

25   else's time but your own?

Page 75

1       A.   For all the electricians that worked with

2   me, they had to write down the time that they had

3   come in, that is to say 6:30, and sign next to that.

4   But Raul Gonzalez never allowed them to put down 6:30

5   on any project.

6            I mean the electricians were required to

7   start working actually at 6:30 at the very latest,

8   but on the timesheet they had to put down 7:00 a.m.

9   and sign next to that.  And the timesheet application

10  has this ability to make the actual time that you

11  signed the form.

12      Q.   You said you had a tablet.  Was it an iPad?

13      A.   It was a tablet.  Yes, an iPad, yes.  Not a

14  laptop.  It was iPad, yes.

15      Q.   And you had one and the other foreman had

16  one.  Correct?

17      A.   Yes.

18      Q.   The electricians did not get eye pads.

19  Right?

20      A.   No.

21      Q.   So how would the electricians give you

22  their time each day?

23      A.   I don't understand your question.

24      Q.   Did they write their time down on a piece

25  of paper and give you those pieces of paper?

Page 76

1       A.    No.  No, no, only on the tablet.

2       Q.    So when they got to the jobsite they came

3   to you and checked in?

4       A.    At 6:30 in the morning we would have

5   already gotten together because there was a meeting

6   point that we had at the jobsite and we had all of

7   the electricians that had to come in.  Some of them

8   came in as early at 6:00 in the morning, as many of

9   us foremen did, and there were a lot of electricians

10  and they would sign in on their foreman's tablet as

11  they came in.

12      Q.    How many electricians reported to you their

13  time?

14      A.    It depends.  Sometimes we would have eight,

15  other times five.

16      Q.    Okay.  But you were responsible for

17  reporting your time as well as the electricians

18  assigned to you at that site.  Correct?

19      A.    I would only write down my own hours.  Each

20  electrician had to write down their time and their

21  signature on the app.

22      Q.    So you would give them your iPad to enter

23  their time and sign.  Correct?

24      A.    That's correct.  I put in the code and give

25  them the iPad for them to put in the time and sign.

Page 77

1        Q.    And that happened every morning?

2        A.    Every morning -- every day in the morning

3   and in the evening.

4        Q.    You met in the evening and you circulated

5   the tablet?

6        A.    At the same point that we met in the

7   morning, which is in front of the trailer used by

8   Raul Gonzalez.

9        Q.    And they entered their time and signed.

10  Right?

11       A.    That's correct.

12       Q.    And you entered your time for the day and

13  you also signed.  Correct?

14       A.    Correct.

15       Q.    And let's say you showed up on Tuesday

16  after working a nine-hour shift on Monday, would you

17  be able to edit your time on Tuesday for the time

18  that was recorded on Monday?

19       A.    No.

20       Q.    So once it's entered for the day, that was

21  it?

22       A.    Yes.

23       Q.    What happens if you made a mistake?

24       A.    The only person that could correct that was

25  the superintendent.  That was the job that only the

1    superintendent could do.  He could go in and change

2    someone's schedule or remove a worker from a jobsite.

3    He was the only one with the authority to be able to

4    do that.

5        Q.   But it's up to the individual employees

6    like yourself to go to the superintendent and say

7    hey, there's an error here.  Correct?

8        A.   Yes.

9        Q.   Let's go to 35 of 48 of the handbook.

10   Under "Time Reporting," the second paragraph, do you

11   see that?

12       A.   Yes.

13       Q.   That second paragraph, the last sentence,

14   do you see that, "In the event"?

15       A.   Yes.

16       Q.   It says that in the event that there is a

17   discrepancy in your time records, you must bring it

18   to your supervisor's attention immediately.  You see

19   that.  Right?

20       A.   Yes.

21       Q.   Let's go to Page 37 of 48, please.  I am

22   looking specifically at the Paid Time Off Policy

23   under Section G.

24            The third paragraph from the bottom says,

25   "If the employee leaves the company for any reason

```
 1   other than termination for cause or resignation, they
 2   will be paid any unused PTO, or paid time off, not to
 3   exceed the maximum annual accrual."
 4           Do you see that?
 5       A.   Yes, I see that.
 6       Q.   You read and understood that to be the
 7   policy.  Correct?
 8       A.   Yes.
 9       Q.   And you understand that -- or you
10   understood -- that if an employee was terminated for
11   cause they would not be entitled to their paid time
12   off.  Right?
13       A.   Yes, but in my case there was no reason to
14   fire me.
15       Q.   Sure, I understand that's your claim.
16       A.   The thing is, the day before I was fired I
17   spoke with the project manager for the port, Ivan
18   Lopez.  He told me "you're the best foreman we have
19   on this project, I don't want you to leave this
20   project.  Please don't send the e-mail you told me
21   about to the company."
22       Q.   Who told you that?
23       A.   Ivan Lopez, the project manager.
24           MS. STRASSER:  I'm going to show you what
25   we will mark as Exhibit 6 to this deposition.
```

Page 80

1           (Thereupon, the document referred to was

2    marked for identification as Defendant's Exhibit

3    No. 6.)

4           MS. STRASSER:  We can go off the record.

5           THE VIDEOGRAPHER:  We are going off the

6    record.  The time is 12:51 p.m.

7           (Thereupon, at 12:51 p.m. a recess was

8    taken.)

9           THE VIDEOGRAPHER:  We are back on the video

10   record.  This is Media three.  The time is 1:00 p.m.

11       Q.   (By Ms. Strasser)  During your employment

12   with Hypower did you ever receive overtime?

13       A.   Yes.

14       Q.   And I think we talked about this earlier,

15   but that was typically dependant on the project.

16   Correct?

17       A.   Yes.

18       Q.   Were you able to receive overtime at Palmer

19   Lakes?

20       A.   All of the hours that I did after 3:30 in

21   the afternoon and Saturdays, they were paid to me as

22   overtime.

23       Q.   Did you ever receive overtime for any time

24   worked before 7:00 a.m.?

25       A.   No, never.

```
                                              Page 81
```

1          Q.   I showed you before the break a document we

2    marked as Exhibit 6.  It is titled Hypower Employee

3    Earning History Summary Report.  It's Bates stamped

4    Hypower 337 through Hypower 339.

5               Do you see this document?

6          A.   (In English)  Yes.

7          Q.   And your first check according to this was

8    on August 13, 2022.  Correct?

9          A.   Directly from Hypower, yes.

10         Q.   And prior to that you were receiving checks

11   from QLM, the staffing company.  Is that right?

12         A.   Yes.  Hypower sent me to work through the

13   staffing company.

14         Q.   Okay.  And so I want to look at on

15   September 10, 2022, it looks like you

16   received -- September 10, 2022 -- how many hours were

17   you paid for that week?

18         A.   (In English)  68.  58.

19         Q.   I see 42 next to September 10, 2022.

20         A.   (In English)  Sorry, sorry, September 10th.

21              (In Spanish) 42 hours, yes.

22         Q.   How about for the week of September 17th?

23         A.   45.

24         Q.   And the next week, how many hours were you

25   paid for?

Page 82

```
 1        A.    44.
 2        Q.    How about the following week?
 3        A.    44.
 4        Q.    How about on October 29, 2022, how many
 5   hours were you paid for?
 6              October 29th.
 7        A.    48.
 8        Q.    Okay.  And then on November 26th you were
 9   paid for 46 hours.  Right?
10        A.    Correct.
11        Q.    On December 3rd you were paid for 54 hours.
12   Right?
13        A.    Correct.
14        Q.    December 10th, 58 hours.  Correct?
15        A.    Yes.
16        Q.    December 17th, 58 hours again.  Right?
17        A.    Yes.
18        Q.    December 24th, 46 hours.  Right?
19        A.    Yes.
20        Q.    And then January 14, 2023, 43 hours.
21   Right?
22        A.    Yes.
23        Q.    On the next page, on April 22, 2023 you
24   were paid for 48 hours.  Right?
25        A.    Yes.
```

Page 83

1       Q.   And then on May 6, 2023, you were paid for
2    41 and-a-half hours.  Right?
3       A.   Yes.
4       Q.   So you are not disputing that you were paid
5    overtime for time that you logged.  Right?
6            MR. LAROU:  Form.
7       A.   Correct.
8       Q.   (By Ms. Strasser)  You are not disputing
9    that you were paid ---
10      A.   For the time that they allowed me to put
11   into the system.  I was only allowed to enter
12   overtime for after 3:30 in the afternoon and on
13   Saturdays.
14           The superintendents of Hypower told us that
15   the preparation work, the meetings, the time to get
16   the Hypower tools and to organize the materials
17   needed for the day, that that was not within the work
18   schedule.
19      Q.   And, again, that was planning in your head
20   and not any kind of physical work at the jobsite once
21   you got there.  Correct?
22      A.   No, no, that was work the electricians had
23   to do every day starting at 6:30.
24      Q.   You weren't an electrician.  Correct?
25      A.   No.  I was a foreman.

Page 84

1        Q.   I'm only talking about what you did prior

2   to 7:00 a.m. and what you told me earlier was

3   planning for what was going to be done and who you

4   would need to do certain things that day.  Correct?

5        A.   I also had to separate the materials that

6   my employees -- that is to say my electricians --

7   what they were going to need that day.

8        Q.   What materials?

9        A.   The materials that they usually use; pipes,

10   couplings, screws, straps, boxes, cables.  It's all

11   types of electrical materials.

12        Q.   And that took you an hour to do?

13        A.   No, 30 minutes is enough.

14             MS. STRASSER:  I'm going to show you what

15   we will mark as Composite Exhibit 7.

16             (Thereupon, the document referred to was

17   marked for identification as Defendant's Composite

18   Exhibit No. 7.)

19             MS. STRASSER:  Can I have that back?  I

20   want to number the pages.  It might be easier to go

21   through it.  The Bates stamps are all out of whack,

22   so I want to make sure we are all looking at the same

23   document here.

24        Q.   (By Ms. Strasser)  I have shown you what is

25   marked as Composite 7 to this deposition and I have

Page 85

```
 1   put my own numbers at the bottom of each corner.  It
 2   is double-sided so it's not accurate, but for
 3   purposes of knowing where we're at and getting on the
 4   same page I think that will help.
 5            On the first page there, which is marked
 6   one with my writing, what is this document?
 7        A.   This is the timesheet application that is
 8   signed on the tablet at Hypower every day.
 9        Q.   So the first column is your name, right,
10   Gustavo Hernandez?
11        A.   Correct.
12        Q.   And then it says "phase code."  Right?
13        A.   It says "phase code."  That means I have to
14   put in the code saying that I'm the foreman.
15        Q.   And then further down it says "start time."
16   Right?
17        A.   "Start time," correct.
18        Q.   And that's the time you start the day.
19   Right?
20        A.   Correct.
21        Q.   And that was entered by you.  Right?
22        A.   Yes.
23        Q.   And is that your signature next to that
24   start time?
25        A.   Yes, that's mine too.
```

Page 86

```
 1        Q.   And then it says "finish time," right,
 2   3:30 p.m. on this "finish time"?
 3        A.   Yes.
 4        Q.   And then is that your signature to the
 5   right of that?
 6        A.   Yes.  I wasn't allowed to put down -- I was
 7   not authorized to put down any schedule that wasn't
 8   that one, from 7:00 to 3:30.
 9        Q.   Let's look at Page 34, the back side of
10   that page.  It's 34 in my handwriting and it's on the
11   back.
12             MS. STRASSER:  It's Bates stamped 68,
13   Brooks.
14             MR. LAROU:  I think he has got it.
15        Q.   (By Ms. Strasser)  It is Bates stamped
16   Hypower 68.  Do you see that in the red?
17        A.   Yes.
18        Q.   On this date you entered a start time of
19   7:00 a.m.  Right?
20        A.   No.  I put down 7:00, but I started working
21   at 6:00.
22        Q.   You entered 7:00.  Right?
23        A.   Always.  We were not authorized to put down
24   any other schedule other than that one.
25        Q.   And you put a finish time of 4:30.
```

Page 87

1    Correct?

2         A.   That day we worked another hour after 3:30

3    and you're allowed to put down times worked after

4    3:30.

5         Q.   So what you said earlier, that you were

6    never allowed to enter anything other than 7:00 to

7    3:30 is actually not true.  You were allowed to enter

8    other times.  Correct?

9         A.   No.  I was only allowed to mark down the

10   overtime hours worked if it was after 3:30 in the

11   afternoon.

12        Q.   I understand that's your argument.

13             Let's look at Page 35 in the handbook,

14   Page 35 in my handwriting, 35.  Are you there?

15        A.   Yes.

16        Q.   Here you marked a start time of 7:00.

17   Right?

18        A.   Yes.

19        Q.   You signed next to it.  Right?

20        A.   Yes.

21        Q.   And then you have a finish time of 4:30

22   again.  Right?

23        A.   That's correct.  We finished working that

24   day at 4:30, which is why I was allowed to put down

25   one extra hour of overtime finishing at 4:30.

Page 88

1        Q.   And on the back side of that same document,
2    it's Bates stamped Hypower 70, you did the same for
3    that day.  Right?
4             7:00 a.m. to 4:30 p.m.  Correct?
5        A.   Yes.  Whenever we worked overtime after
6    3:30 in the afternoon or Saturday we were allowed to
7    make a note on the timesheet if the superintendent
8    allowed it.
9        Q.   That was on September 15, 2022.  Correct?
10       A.   Yes.  And if you compare the prior document
11   with what you have here you will find there are a lot
12   of overtime hours that show up on the payroll and
13   that are not noted here because they would tell us
14   only to write down to 3:30 in the afternoon.
15       Q.   And on Page 36 in my handwriting, the next
16   page, this is for work on September 16, 2022.
17   Correct?
18       A.   Yes.
19       Q.   That was a 7:00 a.m. start time and 4:30
20   end time.  Correct?
21       A.   Yes.  I signed in that it was 7:00.  I had
22   to say that I started at 7:00, although I started
23   working every day at 6:00 a.m.  And electricians
24   started at 6:30.
25             And ever since I filed this lawsuit with my

Page 89

1    attorneys, ever since because of what happened at the

2    work and Hypower found out about it Raul Gonzalez has

3    not required any of the electricians to be there at

4    6:30 in the morning since that date.

5            They do continue to hold the meetings at

6    6:45 a.m., but they haven't fired anyone else from

7    the project at the port for getting there after

8    6:30 in the morning.

9            MS. STRASSER:  I'm going to move to strike.

10   That is not responsive to my question and had

11   absolutely nothing to do with it.

12           I will show you what I will mark as

13   Composite 8 next.

14           (Thereupon, the document referred to was

15   marked for identification as Defendant's Composite

16   Exhibit No. 8.)

17       Q.  (By Ms. Strasser)  These are more

18   timesheets.  Is that correct, sir?

19           The first one is dated -- let's see.  It is

20   Hypower Job 400915, right, MSC terminal?

21       A.  Where are we looking here?

22       Q.  At the very top.  It says Hypower job

23   number.  These are timesheets for MSC.  Right?

24       A.  Yes.

25       Q.  On this date you log a start time of

Page 90

1   7:00 a.m.  Correct?

2       A.   Yes.

3       Q.   And a finish time of 9:00 p.m.  Correct?

4       A.   (In English)  No.  Wait, let me ---

5       Q.   Is that 9:00 a.m.?

6            THE STENOGRAPHER:  Can we stick to one

7   language a little more?  It is confusing with the

8   interpreter.

9       A.   No, I started at 7:00 a.m. and finished at

10  9:00 a.m. because I had to leave the project early

11  that day.

12      Q.   (By Ms. Strasser)  Okay, understood.

13           Let's look at Hypower 280, it's Bates

14  stamped.  It's on the back side of one of the sheets.

15      A.   280.

16      Q.   This states you logged a start time of

17  7:00.  Right?

18      A.   And I finished at Noon.

19      Q.   Let's go to Hypower 278.  It's on the back

20  of the following page.

21           We're at Hypower 278?

22      A.   Yes.

23      Q.   And we started at 7:00 a.m. and what was

24  your finish time on this day?

25      A.   At 9:00 in the morning.  I don't remember

Page 91

1   these days.  I don't even know if this is true.  It's
2   impossible.
3        Q.   Well, that's your signature.  Right?
4        A.   That's correct, but the superintendent in
5   the company can change any kind of schedule.  They
6   can change anything.  They can change anything except
7   for my signature, which they would have to imitate.
8   That's obvious.
9        Q.   Let's look at a couple pages back,
10  Hypower 268.  It's on the back side this time.
11           Let me know when you're there.
12           THE INTERPRETER:  We are here, Counselor.
13       Q.   (By Ms. Strasser)  What time did you start
14  on this day?
15       A.   (In English) 6:00 a.m.
16       Q.   And you stopped at what time?
17       A.   Here it says 3:30.
18       Q.   And that is your signature on both of those
19  entries?
20       A.   Yes.
21       Q.   Do you think somebody entered that
22  6:00 a.m. on your behalf?
23       A.   (In English)  One moment.  Let me see.
24           (In Spanish)  Let me check the date on
25  this.  What is the date here?  Where can I see the

Page 92

1   date here?

2       Q.   I don't know that there are dates on these.

3   You filled this out, I believe.

4           All I am asking, there is a 6:00 a.m. start

5   time.  Correct?

6       A.   What I can tell you is that the signature

7   is mine and I see that it says 6:00 in the morning.

8   It may have been to recover an hour of overtime -- an

9   extra hour I worked the day before.

10      Q.   How about the following page, Hypower 267?

11      A.   On 267 it says I had to leave here at

12  2:00 in the afternoon.

13      Q.   2:30.  Right?

14      A.   Correct.

15      Q.   Let's look at Hypower 185.

16      A.   Okay.

17      Q.   Are you there?

18      A.   Yes.

19      Q.   You started at 8:30 and you worked until

20  4:15 according to this document.  Correct?

21      A.   That's what the document says, but it's

22  impossible for me to remember after these many years

23  or this many months exactly what time I started or

24  ended that day.

25          And my signature is completely illegible as

Page 93

1    you can see here.  It's impossible.

2         Q.   Let's look a couple pages beyond that,

3    Hypower 176, please.  Are you there?

4         A.   Yes.

5         Q.   We have another 6:00 a.m. start time here.

6    Correct?

7         A.   That's what it says there, yes.

8         Q.   Are you able to see your signature next to

9    that time?

10        A.   The signature is illegible.

11        Q.   Does it look like your signature on the

12   other documents that you're able to see?

13        A.    It's similar to my signature, but it's

14   completely illegible.

15        Q.   So you think somebody else entered a

16   6:00 a.m. start time on your behalf?

17        A.    I'm sorry, I did not understand the

18   question.

19        Q.   Are you suggesting that somebody else

20   entered this time on your behalf?

21        A.    No, I'm not suggesting anything.  What I'm

22   saying is that I cannot specifically remember whether

23   that day we started working at 8:30 in the morning or

24   6:30 in the morning.  I cannot remember.

25        Q.   Well, you put 6:00 a.m.  Right?

Page 94

1          A.    I'm not sure about that, no.

2          Q.    Do you recall attending a safety meeting in

3     early January of 2024?

4          A.    What day exactly was that?

5          Q.    January 5, 2024.

6          A.    The 5th?  No, it would have been the 4th.

7          Q.    And what was the purpose of a safety

8     meeting?

9          A.    I had a meeting for all of the Hypower

10    employees there at the project and I informed them of

11    the lawsuit that I had filed against everybody

12    at -- the complaint, rather, not the lawsuit -- the

13    complaint I had lodged to Hypower and the e-mail that

14    I had sent to the owner, the vice-president, the

15    project manager, the general contractor for the

16    project, informing them of the complaint that I had

17    lodged against them because of the discriminatory

18    practices of Raul Gonzalez there at the worksite.

19          I said that I understood -- that I knew

20    that this was a crime to do here according to

21    American law and that someone would have to pay for

22    that.

23          Q.    My question is a little bit different,

24    though.  I asked you what was the purpose of a safety

25    meeting.

Page 95

1      A.   I was telling the workers that all of the

2    complaints that they had been making to me and the

3    other foremen had all been transmitted to Hypower

4    through an e-mail.

5      Q.   Setting aside that specific meeting, I want

6    to know what the purpose was of a safety meeting

7    during your employment at Hypower.

8      A.   Okay.  Well, a safety meeting is held once

9    a week and we describe possible accidents that might

10   have happened or that might happen in the future so

11   we can find ways to avoid them and they don't happen

12   again.  Meetings are held the rest of the week, but

13   they're not safety meetings.

14     Q.   And the purpose of a safety meeting is to

15   discuss safety items.  Correct?

16     A.   Correct.

17     Q.   Had you ever been to a safety meeting at

18   Hypower where other employees aired out their dirty

19   laundry?

20     A.   Yes.

21     Q.   When?

22     A.   Every week.

23     Q.   What kinds of complaints did you hear?

24     A.   Yes, we had complaints like why did I have

25   to go home or why are they getting on my case because

Page 96

1    I signed in when I didn't get to the project until
2    6:40 in the morning, when I'm signing in saying I'm
3    starting at 7:00.
4           All of the employees got into the port to
5    work starting after 6:30 in the morning, they were
6    humiliated, they were all yelled at by Raul Gonzalez
7    and by Raidel Herrera and Raidel Herrera is the
8    assistant superintendent.
9           They were all insulted and if they did it
10   more than once they would be either sent home or on
11   many occasions they would be taken off the job or
12   fired from the job, they would be sent to a different
13   Hypower project.
14       Q.   On January 4th or 5th -- whatever day it
15   was, I think you said the 4th -- you said earlier --
16   I think, correct me if I'm wrong -- that you called
17   that safety meeting?
18       A.   No.
19       Q.   Who called the meeting?
20       A.   It was a meeting, not a safety meeting.
21       Q.   Who called the meeting?
22       A.   I told the workers every day in the morning
23   we have to meet at the same place so you can sign
24   your start time and in the afternoon to sign that
25   you're leaving.  At that same place where we would

Page 97

1    meet is where we would have the meeting every day.

2        Q.   So that was on the specific jobsite at the

3    same place where you all submitted your time.

4    Correct?

5        A.   Correct.

6        Q.   You said there was anywhere between 50 to

7    60 people there at a time.  Correct?

8        A.   At the particular time of that particular

9    meeting I couldn't tell you the exact number, but I

10   would say there were at least 20 people there at that

11   time.  I only spoke to the people that were there

12   present.  I did not speak to the other people there

13   working around on the project.

14       Q.   And you said, I think, earlier that you

15   voiced your issues you had with Raul.  Correct?

16       A.   I talked about the discriminatory practices

17   that Raul did as well as his way of insulting all the

18   Cuban employees there as well as the e-mail that I

19   had sent to the powers that be at Hypower.

20       Q.   And Raul was not there.  Correct?

21       A.   No.

22       Q.   Do you know where he was?

23       A.   No.  I understand that he was on vacation.

24       Q.   And did you know going into that meeting

25   that he would be on vacation?

Page 98

1          A.    I knew he was not at the project.

2          Q.    At some point you were escorted off that

3     project site.  Correct?

4          A.    That same day.

5          Q.    And you were told that you were being ---

6          A.    Does it say I spoke with the Hypower

7     employees at 6:30 in the morning and I was fired that

8     same day at 9:00 a.m?

9          Q.    And you were told you were being terminated

10    for your inappropriate behavior.  Correct?

11         A.    No.

12         Q.    What were you told?

13         A.    No, they told me was being fired because of

14    the e-mail I had sent the day before to Hypower and

15    if I could not continue to work with Raul, which is

16    where I was needed, that they didn't have another job

17    to send me to.

18         Q.    Who told you that?

19         A.    Ivan Lopez, the project manager.  He said,

20    "Please give me your tablet and your phone, I'm going

21    to provide you to someone who can take you to the

22    downtown parking right now."

23         Q.    And the tablet and phone he requested was

24    Hypower's.  Correct?

25         A.    Correct.  I asked him whether or not Adam

Page 99

1   Johnson was aware that I was being fired and he said

2   he was.

3            MS. STRASSER:  I am going to show you what

4   we will mark as Exhibit 8 to this deposition --

5   excuse me, Exhibit 9.

6            (Thereupon, the document referred to was

7   marked for identification as Defendant's Exhibit

8   No. 9.)

9            MS. STRASSER:  For the record, this is a

10  13-page document titled Plaintiff's Response to

11  Defendant's First Set of Interrogatories.

12       Q.   (By Ms. Strasser)  If you take a look at

13  the second-to-last page, is that your signature?

14       A.   Which?

15       Q.   Is that your signature on the top of the

16  page on the right side?

17       A.   Yes.  Well, it's an electronic signature.

18       Q.   Okay.  After you look at this document, let

19  me know if you have seen it before.

20       A.   Yes, I have seen this.

21       Q.   Did you answer these questions?

22       A.   Yes.

23       Q.   In response to No. 2 you listed some

24  employers that you applied with since your separation

25  from Hypower.  Do you see that?

Page 100

1          A.    Yes.

2          Q.    And I know we talked about some of these,

3     so I'm not going to go over those again, but I want

4     to talk about a couple that we did not discuss.

5                The third one listed is Miami-Dade County.

6     What job did you apply for with them?

7          A.    They're all electricians.  They put all the

8     positions up on the Internet.  You can apply online,

9     but they never called me.

10         Q.    Let's go through each of these.  Miami-Dade

11    County, you never received a call from them?

12         A.    No.

13         Q.    How about Miami-Dade Public School Board?

14         A.    Never.  It's very difficult to start

15    working with them when you just come in off the

16    street if they don't know you.

17         Q.    And you're talking about the public school

18    board.  Correct?

19         A.    And Miami-Dade County.

20         Q.    On the next page you have Jackson Health

21    System listed here.  You applied with them and did

22    not get a call.  Is that correct?

23         A.    That is correct.  I applied for the

24    position of maintenance electrician.

25         Q.    Did you ever follow up?

Page 101

1          A.   They let you know by Internet whether or

2     not you've been chosen for an interview for a job

3     position.

4          Q.   Did you hear back from Jackson Health

5     System?

6          A.   No, they did not call me.

7          Q.   Then you have listed here various job

8     listings through the International Brotherhood of

9     Electrical Workers.   Right?

10         A.   That's the electrical union.

11         Q.   Did you receive any offers from them?

12         A.   Well, when I was applying they didn't have

13    any foreman positions available and when they did

14    call me back I had already started working at the

15    CAP Government position.

16         Q.   What job did they offer you when they

17    called you back?

18         A.   I didn't ask.   They called me several

19    months later.   I told them I had already started

20    working with a temporary inspector's license and that

21    I was not going to give up that job.

22         Q.   If you look at the next interrogatory,

23    No. 3, you have Adam Johnson listed as the first

24    person who might have information about this lawsuit.

25    Is that accurate?

Page 102

1       A.    Yes.

2       Q.    And then you write, "I believe that
3   Mr. Johnson has knowledge of my employment with
4   Hypower, the general business of Hypower, his/
5   Hypower's discriminatory treatment toward me and
6   other Hypower employees."

7            There is no question.  Hang on.

8            When you say his discriminatory treatment
9   toward you, who are you talking about?

10      A.    I'm referring to Mr. Raul Gonzalez.

11      Q.    So you're not saying that Adam Johnson
12  treated you unfairly.  Correct?

13      A.    Unfairly, yes, but not discriminatory.

14      Q.    How did he treat you unfairly?

15      A.    I spoke with him telling him that I was
16  being discriminated against because of my
17  nationality, and that is to say I and my electricians
18  were, and he did nothing to resolve that problem,
19  which is why it was an unfair or unjust treatment.
20  But Mr. Adam Johnson never treated me with
21  disrespect.

22      Q.    You also have on Page 3 Robert Weisberg
23  listed.  You say you spoke with Mr. Weisberg,
24  W-e-i-s-b-e-r-g, on the phone about Hypower's
25  violations that were occurring during your

Page 103

1    employment.

2         A.    Correct.

3         Q.    When did you talk to Mr. Weisberg?

4         A.    Well, when Mr. Adam Johnson said he didn't

5    have any other projects to send me to I called

6    Mr. Robert Weisberg to see if there was a possibility

7    of letting me go to work on his project.  If I'm not

8    mistaken, he said he was working in Pompano and at

9    that point in time he did not have space for another

10   foreman.

11        Q.    Are you saying you would have taken a lower

12   paying job to leave MSC?

13        A.    Yes.  In fact, in the message I sent to

14   Adam Johnson, on the phone message I told him it

15   didn't matter if I was switched to a regular job,

16   that money wasn't everything.

17        Q.    You told that to Adam?

18        A.    Yes.

19        Q.    On Page 4 you list Carlos Calcines,

20   C-a-l-c-i-n-e-s, and it states that this individual

21   requested not to be scheduled to work on the same

22   project as Raul Gonzalez because of Gonzalez's

23   mistreatment towards Cuban workers.  Right?

24        A.    That's correct, yes.

25        Q.    And how do you know that?

Page 104

1        A.    Because I worked with him.

2        Q.    So Carlos told you that?

3        A.    Yes.

4        Q.    When is the last time you spoke with

5   Carlos?

6        A.    When I was at the port project.

7        Q.    Of all of these people you have listed here

8   in response to Request No. 3, have you talked to any

9   of them recently?

10        A.    (In English)  Let me see the names.

11        Q.    Sure, take your time.

12             THE INTERPRETER:  Please in Spanish, sir.

13             THE STENOGRAPHER:  I'm not getting this

14   when it is stated in English.

15             THE INTERPRETER:  And I can't get them

16   either.  You're going to have to wait for a minute.

17        A.    (Unintelligible)

18        Q.    (By Ms. Strasser)  Why don't you just go

19   through it silently and tell me if there is anyone

20   you have spoken to.

21        A.    Some of them are personal friends of mine.

22        Q.    Which ones?  Let's start there.

23        A.    Henry Santamaria.

24             MS. STRASSER:  What page is that?  He's on

25   Page 4?

Page 105

1       A.    Page 4.

2       Q.    (By Ms. Strasser)  Okay.  When is the last

3    time you talked to Henry?

4       A.    Yesterday.

5       Q.    Did you tell him about this lawsuit?

6       A.    No.

7       Q.    What did you talk about yesterday?

8       A.    Yesterday, no.

9       Q.    But you have told him about this lawsuit at

10   some point?

11      A.    Yes, he knows that I am suing Hypower.

12      Q.    When did you tell him that?

13      A.    When I filed the lawsuit with my attorneys.

14      Q.    How often do you talk to him?

15      A.    Every month.

16      Q.    Is he still working at Hypower?

17      A.    No.

18      Q.    Where does he work?

19      A.    At CAP Government.

20      Q.    He works at your current employer?

21      A.    That's correct.

22      Q.    Did he start before or after you?

23      A.    After I did.

24      Q.    Did you recruit him?

25      A.    Did I recruit him?  No, but I did let him

Page 106

1    that they were looking to hire people.

2         Q.   Who else do you know or who else are you

3    personal friends with on this list?

4         A.   Erik Lino on Page 5.

5         Q.   When is the last time you spoke with

6    Mr. Lino?

7         A.   Maybe a couple of months ago.

8         Q.   Did you tell him you filed a lawsuit

9    against Hypower?

10        A.   (In English)  I don't remember.

11             (In Spanish)  Well, not in the last

12   conversation, no, and I don't remember if I have

13   discussed that with him at some point in time or not.

14        Q.   Did you ask him if you could list him as a

15   witness to your case?

16        A.   No.

17        Q.   Who else are you personal friends with?

18        A.   For example, Jorge Santos.

19        Q.   When is the last time you talked to

20   Mr. Santos?

21        A.   Maybe three, four months ago.

22        Q.   Did you tell him about your lawsuit?

23        A.   No.

24        Q.   Did you ask him if you could list him as a

25   witness in your case?

Page 107

1      A.   No.

2      Q.   Where does he work now?

3      A.   I don't know.  I think the last time I knew

4   he was still working at Hypower.

5      Q.   Who else are you personal friends with?

6      A.   For example, this fellow, Francisco Santos.

7      Q.   When is the last time you spoke with him?

8      A.   Maybe three months.

9      Q.   Did you tell him you filed a lawsuit

10   against Hypower?

11      A.   No.

12      Q.   Did you ask him if you could list him as a

13   witness in your case?

14      A.   No.

15      Q.   Did he work with you at Palmer Lakes?

16      A.   Yes.

17      Q.   Did he work with you at MSC?

18      A.   Yes.

19      Q.   Is he still employed with Hypower?

20      A.   No.

21      Q.   Where does he work now?

22      A.   I don't know.

23      Q.   Who else are you personal friends with on

24   this list?  There is only a couple more.

25      A.   On this list no one else, although I do

Page 108

```
 1    have a lot of personal friends of mine who do
 2    continue to work at Hypower at the port project.
 3            For example, they're the ones that tell me
 4    that ever since I filed the lawsuit they no longer
 5    have to be there at 6:30 in the morning.
 6        Q.   Who are those people?
 7        A.   Do I have to give those names?
 8        Q.   Yes, unless your counsel tells you not to.
 9            MR. LAROU:  No objection here.
10        A.   For example, Esmildo Cruz.
11            The thing is if Hypower finds out that I
12    speak to these people they're all going to be fired
13    because in the weekly meetings Raul Gonzalez asks if
14    anybody is speaking on the phone with Gustavo.
15        Q.   Who else?
16        A.   Alfredo Lago, Luis Perez, Juan Diaz.
17        Q.   Juan Diaz?
18        A.   Yes.  At the port project no one else.
19            THE WITNESS:  And I need the female
20    attorney to be very serious about this because these
21    people can lose their jobs if Hypower finds out that
22    they are friends of mine.
23        Q.   (By Ms. Strasser)  Understood.  Who else
24    knows?  Who else has said that to you, that the
25    company ---
```

Page 109

```
 1              I know you said these specific individuals
 2    work at the MSC project, but are there others?
 3         A.   Yes, but they no longer work at Hypower.
 4         Q.   What are their names?
 5         A.   Jose Luis, Francisco Santos, but he's not
 6    at Hypower.  Alexis Sosa.
 7         Q.   Let me stop you there.  When is the last
 8    time you spoke with Mr. Sosa?
 9         A.   Several months ago.
10         Q.   Did you tell him about the lawsuit?
11         A.   Yes, he knows about it.
12         Q.   What did you tell him?
13         A.   That my attorneys -- that we had sued
14    Hypower for the time that they had not paid me and
15    because of the discriminatory behavior they had
16    showed me and the way they fired me.
17         Q.   Who else?  You said Jose, Francisco,
18    Alexis.
19         A.   Just them.
20         Q.   I want to go back to the Complaint we
21    marked as Exhibit 1, please.
22              In addition to claiming that you worked
23    hours that you weren't paid for, you're also claiming
24    a breach of contract.  Correct?
25         A.   Well, I signed a 40-hour contract plus
```

Page 110

1    overtime.

2         Q.   Is that document marked as an exhibit?

3         A.   The document -- the contract with Hypower?

4         Q.   Yes.  Did we look at that today?

5         A.   The contract, no.

6         Q.   Where is that contract that you are

7    referring to?

8         A.   At Hypower.  They send it to you and you

9    sign online.

10         Q.   Is that what we marked as Exhibit 3?  Is

11    that what you're talking about?

12         A.   Yes, but this is not the contract.

13         Q.   And you're claiming you don't have that

14    contract?

15              MR. LAROU:  Form.

16         A.   I received this e-mail, but I don't

17    remember whether there was another e-mail in addition

18    to this one.  If this is the only one, then this is

19    the contract.

20         Q.   (By Ms. Strasser)  So this is the basis of

21    your breach of contract claim.  Is that correct?

22              MR. LAROU:  Form.

23         A.   If this is the only contract, then yes, it

24    would be based on this.

25         Q.   (By Ms. Strasser)  On Page 7 of the

Page 111

1    Complaint in Paragraph 34 under the breach of
2    contract claim you write that Plaintiff accrued
3    80 hours of unused paid time off, but that you
4    weren't paid for it.  Right?
5         A.   Of vacation time, yes.  That's correct,
6    yes.
7         Q.   So I guess what I'm trying to understand,
8    is your breach of contract claim based on your unpaid
9    wages that we've talked about for the last four hours
10   or so or is it based on your PTO?
11            THE INTERPRETER:  Overtime or PTO, is that
12   the question?
13            MS. STRASSER:  Yes.
14        A.   In both.
15        Q.   (By Ms. Strasser)  So with respect to the
16   PTO, what contract says that you're going to receive
17   that upon termination?
18        A.   I understand that I have the right to enjoy
19   80 hours of vacation time during the year.  Now, I
20   understand, and you can correct me if I'm wrong, but
21   I understand that according to law when somebody
22   leaves or is fired from a company, if they have some
23   vacation time accumulated, then that time should be
24   paid to the person.
25        Q.   And you think that's regardless of the

Page 112

1    reason of termination.  Correct?

2         A.    They never gave me a reason for which I was

3    fired.

4         Q.    Have you retained an expert to testify on

5    your behalf in this case?

6         A.    No.

7         Q.    What are you claiming your damages are in

8    this case?

9         A.    Are you asking me about how much money?

10        Q.    Yes.

11        A.    Well, I did the calculation together with

12   my attorneys, but I don't have that amount here

13   available to me just now.

14        Q.    Can you look back at what we marked as

15   Exhibit 9.  It's the Interrogatories.

16             On Page 9, is that what you're claiming in

17   damages listed under the answer about halfway down

18   the page?

19        A.    Yes.

20        Q.    $52,296.80.  Right?

21        A.    Yes.

22        Q.    And I know you said in the beginning that

23   you also have an discrimination Complaint.  Correct?

24        A.    Correct.

25        Q.    And I know we've talked about your

Page 113

1   allegation that Raul treated you differently because

2   you're Cuban.  Right?

3       A.   He did so to all of the Cuban workers on

4   the project.

5       Q.   Are you alleging that anyone else on behalf

6   of Hypower discriminated against you outside of Raul?

7            MR. LAROU:  Form.

8       A.   No.

9       Q.   (By Ms. Strasser)  Did Raul ever say

10  anything to you specifically or was it more of him

11  addressing Cubans in general?

12      A.   To Cubans in general.  I mean he was very

13  respectful to my electricians, who were excellent

14  workers, and when my electricians would come and

15  complain to me I went to talk to him saying, look,

16  treating them that way was showing them a lack of

17  respect, disrespecting them.

18           And on those occasions whenever I spoke to

19  him -- and there were many occasions -- he would be

20  very respectful to me, but then he would yell at me

21  and he would offend me too.

22      Q.   And you said earlier Ivan was the one who

23  escorted you out in early January and terminated your

24  employment.  Correct?

25      A.   That's correct, he was the project manager.

Page 114

1      Q.   And you said Adam also knew about your
2  termination.  Correct?
3      A.   I asked Ivan that and he said yes.
4      Q.   And Raul was not there that day, right,
5  when you were terminated?
6      A.   No, he was not.
7      Q.   And as far as you know, he had no
8  involvement in terminating you.  Correct?
9      A.   Ivan Lopez told me that the day before in
10  the afternoon he had a meeting with Raul Gonzalez,
11  Adam Johnson and Mario Luaces and it had been decided
12  to fire me.  That was the same day that I sent the
13  e-mail.
14      Q.   Do you know if that meeting was in person
15  or how did they talk?
16      A.   I don't know.
17      Q.   The following day Raul was out of town,
18  right, he was on vacation?
19      A.   Correct.  That is to say when I came back
20  from my vacation -- I took vacation at the end of
21  December -- when I came back from my vacation he had
22  taken vacation at the beginning of January.
23      Q.   And how long were you gone at the end of
24  December?
25      A.   Like around ten days or something like

Page 115

1    that.

2              MS. STRASSER:  I don't have any other

3    questions.  I appreciate your time.

4              MR. LAROU:  I have just a couple follow-ups

5    for me and I promise I'll make it quick because I

6    know everyone wants to enjoy their New Year's Eve.

7                    CROSS-EXAMINATION

8    BY MR. LAROU:

9         Q.   Mr. Hernandez, earlier you stated that your

10   superintendent Alcides Fleitas and Raul Gonzalez told

11   you that you were required to arrive at the jobsite

12   at 6:00 a.m.  Is that correct?

13        A.   Correct.

14        Q.   Did Alcides tell you that more than once?

15        A.   Yes.

16        Q.   How often?

17        A.   Every week.  Every week all the workers

18   were told that the electricians should be there at

19   6:30 in the morning and the foremen should be there a

20   half-hour before that.

21        Q.   Where would Alcides tell you and the other

22   electricians that?

23        A.   At the project.

24        Q.   Was that during meetings or while you were

25   working?

Page 116

1        A.    At the meetings.  He would say it there at

2    the meetings in front of all the electricians and the

3    foremen on the project.

4        Q.    And just to clarify, would that be the

5    safety meetings or the daily meetings you would hold?

6        A.    The safety meetings and those were held at

7    the Palmer Lakes lacks project at 6:30 in the morning

8    on Mondays.

9        Q.    And Alcides was your direct supervisor,

10   correct, at the Palmer Lakes project?

11       A.    Yes.

12       Q.    He was the one that was responsible for

13   reporting your work hours?

14       A.    Yes.  That's right.  At Hypower the

15   superintendent has to report the work hours to

16   payroll for each of the employees.

17       Q.    And so I'm going to ask you a series of

18   similar questions about Raul Gonzalez as well.

19            So did Raul tell you more than one time

20   that you were required to arrive at the jobsite at

21   6:00 a.m.?

22       A.    Yes, every week.

23       Q.    Every week would Raul convey that

24   information to you during the safety meetings as

25   well?

Page 117

1          A.   At the safety meetings and other days of

2     the week also.  The big difference between the

3     project run by Raul Gonzalez and the one at Palmer

4     Lakes is that Alcides Fleitas never fired a worker

5     for coming in between 6:30 and 7:00, never.

6          Q.   Hold on one second.  Can you tell me a

7     little more about that, an example of an individual

8     being fired for arriving after 6:30?

9               MS. STRASSER:   Form.

10          A.   Yes.  Yes, at the port project for MSC, any

11     of the port workers that came in after 6:30 in the

12     morning, they were -- they would be called in, they

13     would be insulted in front of everybody else.  If it

14     happened a second time they would be sent elsewhere.

15          Q.   (By Mr. LaRou)  When you say "the workers,"

16     are you referring to Hypower's electricians?

17          A.   Electricians and -- I'm referring to the

18     electricians and if a foreman were to get in after

19     6:00 in the morning, then him too.

20          Q.   Who is it that would insult them publicly

21     like you were saying?

22          A.   Raul Gonzalez.

23          Q.   Where would you hold those safety meetings

24     during your time working at the Palmer Lakes project?

25          A.   Right at the beginning at the entrance

Page 118

1   there right next to Alcides Fleitas' office.

2        Q.   So was that inside or outside?

3        A.   Outside.  It was outside in the open air.

4        Q.   What about during your time working at the

5   MSC project, where would the safety meetings be held?

6        A.   In front of Raul Gonzalez's trailer, also

7   in the open air.

8        Q.   I know you testified earlier that you

9   complained to both Alcides as well as Raul about not

10  being paid for the time that you worked before

11  7:00 a.m.  Is there any other individual from Hypower

12  that you complained to about not being paid for all

13  of the hours you worked?

14       A.   Yes, to the project manager, Ivan Lopez.

15  He's the project manager for the port project.

16       Q.   And what was Ivan's response when you

17  complained about not being paid for all of your

18  hours?

19       A.   He told me to speak to Raul.

20       Q.   So, again, I know you stated earlier that

21  you did, in fact, complain to Raul for not being paid

22  for your work before 7:00 a.m.

23            My question for you, how did Raul respond

24  to that complaint?

25       A.   Hypower always said the same thing.  He

Page 119

1    always said the same thing saying this is a federal

2    project and you should be thanking Hypower that

3    you're getting paid at a higher rate.

4             He would say that anybody who comes in

5    tardy, is not here at 6:30 in the morning, I'm going

6    to send them home.  That is to say I will send any

7    electrician home who is not here by 6:30 because this

8    isn't the Palmer Lakes project and the difference was

9    the Palmer Lakes project was a regular one at which

10   the electrician would make approximately $25 an hour,

11   but the port project was a federal one in which an

12   electrician was making approximately $50 an hour.

13        Q.   Just a moment ago you stated that there was

14   an electrician who was fired for arriving to the MSC

15   jobsite after 6:30.  Who was that?  What is the name

16   of that person?

17        A.   Well, from my group there were three

18   electricians who were fired.  There were many others,

19   but there were three from my group that were fired

20   because they couldn't be there at 6:30.

21             One of them is named Kevin.  The other one

22   was named Hugo.  Those two were switched to a

23   different project.  And one of my very best workers

24   who was Alexis Sosa, he was fired from the project

25   because he got there every day at 6:40 in the

Page 120

1    morning.

2         When Raul Gonzalez told Alexis Sosa that he

3    couldn't continue to work there, that he didn't have

4    any more work for him there, he ended up calling the

5    supervisor for the company, Mario Luaces.  He did so

6    in front of me.  He told him if you can't be there at

7    6:30 in the morning I don't have any other jobs for

8    you, I don't have any work for you.

9         So the guy ended up out on the street.  He

10   told him Hypower did not have anymore work for him.

11   They fired him the same way they did me, without an

12   e-mail and without anything.

13       Q.   So I want to talk about some of the work

14   you were performing before 7:00 a.m. when you would

15   arrive to either the Palmer Lakes or MSC jobsite.

16        I know earlier you stated that you would

17   arrive to the jobsite, you would plan out the

18   materials and the tools that you needed for the day.

19   Were you responsible for retrieving those tools as

20   well?

21       A.   Yes.

22       Q.   Were you also responsible for distributing

23   those tools to other Hypower employees who were

24   working as electricians?

25       A.   No.   There was a person in charge of

Page 121

1    controlling the tools and I would tell him which

2    tools we would need each day.  That is a person by

3    the name of Sergio Velez.  It was the same person on

4    both projects.

5           For example, I would tell him look -- I

6    would tell him every day we're going to need all of

7    these tools and as my electricians came in I would

8    say look, this tool is for this electrician, and he

9    would write it down on a sheet, the code for the tool

10   and the name of the electrician who had it and then

11   every day at 3:30 in the afternoon the tools had to

12   be returned to the trailer.

13       Q.   Would you coordinate with Sergio around the

14   same time every day to speak about the necessary

15   tools for the day?

16       A.   Yes.  At 6:30, yes.

17       Q.   So is it safe to say from about 6:00 in the

18   morning until 6:30 you would plan out the materials,

19   all of the necessary tools for the day?

20       A.   That's correct.  It was more than anything

21   else a logistics exercise, which jobs were going to

22   be done that day, how many electricians were going to

23   work on each one of those jobs, if they were going to

24   need some sort of a scissor lift or maybe a ladder,

25   what kind of materials would be required and what

Page 122

1    kind of high-powered tools they would need.  That was
2    the job I did between 6:00 and 6:30 in the morning.
3        Q.   Okay.  And so then at about 6:30, just a
4    moment ago you stated you would go and talk to Sergio
5    and discuss the tools that were needed for the day?
6        A.   That's correct.
7        Q.   About how long did that take?
8        A.   It would take about ten minutes for the
9    electricians to get their tools.
10       Q.   And so if my math is correct, you would
11   finish up coordinating distribution of the tools by
12   about 6:40.  What would you do between 6:40 and 7:00?
13       A.   Well, the meetings would start at 6:45
14   every day.
15       Q.   Where were those tools kept at the Palmer
16   Lakes project?
17       A.   Well, the Palmer Lakes project was a
18   completely new building and right there in the yard
19   there was a little existing warehouse and inside the
20   warehouse Hypower gave them one of the rooms to store
21   the tools and the materials.  They call it a gang
22   box.  It's like a big box with wheels on it.
23            MR. LAROU:  Just to confirm, I believe the
24   spelling is g-a-n-g b-o-x.
25       Q.   (By Mr. LaRou)  Do you know where those

Page 123

1    tools were kept at the MSC project?

2         A.   They were stored within Raul Gonzalez's

3    trailer.

4         Q.   And the gang box as well?

5         A.   No.  No, no, we had two trailers.  One was

6    exclusively for materials and the other one was the

7    offices of Raul Gonzalez and Ivan Lopez and the

8    remaining space was used to store the high-powered

9    tools.

10        Q.   So earlier you stated that while working at

11   the MSC project you would park in a parking lot

12   downtown, get on a bus and then ride that bus to the

13   Port of Miami to begin working?

14        A.   That's correct.

15        Q.   If you were arriving to work each day at

16   6:00 in the morning, what time would you need to get

17   on the bus?

18        A.   I would get on the 5:45 a.m. bus.

19        Q.   Every day?

20        A.   Yes.  Now, there were times when the 5:45

21   bus didn't get there because it would break down, so

22   then we would have to wait for the 6:00 bus.

23        Q.   The bus ride would take about how long?

24        A.   Maximum ten minutes.

25             MR. LAROU:  Great.  No further questions.

Page 124

1          MS. STRASSER:  I have a couple follow-up

2     questions.

3                      REDIRECT EXAMINATION

4     BY MS. STRASSER:

5          Q.   Mr. Hernandez, you told Mr. LaRou a little

6     bit ago that Alcides was responsible for reporting

7     your work hours.  Do you remember saying that?

8          A.   Both superintendents.  All Hypower

9     superintendents have to have the responsibility of

10     reporting the payroll hours to Hypower.

11          Q.   And by "reporting" you mean they would

12     review the time that you entered on behalf of

13     yourself and the electricians below you.  Correct?

14          A.   Correct.

15          Q.   And we were just talking about ---

16          A.   Well, just a moment.  The information I put

17     into the application did not go directly to Hypower

18     because they would extract the information from the

19     application and send the total number of hours for

20     the week to Hypower.

21          Q.   Understood.  With regard to the tools that

22     we were just talking about, you said that Sergio was

23     responsible for getting the tools out every morning.

24     Correct?

25          A.   Yes, for both projects.

Page 125

1   Q. Were those tools locked in a trailer?

2   A. Yes.  Yes, those are tools that cost

3 thousands of dollars, yes.

4   Q. Was Sergio the only one with the key to

5 those tools?

6   A. Sergio and the project superintendent.

7   Q. Did you ever have access to those tools?

8 In other words, did you have a key to the tools at

9 either jobsite?

10   A. No, no foreman has.

11   Q. How long was your drive from your house to

12 Palmer Lakes?

13   A. In the morning 40 minutes.

14   Q. And how about in the afternoon?

15   A. In the morning I might even make it in

16 under 40 minutes, in the morning.  I might have taken

17 40 minutes to get to the port project, but Palmer

18 Lakes a little bit less.

19   Q. I want to talk about just Palmer Lakes.  It

20 took you 40 minutes to get there and how long to get

21 home?

22   A. Okay, so in the afternoon at least an hour

23 and-a-half.

24    MS. STRASSER:  We have to take a break

25 because we have to get a new videotape.

Page 126

1          THE VIDEOGRAPHER:  We are going off the
2     video record.  The time is 2:42 p.m.
3          (Off the record.)
4          THE VIDEOGRAPHER:  This is Media four.  The
5     time is 2:43.
6          Q.   (By Ms. Strasser)  You said it took you
7     about 40 minutes to get from your house to Palmer
8     Lakes.  Correct?
9          A.   Well, to Palmer Lakes more like 30 minutes.
10         Q.   And then how long to get from Palmer Lakes
11    back to your house?
12         A.   About an hour and-a-half because of
13    traffic.
14         Q.   And then from your house to MSC, how long
15    did it take?  Strike that.
16         How long did it take you to get to
17    Fincantieri from your house?
18         A.   About two hours.  When you're talking about
19    the time that I left the project to go to the parking
20    downtown and then the time to go from the parking
21    garage to go home, you're talking about over two
22    hours.
23         Q.   I want to talk specifically about how long
24    it takes you to get from your house to the
25    Fincantieri office before you get on the bus.

Page 127

1          How long does that commute take?

2     A.   Fincantieri's offices?

3          (In English) I never go to Fincantieri.

4     Q.   I thought you went from your house to the

5  Fincantieri parking lots.

6     A.   (In English)  To the parking lot in

7  downtown, not to Fincantieri's offices.

8     Q.   I misspoke then.  Thank you.

9          How long did it take you to get from your

10  house to that Fincantieri parking lot?

11     A.   In the morning about 40 minutes.

12     Q.   And then you said it was about a ten minute

13  bus ride from that parking lot to MSC.  Correct?

14     A.   That's right.

15     Q.   And then in the afternoon was it another

16  ten minutes to get from MSC to the parking lot?

17     A.   No, because in the afternoon there's a lot

18  of downtown traffic.

19     Q.   Okay.  So it could take more at that time?

20     A.   It could take up to 30 minutes.

21     Q.   And then how long was the drive in the

22  afternoon from that parking lot back to your house?

23     A.   At the very least an hour and-a-half.

24     Q.   And you said there were other times you

25  could catch the bus in the morning including at

Page 128

1    6:00 a.m.  Correct?

2          A.   Yes, that's right.  The buses started

3    working at 5:00 a.m.

4          Q.   How late could you catch it in the morning

5    to get to MSC?

6          A.   I really don't know.  I'm not sure.

7               MS. STRASSER:  I don't have anything else.

8    Thank you.

9               MR. LAROU:  Just one last question from me.

10                   RECROSS-EXAMINATION

11   BY MR. LAROU:

12         Q.   At what time would Hypower electricians at

13   the Palmer Lakes and MSC jobsites retrieve their

14   tools from Sergio each day?

15         A.   6:30.

16              MR. LAROU:  No further questions.

17              MS. STRASSER:  I have nothing further.

18              Is the witness going to read or waive?

19              MR. LAROU:  We will waive.

20              THE VIDEOGRAPHER:  We are going off the

21   video record.  The time is 2:47 p.m.

22              (Whereupon, the witness waived the reading

23   and signing of the deposition, and the taking of the

24   deposition was concluded at 2:47 p.m.)

25                        - - -

Page 129

1                        CERTIFICATE
2    STATE OF FLORIDA )
3    COUNTY OF DADE   )
4
           I, JO D. SOFFER-OLSON, a Notary Public in and
5    for the State of Florida at Large, do hereby certify
     that, pursuant to a Notice of Taking Deposition in
6    the above-entitled cause, GUSTAVO HERNANDEZ was by me
     first duly cautioned and sworn to testify the whole
7    truth, and upon being carefully examined testified as
     is hereinabove shown, and the testimony of said
8    witness was reduced to typewriting under my personal
     supervision and that the said deposition constitutes
9    a true record of the testimony given by the witness.
10          I further certify that the said deposition was
     taken at the time and place specified hereinabove and
11   that I am neither of counsel nor solicitor to either
     of the parties in said suit nor interested in the
12   event of the cause.
13          WITNESS my hand and official seal in the
     City of Miami, County of Dade, State of Florida, this
14   15th day of January, 2025.
15
16
                         JO D. SOFFER-OLSON.
17                       Florida Notary
                         Comm. FF158527
18                       Expiration: 9/9/26
19
20
21
22
23
24
25

**[& - 31]**                                                                 Page 1

| & | | | |
|---|---|---|---|
| **&** 2:5 16:13 17:4 65:11 | **15th** 129:14 | **2008** 20:16 | **222** 2:6 |

**&** 2:5 16:13 17:4 65:11

**0**

**08** 64:18

**1**

**1** 2:19 57:2,5 60:5 109:21
**1,400** 18:17
**1,500** 19:11
**1,800** 20:11
**1-18-24** 2:19
**10** 48:22 81:15 81:16,19
**107th** 13:10
**10:00** 25:15
**10:01** 1:13 4:7
**10th** 81:20 82:14
**115** 2:15
**11:16** 41:4
**11:28** 41:7
**124** 2:15
**128** 2:15
**12:51** 80:6,7
**13** 81:8 99:10
**135** 2:3
**139th** 12:2,22
**14** 82:20
**15** 23:1 27:10 54:24 88:9

**15th** 129:14
**16** 88:16
**17247** 129:16
**176** 93:3
**17th** 81:22 82:16
**18** 17:11 57:11
**185** 92:15
**18th** 57:16
**19** 53:8
**19,000** 21:15,15
**1978** 6:4 14:5
**1999** 12:17
**1:00** 80:10
**1:24** 1:3

**2**

**2** 2:20,22 41:7 61:5,8 99:23
**2-2-24** 2:21
**20** 12:16 14:13 27:10 53:8 97:10
**2001** 12:20 14:14
**2002** 13:25 14:5 17:21 18:8
**2003** 18:9 19:13
**2007** 13:22 14:1 19:13,13 19:22 20:13

**2008** 20:16
**2010** 20:13 21:8
**2013** 21:21
**2015** 13:22 17:7,11 21:8
**2016** 17:8 22:13 23:12 25:10
**2017** 23:13 25:4,11
**2018** 23:24 24:1
**2019** 12:5
**20207** 1:3
**2021** 24:2 26:10,13,14
**2022** 14:11,11 26:15 28:23 62:1,11,14 64:2,23 81:8 81:15,16,19 82:4 88:9,16
**2023** 8:16 33:22 54:3 61:25 82:20,23 83:1
**2024** 1:13 4:6 30:3,14 32:3 33:20,20 57:11 94:3,5
**2025** 129:14
**22** 25:18 64:2 67:18,19 82:23

**222** 2:6
**23** 67:18,20
**240** 13:10
**24th** 82:18
**25** 119:10
**25th** 31:3
**267** 92:10,11
**268** 91:10
**26th** 32:3 82:8
**27** 25:24 26:23 28:4
**278** 90:19,21
**280** 90:13,15
**29** 82:4
**29th** 82:6
**2:00** 34:16 51:15 92:12
**2:30** 92:13
**2:42** 126:2
**2:43** 126:5
**2:47** 128:21,24

**3**

**3** 2:22 62:3,6 63:4 101:23 102:22 104:8 110:10
**30** 37:24 66:14 84:13 126:9 127:20
**302** 63:8
**303** 63:8
**31** 1:13 4:6

**[310 - 9:00]**

**310**  64:7
**311**  64:7
**32**  37:2 62:20
**33146**  2:3
**33183**  12:3
**33401**  2:7
**337**  81:4
**339**  81:4
**34**  65:1,6 86:9
86:10 111:1
**35**  62:22 78:9
87:13,14,14
**36**  33:4 67:24
68:1,3,6,15
88:15
**37**  34:12 78:21
**3rd**  82:11

---

**4**

**4**  2:15,23 63:19
63:22 103:19
104:25 105:1
**40**  9:8 58:25
66:4 67:12,14
109:25 125:13
125:16,17,20
126:7 127:11
**400915**  89:20
**401**  48:24 49:3
**41**  83:2
**42**  9:4 67:13
81:19,21
**43**  48:21 82:20

**44**  82:1,3
**45**  9:5 58:22,24
81:23
**46**  82:9,18
**48**  65:1,6 78:9
78:21 82:7,24
**4:15**  92:20
**4th**  94:6 96:14
96:15

---

**5**

**5**  3:3 57:19
58:14,20 64:16
64:21 94:5
106:4
**50**  70:25 71:4
97:6 119:12
**500**  2:6
**52,296.80.**
112:20
**53**  48:14,21
**54**  82:11
**55**  64:18
**57**  2:19
**58**  81:18 82:14
82:16
**5:00**  128:3
**5:30**  34:16
**5th**  94:6 96:14

---

**6**

**6**  3:4 60:5
79:25 80:3
81:2 83:1

**60**  97:7
**61**  2:20
**62**  2:22
**6240**  12:2,21
13:3
**63**  2:23
**64**  3:3
**68**  81:18 86:12
86:16
**6:00**  25:15
37:20 38:18
51:12 70:11
71:6,8,13 72:3
73:24 74:12,20
76:8 86:21
88:23 91:15,22
92:4,7 93:5,16
93:25 115:12
116:21 117:19
121:17 122:2
123:16,22
128:1
**6:40**  96:2
119:25 122:12
122:12

---

**7**

**7**  3:5 84:15,18
84:25 110:25
**70**  88:2
**770**  2:3
**7:00**  33:6 44:15
51:14 69:22
70:2,9,12,16,20

71:5 72:17,20
73:1,3,9,12,21
73:24 74:1,4
74:10,16,17
75:8 80:24
84:2 86:8,19
86:20,22 87:6
87:16 88:4,19
88:21,22 90:1
90:9,17,23
96:3 117:5
118:11,22
120:14 122:12
**7:30**  72:25

---

**8**

**8**  3:6 62:11,14
89:13,16 99:4
**80**  3:4 111:3,19
**84**  3:5
**89**  3:6
**8:00**  51:14
**8:30**  92:19
93:23

---

**9**

**9**  3:7 6:4 99:5,8
112:15,16
**9/9/26**  129:18
**9150**  1:12
**99**  3:7
**9:00**  74:21 90:3
90:5,10,25
98:8

**[a.m - allowed]**                                                    Page 3

| a | | | |
|---|---|---|---|
| **a.m**  98:8 | **absolutely** | 114:1,11 | **aired**  95:18 |
| **a.m.**  1:13 4:7 | 89:11 | **addition** | **airport**  37:18 |
| 41:4,7 72:3,20 | **abusive**  68:11 | 109:22 110:17 | **alcides**  37:7,8 |
| 73:3,9,21 74:4 | **access**  125:7 | **additional** | 37:11 38:10,11 |
| 74:12,21 75:8 | **accidents**  95:9 | 46:21 | 38:14,16,20 |
| 80:24 84:2 | **account**  66:18 | **address**  12:1 | 39:2 42:12 |
| 86:19 88:4,19 | **accrual**  79:3 | 13:4,9 | 43:17 62:25 |
| 88:23 89:6 | **accrued**  111:2 | **addressing** | 63:1 66:7,23 |
| 90:1,5,9,10,23 | **accumulated** | 113:11 | 67:5 68:7,9,10 |
| 91:15,22 92:4 | 111:23 | **administrative** | 68:15,19 69:8 |
| 93:5,16,25 | **accurate**  85:2 | 11:25 | 69:9 70:4,7,11 |
| 115:12 116:21 | 101:25 | **advice**  9:25 | 70:15,19 72:23 |
| 118:11,22 | **accusations** | **afternoon** | 115:10,14,21 |
| 120:14 123:18 | 59:10 | 34:17 37:21 | 116:9 117:4 |
| 128:1,3 | **acknowledge...** | 51:15 80:21 | 118:1,9 124:6 |
| **aaron**  39:21 | 2:23 63:25 | 83:12 87:11 | **alexis**  53:6 |
| 40:17,20 | **action**  7:19 | 88:6,14 92:12 | 109:6,18 |
| **abandoned** | 58:11 | 96:24 114:10 | 119:24 120:2 |
| 68:12 | **actions**  59:5 | 121:11 125:14 | **alfredo**  108:16 |
| **abel**  36:3 | **actual**  73:18 | 125:22 127:15 | **allegation** |
| **ability**  7:5 | 75:10 | 127:17,22 | 57:25 58:13 |
| 75:10 | **actually**  22:4 | **agency**  68:23 | 66:15 113:1 |
| **able**  11:17 | 46:9 75:7 87:7 | 68:24 69:3 | **allegations** |
| 22:22 24:24 | **adam**  40:7,18 | **ago**  106:7,21 | 9:10 |
| 27:18 34:3 | 40:19,20 41:15 | 109:9 119:13 | **allege**  57:20 |
| 47:11,19 51:23 | 42:19 43:3,10 | 122:4 124:6 | **alleging**  113:5 |
| 52:12 73:8,20 | 43:18 48:18 | **agree**  31:10 | **allow**  9:21 22:3 |
| 74:19,20 77:17 | 53:21 54:4 | 55:2 | 73:5,6 |
| 78:3 80:18 | 55:23,25 56:10 | **agreed**  60:7 | **allowed**  34:19 |
| 93:8,12 | 56:11,15,19,24 | **agreement** | 72:17 75:4 |
| **above**  27:1 | 59:18 98:25 | 60:21 | 83:10,11 86:6 |
| 65:6 129:6 | 101:23 102:11 | **aguero**  18:22 | 87:3,6,7,9,24 |
| | 102:20 103:4 | **air**  118:3,7 | 88:6,8 |
| | 103:14,17 | | |

**[american - barcelona]**                                                    Page 4

**american** 32:19
51:10,11,21
52:8 94:21
**americans** 51:2
**amount** 60:16
60:17 112:12
**angel** 59:22
**annual** 79:3
**annually** 19:7
**answer** 6:21,22
8:2,8 20:22
44:22 56:21
59:8 68:20
99:21 112:17
**answered** 6:16
**answers** 4:17
6:10
**antonio** 17:18
**anybody**
108:14 119:4
**anymore**
120:10
**apartment** 13:5
13:9,11,15,17
**app** 76:21
**apparently**
31:8
**appear** 64:22
**appearance** 4:8
**appearances**
2:1
**appears** 5:17
**application**
72:16,19 73:9

73:12 74:4
75:9 85:7
124:17,19
**applied** 24:21
28:13 29:4,18
33:19,21 35:24
36:14,16 99:24
100:21,23
**apply** 24:24
100:6,8
**applying** 34:1
101:12
**appreciate**
115:3
**approximately**
19:10 21:14,14
26:12 43:19
48:21 61:25
67:25 68:3
119:10,12
**april** 25:11
28:23,23 82:23
**area** 47:19
**argue** 69:16
**argument**
87:12
**arias** 53:7
**arrive** 115:11
116:20 120:15
120:17
**arriving** 117:8
119:14 123:15
**aside** 95:5

**asked** 11:14
29:9,12 39:11
42:15 53:23
54:6 56:4
66:10,11 94:24
98:25 114:3
**asking** 8:22
9:11 39:9
53:21 58:13,19
66:16 68:14
72:23 74:12
92:4 112:9
**asks** 38:6
108:13
**asmildo** 36:3
**assigned** 47:18
76:18
**assistant** 10:23
23:3,7,9 24:5
96:8
**associates**
16:13 17:4
**attend** 25:12
**attending** 94:2
**attention** 78:18
**attorney** 7:15
9:19 108:20
**attorneys** 2:4,8
57:14 58:6
89:1 105:13
109:13 112:12
**audible** 6:10
**august** 25:10
61:25 62:11,14

81:8
**authority** 78:3
**authorized**
86:7,23
**autonomously**
21:3
**available**
101:13 112:13
**avenue** 2:3,6
12:2 13:10
31:3
**avoid** 95:11
**aware** 99:1

**b**

**b** 12:11 102:24
122:24
**back** 13:20
37:25 39:3
41:6 46:7 60:4
80:9 84:19
86:9,11 88:1
90:14,19 91:9
91:10 101:4,14
101:17 109:20
112:14 114:19
114:21 126:11
127:22
**bank** 67:10
**bankruptcy**
20:20
**barcelona**
13:22,23,24
19:21,24 20:1

**[barcelona - cap]**                                                           Page 5

20:5
**based**   6:16
   24:25 110:24
   111:8,10
**basis**   110:20
**bates**   63:8 64:6
   64:17 65:4,6
   81:3 84:21
   86:12,15 88:2
   90:13
**beach**   2:7
**becoming**
   55:14
**began**   61:2
   63:9
**beginning**
   17:21 23:24
   24:1 50:6
   112:22 114:22
   117:25
**behalf**   1:22 4:3
   4:12,14 91:22
   93:16,20 112:5
   113:5 124:12
**behavior**   98:10
   109:15
**believe**   6:15 8:6
   17:11 44:3
   92:3 102:2
   122:23
**belonged**   55:4
**belongs**   63:15
**bernard**   59:19

**best**   55:4 79:18
   119:23
**better**   11:20
   20:3 26:1,2
   34:5,9 55:16
**beyond**   93:2
**big**   38:25 117:2
   122:22
**birth**   6:3 50:19
**bit**   11:24 31:12
   37:25 94:23
   124:6 125:18
**board**   16:19
   24:11,21 31:3
   31:25 100:13
   100:18
**bonuses**   27:15
**books**   64:8
**born**   14:6
   35:20 50:20,23
**bottom**   78:24
   85:1
**boulevard**   1:12
**box**   122:22,22
   123:4
**boxes**   84:10
**breach**   109:24
   110:21 111:1,8
**break**   6:18 11:3
   40:25 41:1,9
   41:12 81:1
   123:21 125:24
**brian**   60:11

**bring**   67:7
   78:17
**brooks**   2:2,4
   4:11 86:13
**brotherhood**
   101:8
**brothers**   15:16
   15:21
**brought**   8:12
   10:1
**broward**   31:22
   31:25
**bryant**   23:21
   23:22 25:16,22
   25:25
**build**   27:23,24
**building**   34:25
   35:2,3 40:4
   122:18
**bullshit**   50:15
**bunch**   50:13,14
**bus**   46:19,22,23
   47:22 123:12
   123:12,17,18
   123:21,22,23
   126:25 127:13
   127:25
**buses**   46:5
   128:2
**business**   102:4

| c |
|---|

**c**   12:11,11,11
   12:11 22:23

26:8 36:5
   45:11 103:20
   103:20
**cables**   84:10
**calcines**   103:19
**calculation**
   112:11
**call**   32:24
   33:13,16 38:15
   43:18 44:6
   55:23 56:2
   100:11,22
   101:6,14
   122:21
**called**   4:20
   15:15 17:17
   18:21 22:9
   31:20 32:7
   41:16 43:13
   47:2,3 48:23
   54:9,10,16
   59:10 72:16
   74:9 96:16,19
   96:21 100:9
   101:17,18
   103:5 117:12
**calling**   120:4
**cambeiro**   12:9
**cap**   31:20 32:2
   32:5,24 33:13
   33:21 34:11,13
   34:24 35:8
   101:15 105:19

**[capable - company]**                                                      Page 6

| | | | |
|---|---|---|---|
| **capable**  7:1 | **certify**  129:5,10 | **claim**  7:23 | 69:17,19,21,25 |
| **car**  47:24 | **cetera**  9:1 | 70:13 79:15 | 70:2,7,12,16,20 |
| **card**  47:10,13 | 29:13 46:23 | 110:21 111:2,8 | 71:10 75:3 |
| 47:18,21 | 61:17 | **claiming**  70:10 | 76:7 100:15 |
| **care**  69:5 | **change**  50:8 | 71:5 109:22,23 | 113:14 |
| **carefully**  129:7 | 53:23 56:4 | 110:13 112:7 | **comes**  5:25 6:1 |
| **carlos**  103:19 | 73:19 78:1 | 112:16 | 50:14 60:17 |
| 104:2,5 | 91:5,6,6 | **clarification** | 119:4 |
| **carry**  14:22 | **changed**  11:11 | 45:6 | **coming**  7:8 |
| **casanova**  36:3 | 18:10 52:19 | **clarify**  116:4 | 117:5 |
| **case**  1:3 7:15 | 60:1 | **clear**  5:19 | **comm**  129:17 |
| 7:19,22 9:20 | **charge**  60:19 | 73:20 | **comments** |
| 11:11,12,15 | 120:25 | **client**  34:20 | 50:12 52:20 |
| 14:16 58:18 | **charged**  31:16 | 45:13,13 | **communicate** |
| 60:18,19 79:13 | **check**  65:24 | **climate**  20:3,4 | 38:20 39:17 |
| 95:25 106:15 | 66:22 67:7 | **close**  37:17 | 40:12 |
| 106:25 107:13 | 68:8,17,25 | **closing**  20:15 | **commute**  127:1 |
| 112:5,8 | 81:7 91:24 | **code**  12:3 30:20 | **companies**  18:2 |
| **cases**  58:17 | **checked**  76:3 | 35:3 76:24 | 36:7 45:25 |
| **catch**  127:25 | **checks**  66:8,17 | 85:12,13,14 | **company**  16:3 |
| 128:4 | 81:10 | 121:9 | 16:6 18:3,10 |
| **cause**  79:1,11 | **children**  12:24 | **cold**  20:4 | 18:21 19:5,14 |
| 129:6,12 | **choice**  49:4 | **cole**  2:5 | 20:7,15,18,20 |
| **cautioned** | **choose**  46:16 | **colleagues** | 21:1 22:9 |
| 129:6 | **chose**  46:18 | 11:12 | 23:16,19 26:4 |
| **cellphone** | **chosen**  32:25 | **college**  25:8 | 26:5 27:17,22 |
| 39:16 | 101:2 | 31:1,25 32:1 | 28:15,24,25 |
| **centro**  17:17 | **circulated**  77:4 | **column**  85:9 | 29:3 31:20 |
| **certain**  84:4 | **citizen**  14:8 | **combination** | 32:6 33:8 |
| **certificate** | **citizenship** | 15:22 | 36:14 40:21,23 |
| 15:17 129:1 | 5:18 14:10 | **come**  19:24 | 45:4,15 59:18 |
| **certifications** | **city**  13:7 21:18 | 28:10 32:23 | 59:19 61:13 |
| 16:23 29:22 | 129:13 | 34:1 39:8 | 66:2 68:10 |
| | | 51:14 56:2 | 78:25 79:21 |

**[company - correct]**                                                     Page 7

81:11,13 91:5
108:25 111:22
120:5
**compare** 88:10
**compensation**
65:11
**complain** 56:18
56:23 66:5
113:15 118:21
**complained**
118:9,12,17
**complaining**
68:11
**complaint** 2:19
8:17,21 11:8
31:9,10 54:10
57:10 58:19
59:3,4,12 60:4
94:12,13,16
109:20 111:1
112:23 118:24
**complaints**
7:14 53:19
57:13 95:2,23
95:24
**completed**
34:18
**completely**
51:3,5 53:4
92:25 93:14
122:18
**composite**
84:15,17,25
89:13,15

**concepcion**
12:9,14 14:13
**concluded**
128:24
**conditions** 34:5
57:20 58:16,18
58:21
**confirm** 122:23
**confirmed**
53:19
**confusing** 90:7
**congratulated**
42:9
**considered**
59:7
**considering**
42:13
**consist** 30:18
**constitutes**
129:8
**construction**
33:7 45:4,8,12
46:6 47:15,17
**contact** 10:23
**contents** 64:2
**contingency**
60:21
**continue** 9:19
28:2 53:25
54:1 89:5
98:15 108:2
120:3
**continued** 3:1
56:14

**contract** 61:24
109:24,25
110:3,5,6,12,14
110:19,21,23
111:2,8,16
**contractor**
45:16 48:23
49:6 94:15
**contracts** 31:21
**controlling**
121:1
**conversation**
11:20 44:4
52:10 54:23
55:17 56:7
106:12
**conversations**
9:24
**convey** 116:23
**convicted**
31:13
**coordinate**
121:13
**coordinating**
122:11
**copy** 11:4
63:16 64:15
**coral** 2:3
**corner** 65:7
85:1
**correct** 5:24
8:20 10:18
15:9 17:5,6
19:22 21:10,11

22:5 29:4
30:14,15 31:5
32:9 33:14,18
33:21,24 35:22
36:16,19,20,23
36:24 38:14
40:18 41:14,18
41:21,22 45:14
45:22,23 46:14
46:15 47:2
48:11,16,17,20
48:21 49:1,9
49:23,24 56:15
56:16,21,25
60:22 61:18,21
61:22 62:11,21
63:5 64:4
65:18 66:2,17
69:24 71:6
72:13,22,22
73:4,5,22
74:22 75:16
76:18,23,24
77:11,13,14,24
78:7 79:7
80:16 81:8
82:10,13,14
83:7,21,24
84:4 85:11,17
85:20 87:1,8
87:23 88:4,9
88:17,20 89:18
90:1,3 91:4
92:5,14,20

[correct - december]                                                      Page 8

93:6 95:15,16
96:16 97:4,5,7
97:15,20 98:3
98:10,24,25
100:18,22,23
102:12 103:2
103:24 105:21
109:24 110:21
111:5,20 112:1
112:23,24
113:24,25
114:2,8,19
115:12,13
116:10 121:20
122:6,10
123:14 124:13
124:14,24
126:8 127:13
128:1
**correctly** 23:8
**cost** 125:2
**counsel** 2:2,6
4:7 6:19 9:24
10:2 11:5 60:6
108:8 129:11
**counselor**
28:20 91:12
**county** 10:24
13:8 14:18
16:19 24:11
29:25 31:21,22
34:4 100:5,11
100:19 129:3
129:13

**couple** 42:21
71:14 91:9
93:2 100:4
106:7 107:24
115:4 124:1
**couplings**
84:10
**course** 17:14
25:7,9,10,12
30:22,24
**court** 1:1 2:19
4:9 7:23 8:1,5
8:6 57:12
**cover** 11:25
**crcc7058447**
1:25
**create** 21:1
**created** 49:2
**crime** 31:13,16
59:7 94:20
**crisis** 20:16
**cross** 2:14
115:7
**cruise** 40:3
**cruz** 36:3
108:10
**csklegal.com**
2:7
**cuba** 12:19
14:3,6,21,24,25
15:3 17:12
63:2
**cuban** 50:13,15
50:25 97:18

103:23 113:2,3
**cubans** 52:20
53:15 54:12,13
54:15 58:11
113:11,12
**cujae** 17:17
**current** 12:1
105:20
**currently** 16:22
31:18 35:7
**cv** 1:3

**d**

**d** 1:18,18,19
2:12 5:7 36:5
129:4,16
**dade** 10:24
13:7 14:18
16:19 24:11
25:8 29:25
31:1,2,21,25
100:5,10,13,19
129:3,13
**dadeland** 1:12
**daily** 49:13
116:5
**damages** 112:7
112:17
**damp** 20:4
**daniel** 51:11
**date** 4:6 6:3
62:10,12 86:18
89:4,25 91:24
91:25 92:1

**dated** 89:19
**dates** 62:14
92:2
**day** 9:3 25:14
34:14,22 37:10
38:12 42:3,3,5
44:14 46:7
47:7,23 48:1
53:16 59:14
60:3 63:13
70:11 71:17,24
72:7,11 74:7,8
75:22 77:2,12
77:20 79:16
83:17,23 84:4
84:7 85:8,18
87:2,24 88:3
88:23 90:11,24
91:14 92:9,24
93:23 94:4
96:14,22 97:1
98:4,8,14
114:4,9,12,17
119:25 120:18
121:2,6,11,14
121:15,19,22
122:5,14
123:15,19
128:14 129:14
**days** 54:7 91:1
114:25 117:1
**dealt** 68:12
**december** 1:13
4:6 30:5,13

82:11,14,16,18
114:21,24
**decide** 71:24
**decided** 53:20
114:11
**declare** 21:2
**declared** 20:20
**defendant** 1:9
1:22 2:8 4:14
**defendant's**
2:18 3:2,7 57:2
57:4 61:7 62:5
63:21 64:20
80:2 84:17
89:15 99:7,11
**degree** 15:5,6
15:10,13 16:18
17:14,16,20,20
17:24
**department**
8:18 9:14,21
10:17,24 11:1
11:9,14 65:16
**depend** 49:20
**dependant**
80:15
**depends** 33:9
76:14
**deposed** 6:5
**deposit** 66:18
66:19,22
**deposition** 1:23
4:4 61:5 62:3
63:19 64:16

79:25 84:25
99:4 128:23,24
129:5,8,10
**derogatory**
52:20
**describe** 95:9
**description**
2:18 3:2
**diaz** 108:16,17
**difference**
117:2 119:8
**different** 11:11
18:10 23:16
26:3 41:25
44:18,24 45:24
51:6 53:23
58:17 59:15,24
66:16 94:23
96:12 119:23
**differently** 51:8
113:1
**difficult** 100:14
**diploma** 17:3
**direct** 2:14 4:23
66:18,19 116:9
**directly** 81:9
124:17
**dirty** 95:18
**discrepancy**
78:17
**discriminate**
50:18
**discriminated**
35:18 102:16

113:6
**discrimination**
7:16 50:17
60:18 112:23
**discriminatory**
58:11 59:5
94:17 97:16
102:5,8,13
109:15
**discuss** 44:8
95:15 100:4
122:5
**discussed**
106:13
**discussion**
10:15 16:7
19:17 45:7
**discussions**
60:14
**disputing** 83:4
83:8
**disrespect**
102:21
**disrespecting**
113:17
**distributing**
120:22
**distribution**
122:11
**district** 1:1,1
2:19 57:11,12
**division** 1:2
**document** 57:3
57:7,10,16

61:6,10,11
62:4,7 63:3,8
63:20,24 64:6
64:19 65:2
80:1 81:1,5
84:16,23 85:6
88:1,10 89:14
92:20,21 99:6
99:10,18 110:2
110:3
**documents** 8:9
9:12,15 10:21
11:4 93:12
**doing** 52:25
70:1
**dollars** 125:3
**double** 55:7
85:2
**downtown**
44:21 45:9
46:5,18 47:11
47:13 98:22
123:12 126:20
127:7,18
**drive** 125:11
127:21
**driving** 72:9
**duly** 4:15,20
129:6
**dunlap** 2:10
4:15

[e - engineer]

**e**

**e**  1:18,18,19
2:12 5:7,7 9:13
10:4,6,17
12:11,11 18:25
19:3 22:11,23
38:21 45:11
56:10 59:15
60:2 61:16,23
79:20 94:13
95:4 97:18
98:14 102:24
102:24 103:20
110:16,17
114:13 120:12
**earlier**  40:17
48:8 80:14
84:2 87:5
96:15 97:14
113:22 115:9
118:8,20
120:16 123:10
**early**  47:6
69:19 70:1
76:8 90:10
94:3 113:23
**earning**  81:3
**earnings**  3:4
**easier**  19:9
84:20
**eat**  34:22
**echevarria**
17:18

**edit**  77:17
**education**
14:19
**eight**  34:14,17
57:10 66:13
67:21 70:3
76:14
**either**  8:8 10:13
67:8 96:10
104:16 120:15
125:9 129:11
**electric**  26:6
32:7,12
**electrical**  14:21
15:2,8,11,23
16:19,25 17:14
17:20 18:2,5
18:13 21:6
22:9,11,25
23:21,23 25:17
25:22,25 26:8
26:9,18 27:11
30:8,11,19,20
31:22,23,24
32:6 33:2 34:3
34:7,8 45:19
84:11 101:9,10
**electrician**
16:20,21,25
17:13 18:1,7
19:6 20:6
22:15,16 23:4
24:4 26:19
29:7,23 30:24

32:13 34:6
69:15 70:18,19
70:20 76:20
83:24 100:24
119:7,10,12,14
121:8,10
**electrician's**
23:9
**electricians**
8:24 9:3,6 34:7
36:1,10 37:23
38:7,19 41:23
48:6 49:16
51:3,10 53:2
55:7 66:11,11
67:13 70:6,22
71:4,9,10
72:24 73:25
75:1,6,18,21
76:7,9,12,17
83:22 84:6
88:23 89:3
100:7 102:17
113:13,14
115:18,22
116:2 117:16
117:17,18
119:18 120:24
121:7,22 122:9
124:13 128:12
**electricity**
52:10
**electro**  20:8,10

**electronic**
99:17
**electronically**
64:1
**else's**  74:25
**employed**
74:14 107:19
**employee**  2:24
3:3,4 63:25
64:13 65:14
78:25 79:10
81:2
**employees**  29:2
37:14 49:5
52:16 78:5
84:6 94:10
95:18 96:4
97:18 98:7
102:6 116:16
120:23
**employer**
105:20
**employers**
99:24
**employment**
2:20,22 61:18
61:21 66:2
74:2 80:11
95:7 102:3
103:1 113:24
**ended**  20:15
92:24 120:4,9
**engineer**  14:21
15:2

**[engineer's - f]**

engineer's
  14:22
engineering
  15:8 17:14,19
  17:20
english  6:6
  10:6,8,19 12:7
  12:20 27:2,4
  28:5 31:2
  32:15,19 38:22
  48:1 49:10
  50:4,9 51:18
  51:22 52:1,3,5
  52:7,7,13,14
  54:24 61:19
  64:8,12 67:18
  70:24 71:2
  81:6,18,20
  90:4 91:15,23
  104:10,14
  106:10 127:3,6
enjoy  111:18
  115:6
enter  73:9 74:3
  74:12 76:22
  83:11 87:6,7
entered  77:9,12
  77:20 85:21
  86:18,22 91:21
  93:15,20
  124:12
entering  15:9
entire  23:11
  59:21

entitled  79:11
  129:6
entrance
  117:25
entries  91:19
envelope  8:12
equivalency
  15:22 16:2
equivalent
  16:18 17:3
erik  106:4
erroneous
  65:17
error  65:15
  78:7
errors  65:15,24
  66:1
escorted  98:2
  113:23
esmildo  108:10
esq  2:2,6
et  9:1 29:13
  46:23 61:17
euros  18:17
  19:11 20:11
  21:15
eve  115:6
evening  77:3,4
event  78:14,16
  129:12
eventually
  20:17
everybody
  94:11 117:13

everyone's
  37:22
evidence  7:11
exact  32:18
  97:9
exactly  32:16
  32:20 92:23
  94:4
exam  24:15
  25:5,8 30:12
  30:13,16
examination
  4:23 115:7
  124:3 128:10
examined  4:21
  129:7
examiner  33:2
  34:4
examiners  34:8
example  34:21
  51:9 53:6
  59:16 106:18
  107:6 108:3,10
  117:7 121:5
exceed  79:3
excellent  27:17
  113:13
except  91:6
exclusively
  123:6
excuse  10:7
  99:5
exercise  121:21

exhibit  2:19,20
  2:22,23 3:3,4,5
  3:6,7 57:4 60:5
  61:5,7 62:3,5
  63:4,19,21
  64:16,20 79:25
  80:2 81:2
  84:15,18 89:16
  99:4,5,7
  109:21 110:2
  110:10 112:15
exhibits  2:17
  3:1
existing  122:19
experience  25:1
  29:13 42:16
expert  112:4
expiration
  129:18
explain  24:22
  54:11
explained
  44:13
explanation
  55:1
extend  61:20
extra  9:3 67:11
  87:25 92:9
extract  124:18
eye  75:18

**f**

f  5:14 45:11

facility  15:18
fact  64:8
   103:13 118:21
fairlaw  2:2
fairlawattorn...
   2:4
faithfully  4:16
family  19:20
far  21:4 51:10
   114:7
february  32:3
   33:17,19,20
   67:18,20
federal  7:19,21
   7:23 8:1,5,7
   39:23 48:13
   49:6,8 55:7
   119:1,11
fee  60:7,10,15
fellow  53:7
   107:6
female  108:19
fernandez  5:14
   5:19,21,23,25
ff158527
   129:17
figueroa  53:6
filed  2:19 7:15
   7:23 8:16 11:8
   31:9 57:10,13
   57:16 59:2,4
   88:25 94:11
   105:13 106:8
   107:9 108:4

filing  57:21
filled  92:3
fincantieri  45:8
   45:11,20 46:6
   47:15,16 59:22
   126:17,25
   127:3,5,10
fincantieri's
   47:21 127:2,7
find  65:15
   88:11 95:11
finds  108:11,21
fine  5:3 16:10
   69:21 70:3
finish  34:16
   66:12 86:1,2
   86:25 87:21
   90:3,24 122:11
finished  17:21
   17:24 27:13,15
   39:24 87:23
   90:9,18
finishing  68:13
   87:25
fire  31:7 59:8
   69:15 79:14
   114:12
fired  28:6 31:6
   31:11 32:8,11
   35:5 58:10
   59:2,3,14 60:3
   79:16 89:6
   96:12 98:7,13
   99:1 108:12

109:16 111:22
   112:3 117:4,8
   119:14,18,19
   119:24 120:11
firm  2:2 60:25
first  3:7 5:25
   6:6 11:7 13:21
   16:16 17:22,23
   18:4 20:5
   21:19 22:7
   23:3 25:5
   27:12,13,15
   30:21 35:16
   36:22 38:12
   44:6,7,14 47:7
   47:23 48:1
   61:2 63:13
   68:21 74:7,8
   81:7 85:5,9
   89:19 99:11
   101:23 129:6
fisher  51:11
five  40:24
   49:20,23 67:11
   68:10,18 76:15
flagler  31:3
fleitas  37:7
   38:10 42:12
   43:17 62:25
   66:7 69:8
   115:10 117:4
   118:1
florida  1:1,12
   2:3,7 12:3 13:6

30:1 57:12
   129:2,5,13,17
fluency  52:8
fluent  52:5
folder  8:15
   9:12 10:11,20
follow  11:12,13
   100:25 115:4
   124:1
following  41:25
   43:6 61:21
   72:8 82:2
   90:20 92:10
   114:17
follows  4:22
foreman  2:22
   8:20,23 9:7
   19:6 22:19
   24:4,8 26:3,19
   26:25 29:7
   32:13 38:18
   43:24 51:2,11
   59:21 62:13
   70:17 72:5
   75:15 79:18
   83:25 85:14
   101:13 103:10
   117:18 125:10
foreman's
   76:10
foremen  9:5
   37:24 42:16
   48:7 50:2
   51:13 71:1,3

76:9 95:3
115:19 116:3
**form** 6:20,20
50:17 75:11
83:6 110:15,22
113:7 117:9
**forth** 39:3
**forward** 9:23
**found** 89:2
**four** 13:16
15:10 30:22
68:1,2 106:21
111:9 126:4
**francisco** 107:6
109:5,17
**free** 34:15
**freedom** 26:2
34:23
**friday** 43:20,21
43:21 44:2
**friends** 104:21
106:3,17 107:5
107:23 108:1
108:22
**front** 10:4
50:12 52:25
77:7 116:2
117:13 118:6
120:6
**fuentes** 2:9 4:2
**fulfill** 27:19
**full** 5:4 34:21
**further** 85:15
123:25 128:16

128:17 129:10
**future** 95:10

**g**

**g** 18:25 20:8
78:23 102:24
122:24,24
**gables** 2:3
**gala** 20:8,10
**game** 26:7
**gang** 122:21
123:4
**garage** 126:21
**gathered** 7:12
11:16
**ged** 15:24
**general** 45:15
53:12 59:20
94:15 102:4
113:11,12
**gentlemen** 44:1
**getting** 9:8
66:13 67:12,14
85:3 89:7
95:25 104:13
119:3 124:23
**give** 30:9 42:7
46:8,13,21
47:9,10,12
61:2 63:10,16
68:6 75:21,25
76:22,24 98:20
101:21 108:7

**given** 4:17
29:25 42:12
46:25 47:21
129:9
**gives** 34:4
**giving** 28:1
53:4
**go** 5:20 8:9
20:24 23:19
34:7,21,22
37:24 38:2,8
41:2 56:17
68:24 78:1,6,9
78:21 80:4
84:20 90:19
95:25 100:3,10
103:7 104:18
109:20 122:4
124:17 126:19
126:20,21
127:3
**going** 4:9 6:9
6:15 11:3,12
41:3 43:22
55:15,21,22
56:9 57:1 61:4
64:14 69:15,24
71:11,16,20,21
73:23 79:24
80:5 84:3,7,14
89:9 97:24
98:20 99:3
100:3 101:21
104:16 108:12

111:16 116:17
119:5 121:6,21
121:22,23
126:1 128:18
128:20
**gomez** 15:16,16
15:21
**gonzalez** 31:9
43:7,14,23
44:16 48:3
51:16 59:25
66:6 67:6
72:24 73:19
74:9 75:4 77:8
89:2 94:18
96:6 102:10
103:22 108:13
114:10 115:10
116:18 117:3
117:22 120:2
123:7
**gonzalez's**
103:22 118:6
123:2
**good** 4:1,11,13
4:25 5:1 37:12
39:22 55:6
62:22
**gotten** 24:7
76:5
**government**
22:5 31:21
32:2,24 33:13
101:15 105:19

[great - hours]

**great** 48:19
123:25
**ground** 6:7
**group** 55:4
119:17,19
**grow** 26:3 28:2
**growing** 27:23
**guess** 72:8
111:7
**gustavo** 1:5,21
2:14 4:4,5,12
4:19 5:6,21,23
85:10 108:14
129:6
**guy** 120:9

**h**

**h** 5:7
**half** 9:4,5 48:8
62:17 67:13
83:2 115:20
125:23 126:12
127:23
**halfway** 112:17
**hand** 129:13
**handbook** 2:24
3:3 63:10,12
63:25 64:2,12
64:13,15,23
78:9 87:13
**handbooks**
64:10
**handed** 65:2

**handwriting**
86:10 87:14
88:15
**hang** 102:7
**happen** 55:22
95:10,11
**happened** 11:8
11:13,15 20:16
27:16 55:24
77:1 89:1
95:10 117:14
**happening**
69:14
**happens** 11:10
77:23
**hard** 16:5
**head** 6:11
83:19
**health** 100:20
101:4
**hear** 6:20 95:23
101:4
**heard** 51:9
56:12
**held** 95:8,12
116:6 118:5
**help** 40:25
55:12 58:7
69:19 70:1
85:4
**helped** 58:7
**helping** 58:8
**henry** 104:23
105:3

**hereinabove**
129:7,10
**hermanos**
15:16
**hernandez** 1:5
1:21 2:14 4:4,5
4:12,19 5:6,21
5:23,25 41:8
64:18 85:10
115:9 124:5
129:6
**herrera** 43:24
44:7 96:7,7
**hey** 68:25 78:7
**high** 15:23
16:18 17:3
54:14 122:1
123:8
**higher** 119:3
**highest** 14:19
**hire** 106:1
**hired** 58:6
**history** 3:4
81:3
**hold** 19:5 26:20
60:13 89:5
116:5 117:6,23
**home** 12:6
95:25 96:10
119:6,7 125:21
126:21
**homeowner**
12:5

**hopefully** 8:9
**hour** 8:24 9:6,7
18:13,15 22:24
23:1 25:16,18
25:23,24 26:22
26:23 28:4
33:4 34:11,12
34:21 35:17
36:25 37:2
48:8,14 62:20
62:23 77:16
84:12 87:2,25
92:8,9 109:25
115:20 119:10
119:12 125:22
126:12 127:23
**hourly** 62:19
**hours** 9:4,5,8
24:17,18 33:5
33:7 34:13,14
34:17 58:22,24
58:25 65:20
66:4,13 67:8
67:12,12,14,14
69:1 70:3
76:19 80:20
81:16,21,24
82:5,9,11,14,16
82:18,20,24
83:2 87:10
88:12 109:23
111:3,9,19
116:13,15
118:13,18

124:7,10,19
126:18,22
**house**   125:11
126:7,11,14,17
126:24 127:4
127:10,22
**hugo**   119:22
**huh**   6:11 65:9
**human**   59:11
**humberto**   53:6
53:11
**humiliated**
96:6
**humiliating**
53:4
**hypower**   1:8
4:5,14 7:12
28:9,10,13,18
28:22 29:2,5,8
29:18 31:4
32:4,8,11
33:23 34:2
35:22 36:1,12
36:18 38:3,4,6
38:7,9 39:15
39:17 42:14
45:13,18 49:1
49:5 55:4,13
56:17,19,24
59:4,6,12
60:17 61:16,17
63:8,10,15
64:6 65:17
66:17 68:11,22

68:23 69:14
71:21 72:15
73:4 74:3,14
80:12 81:2,4,4
81:9,12 83:14
83:16 85:8
86:16 88:2
89:2,20,22
90:13,19,21
91:10 92:10,15
93:3 94:9,13
95:3,7,18
96:13 97:19
98:6,14 99:25
102:4,4,6
105:11,16
106:9 107:4,10
107:19 108:2
108:11,21
109:3,6,14
110:3,8 113:6
116:14 118:11
118:25 119:2
120:10,23
122:20 124:8
124:10,17,20
128:12
**hypower's**   59:8
98:24 102:5,24
117:16

**i**

**i.d.**   2:18 3:2

**idea**   58:3,4
**identification**
5:17 57:4 61:7
62:5 63:21
64:20 80:2
84:17 89:15
99:7
**illegible**   92:25
93:10,14
**imitate**   91:7
**immediately**
65:16 78:18
**immigration**
22:2
**impair**   7:5
**impossible**
53:22,24 91:2
92:22 93:1
**inappropriate**
98:10
**including**   9:25
127:25
**increase**   25:19
27:14 28:1
62:24
**increased**
62:22
**independent**
35:11
**individual**   78:5
103:20 117:7
118:11
**individuals**
50:24 51:21

53:10 109:1
**influence**   7:4
**information**
7:11 42:7,12
46:22,24 47:11
101:24 116:24
124:16,18
**informed**   94:10
**informing**
94:16
**inside**   118:2
122:19
**inspector**   17:1
29:24 30:8
31:24 33:2
34:4
**inspector's**
30:11 101:20
**inspectors**   8:17
31:23,23 34:8
**installations**
18:5,13 21:6
45:19
**instance**   74:21
**instruments**
71:22
**insult**   53:13
54:1 117:20
**insulted**   96:9
117:13
**insulting**   97:17
**intelligent**
11:20

**[interact - kind]**                                                          Page 16

**interact** 37:8
42:19 49:12
**interested**
129:11
**international**
37:17 101:8
**internet** 16:9
100:8 101:1
**interpret** 4:16
**interpreter**
2:10 4:9,21
10:13 16:4,5,8
16:11 18:25
19:3,18,25
28:19 40:24
45:5,5 65:3
90:8 91:12
104:12,15
111:11
**interrogatories**
3:8 99:11
112:15
**interrogatory**
101:22
**interview** 27:20
29:8 101:2
**investigated**
59:9
**investigator**
11:10,10
**investigators**
8:18 10:25
**involved** 35:14

**involvement**
114:8
**ipad** 75:12,13
75:14 76:22,25
**irregularities**
59:23
**island** 46:10
**issue** 66:23
68:16
**issues** 37:14
50:5 97:15
**items** 95:15
**ivan** 59:17,25
79:17,23 98:19
113:22 114:3,9
118:14 123:7
**ivan's** 118:16

**j**

**j** 19:3
**jackson** 100:20
101:4
**january** 6:4
14:11 21:21
57:11,16 82:20
94:3,5 96:14
113:23 114:22
129:14
**jem** 1:3
**jillian** 2:6 4:13
**jillian.strasser**
2:7
**jo** 129:4,16

**job** 1:25 9:22
17:23 18:19,20
19:7 20:5,24
21:19 26:1
27:20 29:5,16
32:10 35:24
36:11,15 38:12
39:23,24 43:16
48:19 52:10
53:2 66:12
77:25 89:20,22
96:11,12 98:16
100:6 101:2,7
101:16,21
103:12,15
122:2
**jobs** 34:1 71:18
71:19 108:21
120:7 121:21
121:23
**jobsite** 44:19
44:25 45:1
50:25 71:15,23
76:2,6 78:2
83:20 97:2
115:11 116:20
119:15 120:15
120:17 125:9
**jobsites** 36:19
128:13
**johnson** 39:21
40:7,17,18,19
40:20 41:15
42:20 43:10

53:21 55:25
56:10,19 59:18
99:1 101:23
102:3,11,20
103:4,14
114:11
**jorge** 106:18
**jose** 17:18
109:5,17
**josef** 16:13
17:3
**joseph** 16:11
**journeyman**
16:20,22,24
24:9 30:24
**journeyman's**
23:5 24:7,24
25:2,7 29:19
**juan** 108:16,17
**judge** 11:17
**july** 64:2,23

**k**

**k** 48:24 49:3
**keep** 72:11
**kept** 72:10
122:15 123:1
**kevin** 53:8
119:21
**key** 125:4,8
**kind** 8:6 15:17
34:6,15 35:11
53:3 54:1 70:5
72:4,16 83:20

**[kind - listed]**

91:5 121:25
122:1
**kinds** 95:23
**kissane** 2:5
**knew** 36:1
42:15 43:25
94:19 98:1
107:3 114:1
**know** 6:14,15
6:19 8:4 11:21
13:9 35:24
36:2,7 40:19
43:11 49:10
50:20 54:2
57:7 58:2,13
60:15 61:9,19
63:23 69:14,23
91:1,11 92:2
95:6 97:22,24
99:19 100:2,16
101:1 103:25
106:2 107:3,22
109:1 112:22
112:25 114:7
114:14,16
115:6 118:8,20
120:16 122:25
128:6
**knowing** 85:3
**knowledge**
34:7 102:3
**known** 36:6
**knows** 105:11
108:24 109:11

**l**

**l** 20:8 22:11,23
36:5 103:20
**labor** 8:17 9:14
9:20 10:17,24
11:1,9,14 72:2
72:5
**lack** 113:16
**lacks** 116:7
**ladder** 121:24
**lady** 29:9 69:4
**lago** 108:16
**laid** 20:19,21
**lakes** 36:23
37:3,9,16,19
38:1,8,12,17
39:20,24 40:8
40:15 41:13,20
41:23 42:2,8
42:10 43:17
48:10,15,19
67:2,17 70:23
80:19 107:15
116:7,10 117:4
117:24 119:8,9
120:15 122:16
122:17 125:12
125:18,19
126:8,9,10
128:13
**lakeview** 2:6
**language** 51:20
90:7

**laptop** 75:14
**large** 129:5
**larger** 42:1
**larou** 2:2,15
4:11,11 10:2
11:6 83:6
86:14 108:9
110:15,22
113:7 115:4,8
117:15 122:23
122:25 123:25
124:5 128:9,11
128:16,19
**larou's** 60:25
**late** 74:21
128:4
**latest** 75:7
**laundry** 95:19
**law** 49:8 94:21
111:21
**lawsuit** 35:15
57:21 88:25
94:11,12
101:24 105:5,9
105:13 106:8
106:22 107:9
108:4 109:10
**lazy** 53:15
**learn** 28:10
**leave** 19:14
20:14 23:14
25:25 27:11
51:15 79:19
90:10 92:11

103:12
**leaves** 78:25
111:22
**leaving** 96:25
**left** 17:24 25:22
26:13,14 28:3
28:7 31:4
39:19 51:16
68:10 126:19
**legal** 4:3
**letting** 103:7
**level** 8:5 14:19
54:14
**license** 14:22
14:24 16:20
23:5 24:8,10
24:13,20,24
25:3,7 29:19
29:23 30:2,8
30:10 101:20
**licenses** 14:25
16:23 29:21
**lift** 121:24
**lily** 29:9
**linda** 2:10 4:15
**lino** 106:4,6
**list** 103:19
106:3,14,24
107:12,24,25
**listed** 99:23
100:5,21 101:7
101:23 102:23
104:7 112:17

**[listings - marked]** Page 18

listings   101:8
little   11:24
   20:17,17 31:12
   37:25 45:3
   52:6 66:16
   90:7 94:23
   117:7 122:19
   124:5 125:18
live   12:21 13:3
   13:15,17,24
   14:2
lived   12:4
   13:25 17:12
living   13:21
llc   1:8 4:5,14
located   37:16
locked   125:1
lodged   94:13
   94:17
log   89:25
logged   83:5
   90:16
logic   72:8
logistics   121:21
long   12:4,14
   13:15 14:12
   19:12 20:12
   21:7 23:10,25
   26:11 32:2,21
   54:23 67:16
   114:23 122:7
   123:23 125:11
   125:20 126:10
   126:14,16,23

127:1,9,21
longer   108:4
   109:3
look   11:6,19
   16:8 57:6 65:1
   69:14,18,23
   71:17 81:14
   86:9 87:13
   90:13 91:9
   92:15 93:2,11
   99:12,18
   101:22 110:4
   112:14 113:15
   121:5,8
looking   65:10
   78:22 84:22
   89:21 106:1
looks   10:20
   63:25 64:24
   81:15
lopez   59:17,25
   79:18,23 98:19
   114:9 118:14
   123:7
lorenzo   2:3
lose   108:21
lot   27:25 34:5,7
   34:23 47:22
   76:9 88:11
   108:1 123:11
   127:6,10,13,16
   127:17,22
lots   127:5

lower   103:11
luaces   59:20
   114:11 120:5
luis   108:16
   109:5
lunch   34:22

**m**

m   12:11 19:3
   26:8 36:5
made   17:15
   27:19 47:17
   54:10 59:12
   72:15 77:23
madrid   13:25
   19:20,25 20:1
   20:4
mail   38:21
   56:10 59:15
   60:2 61:16,23
   79:20 94:13
   95:4 97:18
   98:14 110:16
   110:17 114:13
   120:12
mails   9:13 10:4
   10:6,17
maintenance
   100:24
majority   52:14
make   11:4
   18:12 19:7
   20:9 21:12
   22:24 26:22

34:11 36:25
   47:20 55:7
   69:25 73:7
   75:10 84:22
   88:7 115:5
   119:10 125:15
making   18:17
   19:10 21:14
   25:16,18,23
   28:4 33:3
   48:14 50:11
   59:11 70:8
   95:2 119:12
man   26:7 32:19
manager   14:16
   59:16 79:17,23
   94:15 98:19
   113:25 118:14
   118:15
mandatory
   69:25
manual   65:4
march   54:3
mario   59:20
   114:11 120:5
mark   61:5 62:3
   63:18 64:15
   79:25 84:15
   87:9 89:12
   99:4
marked   57:4
   60:5 61:7 62:5
   63:4,21 64:20
   80:2 81:2

[marked - morning]                                      Page 19

84:17,25 85:5
87:16 89:15
99:7 109:21
110:2,10
112:14
**marking**  37:2
**married**  12:12
12:15,18 14:12
**martinez**  35:1
46:25
**match**  68:25
**materials**  69:20
71:20 83:16
84:5,8,9,11
120:18 121:18
121:25 122:21
123:6
**math**  122:10
**matter**  4:5 49:4
58:10 59:1,9
68:19 103:15
**maximum**  79:3
123:24
**mean**  5:16 18:9
44:9 58:20
75:6 113:12
124:11
**means**  58:2,3,4
58:14 85:13
**meba**  18:5,13
**media**  41:7
80:10 126:4
**medicaid**  14:16

**medication**  7:5
**meet**  38:23
47:8,9 96:23
97:1
**meeting**  76:5
94:2,8,9,25
95:5,6,8,14,17
96:17,19,20,20
96:21 97:1,9
97:24 114:10
114:14
**meetings**  83:15
89:5 95:12,13
108:13 115:24
116:1,2,5,5,6
116:24 117:1
117:23 118:5
122:13
**meisner**  32:7
32:10,12,14,21
33:3,5,6,13
35:4
**mentally**  7:1
**mentioned**  9:2
10:1 59:24
**message**  42:24
53:21 103:13
103:14
**messages**  39:2
39:5,10,13,14
**met**  77:4,6
**miami**  1:2,12
10:24 12:2
13:7 14:18

16:19 21:18
24:11 25:8
29:25 31:1,2
31:21,25 37:17
37:18 40:5,6
46:5 100:5,10
100:13,19
123:13 129:13
**mid**  34:22
**middle**  5:8
33:17,20
**mine**  42:16
85:25 92:7
104:21 108:1
108:22
**minute**  40:25
104:16 127:12
**minutes**  37:24
54:24 66:14
84:13 122:8
123:24 125:13
125:16,17,20
126:7,9 127:11
127:16,20
**misspoke**  41:19
127:8
**mistake**  77:23
**mistaken**  103:8
**mistreatment**
103:23
**misunderstan...**
74:11
**moment**  91:23
119:13 122:4

124:16
**monday**  25:14
41:25 43:6,11
77:16,18
**mondays**  116:8
**money**  23:15
23:20 27:25
58:8 60:16
70:9 103:16
112:9
**montajes**  18:21
**month**  18:17
20:9,11 21:12
28:23 30:4,5
30:22 33:17,22
52:25 53:18
54:3 61:12,25
68:2 105:15
**monthly**  19:9
19:10
**months**  8:16
26:12 30:9
32:22 39:25
42:21 67:21,22
67:23 68:10,18
68:21 92:23
101:19 106:7
106:21 107:8
109:9
**morning**  4:1,11
4:13,25 5:1,2
7:8 8:13 9:6
31:19 34:16
37:20 38:18

44:15 48:7
51:13,14 69:16
69:19,22 70:8
70:20 71:8,14
73:12,24,25
74:1,10,18
76:4,8 77:1,2,2
77:7 89:4,8
90:25 92:7
93:23,24 96:2
96:5,22 98:7
108:5 115:19
116:7 117:12
117:19 119:5
120:1,7 121:18
122:2 123:16
124:23 125:13
125:15,16
127:11,25
128:4
**mornings**  9:3
**mouth**  50:14
**move**  21:17
54:6 89:9
**moved**  17:9
19:20,24 21:9
21:16 22:7
39:19 56:8
**movement**  42:8
**moving**  9:23
35:10 40:8
41:13,21
**msc**  40:3,8
41:13,16,21

42:1,8 43:3,5
45:21 46:2
47:25 48:5,12
48:13 49:11,15
52:15 54:19
67:3 89:20,23
103:12 107:17
109:2 117:10
118:5 119:14
120:15 123:1
123:11 126:14
127:13,16
128:5,13

**n**

**n**  1:19 2:12 5:7
5:7 12:11,11
19:3 22:23
26:8 45:11,11
103:20 122:24
**name**  4:2 5:4,6
5:8,10,20 12:8
16:6 18:3
22:20,22 27:4
27:5 28:25
29:9 32:15,18
32:20 34:25
37:6 40:20
51:11 53:7
59:17,22 69:6
85:9 119:15
121:3,10
**named**  119:21
119:22

**names**  10:24
36:8 104:10
108:7 109:4
**nationality**
102:17
**necessary**
11:18 121:14
121:19
**need**  6:18 38:7
39:25 47:8
56:8 71:19,20
71:21 84:4,7
108:19 121:2,6
121:24 122:1
123:16
**needed**  16:17
28:2 38:8 40:1
41:16 43:5,8
44:16 71:24
72:7 83:17
98:16 120:18
122:5
**needs**  45:5
**neither**  129:11
**never**  7:17,18
11:7,13 27:7
27:16 31:17
37:15 39:16
51:9,12 58:9
59:9 66:1 70:5
73:2,13,15
75:4 80:25
87:6 100:9,11
100:14 102:20

112:2 117:4,5
127:3
**new**  18:19,20
40:3,9 115:6
122:18 125:25
**nine**  67:22,23
68:1 77:16
**nod**  6:10
**noel**  27:4
**noon**  90:18
**normal**  33:7
34:6
**normally**  38:23
39:1 45:1
**notary**  129:4
129:17
**note**  72:15 88:7
**noted**  66:3
88:13
**notice**  1:23
129:5
**noticed**  66:1
**notion**  58:5
**november**  82:8
**number**  38:15
39:18 47:18
60:15 65:4,5
71:18 84:20
89:23 97:9
124:19
**numbers**  10:22
10:25 85:1

[o - paid]

**o**

**o** 1:18,19,19
12:11,11,11
18:25 19:3
22:11 36:5
122:24
**object** 6:19
**objection** 108:9
**obtain** 14:10
**obtained** 23:4
**obvious** 91:8
**occasions** 42:25
59:25 67:5
96:11 113:18
113:19
**occurred** 57:21
58:16
**occurring**
102:25
**october** 17:11
82:4,6
**offend** 113:21
**offer** 2:20,22
61:18,21
101:16
**offered** 23:15
23:20 26:1,2
36:11,15
**offers** 101:11
**office** 9:16
28:13,18,22
38:3,3,4 39:6
39:10,11,12

54:10,16 118:1
126:25
**offices** 21:25
27:24 47:16
123:7 127:2,7
**official** 34:25
35:2,3 129:13
**okay** 6:2,8,12
6:17,23 11:4
11:23 41:8
44:15 58:21
62:18 65:12
66:21 68:5
70:21 76:16
81:14 82:8
90:12 92:16
95:8 99:18
105:2 122:3
125:22 127:19
**old** 53:8
**older** 53:9
**olson** 129:4,16
**once** 11:19
27:12 47:7,8
61:13 67:5
68:7,15 69:9
77:20 83:20
95:8 96:10
115:14
**ones** 58:6 69:18
69:21 70:2
104:22 108:3
**online** 30:17
100:8 110:9

**open** 11:13
118:3,7
**opportunity**
26:3
**option** 46:13,16
**options** 46:8
**order** 28:2
50:15
**organize** 71:16
83:16
**outside** 49:25
50:24 113:6
118:2,3,3
**overall** 58:12
**overpayment**
65:17
**overtime** 8:25
34:19 80:12,18
80:22,23 83:5
83:12 87:10,25
88:5,12 92:8
110:1 111:11
**owes** 60:17
**own** 12:6 13:1
13:11 21:7
33:8 46:12
47:24 74:25
76:19 85:1
**owner** 59:19
94:14

**p**

**p** 1:18,19 12:11
22:23 26:8

**p.a.** 2:5
**p.m.** 25:15 80:6
80:7,10 86:2
88:4 90:3
126:2 128:21
128:24
**pac** 26:7
**pacman** 26:6,8
26:9,17,24
27:9,11 28:3
**pads** 75:18
**page** 8:10
57:10,19 62:17
63:3 65:1,5,6
78:21 82:23
85:4,5 86:9,10
87:13,14 88:15
88:16 90:20
92:10 99:10,13
99:16 100:20
102:22 103:19
104:24,25
105:1 106:4
110:25 112:16
112:18
**pages** 64:6
84:20 91:9
93:2
**paid** 7:17 8:23
8:24,25 9:7,8
18:14,15 35:17
58:9,24 60:24
66:13 67:8,12
67:14 78:22

**[paid - plaintiff's]**

79:2,2,11
80:21 81:17,25
82:5,9,11,24
83:1,4,9
109:14,23
111:3,4,24
118:10,12,17
118:21 119:3
**palm** 2:7
**palmer** 36:22
37:3,9,16,19
38:1,8,12,17
39:20,24 40:8
40:15 41:13,19
41:23 42:2,8
42:10 43:17
48:10,15,19
67:2,16 70:23
80:18 107:15
116:7,10 117:3
117:24 119:8,9
120:15 122:15
122:17 125:12
125:17,19
126:7,9,10
128:13
**paper** 75:25,25
**papers** 8:12
**paragraph**
57:19 58:14,20
60:5 78:10,13
78:24 111:1
**park** 44:9,20
46:2,4,4,11,18

47:11,13,19,21
123:11
**parked** 47:25
**parking** 44:10
44:13,18,24
45:2,3,8,21
46:10 47:19,22
98:22 123:11
126:19,20
127:5,6,10,13
127:16,22
**parole** 22:2
**particular** 97:8
97:8
**parties** 129:11
**pass** 24:14 25:5
25:9 30:11,21
**passed** 25:6
30:13,23 61:14
**patrick** 2:2
**paul** 59:19
**pay** 25:19 34:9
46:12,14 48:12
60:7 62:19
65:14 66:23
94:21
**paychecks**
65:23
**paying** 66:3
103:12
**payment** 7:18
65:13,20
**payroll** 48:22
65:16 88:12

116:16 124:10
**pedro** 35:1 53:7
**people** 10:22
27:8,10 46:17
49:23 55:3
59:15 69:16
70:12 71:14,19
97:7,10,11,12
104:7 106:1
108:6,12,21
**percentage**
60:16
**perez** 108:16
**perfectly** 52:11
**performing**
120:14
**period** 7:18
30:10 61:12,14
**permit** 21:22
22:3
**person** 6:9
10:23 11:2
24:15 25:13
27:3 29:11,14
30:16 37:12
38:22,24 39:1
40:13 52:8,11
53:25 54:8
56:1 77:24
101:24 111:24
114:14 119:16
120:25 121:2,3
**personal** 39:16
39:18 104:21

106:3,17 107:5
107:23 108:1
129:8
**personally**
31:24
**phase** 85:12,13
**phone** 10:22,25
11:2 19:16
29:15 38:14,21
38:25 39:15
42:23,24 43:1
47:1 98:20,23
102:24 103:14
108:14
**photocopy**
47:17
**physical** 63:16
72:2,5 83:20
**physically** 73:8
74:20
**piece** 75:24
**pieces** 75:25
**pipes** 84:9
**place** 35:19
50:19 96:23,25
97:3 129:10
**placed** 38:1
**places** 46:11
**plaintiff** 1:6 2:4
4:12 57:22
60:6 111:2
**plaintiff's** 3:7
99:10

[plan - project]                                                        Page 23

**plan**   31:23 33:2
34:4,8 48:23
49:6,6 120:17
121:18
**planning**   83:19
84:3
**plasencia**   22:21
**please**   4:7 5:4
6:14,18 10:9
12:10 18:24
19:16 22:10
42:17 44:23
57:8 78:21
79:20 93:3
98:20 104:12
109:21
**pleased**   42:11
42:17 61:14,20
**plus**   109:25
**pockets**   46:12
**point**   24:6
27:18,23 29:16
31:4 34:12
39:19 40:21,22
40:25 50:8
52:19 53:20
54:5 74:2 76:6
77:6 98:2
103:9 105:10
106:13
**policy**   2:23
63:24 65:19
78:22 79:7

**pollock**   60:12
60:14
**pompano**   103:8
**port**   8:19 40:3
40:4,6,11
43:22 44:20
45:2,24 46:4,9
46:10,18 59:16
59:21 73:14,15
73:17 74:7
79:17 89:7
96:4 104:6
108:2,18
117:10,11
118:15 119:11
123:13 125:17
**posed**   4:16
**position**   19:4
24:3 26:17
29:6 33:19
62:13 100:24
101:3,15
**positions**   33:1
36:9 100:8
101:13
**positive**   42:12
**possibility**
103:6
**possible**   42:13
47:7 65:18
95:9
**powered**   122:1
123:8

**powers**   97:19
**practically**
37:18 55:7
**practices**   94:18
97:16
**precedent**
57:20 58:16
**precisely**   55:5
**preparation**
83:15
**prepare**   7:9,10
**prepares**   25:7
**present**   2:9
97:12
**presented**   7:25
8:5
**president**   40:22
59:18 94:14
**prior**   13:3
33:19 38:11
81:10 84:1
88:10
**problem**   66:9
69:22 70:5
102:18
**process**   34:6
**produce**   55:16
**produced**   9:15
39:5,11 42:18
**production**
54:14
**professional**
14:22

**professor**   30:25
**project**   8:18,19
22:19 26:25
27:7,13,15
33:10,11 37:1
37:10,13,16
38:25 39:20,22
40:1,2,3,9,15
41:16,20,21,22
42:1,1,22 43:4
43:6,13,16,25
44:11 45:16,21
45:21 46:2,3
46:18 47:10,23
47:25 48:5,10
48:13 49:11
50:2 51:1,2,7
52:15,24 53:18
53:24,25 54:6
54:7,18 55:3,7
55:8,25 56:5
56:15 59:16,21
67:3,3 68:12
75:5 79:17,19
79:20,23 80:15
89:7 90:10
94:10,15,16
96:1,13 97:13
98:1,3,19
103:7,22 104:6
108:2,18 109:2
113:4,25
115:23 116:3,7
116:10 117:3

**[project - received]**                                                    Page 24

117:10,24
118:5,14,15,15
119:2,8,9,11,23
119:24 122:16
122:17 123:1
123:11 125:6
125:17 126:19
**projects** 27:25
36:21 51:4
103:5 121:4
124:25
**promise** 115:5
**promises** 27:19
**promotion**
48:15
**proper** 8:20
**properties** 13:1
**prove** 16:17
**proved** 27:13
**provide** 6:10
31:22 98:21
**provided** 45:23
62:24
**pto** 79:2 111:10
111:11,16
**public** 100:13
100:17 129:4
**publicly** 117:20
**puerto** 50:23
**purpose** 94:7
94:24 95:6,14
**purposes** 85:3
**pursuant** 1:23
129:5

**put** 10:14 73:11
74:10,16,17
75:4,8 76:24
76:25 83:10
85:1,14 86:6,7
86:20,23,25
87:3,24 93:25
100:7 124:16

**q**

**qlm** 29:2,4 38:5
38:6,14 81:11
**qualities** 55:6
**question** 6:16
6:20,21 7:21
44:23 66:10
68:14 71:13
72:23 75:23
89:10 93:18
94:23 102:7
111:12 118:23
128:9
**questioning**
29:14
**questions** 4:16
6:14,24 8:3,8
29:10,12 30:19
52:12 59:10
99:21 115:3
116:18 123:25
124:2 128:16
**quick** 115:5
**quit** 28:6

**r**

**r** 5:7 12:11
18:25 22:11
36:5 45:11
102:24
**raidel** 43:24
44:7,8,12 46:1
46:21 47:1
96:7,7
**raised** 25:21
**rate** 48:12
62:19 119:3
**rather** 53:17
94:12
**raul** 31:9 43:7
43:14,19,23
44:4,15 46:25
47:2,3,5 48:3,4
49:12,22 50:1
50:3,20 51:16
51:17,20 52:19
54:9,9,10
55:11,24 56:7
56:9,12,18
59:25 66:6,23
67:6 72:23
73:19 74:9
75:4 77:8 89:2
94:18 96:6
97:15,17,20
98:15 102:10
103:22 108:13
113:1,6,9

114:4,10,17
115:10 116:18
116:19,23
117:3,22 118:6
118:9,19,21,23
120:2 123:2,7
**raul's** 43:15
**reach** 56:11
**read** 9:11 64:1
79:6 128:18
**reading** 128:22
**really** 8:4 40:19
128:6
**reason** 78:25
79:13 112:1,2
**reasonable**
60:7
**recall** 17:9
23:22 28:17,21
40:8 41:13
42:3 52:23
94:2
**receive** 15:6,12
16:14 17:19
21:23 24:9,12
24:19 25:2,19
30:2 63:12
66:19 80:12,18
80:23 101:11
111:16
**received** 7:18
17:2 33:13
64:11,23,24
65:23 66:17,21

[received - rest]                                          Page 25

68:25 81:16
100:11 110:16
**receiving** 81:10
**recently** 30:6
104:9
**recess** 41:5
80:7
**recognition**
16:2,15 17:2
**recognize** 57:7
61:10 63:24
**recommend**
42:17
**recommended**
9:19
**record** 4:2,8
5:5 10:8 41:2,4
41:7 57:9 63:7
64:5,17 72:14
72:20 73:21
80:4,6,10 99:9
126:2,3 128:21
129:9
**recorded** 73:3
77:18
**recording**
74:24
**records** 78:17
**recover** 58:8
92:8
**recross** 2:14
128:10
**recruit** 105:24
105:25

**red** 86:16
**redirect** 2:14
124:3
**reduced** 129:8
**referred** 57:3
61:6 62:4
63:20 64:19
80:1 84:16
89:14 99:6
**referring** 10:2
59:13 62:8
102:10 110:7
117:16,17
**reflect** 10:8
**regard** 124:21
**regarding** 68:7
**regardless**
111:25
**registered** 5:11
5:15 21:25
**registration**
5:20
**regular** 55:8
103:15 119:9
**related** 65:20
**remaining**
123:8
**remember** 7:6
27:5 28:25
32:15,18,20
42:5 70:17
90:25 92:22
93:22,24
106:10,12

110:17 124:7
**remove** 78:2
**rendered** 60:8
**rent** 13:11
**rented** 13:5,12
13:13,14 45:8
46:5
**repeat** 44:23
**report** 22:18
26:24 32:14
34:24 37:3
38:17 43:3,6
65:15 81:3
116:15
**reported** 32:17
36:19 49:22
76:12
**reporter** 4:9
**reporting**
38:11 44:17
49:14,23 50:1
59:23 76:17
78:10 116:13
124:6,10,11
**request** 104:8
**requested** 22:1
29:5 34:20
98:23 103:21
**required** 23:2
46:4 49:8
71:11 72:11
74:17 75:6
89:3 115:11
116:20 121:25

**requirement**
49:7
**residency** 22:4
**resign** 35:4
**resignation**
79:1
**resigned** 23:17
35:6
**resolve** 102:18
**resources**
59:11
**respect** 111:15
113:17
**respectful**
113:13,20
**respond** 56:9
118:23
**response** 3:7
54:4,25 55:11
55:19 99:10,23
104:8 118:16
**responses**
11:16
**responsibility**
124:9
**responsible**
74:24 76:16
116:12 120:19
120:22 124:6
124:23
**responsive**
89:10
**rest** 51:6 95:12

**[result - send]**                                      Page 26

result   20:15
retained   60:6
  112:4
retrieve   128:13
retrieving
  120:19
returned
  121:12
review   7:13
  57:15 63:10
  65:14 124:12
rico   50:23
ride   123:12,23
  127:13
right   9:11 16:9
  36:11,15 37:18
  39:20 41:17
  45:1 46:13
  52:21 56:18
  57:25 62:13,20
  65:6,7 67:21
  67:24 68:1,4,8
  69:6,10 70:4
  70:16 72:3,12
  73:13 75:19
  77:10 78:19
  79:12 81:11
  82:9,12,16,18
  82:21,24 83:2
  83:5 85:9,12
  85:16,19,21
  86:1,5,19,22
  87:17,19,22
  88:3 89:20,23

  90:17 91:3
  92:13 93:25
  98:22 99:16
  101:9 103:23
  111:4,18
  112:20 113:2
  114:4,18
  116:14 117:25
  118:1 122:18
  127:14 128:2
river   37:18
robert   102:22
  103:6
rooms   122:20
rules   6:7
run   117:3

**s**

s   1:19 19:3
  22:11,11,23
  36:5 102:24
  103:20
safe   121:17
safety   64:12
  94:2,7,24 95:6
  95:8,13,14,15
  95:17 96:17,20
  116:5,6,24
  117:1,23 118:5
salary   18:14,16
  25:21 27:14
  28:1
san   2:3

santamaria
  104:23
santos   106:18
  106:20 107:6
  109:5
satisfied   57:21
saturday   88:6
saturdays
  80:21 83:13
saying   32:25
  50:12 51:24
  52:20 58:7
  72:19 73:16
  85:14 93:22
  96:2 102:11
  103:11 113:15
  117:21 119:1
  124:7
says   61:20
  62:10,13,14,19
  65:5,14 78:16
  78:24 85:12,13
  85:15 86:1
  89:22 91:17
  92:7,11,21
  93:7 111:16
schedule   33:8
  34:15,23 37:19
  37:22 44:10,16
  47:10 48:5
  72:17 73:18
  78:2 83:18
  86:7,24 91:5

scheduled
  103:21
school   15:14,15
  15:23 16:18
  17:3 30:23
  31:2,25 100:13
  100:17
scissor   121:24
scott   2:5
screws   84:10
seal   129:13
second   5:11
  57:6,19 58:10
  59:1 61:3 63:3
  78:10,13 99:13
  117:6,14
section   65:10
  78:23
security   21:3
see   8:12,20
  57:23,24 60:8
  62:15 64:3
  65:13 78:11,14
  78:18 79:4,5
  81:5,19 86:16
  89:19 91:23,25
  92:7 93:1,8,12
  99:25 103:6
  104:10
seen   11:7 99:19
  99:20
send   39:2,9,23
  53:20 56:6
  60:2 79:20

**[send - southwest]**

98:17 103:5
110:8 119:6,6
124:19
**sent** 9:13 11:15
28:14,24 38:7
39:14 55:5
59:14,15,16,17
59:18,20 61:11
61:16,23,23
81:12 94:14
96:10,12 97:19
98:14 103:13
114:12 117:14
**sentence** 78:13
**separate** 84:5
**separated** 51:3
**separation**
99:24
**september**
33:22 81:15,16
81:19,20,22
88:9,16
**sergio** 121:3,13
122:4 124:22
125:4,6 128:14
**series** 11:16
116:17
**serious** 108:20
**services** 31:22
60:7
**set** 3:7 48:25
69:20 99:11
**setting** 95:5

**seven** 71:2,3
**several** 39:25
42:25 59:15,24
67:5 101:18
109:9
**sheet** 121:9
**sheets** 90:14
**shift** 77:16
**shit** 50:13
53:16
**shortly** 62:21
**show** 11:17
43:11 57:1
61:4 62:2
63:18 64:14
67:10 71:4,5
79:24 84:14
88:12 89:12
99:3
**showed** 56:15
70:10 77:15
81:1 109:16
**showing** 113:16
**shown** 84:24
129:7
**shut** 20:17
**sic** 12:22 39:21
**side** 86:9 88:1
90:14 91:10
99:16
**sided** 85:2
**sign** 61:24 75:3
75:9 76:10,23
76:25 96:23,24

110:9
**signature** 63:4
76:21 85:23
86:4 91:3,7,18
92:6,25 93:8
93:10,11,13
99:13,15,17
129:16
**signed** 64:1
75:11 77:9,13
85:8 87:19
88:21 96:1
109:25
**signing** 96:2
128:23
**silence** 19:15
**silent** 10:14
19:18
**silently** 104:19
**silny** 16:13
17:4
**similar** 42:16
48:23 93:13
116:18
**simply** 35:19
59:8
**sir** 4:25 5:8 6:3
12:1 14:20
31:14 35:15
61:10 89:18
104:12
**sit** 31:18 60:24
**site** 54:18 56:15
76:18 98:3

**situation** 35:17
44:18,24 45:2
**six** 26:12 49:21
71:2,3
**slowed** 20:16
**social** 21:3
**soffer** 129:4,16
**solares** 22:9,24
23:12,14
**solicitor** 129:11
**solutions** 4:3
**somebody**
91:21 93:15,19
111:21
**someone's** 78:2
**soon** 17:23
43:18 65:18
**sorry** 9:20
10:12 16:4,12
16:21 20:2
21:15 39:9
58:17 62:1
81:20,20 93:17
**sort** 8:21 34:15
121:24
**sosa** 53:7 109:6
109:8 119:24
120:2
**south** 1:12
**southern** 1:1
57:12
**southwest** 12:2
12:21 13:10

**[space - strasser]**                                                    Page 28

| | | | |
|---|---|---|---|
| **space** 45:9 | **specified** | **stamps** 84:21 | 73:3,25 83:23 |
| 103:9 123:8 | 129:10 | **stands** 17:17 | 96:3,5 |
| **spain** 13:18,19 | **spell** 5:5 12:10 | **start** 17:22 | **state** 4:8 5:4 |
| 17:23,24,25 | 18:23 22:10,22 | 18:19 22:12 | 30:1 129:2,5 |
| 18:14 19:24 | 36:4 45:10 | 26:9 28:11 | 129:13 |
| 20:25 35:12 | **spelling** 122:24 | 29:2 34:15 | **stated** 104:14 |
| **spanish** 10:15 | **spend** 53:16 | 37:23 41:25 | 115:9 118:20 |
| 16:7 19:17 | **spent** 28:1 | 43:22 53:11 | 119:13 120:16 |
| 27:6 32:17 | **spoke** 8:19 | 62:10 70:8 | 122:4 123:10 |
| 38:23 45:7 | 10:23 11:1 | 72:20,25 73:3 | **statement** |
| 51:17,19 67:19 | 38:11,16 43:13 | 73:11,23 74:3 | 67:11 |
| 71:3 81:21 | 43:23 44:7 | 74:12,21 75:7 | **states** 1:1 11:1 |
| 91:24 104:12 | 54:9 56:1 | 85:15,17,18,24 | 12:18 14:23 |
| 106:11 | 60:11 68:19 | 86:18 87:16 | 16:17,23,24 |
| **speak** 39:1 44:1 | 69:4 79:17 | 88:19 89:25 | 17:5,10 21:10 |
| 51:17,20 52:5 | 97:11 98:6 | 90:16 91:13 | 21:16,20 24:23 |
| 52:6,7 54:8 | 102:15,23 | 92:4 93:5,16 | 29:22 35:10 |
| 69:7,7 97:12 | 104:4 106:5 | 96:24 100:14 | 57:11 90:16 |
| 108:12 118:19 | 107:7 109:8 | 104:22 105:22 | 103:20 |
| 121:14 | 113:18 | 122:13 | **stay** 54:7 |
| **speaking** 10:8 | **spoken** 104:20 | **started** 20:25 | **stenographer** |
| 108:14 | **staff** 61:15 | 23:22 25:18 | 10:7 19:1 90:6 |
| **speaks** 6:9 | 68:22 | 26:14 37:2 | 104:13 |
| **special** 17:14 | **staffing** 28:14 | 40:9,10 50:6 | **stick** 90:6 |
| **specific** 66:8 | 28:15,24,25 | 50:11,11,12 | **stop** 109:7 |
| 67:7 95:5 97:2 | 29:3 61:13 | 52:20,25 53:3 | **stopped** 91:16 |
| 109:1 | 63:14,14 68:24 | 63:14 73:17,18 | **store** 122:20 |
| **specifically** | 69:3 81:11,13 | 86:20 88:22,22 | 123:8 |
| 7:13,14 11:21 | **stamp** 65:4,6 | 88:24 90:9,23 | **stored** 123:2 |
| 17:9 34:20 | **stamped** 63:8 | 92:19,23 93:23 | **straps** 84:10 |
| 46:1 47:13 | 64:6,17 81:3 | 101:14,19 | **strasser** 2:6,15 |
| 65:10 78:22 | 86:12,15 88:2 | 128:2 | 4:13,14,24 8:2 |
| 93:22 113:10 | 90:14 | **starting** 41:24 | 10:9,10,16 |
| 126:23 | | 62:14,19 72:24 | 16:10,14 18:23 |

19:4,15,19
20:1 28:21
41:1,8 45:10
57:1,6,9,15
61:4,9 62:2,7
63:7,9,18,23
64:5,10,14,22
65:5,8 79:24
80:4,11 83:8
84:14,19,24
86:12,15 89:9
89:17 90:12
91:13 99:3,9
99:12 104:18
104:24 105:2
108:23 110:20
110:25 111:13
111:15 113:9
115:2 117:9
124:1,4 125:24
126:6 128:7,17
**street** 12:22
31:3 100:16
120:9
**strike** 44:5 61:3
89:9 126:15
**stub** 66:22
**stubs** 65:14
**studied** 15:14
**studies** 24:25
**study** 15:4
**subcontracted**
45:18

**submitted** 97:3
**sued** 109:13
**suggested** 69:7
**suggesting**
93:19,21
**suggestion**
55:20
**suing** 35:22
105:11
**suit** 129:11
**suite** 2:3,6
**summary** 81:3
**summer** 8:16
**superintendant**
32:18
**superintendent**
27:1,6 37:5
42:14 43:16
55:13,14 59:6
77:25 78:1,6
88:7 91:4 96:8
115:10 116:15
125:6
**superintende...**
66:6 73:10
83:14 124:8,9
**supervise** 27:8
**supervision**
129:8
**supervisor**
40:21 59:20
116:9 120:5
**supervisor's**
78:18

**supplied** 45:20
**support** 55:14
**supposed** 71:10
**supposedly**
21:24
**sure** 44:24
47:20 73:7
79:15 84:22
94:1 104:11
128:6
**surname** 5:12
5:13
**surnames** 5:22
**swear** 4:9
**sweetwater**
13:5,7 21:18
22:8
**switched** 61:15
103:15 119:22
**sworn** 4:15,20
129:6
**system** 83:11
100:21 101:5

|  t  |
| --- |

**t** 1:18,19 19:3
45:11
**tablet** 72:15
75:12,13 76:1
76:10 77:5
85:8 98:20,23
**take** 11:3,6,19
34:21 40:24
41:1 46:6,7,19

57:6 66:22
68:7 98:21
99:12 104:11
122:7,8 123:23
125:24 126:15
126:16 127:1,9
127:19,20
**taken** 1:22 41:5
80:8 96:11
103:11 114:22
125:16 129:10
**takes** 126:24
**talk** 31:12
35:21 38:24,25
41:9 42:23
52:9,11 72:10
100:4 103:3
105:7,14
113:15 114:15
120:13 122:4
125:19 126:23
**talked** 69:9
80:14 97:16
100:2 104:8
105:3 106:19
111:9 112:25
**talking** 41:12
43:18 53:16
65:3 84:1
100:17 102:9
110:11 124:15
124:22 126:18
126:21

**[tardy - time]**                                                    Page 30

| | | | |
|---|---|---|---|
| **tardy** 119:5 | **terminated** | 84:4 | 65:11 68:19 |
| **team** 49:17 | 79:10 98:9 | **think** 41:15,19 | 69:17 72:5,10 |
| **technical** 15:10 | 113:23 114:5 | 69:5 74:11 | 72:11,14,20 |
| 15:12 | **terminating** | 80:14 85:4 | 73:3,9,11,21,23 |
| **technician** | 114:8 | 86:14 91:21 | 74:2,3,13,22,25 |
| 15:11,20,23 | **termination** | 93:15 96:15,16 | 75:2,10,22,24 |
| **tell** 8:15 9:23 | 79:1 111:17 | 97:14 107:3 | 76:13,17,20,23 |
| 43:3,8 44:4,12 | 112:1 114:2 | 111:25 | 76:25 77:9,12 |
| 44:16 46:1 | **test** 24:14 | **thinking** 72:9 | 77:17,17 78:10 |
| 47:5,14 48:4 | 30:17 61:12,14 | **third** 78:24 | 78:17,22 79:2 |
| 53:10 55:23 | **testified** 4:21 | 100:5 | 79:11 80:6,10 |
| 60:13 66:8 | 118:8 129:7 | **thought** 24:22 | 80:23 83:5,10 |
| 68:15 69:3,12 | **testify** 112:4 | 48:19 72:7 | 83:15 85:15,17 |
| 88:13 92:6 | 129:6 | 127:4 | 85:18,24 86:1 |
| 97:9 104:19 | **testifying** 7:1 | **thousands** | 86:2,18,25 |
| 105:5,12 106:8 | **testimony** | 125:3 | 87:16,21 88:19 |
| 106:22 107:9 | 41:10 48:9 | **three** 24:18 | 88:20 89:25 |
| 108:3 109:10 | 72:21 73:2 | 51:1 61:12 | 90:3,16,24 |
| 109:12 115:14 | 129:7,9 | 68:21 80:10 | 91:10,13,16 |
| 115:21 116:19 | **text** 38:21 39:2 | 106:21 107:8 | 92:5,23 93:5,9 |
| 117:6 121:1,5 | 39:5,10,13 | 119:17,19 | 93:16,20 96:24 |
| 121:6 | 42:24 53:21 | **thursday** 25:14 | 97:3,7,8,11 |
| **telling** 71:25 | 56:6 | **time** 4:7,7 6:6,9 | 103:9 104:4,11 |
| 95:1 102:15 | **thank** 5:3 6:2 | 6:18 7:16,18 | 105:3 106:5,13 |
| **tells** 6:21 108:8 | 19:19 26:16 | 8:3 9:3 16:5 | 106:19 107:3,7 |
| **temporary** 30:8 | 70:1 127:8 | 23:11 25:20 | 109:8,14 111:3 |
| 30:10 101:20 | 128:8 | 27:18,23 29:18 | 111:5,19,23,23 |
| **ten** 30:8 49:21 | **thanking** 119:2 | 30:21 34:12 | 115:3 116:19 |
| 49:23 114:25 | **thing** 50:14 | 35:16 37:9 | 117:14,24 |
| 122:8 123:24 | 53:12 69:24 | 38:17 40:21,22 | 118:4,10 |
| 127:12,16 | 79:16 108:11 | 41:4,7 43:8 | 121:14 123:16 |
| **terminal** 40:4 | 118:25 119:1 | 47:3 50:16 | 124:12 126:2,5 |
| 89:20 | **things** 11:25 | 51:16 53:20 | 126:19,20 |
| | 50:12 69:20 | 54:5 56:3 58:9 | 127:19 128:12 |

**[time - underpayment]** Page 31

128:21 129:10
**times** 6:19
49:19,20,21
67:4 68:1
76:15 87:3,8
123:20 127:24
**timesheet** 72:16
75:8,9 85:7
88:7
**timesheets** 3:5
3:6 74:13
89:18,23
**title** 18:6 22:16
32:12 35:2
43:15
**titled** 57:10
63:24 65:11
81:2 99:10
**titles** 26:20
**today** 7:2 29:20
35:21 52:13
60:24 66:15
71:18,21 110:4
**today's** 4:6
**together** 11:16
12:16,17 50:7
70:24 76:5
112:11
**told** 11:11
27:12,17 38:2
38:7,9,15,16
39:21,23 40:7
40:13 41:15,20
41:23 42:10,11

43:5 46:3
47:12 48:2,6
48:10,18 50:23
51:12 53:5,22
54:12 55:2,2
55:12,21 56:9
60:18 61:13
67:11 69:13
70:4,11 73:8
73:11 74:9
79:18,20,22
83:14 84:2
96:22 98:5,9
98:12,13,18
101:19 103:14
103:17 104:2
105:9 114:9
115:10,18
118:19 120:2,6
120:10 124:5
**tony** 22:21 23:6
23:10
**took** 25:10
84:12 114:20
125:20 126:6
**tool** 121:8,9
**tools** 69:20
71:22 83:16
120:18,19,23
121:1,2,7,11,15
121:19 122:1,5
122:9,11,15,21
123:1,9 124:21
124:23 125:1,2

125:5,7,8
128:14
**top** 62:17 63:24
89:22 99:15
**total** 124:19
**totally** 70:24
**toward** 102:5,9
**towards** 26:10
103:23
**town** 114:17
**traffic** 126:13
127:18
**trailer** 54:18
77:7 118:6
121:12 123:3
125:1
**trailers** 123:5
**transmitted**
95:3
**treat** 102:14
**treated** 51:8
102:12,20
113:1
**treating** 113:16
**treatment** 51:5
51:6 53:3
68:11 102:5,8
102:19
**tried** 54:11
**true** 33:9 50:17
53:19 87:7
91:1 129:9
**truly** 4:15

**truth** 129:7
**try** 25:5 47:6
**trying** 111:7
**tuesday** 1:13
77:15,17
**turn** 10:14
**two** 7:14 8:17
10:6,17,21
16:22 30:10,11
32:22 36:19,20
51:2 56:1,14
58:17 64:6
73:10 119:22
123:5 126:18
126:21
**types** 84:11
**typewriting**
129:8
**typically** 80:15

**u**

**u** 18:25 36:5
**u.s.** 2:19 5:18
8:17 9:14,20
10:17 11:9,14
14:8 22:5
**uh** 6:11 65:9
**under** 7:4
61:12 62:13
65:13 78:10,23
111:1 112:17
125:16 129:8
**underpayment**
65:17

**undersigned**
60:6
**understand**
6:13 7:17 9:9
28:19 51:23
52:1,9,12
58:12 66:15
73:7 75:23
79:9,15 87:12
93:17 97:23
111:7,18,20,21
**understanding**
6:16 7:20,24
8:10,11 16:5
16:11 23:7
33:18 38:13
47:20 65:19
**understood**
6:15 11:19
34:24 45:20
64:1 79:6,10
90:12 94:19
108:23 124:21
**unfair** 102:19
**unfairly** 102:12
102:13,14
**unintelligible**
104:17
**union** 101:10
**united** 1:1
10:25 12:18
14:23 16:17,23
16:24 17:4,10
21:9,16,20

24:23 29:22
35:10 57:11
**universitario**
17:18
**university** 15:4
15:5,6,10,19
**unjust** 102:19
**unpaid** 111:8
**unused** 79:2
111:3
**ups** 115:4
**use** 5:21 84:9
**used** 39:16 77:7
123:8
**usually** 84:9

**v**

**v** 1:18
**vacation** 97:23
97:25 111:5,19
111:23 114:18
114:20,20,21
114:22
**valle** 59:22
**value** 27:14
**various** 101:7
**velez** 121:3
**veritext** 4:3
**versus** 4:5
**vice** 40:22
59:18 94:14
**victor** 2:9 4:2
**video** 4:2,4
41:4,6 80:9

126:2 128:21
**videographer**
2:9 4:1,3 41:3
41:6 80:5,9
126:1,4 128:20
**videotape**
125:25
**violations**
102:25
**visit** 42:22
**visited** 40:16
41:22
**voiced** 97:15
**vs** 1:7

**w**

**w** 102:24
**wage** 7:23
**wages** 65:13
111:9
**wait** 90:4
104:16 123:22
**waive** 128:18
128:19
**waived** 128:22
**want** 9:23 10:7
34:21 37:25
47:20 60:14
69:15,17,18,21
70:2,7 71:18
73:7 79:19
81:14 84:20,22
95:5 100:3
109:20 120:13

125:19 126:23
**wanted** 39:23
46:11 55:13
73:21
**wants** 69:25
115:6
**warehouse**
27:24 122:19
122:20
**warned** 53:1
**way** 54:14 72:6
97:17 109:16
113:16 120:11
**ways** 95:11
**we've** 60:4
111:9 112:25
**week** 9:4,8
32:11 40:10
42:4,6 43:22
58:22,24,25
66:24 67:12,14
67:15 81:17,22
81:24 82:2
95:9,12,22
115:17,17
116:22,23
117:2 124:20
**weekly** 66:20
66:21 108:13
**weeks** 56:1,14
67:24 68:2,3,6
68:16
**weisberg**
102:22,23

**[weisberg - year]**                                                          Page 33

103:3,6
**welcome**  61:16
**went**  11:9
  18:19 21:25
  28:17,22 40:15
  47:16,23 48:22
  68:7 113:15
  127:4
**west**  2:7
**whack**  84:21
**wheels**  122:22
**wife**  12:7,22
  14:16 17:24
**wife's**  12:8
**win**  60:19
**witness**  2:14
  4:10,17,17,20
  7:25 10:12
  106:15,25
  107:13 108:19
  128:18,22
  129:8,9,13
**word**  19:2
**words**  125:8
**work**  14:15
  17:12,25 19:12
  20:12 21:4,21
  21:24 22:3,3,7
  22:14 23:10,25
  24:3,8 26:11
  28:8 31:8,24
  32:4,21 33:7
  34:3,8,14,19
  35:11,18 37:20

39:22 42:9
43:1 44:20
50:15 53:23,25
56:14 61:15
62:22 71:16
72:6 73:18,24
81:12 83:15,17
83:20,22 88:16
89:2 96:5
98:15 103:7,21
105:18 107:2
107:15,17,21
108:2 109:2,3
116:13,15
118:22 120:3,4
120:8,10,13
121:23 123:15
124:7
**worked**  18:1,4
  18:8 23:3 32:2
  32:6 36:7,20
  44:11 49:5
  52:16 54:12
  58:9 65:21
  66:13 67:9
  68:18 69:1
  73:11 74:7
  75:1 80:24
  87:2,3,10 88:5
  92:9,19 104:1
  109:22 118:10
  118:13
**worker**  78:2
  117:4

**worker's**  47:18
**workers**  17:15
  44:10 45:24
  50:13 51:7
  55:4,6,15 95:1
  96:22 101:9
  103:23 113:3
  113:14 115:17
  117:11,15
  119:23
**working**  7:12
  9:2,4,5 17:22
  20:25 21:2,12
  22:12 23:6,7
  23:11 24:5
  28:11 30:7
  31:18,20 33:1
  33:12,23 34:5
  34:5,15 35:7
  35:25 36:18
  41:24 43:21,22
  43:25 46:17
  49:17 50:6
  51:2,4 53:3,17
  53:18 55:3
  58:22 61:2,12
  63:9,14 67:2,3
  67:11,13,16
  68:9,22,22
  70:6 73:4,17
  73:19 75:7
  77:16 86:20
  87:23 88:23
  93:23 97:13

100:15 101:14
101:20 103:8
105:16 107:4
115:25 117:24
118:4 120:24
123:10,13
128:3
**works**  63:15
  105:20
**worksite**  46:6
  94:18
**worry**  69:13
**write**  52:3,9
  60:5 72:17
  74:20 75:2,24
  76:19,20 88:14
  102:2 111:2
  121:9
**writing**  73:18
  85:6
**wrong**  96:16
  111:20

|   x   |
|---|
| **x**  2:12 122:24 |

|   y   |
|---|

**yard**  122:18
**year**  15:10
  16:16 18:10,18
  21:15 22:13
  23:3 24:23
  25:21 30:3
  57:17 111:19

**[year's - zip]**                                                            Page 34

| | |
|---|---|
| **year's** | 115:6 |
| **yearly** | 19:8 |
| **years** | 12:16 |
| | 13:16 14:4,13 |
| | 23:12 24:25 |
| | 25:1 30:10,11 |
| | 53:8 54:13 |
| | 92:22 |
| **yell** | 50:16 51:9 |
| | 53:13 55:15,15 |
| | 113:20 |
| **yelled** | 96:6 |
| **yesterday** | |
| | 105:4,7,8 |
| **young** | 53:7 |

**z**

| | |
|---|---|
| **z** | 5:7 36:5 |
| **zip** | 12:3 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT C

## Policy Acknowledgement: Employee Handbook

I acknowledge that I have read this document and understand its contents

Digitally Signed By:

Gustavo Hernandez

7/22/2022 6:33:12 PM

## Policy Acknowledgement: Hypower Safety Manual

I acknowledge that I have read this document and understand its contents

Digitally Signed By:

Gustavo Hernandez

7/22/2022 6:33:28 PM

## Policy Acknowledgement: Fair Credit Reporting Act

I acknowledge that I have read this document and understand its contents

Digitally Signed By:

Gustavo Hernandez

7/22/2022 6:33:38 PM

## Policy Acknowledgement: Driver's Certification

I acknowledge that I have read this document and understand its contents

Digitally Signed By:

Gustavo Hernandez

7/22/2022 6:34:11 PM

## Policy Acknowledgement: Leave of Absence Policy

I acknowledge that I have read this document and understand its contents

Digitally Signed By:

Gustavo Hernandez

7/22/2022 6:34:22 PM

## Policy Acknowledgement: Corporate Credit Card Policy

If I receive a corporate credit card, I acknowledge that I have read this document and understand its contents.

Digitally Signed By:

Gustavo Hernandez

7/22/2022 6:34:49 PM

# EXHIBIT D



# EMPLOYEE HANDBOOK



Hernandez000007

**ABOUT US**

Welcome to Hypower! We are glad you've chosen to become a part of the Hypower family.

Our company, based in Fort Lauderdale Florida, is a leading electrical and utility contractor servicing the State's leading General Contractors, Utilities, Developers, and Institutions.

Ranked by ENR magazine as a top commercial electrical and utility contractor in the Southeast, Hypower works with some of the leading general contractors, utilities, developers, and institutions in the United States. The company operates through several divisions specializing in electrical building construction, outside plant power and communications projects, prime electrical infrastructure, airfield lighting, and ground-mount and floating solar farms nationwide. Hypower also specializes in 24/7 commercial and industrial electrical service and repair in South and Central Florida. Founded in 1991 and headquartered in Fort Lauderdale, Florida, Hypower is a family-owned company that employs more than 400 people and has successfully completed over 1,000 projects valued at over $1 billion. Hypower is licensed to operate in more than 30 states and consistently ranks at the top of its class nationally for its exemplary safety and innovation record within the construction market.

Everything we do at Hypower is based upon our core values: RELATIONSHIPS, RESULTS, PROFESSIONALISM, CONTINUOUS IMPROVEMENT, and COMMUNITY. These core values drive our business practices and our commitments to our customers. These same values also account for our exemplary safety record, which is the result of a concerted effort to provide our employees a safe and productive work environment.

**VISION AND MISSION**

Our culture fosters:
**Consistency** – Providing the highest levels of Safety and Quality to deliver a positive outcome on every project.
**Predictability –** Our clients know what to expect when hiring the Hypower team. We are solutions providers who will help identify the best value options.
**Scalability** – We hire the right people and put them in the right places with the systems, workforce, resources, and tools to ensure their success.
Our clients know with confidence that they will receive the same experience project after project, no matter the location or size.

Hypower is where great opportunities are born: our culture thrives on high-energy reinvention – and a ton of fun! We love what we do and live by a forward-thinking mindset, constantly challenging ourselves and each other to find newer, better ways to excel.
A big part of that reinvention comes from attracting the best and brightest to join our team. We have exceptional talent charting new paths for us across every sector of our operation, including exciting, constantly evolving divisions like renewable energy. We nurture and motivate our talented team by encouraging them to achieve all possible right now and explore enthusiastically what soon may be. There is no limit for those who join us.



Hernandez000008

**ABOUT THIS HANDBOOK**

HYPOWER's Employee's Handbook Guide is printed for the information of HYPOWER, LLC's ("Hypower" or "Company") employees to offer guidance as to some of the rules, regulations, procedures and policies of this company and is intended to provide employees with a general understanding of our personnel policies.  Employees are encouraged to familiarize themselves with the contents of this Handbook for it will answer many common questions concerning employment with the Company.  Upon receipt and review of this Handbook, please sign the attached "Acknowledgement of Receipt of The Handbook" and return the acknowledgement to your direct supervisor or Hypower's personnel administrator.

**Nothing in this Handbook or any other policy, practice, procedure, or benefit constitutes an express or implied contract, guarantee, promise, or covenant of any type. <u>Employment at Hypower is at-will</u>, meaning it may be terminated by you or the Company for any reason without notice, cause, at any time.**

This Handbook expresses guidelines regarding the Company's policies and procedures. The rules, regulations, policies and procedures contained in this guide may be modified, added to, suspended, interpreted or canceled by the Company at any time, without notice to its employees and without a written revision of the guide.  **Each employee should read and become familiar with the information contained in this Handbook.** Failure to comply with Hypower' s policies or procedures may result in discipline, up to and including termination.

This Handbook supersedes all prior versions published or distributed by Hypower and all inconsistent oral or written statements.

If your position requires a background check of any kind, a skills test and/or a pre-employment drug test and if you have been offered employment before any of these items are completed, your employment is contingent upon a satisfactory result on all required tests and background checks.



**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y

Page **2** of 48
Rev. Date: 04/2022

Hernandez000009

# Table of Contents

CHAPTER 1 ........................................................................................................................ 6

**I.  EMPLOYMENT RELATIONSHIP** ................................................................................ 6

   A. Equal Employment Opportunity Statement ................................................................ 6

   B. Prohibited Discrimination and Harassment ............................................................... 6

   C. Individuals and Conduct Covered .............................................................................. 7

   D. Complaint Process ..................................................................................................... 7

   E. Americans with Disabilities Act (ADA) and the ADA Amendments Act (ADAAA) ...... 8

   F. Affirmative Action Policy Statement ........................................................................... 9

CHAPTER 2 ...................................................................................................................... 10

**II. EMPLOYMENT WITH HYPOWER** ........................................................................... 10

   A. Immigration Compliance .......................................................................................... 10

   B. Employee Classification Categories ........................................................................ 10

   C. Introductory/Probationary Period ............................................................................ 11

   D. Background and Reference Checks ......................................................................... 11

   E. Safety and Health Laws ........................................................................................... 12

   F. Safe Operation of Vehicles ...................................................................................... 12

   G. Standards of Conduct .............................................................................................. 16

   H. Theft of Company Property ...................................................................................... 17

   I. Separation of Employment ........................................................................................ 17

   J. Return of Company Property .................................................................................... 18

   K. Rehire ...................................................................................................................... 18

CHAPTER 3 ...................................................................................................................... 19

**III. WORKPLACE SAFETY** ........................................................................................... 19

   A. Drug-Free Workplace Policy .................................................................................... 19

   B. Workplace Bullying .................................................................................................. 24

   C. Violence in the Workplace ....................................................................................... 25

   D. Safety in the Workplace ........................................................................................... 26

   E. Hazardous Substances Communications Policy ...................................................... 27

CHAPTER 4 ...................................................................................................................... 28

**IV. WORKPLACE EXPECTATIONS** .............................................................................. 28

   A. Confidentiality .......................................................................................................... 28

**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S · R E S U L T S · P R O F E S S I O N A L I S M ·
C O N T I N U O U S   I M P R O V E M E N T · C O M M U N I T Y



Hernandez000010

B. Conflicts of Interest ........................................................................................... 28

C. Attendance and Punctuality ............................................................................... 29

**CHAPTER 5** ............................................................................................................... **29**

**V. Electronic Communication, Internet Use and Company Records** ...................... **29**

A. GUIDELINES .................................................................................................... 29

   (i)  Email ............................................................................................................ 30

   (ii)  Internet ...................................................................................................... 31

   (iii)  Software .................................................................................................... 31

   (iv) Confidentiality ............................................................................................ 31

   (v) File Management ........................................................................................ 31

   (vi) Proprietary Information Restrictions .......................................................... 32

   (vii)  Anti-Harassment Policies Applicable ....................................................... 32

   (viii)  Notice of Violations .................................................................................. 32

   (ix)  Discipline .................................................................................................. 32

B. Right to Monitor ................................................................................................. 32

C. Social Media—Acceptable Use ......................................................................... 33

D. Solicitations, Distributions and Posting of Materials ......................................... 33

E. Employee Personnel Files ................................................................................. 34

**CHAPTER 6** ............................................................................................................... **34**

**VI. Compensation & Time Off** ................................................................................. **34**

A. Payment of Wages ............................................................................................ 34

B. Method of Payment. ........................................................................................... 34

C. Time Reporting .................................................................................................. 35

D. Mandatory Meal Period ..................................................................................... 35

E. Employee Expense Reimbursement .................................................................. 36

F. Company Observed Holidays ............................................................................. 37

G. Paid Time Off Policy ("PTO") ............................................................................ 37

H. Bereavement Leave .......................................................................................... 39

I. Jury Duty ............................................................................................................ 39

**CHAPTER 7** ............................................................................................................... **40**

**VII. Family and Medical Leave Act** .......................................................................... **40**

A. General Provisions ............................................................................................ 40

B. Eligibility ............................................................................................................ 40

C. Type of Leave Covered ..................................................................................... 41



**EMPLOYEE HANDBOOK**
RELATIONSHIPS · RESULTS · PROFESSIONALISM ·
CONTINUOUS IMPROVEMENT · COMMUNITY

Page **4** of **48**
Rev. Date: 04/2022

Hernandez000011

D. Amount of Leave ...................................................................................................... 42

E. Leave for Families of Military Members ..................................................................... 42

F. Employee Status and Benefits During Leave............................................................ 42

G. Employee Status After Leave ................................................................................... 43

H. Use of Paid and Unpaid Leave ................................................................................. 43

I. Intermittent Leave or a Reduced Work Schedule ...................................................... 43

J. Certification for the Employee's Serious Health Condition ........................................ 43

K. Certification for the Family Member's Serious Health Condition ............................... 43

L. Certification of Qualifying Exigency for Military Family Leave ................................... 43

M. Certification for Serious Injury or Illness of Covered Service Member for Military Family Leave.................................................................................................................... 44

N. Recertification .......................................................................................................... 44

O. Procedure for Requesting FMLA Leave ................................................................... 44

P. Designation of FMLA Leave ..................................................................................... 44

Q. Intent to Return to Work from FMLA Leave .............................................................. 44

R. Failure to Return To Work Following FMLA Leave.................................................... 44

S. Additional Information ............................................................................................... 45

**CHAPTER 8**...................................................................................................................**45**

**VIII. Benefits** ...................................................................................................................**45**

A. Medical Benefits ...................................................................................................... 45

B. Educational Reimbursement .................................................................................... 45

C. Workers' Compensation Benefits ............................................................................. 46

D. Voluntary Training Policy ......................................................................................... 46



Hernandez000012

# CHAPTER 1

## I. EMPLOYMENT RELATIONSHIP

### A. Equal Employment Opportunity Statement

HYPOWER is an Equal Employment Opportunity Employer and does not discriminate against applicants or employees with regard to employment based on race, color, religion, sex, age, sexual orientation, gender identity, national origin, disability, or any other protected characteristic in accordance with applicable federal, state and local laws.

All such discrimination is unlawful, and all persons involved in the operations of HYPOWER are prohibited from engaging in this type of conduct.  This policy applies to all areas of employment, including recruitment, hiring, training, transfer, termination, layoff, compensation benefits, social and recreational programs, and all other conditions and privileges of employment in accordance with applicable federal, state, and local laws.

### B. Prohibited Discrimination and Harassment

HYPOWER expressly prohibits any form of unlawful employee harassment based on race, color, religion, sex, age, sexual orientation, gender identity, national origin, disability, or any other protected characteristic in accordance with applicable federal, state and local laws.

HYPOWER is committed to providing a work environment that is free of unlawful discrimination and harassment.  Actions, words, jokes, or comments based on an individual's sex, race, national origin, age, religion, disability, or any other legally protected category will not be tolerated.  As an example, sexual harassment (both overt and subtle) is a form of employee misconduct that is demeaning to another person, undermines the integrity of the employment relationship, and is strictly prohibited.

In terms of sexual harassment, HYPOWER prohibits:

a)  Unwelcome sexual advances;

b)  Requests for sexual acts or favors, with or without accompanying promises, threats, or reciprocal favors or actions; and

c)  Other verbal or physical conduct of a sexual nature made to an employee, when for example:

    i.    Submission to such conduct is made either explicitly or implicitly a condition of an individual's employment;

    ii.    Submission to or rejection of such conduct by an individual is used as the basis for employment decisions;

    iii.    Such conduct has the purpose or effect of substantially interfering with an individual's work performance;


Hernandez000013

iv.   Or such conduct has the purpose or effect of creating an intimidating, hostile or offensive working environment.

Examples of sexual harassment include but are not limited to the following:

a)   Conditioning promotion, demotion, performance evaluations and the like upon submission to sexual favors.

b)   Touching that is unwanted, uninvited or offensive.

c)   Displaying sexually suggestive or explicit material, pictures or cartoons.

d)   Relating sexually suggestive or explicit stories or "jokes."

e)   Making sexually suggestive or explicit gestures.

Harassment because of one's sex, race, national origin, age, religion, disability, or any other legally protected is also prohibited and is defined as:

Verbal or physical conduct that:

i.   Denigrates or shows hostility or aversion toward an individual because of his/her sex, race, national origin, age, religion, disability, or any other legally protected characteristic, or

ii.   Has the purpose or effect of creating an offensive work environment, unreasonably interferes with an individual's work performance, or otherwise adversely affects an individual's work performance.

Examples of harassing conduct include: epithets, slurs or negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; and written or graphic material that denigrates or shows hostility or aversion toward an individual or group and that is placed on walls or elsewhere on the employer's premises or circulated in the workplace, or using company equipment via e-mail, phone (including voice messages), text messages, tweets, blogs, social networking sites or other means at any time.

### C. Individuals and Conduct Covered

These policies apply to <u>all</u> applicants and employees, whether related to conduct engaged in, by or towards fellow employees or someone not directly connected to HYPOWER (e.g., an outside vendor, consultant or customer).

Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting outside the workplace, such as during business trips, business meetings and business-related social events. These policies apply to <u>all</u> employees, including management.

### D. Complaint Process

Employees who believe they have been subjected to any form of discriminatory or harassing behavior by anyone, including supervisors, co-workers, customers, clients, or visitors,



Hernandez000014

are encouraged to let the other party know clearly, calmly, and without any doubt, that they object and demand that they stop the unwelcomed behavior.  Employees uncomfortable with this approach, or who find that the behavior continues, are urged to bring the matter to the immediate attention of Hypower management so that we may investigate and deal with the problem appropriately.  Employees may bring their complaint to their supervisor or to any other member of the Hypower management team. If the complaint involves someone in the employee's direct line of command, or if the employee is uncomfortable discussing the matter with his or her direct supervisor, the employee is urged to go to another supervisor or member of management with the complaint.  Employees can raise concerns and make reports without fear of reprisal. In order for Hypower to conduct an investigation and become aware, you must notify management and/or the owners of Hypower.

The Company will investigate all complaints and will endeavor to handle these matters quickly in a confidential and professional manner so as to protect the parties involved.  All members of management are responsible for promoting a working environment free of discrimination or harassment.  If a supervisor is advised, or becomes aware, of an alleged incident, he or she immediately must report it to a division manager or Hypower owner.  If the results of an investigation confirm the offense, appropriate disciplinary action, up to and including discharge, will be taken against the person violating this policy.

This policy prohibits retaliation or intimidation against any employee bringing a complaint or assisting in the investigation of a complaint.  No one will be subject to, and Hypower prohibits, any form of discipline, reprisal, intimidation or retaliation for good faith reports or complaints of incidents of discrimination of any kind, pursuing any discrimination claim or cooperating in related investigations.

HYPOWER encourages the prompt reporting of complaints or concerns so that action can be taken before relationships become irreparably strained. Therefore, although no fixed reporting period has been established, early reporting and intervention have proven to be the most effective method of resolving actual or perceived incidents of harassment. If employees do not report retaliatory conduct, Hypower may not become aware of a possible violation of this policy and may not be able to take appropriate corrective action.

## E. Americans with Disabilities Act (ADA) and the ADA Amendments Act (ADAAA)

The Americans with Disabilities Act (ADA) and the Americans with Disabilities Amendments Act, known as the ADAAA, (collectively referred to as "ADA") are federal laws that prohibit employers with 15 or more employees from discriminating against applicants and individuals with disabilities. In accordance with the ADA, HYPOWER will provide reasonable accommodations to qualified individuals with a disability, who have made HYPOWER aware of the need for a reasonable accommodation, so long as such requested accommodation does not constitute an undue hardship on Hypower.

Individuals with a disability who need a reasonable accommodation to perform the essential duties of their jobs need to contact their division manager or Hypower owner with any


**EMPLOYEE HANDBOOK**
R E L A T I O N S H I P S · R E S U L T S · P R O F E S S I O N A L I S M · C O N T I N U O U S   I M P R O V E M E N T · C O M M U N I T Y

Page 8 of 48
Rev. Date: 04/2022

Hernandez000015

questions or requests for reasonable accommodation.  You may make the request orally or in writing. Hypower encourages employees to make their request in writing and to include relevant information, such as:

- A description of the accommodation you are requesting.

- The reason you need an accommodation.

- How the accommodation will help you perform the essential functions of your job.

After receiving your oral or written request, Hypower will engage in an interactive dialogue with you to determine the precise limitations of your disability and explore potential reasonable accommodations that could overcome those limitations.  Hypower encourages you to suggest specific reasonable accommodations that you believe would allow you to perform your job. However, Hypower is not required to make the specific accommodation requested by you and may provide an alternative, effective accommodation, to the extent any reasonable accommodation can be made without imposing an undue hardship on Hypower.

Hypower will keep confidential any medical information that it obtains in connection with your request for a reasonable accommodation.

Individuals will not be retaliated against for requesting an accommodation in good faith. Hypower expressly prohibits any form of discipline, reprisal, intimidation or retaliation against any individual for requesting an accommodation in good faith.

The ADA also requires facilities, programs and services be accessible to individuals with disabilities. To report that a facility, program or service is inaccessible, or that an accommodation may be needed, please contact a division manager or owner of Hypower Director of Personnel.

### F. Affirmative Action Policy Statement

As part of the Company's equal employment opportunity policy, Hypower will also take affirmative action as called for by applicable laws and Executive Orders to ensure that minority group individuals, females, disabled veterans, recently separated veterans, other protected veterans, Armed Forces service medal veterans, and qualified disabled persons are introduced into our workforce and considered for promotional opportunities.

This policy shall periodically be brought to the attention of all supervisory personnel and shall be administered with a positive attitude. It is the responsibility of each supervisor of the Company to ensure affirmative implementation of this policy.  Please report any situation that is in violation to the above stated policy to a division manager or Hypower owner.

This policy shall apply to all of the Company's employment, training and promotional activities, including but not limited to employment, placement. upgrading, demotion, transfer, layoff, recall, termination, rates of pay, or other forms of compensation, selection for training, the use of Company facilities, and participation in all Company sponsored activities.


Hernandez000016

# CHAPTER 2

## II. EMPLOYMENT WITH HYPOWER
### A. Immigration Compliance

Hypower complies with all laws requiring Hypower to employ only those persons who are legally eligible to work in the United States. U.S. law requires companies to employ only individuals who may legally work in the United States – either U.S. citizens, or foreign citizens who have the necessary authorization.

Hypower participates in the E-Verify program through the US Citizenship and Immigration Services. E-Verify is an Internet-based system that allows businesses to determine the eligibility of their employees to work in the United States.

All employees are asked on their first day of employment to provide original documents verifying the right to work in the United States and to sign a verification form required by federal law (Form I-9).  If an individual cannot verify his/her right to work within three days of hire, Hypower must terminate his/her employment

### B. Employee Classification Categories

All employees are at-will employees. Employees at HYPOWER are designated as either non-exempt or exempt under state and federal wage and hour laws. The following is intended to help employees understand employment classifications and employees' employment status and benefit eligibility. These classifications do not guarantee employment for any specified period of time or any specific benefits and are listed simply as a guide. The right to terminate the employment-at-will relationship at any time is retained by both the employee and HYPOWER.

Employee Classifications

- FULL-TIME EMPLOYEES regularly work at least 30 hours every week, may be paid hourly or on a salary basis, and are eligible for our fringe benefits package in accordance with their position and length of employment.  Such employees may be "exempt" or "non-exempt" as more fully defined below.

- PART-TIME EMPLOYEES generally work less than 30 hours each week, or 1,000 hours per year.

- TEMPORARY EMPLOYEES are engaged to work full-time or part-time on the Company's payroll with the understanding that their employment will be terminated no later than upon completion of a specific assignment.  A temporary employee may be offered, and may accept, a new temporary assignment with the Company and thus still retain temporary status.  Such employees may be "exempt" or "non-exempt" as defined below.  Temporary employees hired from temporary employment agencies for specific assignments are employees of the respective temporary employment agency and not of the Company.

In addition to the preceding, employees are also categorized as "exempt" or "non-exempt".


**EMPLOYEE HANDBOOK**
RELATIONSHIPS · RESULTS · PROFESSIONALISM ·
CONTINUOUS IMPROVEMENT · COMMUNITY

Page **10** of 48
Rev. Date: 04/2022

Hernandez000017

- NON-EXEMPT EMPLOYEES – Pursuant to the Fair Labor Standards Act (FLSA), non-exempt employees are generally entitled to overtime pay for all hours worked in excess of 40 hours per week, unless otherwise required by state law, and are required to be paid minimum wage.

- EXEMPT EMPLOYEES – Pursuant to the Fair Labor Standards Act (FLSA) and applicable state laws, exempt employees include, but are not limited to, those who perform administrative, professional, supervisory or managerial responsibilities or those who are considered outside sales personnel.  Exempt Employees are not required to receive overtime pay for hours over 40 worked in a given week and are not subject to certain deductions to their weekly salary under the Company's policies.

The accounting department is responsible for the administration of Hypower's Payroll Practices and Compensation Policy. If you have any questions regarding this policy or if you have questions about payroll practices that are not addressed in this policy, please contact the company controller. If you have any questions regarding your classification, please refer your questions to the company controller or vice president of finance.

### C. Introductory/Probationary Period

Every new employee goes through an initial introductory/probationary period of adjustment in order to learn about the Company and about his/her job.  During this time the employee will have an opportunity to find out if he/she is suited to, and likes, his/her new position.  Additionally, the initial employment period gives the employee's supervisor a reasonable period of time to evaluate his/her performance. Hypower's initial introductory/probationary employment period is 90 days from the date of hire.

As is true at all times during an employee's employment with the Company, any employee may terminate his/her job at any time or be discharged at any time during this period if his/her supervisor concludes that he/she is not progressing or performing satisfactorily. **Termination for unsatisfactory performance during an initial employment 90-day introductory/ probationary period will not result in Hypower's responsibility for payment of unemployment compensation benefits to Employee.**

At the end of the initial employment period, the employee and his/her supervisor may discuss his/her performance.  Provided his/her job performance is "satisfactory" at the end of the introductory/probationary employment period, he/she will continue in our employment as an at-will employee.  Employment is not for any specific time and may be terminated at will, with or without cause and without prior notice.

### D. Background and Reference Checks

To ensure that individuals who join HYPOWER are well qualified and to ensure that HYPOWER maintains a safe and productive work environment, it is our policy to conduct employment background checks on all applicants who accept an offer of employment. Background checks may include verification of any information on the applicant's resume or application form.

Page **11** of 48
Rev. Date: 04/2022

**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y



Hernandez000018

All offers of employment are conditioned on receipt of a background check report, which may include a criminal background check, a credit report check and/or a driving history check, acceptable to HYPOWER. All background checks are conducted in conformity with the Federal Fair Credit Reporting Act, the Americans with Disabilities Act, and state and federal privacy and antidiscrimination laws. Reports are kept confidential and are only viewed by individuals involved in the hiring process.

If information obtained in a background check would lead HYPOWER to deny employment, a copy of the report will be provided to the applicant upon written request, and the applicant will have the opportunity to dispute the report's accuracy. Background checks may include a criminal record check, although a criminal conviction does not automatically bar an applicant from employment.  Additional background checks such as a driving record or credit report may be made on applicants for particular job categories, if appropriate and job related.

Hypower also reserves the right to conduct a background check, a driving record check and a credit report check for current employees to determine eligibility for promotion or reassignment in the same manner as described above.

### E. Safety and Health Laws

The Company will make reasonable efforts to provide a safe and secure workplace that is free from recognized hazards that could cause death or serious injury.  All employees are required to abide by all federal, state, local, and jobsite safety rules and regulations as well as special requirements of the Company as communicated to you by the Company from time to time.  Additionally, all employees are required to immediately notify their supervisor of any threatening hazard.

### F. Safe Operation of Vehicles

HYPOWER is committed to providing a safe work place for all employees and others around us.  That includes promoting safe and responsible driving practices for all of its employees.  To ensure that this commitment is followed through, the Company has adopted a vehicle policy that requires all employees who operate leased, rented, or personal vehicles during the performance of their jobs, to do so in a lawful and safe manner.

Persons under the influence of drugs or alcohol will not operate or occupy any Company owned, leased, or rented vehicle or piece of equipment. Any employee assigned driving privileges who is convicted of a DUI must notify a division manager or Hypower owner the immediately, but no later than the end of the next business day. Employees in Driving Group 2 and 3 that obtain two or more traffic citations, regardless of whether they receive a withhold of adjudication or are adjudicated, must immediately notify director of risk management and have their record re-evaluated.

It is Company policy that no one shall be permitted or required to work while their ability or alertness is so impaired by fatigue, illness or other causes that it might unnecessarily expose them or others to injury.


Hernandez000019

Additionally, no firearms or weapons of any kind may be stored or transported in Company vehicles or pieces of equipment.

Employees assigned driving privileges for the Company will be placed in a Driving Group. An employee listing, indicating assignments to Driving Groups is available for your review in each division manager's office. All employees are expected to adhere to these Groups. Anyone not on the listing should inquire. Driving Groups are determined by criteria established by management. Upon initial hiring, each employee's Driving Group will be established, subject to review and may change at any time. Additionally, the Company has the right to review any appropriate documents including driving records, proof of a valid license, automobile insurance information etc., and must be made aware of any driving violations, changes to driver information and driver status immediately.

Group 1 - ON SITE DRIVING ONLY- Employees under this group have authority to drive on our job site only.

Group 2 - ON AND OFF-SITE DRIVING FOR BUSINESS PURPOSES ONLY- Employees under this group have authority to operate Company vehicles on and off the job site for business purposes only. Off-site travel for hourly employees shall be with the express consent of the superintendent and/or project manager.

Group 3 - PROJECT MANAGER AND SUPERINTENDENTS AND SPECIFIC EMPLOYEES ASSIGNED A PERMANENT VEHICLE FOR USE ON THE JOB AND COMMUTING T0 WORK- Employees under this group are usually assigned one specific Company vehicle which is their responsibility to maintain and upkeep. These employees have the authority to take their assigned vehicles home at night.

Group 4 - SUSPENDED DRIVING PRIVILEGES UNTIL FURTHER NOTICE- Employees under this group cannot drive or operate Company vehicles under any circumstances. Any violation of this policy is grounds for termination.

**RULES FOR SAFE OPERATION**

1.      Company vehicles are to be used for business purposes only. Unless specifically authorized by the Division Manager/Vice President, the personal use of vehicles and equipment is not allowed.  Under no circumstances shall anyone other than a Company employee be allowed to drive or ride in a Company vehicle.

2.      Only those employees specifically authorized and who possess a valid license or permit for the equipment being used shall operate company owned vehicles or equipment or personally owned vehicles on Company business.

3.      Each operator is responsible for knowing and operating the vehicle in accordance with all Company, local, state and federal laws governing the area of operation. In addition, they are responsible for any violations concerning the vehicle and/or passengers while operating the vehicle.  Anyone driving a Company vehicle will be 100% liable for any moving and non-moving violation(s), including but not limited to, parking tickets, unpaid toll citations, speeding tickets,

**EMPLOYEE HANDBOOK**
RELATIONSHIPS·RESULTS·PROFESSIONALISM·
CONTINUOUS IMPROVEMENT·COMMUNITY



Hernandez000020

etc. and must pay any fines and/or costs associated with the violation.  HYPOWER will not reimburse or pay for any moving or non-moving violation.

4.      Where seat belts are provided, they shall be used.

5.      The driver shall drive at safe speeds no greater than that permitted by law.  Traffic, road, and weather conditions shall be given consideration in determining the safe speed within the legal limit at which the vehicle shall be operated.

6.      Operators shall not permit anyone to ride on the running boards, fenders or any part of the vehicle, except on factory installed inside the body of the vehicle. Passengers are not permitted to allow their arms or legs to dangle over the sides.

7.      Passengers shall not stand in moving vehicles or ride in the bed of any vehicle. Additionally, no person shall ride on, in or be hoisted by any bucket, hook, hoist or other material handling equipment not specifically designed to carry riders.

8.      Operators must not move equipment or vehicles until riders comply with all safety precautions.

9.      Employees shall not ride on trailers.

10.     The driver shall determine that brakes are in a safe operating condition before operating equipment. If brakes are not working properly, they must be corrected before vehicle is used. Safety equipment (fire extinguishers, reflectors, back up alarms, etc.) will also be inspected and replaced or repaired, when necessary, prior to putting any vehicle or piece of equipment into operation.

11.     The driver shall inspect windshield wipers frequently and see that they are in good operating condition and that the windows and windshield give sufficient visibility for safe operation of vehicle.

12.     All lights and reflectors of vehicle shall be inspected by the driver doing any night driving, and if found defective, they shall be repaired immediately.

13.     The driver shall report any defects, which may have developed during the day to their immediate supervisor. If the brakes are not working properly, they shall be adjusted or repaired before the vehicle is put in operation. Other items, which affect safety, shall be repaired prior to continued vehicle operation.

14.     The driver shall not operate the motor in any garage except when driving in or out, and then the motor shall be operated as little as practicable. The motor shall not be warmed up inside a garage.  Additionally, the driver shall not test motor operation in a garage unless the exhaust gas is carried directly to outside atmosphere or doors and windows are open so that adequate ventilation exists.

15.     The driver of a motor vehicle shall clearly signal his intention of turning, passing or stopping.


Hernandez000021

16.     Upon signal from a vehicle approaching from the rear, the driver of a Company vehicle shall yield the right of way.

17.     Drivers shall be prepared to stop, and the right of way shall be yielded in all instances where necessary to avoid an accident.

18.     The driver of a vehicle shall be courteous toward other drivers and pedestrians. He shall operate his vehicle in a safe manner and shall yield the right of way to pedestrians and other vehicles when failure to do so might endanger any person or other vehicle.

19.     The driver shall stay a sufficient distance behind, when following another vehicle, so that he can safely stop the vehicle in the clear distance ahead.

20.     Do not back any vehicle or equipment when the view to the rear is obstructed unless:
   •   It is equipped with an operating back up alarm which is audible above the surrounding noise for a distance of 200 feet, or
   •   An observer signals that it is safe to back up.

21.     Parking brakes must be set whenever a vehicle is parked. Equipment parked on an incline must have the wheels chocked.  Buckets and implements must be lowered to the ground whenever equipment is parked.  When traveling, equipment operators will keep buckets and attachments as low to the ground as practical.

22.     Drivers shall exercise added caution when driving through residential and school zones.

23.     When entering or leaving any building, enclosure, alley or street where vision is obstructed, a complete stop shall be made, and the driver shall proceed with caution.

24.     To ensure the safety and reliability of the vehicle, the vehicle report (see FORM HP 419) must be filled out weekly.

25.     A driver, operator, or worker shall report accurately and immediately any accident and tool loss in his possession to the Hypower safety director by phone and his supervisor on HP FORM# 410. The supervisor shall immediately send the report along with any comments directly to the Hypower equipment manager and safety manager. Additional reports shall be made immediately to the police, state authority or other authority as required.

26.     Hypower encourages drivers to back into a parking space instead of using front end parking. Driver shall park by backing into a parking space when practical and allowed.

27.     No smoking is permitted in Company vehicles.

28.     Drivers shall keep the interior and exterior of vehicles clean and presentable at all times.

**EMPLOYEE HANDBOOK**
RELATIONSHIPS·RESULTS·PROFESSIONALISM·
CONTINUOUS IMPROVEMENT·COMMUNITY



Hernandez000022

## G. Standards of Conduct

It is not possible to list all the forms of behavior that are considered unacceptable in the workplace, but the following are examples of infractions of standards of conduct that may result in disciplinary action, including suspension or immediate termination of employment.

1. Falsifying employment records, employment information, or Company records.

2. Recording the work time of another employee, allowing any other employee to record an individual's work time, or allowing falsification of any time card, whether or not it belongs to the employee.

3. Theft or deliberate careless damage of any Company property or the property of any employee or customer.

4. Removing or borrowing Company property without prior authorization.

5. Unauthorized or inappropriate use of Company equipment, vehicles, tools, time, materials or facilities.

6. Possessing, distributing, selling, transferring, using or being under the influence of alcohol or illegal drugs, as defined by federal law, in the workplace.

7. Provoking a fight or fighting during working hours or on the premises owned or occupied by the Company, or the deliberate injury of another person.

8. Breaching confidentiality, committing a fraudulent act, or breaching trust in any circumstance.

9. Carrying and possessing firearms or any other dangerous weapons, at any time, on the premises owned or occupied by the Company.

10. Engaging in criminal conduct.

11. Causing, creating, or participating in a disruption of any kind during working hours or on the premises owned or occupied by the Company.

12. Insubordination, including but not limited to, failure or refusal to obey orders or instructions of any supervisor or member of management, or the use of abusive or threatening language toward any supervisor or member of management.

13. Using profane or abusive language at any time during working hours or while on the premises owned or occupied by the Company.



**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S · R E S U L T S · P R O F E S S I O N A L I S M ·
C O N T I N U O U S   I M P R O V E M E N T · C O M M U N I T Y

Page **16** of **48**
Rev. Date: 04/2022

Hernandez000023

14.     Failing to personally notify the appropriate supervisor when unable to report to work. Notification to a co-worker only is not acceptable.

15.     Unreported and/or unexcused absence.

16.     Failing to obtain permission to leave work for any reason during normal work hours.

17.     Failing to observe working schedules, including rest and lunch periods.

18.     Abusing personal time off.

19.     Failing to provide a physician's certificate when requested or required to do so.

20.     Working overtime without prior approval from the supervisor or refusing to work assigned overtime.

21.     Violating any safety, health, harassment or security policy, rule of procedure of the Company, as well as not adhering to the Company policy and procedures as outlined in this Employee Handbook.

The Company may exercise its discretion to immediately terminate any employee that violates Company policy.

By accepting employment with us, you have a responsibility to HYPOWER and to your fellow employees to adhere to certain rules of behavior and conduct.

### H. Theft of Company Property

Theft of Company property will not be tolerated and will result in employee disciplinary action up to and including immediate termination.  The employee may additionally be subject to criminal prosecution even if terminated from their position by the Company and even if restitution has been made.  Company property includes but is not limited to materials, scrap metal, scrap wire, equipment, fuel, tools, equipment, supplies and items purchased for projects and reimbursed to employees that are used for personal purposes.

You are expected to use adequate care when using the Company's property and equipment.  No property may be removed from the premises or job site without the proper authorization of management.  If you lose, break or damage any property, report it to your supervisor at once.  Additionally, failure to return Company property upon separation from Hypower or upon Hypower's request may be considered theft and reported to the appropriate authorities.

### I. Separation of Employment

Separation of employment within an organization can occur for several different reasons, such as:



Hernandez000024

(i)    **Resignation:** Although we hope your employment with us will be a mutually rewarding experience, we understand that varying circumstances cause employees to voluntarily resign employment. Resigning employees are encouraged to provide two weeks' notice, preferably in writing, to facilitate a smooth transition out of the organization. If an employee provides less notice than requested, the employer may deem the individual to be ineligible for rehire depending on the circumstances regarding the notice given.

(ii)    **Job abandonment:** Employees who fail to report to work or contact their supervisor for three (3) consecutive workdays shall be considered to have abandoned their job without notice, effective at the end of their normal shift on the third day. The supervisor shall notify the division manager at the expiration of the third workday and initiate the paperwork to terminate the employee. To the extent permissible by law, employees who are separated due to job abandonment are ineligible to receive accrued benefits and are ineligible for rehire.

(iii)    **Termination:** Employees of HYPOWER are employed on an at-will basis, and the company retains the right to terminate an employee at any time.  The Employee also retains the right to resign from his or her employment at any time.

Health insurance terminates the last day of the month of employment, unless an employee requests immediate termination of benefits. Information for Consolidated Omnibus Budget Reconciliation (COBRA) continued health coverage is available from the payroll department or company controller. Employees will be required to pay their usual share of the premiums through the end of the month.

### J. Return of Company Property

The separating employee must return all Company property at the time of separation, including tools, equipment, assigned electronic devices, cell phones, keys, PCs and identification cards.   Failure to return Company property upon separation from the Company may subject Employee to financial obligations.

Employee must complete Hypower's Interview and Termination Record Exit Form.

### K. Rehire

Former employees who left Hypower in good standing and were classified as eligible for rehire may be considered for reemployment. An application must be submitted to the division manager, and the applicant must meet all minimum qualifications and requirements of the position, including any qualifying exam and background check when required.

Generally, former employees who have been separated from Hypower for more than 12 months will be required to submit to a drug screening and a background check.  Former employees that have been separated from Hypower for less than 12 months will be required to submit to a drug screening. PTO will be based on the most recent start date unless otherwise agreed to in writing by an owner of Hypower.



Hernandez000025

# CHAPTER 3

## III. WORKPLACE SAFETY

### A. Drug-Free Workplace Policy

HYPOWER recognizes that drug and alcohol abuse in our society is a serious problem. Drug or alcohol abuse in the workplace results in unacceptable safety hazards, causes accidents and/or injuries to employees and other individuals, and exposes all employees to unnecessary risks. Accordingly, to protect the health, safety and welfare of all Company employees working at Company job sites, and in response to Federal requirements for drug-free workplaces, HYPOWER is instituting a Drug-Free Workplace program.

HYPOWER is committed to maintaining a safe workplace free from the influence of drugs. All employees and subcontractors are hereby notified that HYPOWER will comply with the requirements of the Drug-Free Workplace Act of 1988, and all applicable regulations issued thereunder, as well as when applicable, any more stringent rules promulgated by other state or Federal agencies.

This Drug-Free Workplace Policy is implemented pursuant to requirements under F.S. 440.102 and Administrative Rules 38F9.001 through 38F-9.014 of the Department of Labor and Employment Security, Division of Workers Compensation.

As a condition of employment, each HYPOWER employee must comply with the Company's Drug-Free Workplace Policy and notify HYPOWER of any conviction for a drug related offense committed in the workplace within five (5) days of conviction. Under this rule, a conviction includes a finding or plea of guilty, or a plea of no contest to any federal or state criminal drug statute.

Any violation of the Company's policy of maintaining a drug free, marijuana-free and alcohol-free workplace will result in appropriate discipline, up to and including termination.

HYPOWER Drug-Free Workplace Policy prohibits employees from engaging in any of the following activities:

a) Use, possession, manufacture, distribution, dispensation, or sale of illegal drugs, as defined by federal law, on Company premises or Company business, in Company supplied vehicles, or during working hours.
b) Unauthorized use or possession, or any manufacture, distribution, dispensation, or sale of a controlled substance on Company premises or while on Company business, or while in Company supplied vehicles.
c) Storing in a locker, desk, automobile, or other repository on Company premises any controlled substance whose use is unauthorized.
d) Being under the influence of alcohol, marijuana or of a controlled substance on Company premises or while on Company business, or while in Company supplied vehicles.



Hernandez000026

e)  Any possession, use, manufacture, distribution, dispensation, or sale of illegal drugs, as defined by federal law, off Company premises that adversely affects the individual's work performance, his own or others safety at work, or the Company's regard or reputation in the community.

f)  Failure to adhere to the requirements of any drug treatment or counseling program in which the employee is enrolled.

g)  Failure to notify the Company of any conviction under criminal drug statutes for a workplace offense within five (5) days of the conviction.

h)  Refusal to sign a statement to abide by the Company's Drug Free Workplace Policy.

### 1.   AUTHORIZED USE OF PRESCRIBED MEDICINE

Prescription and over-the-counter drugs are not prohibited when taken in standard dosage and/or according to a physician's prescription, for drugs that can be legally prescribed *under both federal and state law*. Any employee taking prescribed or over-the-counter medications will be responsible for consulting with the prescribing physician and/or pharmacist to ascertain whether the medication may interfere with safe performance of his/her job. If the use of a medication could compromise the safety of the employee, fellow employees, or the public, it is the employee's responsibility to use appropriate personnel procedures (e.g., call in sick, use leave, request change of duty, notify supervisor, consult with doctor) to avoid unsafe workplace practices.

The illegal or unauthorized use of prescription drugs is prohibited.  It is a violation of our drug-free workplace policy to intentionally misuse and/or abuse prescription medications. Appropriate disciplinary action will be taken if job performance deterioration and/or other accidents occur.

### 2.   EMPLOYEE EDUCATION AND ASSISTANCE PROGRAMS

The employees of HYPOWER are our most valuable resource and for that reason, their health and safety is our number one concern. To assist employees and their families in understanding and avoiding the perils of drug abuse, HYPOWER, has developed a comprehensive Drug Awareness Program. The Company will use this program in an educational effort to prevent and eliminate drug abuse that may affect the workplace.

The Drug Awareness Program will inform employees about:

(1)  the dangers of drug abuse in the workplace,
(2)  our Company's Drug Free Workplace Policy;
(3)  the availability of treatment and counseling for employees who voluntarily seek such assistance; and
(4)  sanctions for violations of HYPOWER Workplace Policy.

Early recognition and treatment of drug abuse is important for successful rehabilitation. Whenever feasible, HYPOWER will assist employees in overcoming drug abuse by providing information on treatment opportunities and programs available in the local geographical area of all Company job sites.  However, the decision to seek diagnosis and accept treatment for drug abuse is primarily the individual employee's responsibility.



**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y

Page **20** of 48
Rev. Date: 04/2022

Hernandez000027

Employees with drug abuse problems should request assistance from a division manager, owner of Hypower, or safety department.  The Company will treat all such requests as confidential and will refer the employee to the appropriate treatment and counseling services.

Employees who voluntarily request the Company's assistance in dealing with a drug abuse problem may do so without jeopardizing their continued employment, provided they strictly adhere to the terms of their treatment and counseling program.

At a minimum, these terms include the immediate cessation of any use of drugs, and participation, where required by a program, and in periodic unannounced testing for a twenty-four-month period following enrollment in the program.  It is the policy of Hypower to require follow up drug testing; which must be conducted at least once a year for a 2-year period after completion of the program. Advance notice of a follow-up testing date will not be given to the employee to be tested.

A violation of HYPOWER's Drug-Free Workplace Policy may result in disciplinary action, up to and including termination, at the Company's sole discretion.

In addition to any disciplinary action, the Company may, at its sole discretion, refer the employee to a treatment and counseling program for drug abuse. Employees referred to such a program by the Company must immediately cease any drug use, may be subject to periodic unannounced testing for a period of twenty-four months, and must comply with all other conditions of the treatment and counseling program. The Company shall determine whether an employee it has referred for drug treatment and counseling should be temporarily reassigned for safety reasons to another position.

HYPOWER will promptly terminate any employee who tests positive for drugs while undergoing treatment and counseling for drug abuse, regardless of whether such treatment and counseling is voluntary or required by the Company.

IF YOU OR ANYONE YOU KNOW HAS A PROBLEM WITH DRUGS AND/OR ALCOHOL, YOU CAN RECEIVE FREE CONFIDENTIAL HELP THROUGH EMPLOYEE ASSISTANCE RESOURCES AND LOCAL DRUG REHAB PROGRAMS POSTED ON THE BULLETIN BOARD AT YOUR JOBSITE TRAILER OR AVAILABLE FOR EACH HYPOWER LOCATION OR FROM THE SAFETY DIRECTOR AT THE HOME OFFICE.

3.     **NOTICE TO EMPLOYEES AND JOB APPLICANTS REGARDING DRUG TESTING**

In addition to the Drug-Free Workplace policy, we have adopted a policy for Drug Testing (Substance Screening). Our policy on Substance Screening is as follows:

Both employees and applicants for employment will be subject to substance screening under the circumstances described below. "Substance Screening" means testing of blood, urine, breath, saliva, or otherwise as reasonably deemed necessary to determine possession or

Page **21** of 48
Rev. Date: 04/2022

**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y



Hernandez000028

impairment, and the completion of a substance use questionnaire. Such screening will be conducted in conformity with F.S.A. §440.102.

HYPOWER uses the National Institute on Drug Abuse (NIDA 10 panel) testing schedule. Additionally, at its option, the Company may choose blood alcohol screening.
Such screening will be conducted in conformity with F.S.A. §440.102.

**APPLICANTS:** After being offered a position, but prior to assuming any job, an applicant will be subject to screening for illegal substances. Refusal to submit to such screening makes it impossible to medically classify the applicant, prohibiting any further action on his/her application.

**EMPLOYEES:** Substance screening of all employees will be under the circumstances described below:

a) SUSPECTED IMPAIRMENT: When there is reasonable suspicion that any employee has reported to work or is working impaired, he/she will be subject to substance screening. Refusal to submit to such screening will be considered an act of insubordination, with attendant disciplinary and employment consequences (see section below titled Consequences). If reasonable suspicion testing is conducted, the Company will explain in writing the circumstances surrounding that suspicion. A copy of this documentation will be supplied to the employee upon request, and the original documentation will be kept confidential.

b) ROUTINE FITNESS-FOR-DUTY DRUG TESTING: The Company will require an employee to submit to a drug test if the test is conducted as part of a routinely scheduled employee fitness-for-duty medical examination that is part of the Company's established policy or that is scheduled routinely for all members of an employment classification or group.

c) POST ACCIDENT/INCIDENT: Any employee involved in either a job-related accident, or a job-related incident involving the apparent violation of a safety rule or standard which did or could have resulted in serious injury or property damage may be required to submit to drug and alcohol testing. This applies even if the incident did not result in injury to any person or any property damage. Additionally, if an employee is involved in a work-related accident and the Company reasonably suspects an employee of drug use, the Company will require the employee to submit to a drug test.

    i. Refusal to submit to such screening will be considered an act of insubordination, with attendant disciplinary and employment consequences. If an injured worker refuses to submit to a test for drugs or alcohol, he/she may be terminated from employment or otherwise disciplined by the Employer.

d) SAFETY CRITICAL JOBS: Employees holding safety critical jobs will be subject to random substance screening on a nondiscriminatory basis, as a term and condition of holding such jobs

    (i) Some, but not all examples of safety critical jobs are: crane operators, commercial truck drivers, equipment operators, electricians, supervisors and employees authorized to operate HYPOWER vehicles on public highways.



**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y

Page **22** of 48
Rev. Date: 04/2022

Hernandez000029

(ii) An employee whose name appears on the monthly random drug screen list is to report immediately to the collection facility for screening. DOT regulations for CDL drivers require a specific collection form. Employees going for random drug screens are required to have a picture ID, which is to be checked when they pick up their collection form. Employees without a picture ID must be escorted to the collection facility by a HYPOWER supervisor who can vouch for their identity.

e) COMMERCIAL TRUCK DRIVERS: Testing is conducted in accordance with the Federal Procedures for Transportation Workplace Drug Testing and the Motor Carrier Safety Regulation (49 CFR 391.41391.49).

**4.    CONSEQUENCES:** Refusing the Drug Screen is considered insubordination subjecting the employee to disciplinary procedures up to and including termination. For use, possession, or selling please refer to the Drug-free Workplace Policy. An employee who receives a positive **confirmed** drug test result may be terminated from employment or otherwise disciplined by the Company at its sole discretion. Job applicants who receive a positive **confirmed** drug test will be denied employment.

**5.    INSPECTIONS:** For purpose of assuming compliance with the prohibition of possession, employees will be subject to inspection. An employee's coolers, work area, desk, files, Company motor vehicle, equipment, and similar areas are subject to inspection at any time on a random or any other nondiscriminatory basis for purpose of this program. Similarly, an employee's own car, lunch box, and like personal containers are subject to such inspection when brought onto any work site. Any refusal to submit to such an inspection will be treated as an act of insubordination, with disciplinary and employment consequences.

**6.    PROCEDURES AND EMPLOYEE PROTECTION:** It is your responsibility to notify the Medical Review Officer (MRO) of the testing facility of any medicine that you are taking. This will assist the MRO to make a proper determination on any positive test. It is your right to consult the testing facility for technical information regarding prescription and nonprescription medication and most pharmacies usually help people on medication to understand prescribed and non-prescribed medication. Additionally, a list of the most commonly used over-the-counter and prescription drugs or medications by brand name or common name, as well as by chemical name, which may alter or affect a drug test is included below. Please note, due to the large number of obscure brand names and constant marketing of new products, the following list cannot and is not intended to be all inclusive:

1. <u>ALCOHOL</u> - All liquid medications containing ethyl alcohol (ethanol). Please read the label for alcohol content. As an example, Vick's Nyquil is 25% (50proof) ethyl alcohol, Comtrex is 20% (40 proof), Contac Severe Cold Formula is 25% (50proof) and Listerine is 26.9% (54 proof).

2. <u>AMPHETAMINES</u> - Obetrol, Biphetamine, Desoxyn, Dexedrine, Didrox

3. <u>CANNABINOIDS</u> - Marinol (Dronabinol, THQ)

4. <u>COCAINE</u> - Cocaine HCl topical solution (Roxanne)



Hernandez000030

5. <u>PHENCYCLIDIN</u> - Not legal by prescription

6. <u>METHAQUALONE</u> - Not legal by prescription

7. <u>OPIATES</u> - Paregoric. Parepectolin, Donnagel PG, Morphine, Tylenol with Codeine, Empirin with Codeine, APAP with Codeine. Aspirin with Codeine, Robitussin AC, Guiatuss AC, Novahistine DH, Novahistine Expectorant, Dilaudid (Hydromorphone), M-S Contin and Roxanol (morphine sulfate), Percodan, Vicodin, etc.

8. <u>BARBITURATES</u> - Phenobarbital, Tuinal, Amytal, Nembutal, Seconal, Lotusatc, Fiorinal, Fioricet, Esgic, Butisol, Mebaral, Butabarbital, Butabital, Phrenilin. Triad, etc.

9. <u>BENZODIAZEPHINES</u> - Ativan. Azene, Clonopin, Dalmane, Diazepam, Librium, Xanax. Serax, Tranxene, Valium, Verstran, Halcion. Paxipam. Restoril, Centrax

10. <u>METHADONE</u> - Dolophine, Metadose

11. <u>PROPOXYPHENE</u> - Darvocet, Darvon N. Dolene, etc.

All specimen collection and testing for drugs shall be performed in accordance with the Drug-Free Workplace Act of 1988, and all applicable regulations issued thereunder, as well as when applicable, any more stringent rules promulgated under state or Federal law.

**7. PROCEDURES FOR CONTESTING RESULTS:** Employees or job applicants who receive positive confirmed drug tests may contest or explain the results to the MRO and/or the Company within five (5) working days after the positive test result. If an employee or applicant's explanation or challenge is unsatisfactory to the MRO, the MRO shall report a positive test result back to HYPOWER

A person may contest the result pursuant to law or to rules adopted by the Agency for Health Care Administration.  An employee or applicant, in order to bring any administrative or civil action, must notify the appropriate laboratory.

Job applicants who feel there has been an error in the testing procedure have the option of re-testing at their own expense.  Applicants who choose this option must also agree to undergo additional random screenings.

The re-test must be taken at an approved collection center and use HYPOWER Medical Review Officer (MRO).  Applicants who fail the re-test will be subject to the provisions of the Drug Free Work Place Policy as outlined above.

The program will be administered so as not to interfere with the rights of disabled and/or handicapped applicants and employees, except to the extent any substance abuse directly interferes with job performance and safety.

## B. Workplace Bullying

HYPOWER defines bullying as "repeated inappropriate behavior, either direct or indirect, whether verbal, by electronic means, physical, or otherwise, conducted by one or more persons against another or others, at the place of work and/or in the course of employment." Such


**EMPLOYEE HANDBOOK**
R E L A T I O N S H I P S · R E S U L T S · P R O F E S S I O N A L I S M ·
C O N T I N U O U S   I M P R O V E M E N T · C O M M U N I T Y

Page **24** of **48**
Rev. Date: 04/2022

Hernandez000031

behavior violates the Company's policies, which clearly states that all employees will be treated with dignity and respect.

The purpose of this policy is to communicate to all employees, including supervisors, managers and executives, that the Company will not tolerate bullying behavior. Employees found in violation of this policy will be disciplined up to and including termination.

Bullying may be intentional or unintentional. However, it must be noted that where an allegation of bullying is made, the intention of the alleged bully is irrelevant and will not be given consideration when determining appropriate discipline. HYPOWER considers the following types of behavior examples of bullying:

- **Verbal bullying:** Slandering, ridiculing or maligning a person or his/her family; persistent name calling that is hurtful, insulting or humiliating; using a person as the butt of jokes; abusive and offensive remarks.

- **Physical bullying:** Pushing, shoving, kicking, poking, tripping, assault or threat of physical assault; damage to a person's work area or property.

- **Gesture bullying:** Nonverbal threatening gestures or glances that convey threatening messages.

- **Exclusion:** Socially or physically excluding or disregarding a person in work-related activities.

## C. Violence in the Workplace

All employees, customers, vendors and business associates must be treated with courtesy and respect at all times. Employees are expected to refrain from conduct that may be dangerous to others.

Conduct that threatens, intimidates or coerces another employee, customer, vendor or business associate will not be tolerated and may result in immediate termination. HYPOWER resources or property may not be used to threaten, stalk or harass anyone at the workplace or outside the workplace.

Indirect or direct threats of violence, incidents of actual violence and suspicious individuals or activities should be reported as soon as possible to a supervisor, security personnel, or any member of senior management. When reporting a threat or incident of violence, the employee should be as specific and detailed as possible. Employees should not place themselves in peril, nor should they attempt to intercede during an incident. Of course, if the employee feels that anyone is in imminent harm, the employee should contact 911 immediately.

HYPOWER will promptly and thoroughly investigate all reports of threats of violence or incidents of actual violence and of suspicious individuals or activities. The identity of the

Page **25** of 48
Rev. Date: 04/2022

**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y



Hernandez000032

individual making a report will be protected as much as possible. HYPOWER will not retaliate against employees making good-faith reports of violence, threats or suspicious individuals or activities. In order to maintain workplace safety and the integrity of its investigation, HYPOWER may suspend employees suspected of workplace violence or threats of violence, either with or without pay, pending investigation.

Anyone found to be responsible for threats of or actual violence or other conduct that is in violation of these guidelines will be subject to prompt disciplinary action up to and including immediate termination of employment.

HYPOWER encourages employees to bring their disputes to the attention of their supervisors or management before the situation escalates. HYPOWER will not discipline employees for raising such concerns.

## D. Safety in the Workplace

It is the responsibility of each employee to conduct all tasks in a safe and efficient manner complying with all local, state and federal safety and health regulations and program standards, and with any special safety concerns for use in a particular area or with a client.

It is the responsibility of the employee to complete an Accident and Incident Report for each safety and health infraction that occurs by an employee or that the employee witnesses. Failure to report such an infraction may result in employee disciplinary action, including termination.

Any employee who is injured on a job site is required to notify his or her superintendent immediately and must contact safety director for further instructions.  Employee is required to submit a written statement with specific details on how the injury occurred and present the written statement to the safety director before leaving work that day. If such notification is not feasible due to the injury, the employee's supervisor must submit such information within 24 hours of the incident.

Furthermore, management requires that every person in the organization assumes the responsibility of individual and organizational safety. Failure to follow Company safety and health guidelines or engaging in conduct that places the employee, client or Company property at risk can lead to employee disciplinary action and/or termination.

It is the policy of the Company to provide its employees a safe and healthy work place and to follow procedures aimed at safeguarding all employees.  Accident prevention and efficiency in production go together; neither should be given priority over the other. Safety can only be achieved through teamwork.  Each employee, supervisor and project manager must practice safety awareness by thinking defensively, anticipating unsafe situations and reporting unsafe conditions immediately.

Please observe the following precautions:



1. Obey all safety rules.
2. Follow safe job procedures. Do not take short cuts.
3. Wear personal protective equipment in accordance with the job you are performing.
4. Keep work areas clean and free from hazards.
5. Notify your supervisor of any emergency situation. If you are injured or become sick at work, no matter how slightly, **you must inform your supervisor immediately**.
6. Use, adjust and repair machines and equipment only if you are trained and qualified.
7. Observe all restricted areas and warning signs.
8. Use care when lifting and carrying objects. Get help if necessary.
9. Know emergency procedures.
10. Know the locations, contents and use of first aid and firefighting equipment.
11. Report unsafe conditions to supervisors.
12. Follow the care prescribed by your attending physician when treated for an injury or illness.
13. Attend all employee safety meetings.
14. Participate in accident investigations, serve on safety committees or other loss control activities as needed.
15. The use of alcoholic beverages, marijuana, illegal drug substances and firearms or explosives during working hours or while operating machinery or vehicles while on Company assignments will not be tolerated.
16. Understand your job fully and follow instructions. If you are not sure of the safety procedure- ask your supervisor.

If you have any question about how to safely perform a job, it is your responsibility to ask your supervisor for assistance. Any suspected unsafe conditions and all injuries that occur on the job must be reported immediately.

A violation of a safety precaution is in itself an unsafe act. Failure to report unsafe conditions is also a violation of a safety precaution and is in itself an unsafe act. A violation may lead to disciplinary action, up to and including discharge.

### E. Hazardous Substances Communications Policy

The Company Hazardous Substances Communications Policy was written to comply with the Occupational Safety and Health Administration's Hazard Communication Standard, 29CFR 1910.1200, commonly known as the "Employee Right to Know Law". This document provides information and training to employees regarding

the hazardous substances they may encounter in their workplace. It also compiles Safety Data Sheets on hazardous substances with which the Company employees may come in contact. Each individual jobsite will have its own custom, SDS book that will be maintained by the project's staff.

## CHAPTER 4

## IV. WORKPLACE EXPECTATIONS

### A. Confidentiality

Our clients and other parties with whom we do business entrust the Company with important information (candidates' personal information) or (Clients) information relating to their businesses. It is our policy that all information considered confidential will not be disclosed to external parties or to employees who are not on a "need to know" basis.  If an employee questions whether certain information is considered confidential, he/she should first check with his/her immediate supervisor and always err in favor of maintaining the information confidential until he or she receives clarification from management.

This policy is intended to alert employees to the need for discretion at all times and is not intended to inhibit normal business communications.

### B. Conflicts of Interest

Employees must avoid any relationship or activity that might impair, or even appear to impair, their ability to make objective and fair decisions when performing their jobs. At times, an employee may be faced with situations in which business actions taken on behalf of HYPOWER may conflict with the employee's own personal interests; the employee should avoid putting him/herself in such situation.  Company property, information or business opportunities may not be used for personal gain.

Conflicts of interest could arise in the following circumstances:

- Being employed by, or acting as a consultant to, a competitor or potential competitor, supplier or contractor, regardless of the nature of the employment, while employed with HYPOWER.
- Hiring or supervising family members or closely related persons.
- Serving as a board member for an outside commercial company or organization.
- Owning or having a substantial interest in a competitor, supplier or contractor.
- Accepting gifts, discounts, favors or services from a customer/potential customer, competitor, candidate or supplier, unless equally available to all Company employees.


Hernandez000035

Employees with a conflict-of-interest question should seek advice from management. Before engaging in any activity, transaction or relationship that might give rise to a conflict of interest, employees must seek review from their manager or division manager. Prior to hiring or supervising family members or closely related persons, written permission must be obtained from the President of Hypower.

## C. Attendance and Punctuality

Regular attendance is a condition of continuing employment with the Company.  If you are going to be late or absent from work, you must notify your supervisor or have someone notify your supervisor prior to the beginning of your work shift, or as soon as you realize you will be absent or late.

Time off must be scheduled with one's supervisor two weeks in advance except in cases of emergency or sudden illness. Patterns of absenteeism or tardiness may result in discipline even if the employee is eligible but has not yet exhausted available paid time off ("PTO").

Not reporting to work and not calling to report the absence is a no-call/no-show and is a serious matter. The first instance of a no call/no show will result in a warning. The second separate offense may result in termination of employment with no additional disciplinary steps. **A no call/no show lasting three days may be considered job abandonment and may be deemed an employee's voluntary resignation of employment.**  If an employee is absent three or more days without previously scheduling time off with his or her supervisor, the employee must provide a doctor's note to their direct supervisor immediately upon returning to work.

The Company will record absences and/or lateness in your personnel file and your attendance record may be considered when evaluating requests for promotions, transfers, leaves of absence, and approved time off, as well as scheduling layoffs, etc.  In addition, an unacceptable attendance record may result in disciplinary action, including termination.

# CHAPTER 5

# V. Electronic Communication, Internet Use and Company Records

## A. GUIDELINES

All Employees waive any right to privacy in Company's Electronic Communication System ("ECS").  The phrase Electronic Communication Systems ("ECS") is defined as Company's (i) e-mail accounts; (ii) internet accounts; (iii) laptops, cell phones, telephones, tablets, iPads, fax machines, or other electronic devices; (iv) computer and electronic mail systems and (v) voicemail.  ECS are provided and assigned, on an as needed basis, at



Hernandez000036

Company's sole discretion, to Company employees to conduct work-related business.  Your access to the Company's ECS may be terminated at any time, with or without notice, at the Company's discretion.   This policy is not intended to restrict communications or actions protected or required by state or federal law. All Employees waive any right to privacy in Company Electronic Communication System texting, messaging and social media.

All communication systems are to be used primarily for business purposes – such use must be job-related.

E-mail and voice-mail should be composed in a professional manner that is similar to messages sent on Company letterhead.  Employees should keep in mind that electronic files are subject to discovery and may subsequently be used in litigation involving the Company or the employee.  Therefore, it is expected that employees conduct themselves in a professional manner at all times.

**An employee's use of Company's ECS constitutes the employee's agreement to abide by the Company policies governing such systems as set forth below, or as modified in the future:**

**(i)  Email**: E-mail is a written means of electronic communication.  Employees should not transmit anything in an e-mail message that they would not be comfortable writing in a letter or memorandum.  Electronic mail created on the Company's ECS is Company-owned property.  The ECS shall not be used to solicit commercial ventures, or promote religious or political causes, outside companies, or other personal matters unrelated to the job.  The ECS shall not be used to transmit any Company confidential or proprietary information to unauthorized third parties.

Company reserves the right to access and disclose the contents contained in any of Company's ECS.  All system pass codes or passwords must be made known to IT. Company retains the right to access them at any time.  No pass code or password may be shared with another Employee or anyone else without prior authorization from IT.

As such, the Company reserves the right to inspect electronic mail files at any time to ensure the system is not being inappropriately used by employees.  The reviews may be carried out to investigate misconduct, to verify that confidential information is not being disclosed and to audit the system for waste, fraud or abuse.

Misconduct through electronic mail will not be tolerated.  This includes electronic mail messages intended to slander or harass, or the improper sending of confidential or copyrighted materials or other trade secret information of the Company.  Use of the system to send offensive messages, such as racial or sexual slurs, is absolutely prohibited and will result in appropriate disciplinary action, up to and including termination of the offender's employment by the Company.

Employees are cautioned that electronic mail can create a lasting record.  Deleting an email message does not guarantee that it has been erased from the system.  The Company



**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y

Page **30** of 48
Rev. Date: 04/2022

Hernandez000037

occasionally retains backup copies of documents, including e-mail correspondence, produced on the Company's computer system.

Company prohibits the unauthorized use, copying or distribution of any of its Confidential Information which includes but is not limited to Company's customer lists and information concerning products purchased by clients, technical information, procurement and sales activities and procedures, promotion and credit and financial data concerning customers, vendor information, supplier information, pricing information, and sales reports and data ("Confidential Information").  Employees are required to maintain Company's Confidential Information confidential and are prohibited from maintaining, storing, sending, or receiving Company's Confidential Information in, or to, any location other than Company's ECS, Company's server and Company's devices.  Employees are strictly prohibited from using storing, transmitting, or in any way accessing Company's Confidential Information from any non-Company issued electronic device or email account.

**(ii)  Internet**: As with e-mail, use of the Internet is meant for Company business, not for personal use. The Internet is considered a work tool and should be used appropriately.  No unauthorized software or computer files are to be downloaded from the Internet.  All necessary downloads are to be approved by the Director of Information Technology. Internet use at work is not private.  The Company reserves the right to monitor all Internet activity on the Company's Internet server.  Unauthorized, unlawful or inappropriate use of the Internet will be result in disciplinary action, including termination.

**(iii)  Software**: Software is a valuable resource to the Company.  No personnel are to install, uninstall, download or copy software.  Most commercially available software programs are protected by copyrights which generally prohibit the copying or other reproduction of the software, except for backup or archival purposes.  Violations of software licensing agreements and copyright violations, whether or not intentional, are being actively prosecuted and are contrary to the Company's standard of conduct.  Employees found making copies of software for unauthorized reasons are subject to disciplinary action, and may be subject to civil and criminal penalties, including fines and imprisonment.

**(iv) Confidentiality**: Employees are expected to respect the confidentiality of messages sent to others.  Employees may not access or review e-mail or voice-mail messages that are not distributed to them. Employees may not share their log in information with others, shall not log in with any other employee's information or allow another employee to log in under employee's username.

**(v)  File Management**:  To keep the communication systems running efficiently, employees should delete unnecessary electronic messages stored in the system, as well as computer files that are no longer needed. Storage of any company electronic files or emails or uses of external and/or removable devices are prohibited. Only approved company software platforms such as ProCore or other company approved e-document storage platforms are allowed. Storage of files on local drives is prohibited without prior written consent of a division manager, vice president, or IT department.

Page **31** of 48
Rev. Date: 04/2022

**EMPLOYEE HANDBOOK**
R E L A T I O N S H I P S · R E S U L T S · P R O F E S S I O N A L I S M ·
C O N T I N U O U S   I M P R O V E M E N T · C O M M U N I T Y



Hernandez000038

**(vi) Proprietary Information Restrictions**:  Receiving or downloading, or sending or uploading of proprietary information is prohibited without prior authorization.  Such information includes copyrighted materials, trade secrets, proprietary financial information, or similar materials.

**(vii)    Anti-Harassment Policies Applicable**:    Company policies prohibiting discrimination and harassment are applicable to Company's Communication Systems. Messages that contain foul, inappropriate or offensive language, or those containing racially or sexually inappropriate language are prohibited.

**(viii)  Notice of Violations**:  Employees who observe violations of this policy shall notify their immediate supervisor or shall report the violation to a division manager or owner of Hypower. If you want to send an e-mail within the Company and are uncertain about whether it is permitted under these guidelines, discuss the matter first with your immediate supervisor or division manager.

**(ix)  Discipline**:  Employees who violate this policy are subject to discipline, up to and including termination.

## B. Right to Monitor

All Company-supplied technology, including but not limited to internet, electronic devices and e-mail, and Company-related work records belong to the Company and not to the employee.    HYPOWER routinely monitors use of Company-supplied technology. Any inappropriate or illegal use of the Company supplied technology or communications may be subject to disciplinary action up to and including termination of employment. Employees do not have an expectation of privacy in any of the Company-supplied technology, including but not limited to Internet, electronic devices and e-mail, and Company-related work records. HYPOWER reserves the right to access any materials or content stored in any Company-supplied technology, including but not limited to Internet, Electronic Devices and e-mail, and Company-related work records.  In addition to the system hardware and software, all electronic files and electronic messages are Company property and business records, whether composed, received or sent by the employee.

Additionally, the Company reserves the right to delete such files.  It is expected that the use of the Company's ECS will be business related.  In the event that the Company believes that an employee is acting in a manner which is contrary to this policy or the interests of the Company, it may, without notice to the employee, undertake to investigate such activities including review of any documents, data or software and take any further action deemed necessary by the Company.

The Company reserves the right to retrieve, monitor, and review any messages in the Company's ECS and may disclose such messages for any purpose without notice to the employee and without seeking further permission of the employee.    Passwords must be disclosed to the IT department upon request. If you would not say it in a typewritten memo or letter, you should not say it in e-mail.



**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S · R E S U L T S · P R O F E S S I O N A L I S M ·
C O N T I N U O U S   I M P R O V E M E N T · C O M M U N I T Y

Page **32** of 48
Rev. Date: 04/2022

Hernandez000039

### C. Social Media—Acceptable Use

Below are guidelines for social media use.

Employees may not post financial, confidential, sensitive or proprietary information about HYPOWER, its clients, employees or applicants.

HYPOWER may monitor content out on the Internet. Policy violations may result in discipline up to and including termination of employment.

Make it clear in your social media activity that you are speaking on your own behalf. Write in the first person and use your personal e-mail address when communicating via social media.

If you disclose your affiliation as an employee of Hypower, it is required that you also include a disclaimer that your views do not represent those of your employer. For example, consider such language as "the views in this posting reflect my personal views and do not represent the views of my employer."

Use good judgment about what you post and remember that anything you say can reflect on Hypower, even if you do include a disclaimer. Always strive to be accurate in your communications about Hypower and remember that your statements have the potential to result in liability for you or Hypower.  Hypower encourages professionalism and honesty in social media and other communications.  This policy is not intended to restrict communications or actions protected or required by state or federal law.

### D. Solicitations, Distributions and Posting of Materials

HYPOWER prohibits the solicitation, distribution and posting of materials on or at HYPOWER property by any employee or nonemployee, except as may be permitted by this policy. The sole exceptions to this policy are charitable and community activities supported by HYPOWER management and company-sponsored programs related to HYPOWER's products and services.

Provisions:

- Nonemployees may not solicit employees or distribute literature of any kind on Company premises at any time.
- Employees may only admit nonemployees to work areas with management approval or as part of a Company-sponsored program. These visits should not disrupt workflow. An employee must accompany the nonemployee at all times. Former employees are not permitted onto Company property except for official Company business.
- Employees may not solicit other employees during work times, except in connection with a Company-approved or sponsored event.

Page **33** of 48
Rev. Date: 04/2022

**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S · R E S U L T S · P R O F E S S I O N A L I S M ·
C O N T I N U O U S   I M P R O V E M E N T · C O M M U N I T Y



Hernandez000040

- Employees may not distribute literature of any kind during work times or in any work area at any time, except in connection with a Company-sponsored event.
  - The posting of materials or electronic announcements are permitted only with approval from the president of Hypower. Violations of this policy should be reported to a division manager or Hypower owner. This policy is not intended to restrict communications or actions protected or required by state or federal law.

## E. Employee Personnel Files

Employee files are maintained by the payroll department and are considered confidential. Managers and supervisors may only have access to personnel file information on a need-to-know basis.

A manager or supervisor considering the hire of a former employee or transfer of a current employee may be granted access to the file, or limited parts of it, in accordance with the law.

Personnel file access by current employees and former employees upon request will generally be permitted within three days of the request unless otherwise required under state law. Personnel files are to be reviewed in the payroll department office. Personnel files may not be taken outside the department.

Representatives of government or law enforcement agencies, in the course of their duties, may be allowed access to file information.

# CHAPTER 6

## VI. Compensation & Time Off

### A. Payment of Wages

Paydays are usually Friday following the time worked in the prior weekly period.

Employees should review their pay stubs for errors. **If you find an error, report it to the Payroll Department immediately.** If there has been an erroneous overpayment or underpayment, Hypower will correct it as soon as possible.

### B. Method of Payment.

Employees will need to complete the Payroll Paycheck Form and may elect to be paid by various methods authorized by state and federal law, such as a Paycard, a paycheck or


**EMPLOYEE HANDBOOK**
RELATIONSHIPS-RESULTS-PROFESSIONALISM-
CONTINUOUS IMPROVEMENT-COMMUNITY

Page **34** of 48
Rev. Date: 04/2022

Hernandez000041

through direct deposit of funds to either a savings or checking account at the financial institution of their choice.

If an employee's marital status changes or the number of exemptions previously claimed increases or decreases, a new Form W-4 must be submitted by the employee to the payroll department. It is the employee's responsibility to keep the payroll department current with all of his/her personal information.

## C. Time Reporting

To ensure that Hypower has accurate time records and that employees are paid for all hours worked in a timely manner, nonexempt employees are required to accurately record all hours worked.

Nonexempt employees should record all hours worked and breaks longer than 20 minutes on a daily basis, including lunch breaks. Your supervisor will review your time records and you need to verify them at the end of each week.  In the event that there is a discrepancy in your time records, you must bring it to your supervisor's attention immediately.

Employees must ensure all time is recorded accurately. Off-the-clock work is strictly prohibited. Fraudulent timekeeping and falsification of time records are subject to discipline, up to and including termination of employment.

Employees may be required to come in early, work late, or work overtime from time to time, depending on various factors, such as workloads, staffing needs, and special projects. Employees will receive their specific work schedule from their direct supervisor. Nonexempt employees must have permission from their supervisor before working overtime.

Overtime is defined as hours worked by an hourly or nonexempt employee in excess of 40 hours in a workweek and should be recorded up to the nearest tenth of an hour. All overtime must be approved in advance by the manager to whom the employee reports.

Employees will submit their daily time record in accordance with the Company's practices. Each employee (exempt or non-exempt) is responsible to record his or her hours worked. All absences from work schedules will be appropriately recorded. Falsification of time records may result in immediate termination.

## D. Mandatory Meal Period

Employee meal periods are important to company productivity and employee health. Employees who work at least eight consecutive hours in a day will be required to take a meal break.  Employees should check with their supervisor to determine the length of the meal break applicable to the Employee's position.

The meal period will not be included in the total hours of work per day and is not compensable. Nonexempt employees are to be completely relieved of all job duties while on meal breaks and must clock out for meal periods and clock back in once their meal break is

Page **35** of 48
Rev. Date: 04/2022

**EMPLOYEE HANDBOOK**
R E L A T I O N S H I P S · R E S U L T S · P R O F E S S I O N A L I S M ·
C O N T I N U O U S   I M P R O V E M E N T · C O M M U N I T Y



Hernandez000042

finished and the employee is returning to work. Violation of this policy may result in immediate termination.

Any employee who performs work during their lunch break must report back in to work before performing the work to account for the time spent working and notify their supervisor/manager of the time spent working so that the appropriate adjustment can be made to the employee's time record.

**Employees are responsible for reporting any supervisor or manager who encourages or requires work during lunch breaks to a division manager or Hypower owner.**

## E. Employee Expense Reimbursement

It is Hypower's practice to reimburse employees for reasonable expenses incurred during the period they are employed by Hypower in connection with travel and other business on its behalf, subject to the guidelines and procedures set out in this policy. Employees must obtain advance written approval from the Division Manager/Vice President and must complete an Expense Form accompanied by receipts or other appropriate substantiating documentation for all travel and other business expenses incurred.  Employees must submit expense reimbursement forms to the Division Manager/Vice President within 30 days of incurring the expense. Failure to comply with this time frame may result in the reimbursement being taxable income for the employee. Hypower will not reimburse employees for any expenses submitted after this deadline.

If a receipt or other substantiating documentation is not available, the employee must submit a written explanation of why the documentation cannot be provided. Hypower, in its sole discretion, will evaluate the explanation and determine whether the expense is reimbursable.

Reimbursable Expenses

Expenses that may be reimbursed under this policy are:

Reasonable business travel expenses, including transportation, lodging and meals.

Reasonable business meals and Company approved entertainment.

If you have any questions about this policy or Hypower's travel and business expense reimbursement procedures, please contact the payroll department.

Any employee, who abuses this policy, for example by submitting fraudulent expense reimbursement requests, will be subject to disciplinary action, up to and including termination of employment.


Hernandez000043

### F. Company Observed Holidays

HYPOWER observes the following paid holidays each year for all full time Salaried and Administrative hourly employees, and construction hourly workforce.

- New Year's Day
- Memorial Day
- Independence Day
- Labor Day
- Thanksgiving Day and the day after Thanksgiving Day
- Christmas Day

**For personnel to be eligible for holiday pay, they must work their first scheduled day before and after the holiday, unless they are on approved PTO leave. Holiday pay is equivalent to one day's straight time earnings. Any exceptions to this policy must be approved by the Company President or designee in writing.**

### G. Paid Time Off Policy ("PTO")

1. **The Company PTO policy for all Salaried and Administrative fulltime employees will be as follows:**

- 40 hours (prorated) paid PTO effective first day of employment. PTO will be prorated based on remaining days left in the year. You will receive .11 hours of PTO for each day remaining in the calendar year. This number will then be rounded up. That prorated amount will be available until December 31st.
- 40 hours paid PTO starting on January 1st after your hire date. This is available for the calendar year.
- 80 hours paid PTO starting on your second calendar year, and then again, each year thereafter.
    - Example based on a hire date of April 15, 2022:
        - 4/15/22-12/31/22 = 29 hours of PTO (261 remaining days x .11)
        - 1/1/23-12/31/23 = 40 hours of PTO
        - 1/1/24-12/31/24 = 80 hours of PTO

- 40 additional hours of paid PTO will be added once you have reached your 7th calendar year of continuous employment.
- Request for PTO shall be submitted to the Employee's supervisor with at least thirty (30) days' notice prior to the requested leave, unless in the event of an emergency.

**There will be no PTO carryover from year to year.**

If the employee leaves the Company for any reason, other than termination for cause or resignation, they will be paid any unused PTO, not to exceed the maximum annual accrual.

No more than two consecutive weeks may be taken at any time.

If the period to take a PTO is set to expire, but the employee was not able to take PTO for reasons of Company work requirements, the Company will carryover the unused PTO at year end upon submission of an appropriate form approved by the Vice President having

Page **37** of **48**
Rev. Date: 04/2022

**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y



Hernandez000044

jurisdiction over and justifying the payment. The form will become part of the permanent file of the employee.

2.  **The Company PTO policy for all fulltime, hourly paid administrative employees, Foreman, and Service Technician's will be as follows:**

- 40 hours (prorated) paid PTO effective first day of employment.  PTO will be prorated based on remaining days left in the year.  You will receive .11 hours of PTO for each day remaining in the calendar year.  This number will then be rounded up. That prorated amount will be available until December 31st.
- 40 hours paid PTO starting on January 1st after your hire date.  This is available for the calendar year.
- 80 hours paid PTO starting on your second calendar year, and then again, each year thereafter.
  - Example based on a hire date of April 15, 2022:
    - 4/15/22-12/31/22 = 29 hours of PTO (261 remaining days x .11)
    - 1/1/23-12/31/23 = 40 hours of PTO
    - 1/1/24-12/31/24 = 80 hours of PTO

- Request for PTO shall be submitted to the Employee's supervisor with at least thirty (30) days' notice prior to the requested leave, unless in the event of an emergency.

**There will be no PTO carryover from year to year.**

If the employee leaves the Company for any reason, other than termination for cause or resignation, they will be paid any unused PTO, not to exceed the maximum annual accrual.

No more than two consecutive weeks may be taken at any time.

If the period to take a PTO is set to expire, but the employee was not able to take PTO for reasons of Company work requirements, the Company will carryover the unused PTO at year end upon submission of an appropriate form approved by the Vice President having jurisdiction over and justifying the payment. The form will become part of the permanent file of the employee.

3.  **The Company PTO policy for the construction hourly workforce will be as follows:**

- 0 hours paid PTO from hire date until December 31st of that same year.
- 40 hours paid PTO starting on January 1st after your hire date.  This is available for the calendar year, and then again each year thereafter
  - Example based on a hire date of April 15, 2022:
    - 4/15/22-12/31/22 = 0 hours of PTO
    - 1/1/23-12/31/23 = 40 hours of PTO
    - 1/1/24-12/31/24 = 40 hours of PTO

**There will be no PTO carryover from year to year.**

If the employee leaves the Company for any reason, other than termination for cause or resignation, they will be paid any unused PTO, not to exceed the maximum annual accrual.

No more than two consecutive weeks may be taken at any time.


**EMPLOYEE HANDBOOK**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y

Page 38 of 48
Rev. Date: 04/2022

Hernandez000045

If the period to take a PTO is set to expire, but the employee was not able to take PTO for reasons of Company work requirements, the Company will carryover the unused PTO at year end upon submission of an appropriate form approved by the Vice President having jurisdiction over and justifying the payment. The form will become part of the permanent file of the employee.

**4. Violations to this Policy:**

Anyone who takes time off without properly reporting and recording his/her time off is in violation of this policy and may be subjected to immediate termination.

## H. Bereavement Leave

All Full-Time Employees may be granted up to three (3) days paid leave in the event of the death of a member of their immediate family.  If major travel is necessary, additional non-paid time off may be granted according to the distance involved. An employee who wishes to take time off due to the death of an immediate family member should notify his or her supervisor immediately.  Bereavement leave will be granted unless there are unusual business needs or staffing requirements.

Paid bereavement leave is granted according to the following schedule:

Employees are allowed three days of paid leave in the event of the death of the employee's spouse, significant other, child, legal guardian, father, father-in-law, mother, mother-in-law, brother, sister, stepfather, stepmother, stepbrother, stepsister, stepson or stepdaughter.

To attend the funeral of anyone not listed above, time off without pay may be granted at the discretion of the employee's Department or Division Manager/Vice President.

## I. Jury Duty

Upon receipt of notification from the state or federal courts of an obligation to serve on a jury, employees must notify their supervisor and provide him/her with a copy of the jury summons. The Company will pay regular full-time and regular part-time employees for time off for jury duty up to 5 days of pay or as required by law.  An employee on jury duty is expected to report to work any day he/she is excused from jury duty.

Upon receipt of the notice to serve jury duty, the employee should immediately notify his/her supervisor, as well as the payroll department.  Additionally, a copy of the notice to serve jury duty should be attached to the employee's attendance record for attendance purposes.

Page **39** of 48
Rev. Date: 04/2022

**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S · R E S U L T S · P R O F E S S I O N A L I S M ·
C O N T I N U O U S   I M P R O V E M E N T · C O M M U N I T Y



Hernandez000046

# CHAPTER 7

## VII. Family and Medical Leave Act

The function of this policy is to provide employees with a general description of their FMLA rights. In the event of any conflict between this policy and the applicable law, employees will be afforded all rights required by law.

If you have any questions, concerns or disputes with this policy, you must contact the Director of Personnel.

FMLA leave or return to work may be delayed or denied if the appropriate documentation is not provided in a timely manner.  Also, a failure to provide requested documentation of the reason for an absence from work may lead to termination of employment.

### A. General Provisions

To the extent required by law, HYPOWER will grant up to 12 weeks (or up to 26 weeks of military caregiver leave to care for a covered service member with a serious injury or illness) during a 12-month period to eligible employees.

### B. Eligibility

To qualify to take family or medical leave under this policy, the employee must meet the following conditions:

(i)     The employee must have worked for the Company for 12 months or 52 weeks. The 12 months or 52 weeks need not have been consecutive. Separate periods of employment will be counted, provided that the break in service does not exceed seven years. Separate periods of employment will be counted if the break in service exceeds seven years due to National Guard or Reserve military service obligations or when there is a written agreement, including a collective bargaining agreement, stating the employer's intention to rehire the employee after the service break. For eligibility purposes, an employee will be considered to have been employed for an entire week even if the employee was on the payroll for only part of a week or if the employee is on leave during the week.

(ii)    The employee must have worked at least 1,250 hours during the 12-month period immediately before the date when the leave is requested to commence. The principles established under the Fair Labor Standards Act (FLSA) determine the number of hours worked by an employee. The FLSA does not include time spent on paid or unpaid leave as hours worked. Consequently, these hours of


Hernandez000047

leave should not be counted in determining the 1,250 hours eligibility test for an employee under FMLA.

(iii)     The employee must work in a work site where 50 or more employees are employed by the Company within 75 miles of that office or work site. The distance is to be calculated by using available transportation by the most direct route.

### C. Type of Leave Covered

To qualify as FMLA leave under this policy, the employee must be taking leave for one of the reasons listed below:

(i)     The birth of a child and in order to care for that child.
(ii)     The placement of a child for adoption or foster care and to care for a newly placed child.
(iii)     To care for a spouse, child or parent with a serious health condition (Under the FMLA, a "spouse" means a husband or wife as defined under the law in the state where the employee resides, including same-sex marriages in states that legally recognize such civil unions).
(iv)     The serious health condition (described below) of the employee.

An employee may take leave because of a serious health condition that makes the employee unable to perform the functions of the employee's position.

A serious health condition is defined as a condition that requires inpatient care at a hospital, hospice or residential medical care facility, including any period of incapacity or any subsequent treatment in connection with such inpatient care or as a condition that requires continuing care by a licensed health care provider.

This policy covers illnesses of a serious and long-term nature, resulting in recurring or lengthy absences. Generally, a chronic or long-term health condition that would result in a period of three consecutive days of incapacity with the first visit to the health care provider within seven days of the onset of the incapacity and a second visit within 30 days of the incapacity would be considered a serious health condition. For chronic conditions requiring periodic health care visits for treatment, such visits must take place at least twice a year.

Employees with questions about what illnesses are covered under this FMLA policy or under the Company's sick leave policy are encouraged to consult with the Director of Personnel.

If an employee takes paid sick leave for a condition that progresses into a serious health condition and the employee requests unpaid leave as provided under this policy, the Company may designate all or some portion of related leave taken as leave under this policy, to the extent that the earlier leave meets the necessary qualifications.

**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S · R E S U L T S · P R O F E S S I O N A L I S M ·
C O N T I N U O U S   I M P R O V E M E N T · C O M M U N I T Y



Hernandez000048

### D. Amount of Leave

An eligible employee may take up to 12 weeks for covered leave under this policy during any 12-month period. The Company will measure the 12-month period as a rolling 12-month period measured backward from the date an employee uses any leave under this policy. Each time an employee takes leave, the Company will compute the amount of leave the employee has taken under this policy in the last 12 months and subtract it from the 12 weeks of available leave, and the balance remaining is the amount of time the employee is entitled to take at that time.

If a husband and wife both work for the Company and each wishes to take leave for the birth of a child, adoption or placement of a child in foster care, or to care for a parent (but not a parent "in-law") with a serious health condition, the husband and wife may only take a combined total of 12 weeks of leave. If a husband and wife both work for the Company and each wishes to take leave to care for a covered injured or ill service member, the husband and wife may only take a combined total of 26 weeks of leave.

### E. Leave for Families of Military Members

The FMLA also provides for qualifying exigency leave for families of members of the National Guard or Reserves or of a regular component of the Armed Forces when the covered military member is on covered active duty or called to covered active duty.

An eligible employee can take up to 26 weeks for the FMLA military caregiver leave circumstance above during a single 12-month period. For this military caregiver leave, the Company will measure the 12-month period as a rolling 12-month period measured forward. FMLA leave already taken for other FMLA circumstances will be deducted from the total of 26 weeks available.

An employee whose spouse, son, daughter or parent has been notified of an impending call or order to covered active military duty or who is already on covered active duty may take up to 12 weeks of leave for reasons related to or affected by the family member's call-up or service. The qualifying exigency must be one of the following: a) short-notice deployment, b) military events and activities, c) child care and school activities, d) financial and legal arrangements, e) counseling, f) rest and recuperation, g) post-deployment activities, and h) additional activities that arise out of active duty, provided that the employer and employee agree, including agreement on timing and duration of the leave.

Employees requesting leave for military duty should contact Director of Personnel to request leave as soon as they are aware of the need for leave. For request forms and detailed information on eligibility, employee rights while on leave and job restoration upon completion of leave, refer to the policies, procedures and forms available by contacting the Director of Personnel .

### F. Employee Status and Benefits During Leave



**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S · R E S U L T S · P R O F E S S I O N A L I S M ·
C O N T I N U O U S   I M P R O V E M E N T · C O M M U N I T Y

Page **42** of **48**
Rev. Date: 04/2022

Hernandez000049

While an employee is on leave, the Company will continue the employee's health benefits during the leave period at the same level and under the same conditions as if the employee had continued to work.

## G. Employee Status After Leave

An employee who takes leave under this policy may be asked to provide a fitness for duty (FFD) clearance from the health care provider.

## H. Use of Paid and Unpaid Leave

All PTO leave runs concurrently with FMLA leave.

Disability leave for the birth of a child and for an employee's serious health condition, including workers' compensation leave (to the extent that it qualifies), will be designated as FMLA leave and will run concurrently with FMLA.

## I. Intermittent Leave or a Reduced Work Schedule

The employee may take FMLA leave in 12 consecutive weeks, may use the leave intermittently (take a day periodically when needed over the year) or, under certain circumstances, may use the leave to reduce the workweek or workday, resulting in a reduced-hour schedule. In all cases, the leave may not exceed a total of 12 workweeks (or 26 workweeks to care for an injured or ill service member over a 12-month period).

## J. Certification for the Employee's Serious Health Condition

The Company will require certification for the employee's serious health condition. The employee must respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave.

## K. Certification for the Family Member's Serious Health Condition

The Company will require certification for the family member's serious health condition. The employee must respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave.

## L. Certification of Qualifying Exigency for Military Family Leave

The Company will require certification of the qualifying exigency for military family leave. The employee must respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave.

Page **43** of **48**
Rev. Date: 04/2022

**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y



Hernandez000050

## M. Certification for Serious Injury or Illness of Covered Service Member for Military Family Leave

The Company will require certification for the serious injury or illness of the covered service member. The employee must respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave.

## N. Recertification

The Company may request recertification for the serious health condition of the employee or the employee's family member when circumstances have changed significantly, or if the employer receives information casting doubt on the reason given for the absence, or if the employee seeks an extension of his or her leave. Otherwise, the Company may request recertification for the serious health condition of the employee or the employee's family member every six months in connection with an FMLA absence.

## O. Procedure for Requesting FMLA Leave

All employees requesting FMLA leave must provide the payroll department with written notice of the need for the leave. Within five business days after the employee has provided this notice, the payroll department will provide the employee with the DOL Notice of Eligibility and Rights.

When the need for the leave is foreseeable, the employee must provide the employer with at least 30 days' notice. When an employee becomes aware of a need for FMLA leave less than 30 days in advance, the employee must provide notice of the need for the leave either the same day or the next business day. When the need for FMLA leave is not foreseeable, the employee must comply with the Company's usual and customary notice and procedural requirements for requesting leave.

## P. Designation of FMLA Leave

Within five business days after the employee has submitted the appropriate certification form, the payroll department will provide the employee with a written response to the employee's request for FMLA leave.

## Q. Intent to Return to Work from FMLA Leave

The Company may require an employee on FMLA leave to report periodically on the employee's status and intent to return to work.

## R. Failure to Return To Work Following FMLA Leave

If the employee does not return to work following the conclusion of FMLA leave, the employee will be considered to have voluntarily resigned.  HYPOWER may recover health


**EMPLOYEE HANDBOOK**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y

Page **44** of **48**
Rev. Date: 04/2022

Hernandez000051

insurance premiums that HYPOWER paid on behalf of the employee, if any, during any unpaid FMLA leave except that HYPOWER employee's share of such premiums may not be recovered if the employee fails to return to work because of the employee's or a family member's serious health condition or because of other circumstances beyond the employee's control.  In such cases, HYPOWER may require the employee to provide medical certification of the employee's or the family member's serious health condition.

## S. Additional Information

For further information or clarification about FMLA leave, please contact the payroll department.

# CHAPTER 8

## VIII. Benefits

For more information regarding benefits programs, please refer to the Company Summary Plan Descriptions, which were provided to employees upon hire, or contact the payroll department. To the extent that any of the information contained in this Handbook, or in any other summary plan description or any information you receive orally is inconsistent with the official Plan document, the provisions set forth in the Plan document will govern in all cases.

### A. Medical Benefits

You will receive information regarding the Company's medical benefit plan and your eligibility to participate in any of the Company's plan(s) at the time that you are hired.

### B. Educational Reimbursement

Upon completion of approved courses, HYPOWER will reimburse regular full time employees if the employee's final grade of "C" or above has been maintained at all times.

Tuition and materials, including books, will be reimbursed at the rate of:

        50 percent for a grade of "C".

        75 percent for a grade of "B".

        100 percent for a grade of "A".

The courses taken must be related to the employee's position and the employee must have prior written approval from their immediate supervisor who in turn must obtain approval from the Division Manager/Vice President of HYPOWER.  Written approval from the president of

Page 45 of 48
Rev. Date: 04/2022

**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S · R E S U L T S · P R O F E S S I O N A L I S M ·
C O N T I N U O U S   I M P R O V E M E N T · C O M M U N I T Y



Hernandez000052

Hypower should be forwarded to the payroll department and the division manager/vice president.

After the courses have been completed, the employee must submit a written request for reimbursement, including proof of final grade or Certificate of Completion to their division V.P. who will arrange for the reimbursement check with the Accounting Department.

Employees who have received approval for a course of study may request an advance for tuition costs. Upon completion and presentation of final grades, that portion of the tuition not reimbursable to the employee can be paid back to the Company through a weekly payroll deduction. Employee's receiving a tuition advance will be required to sign an agreement giving the Company the right to make payroll deductions if for any reason they do not complete their chosen course of study or are not entitled to full reimbursement based on the grade obtained. The employee will be liable for the entire amount advanced. This applies to all employees, including employees enrolled in any approved apprenticeship program or those who do not finish because they are leaving the Company for any reason.

Employees attending seminars at Company expense are required to submit a written report within one week of their return. The report should include a description of what the seminar was about, what they found most valuable, and what changes, if any, they will make to the way they do things as a result of the seminar.

## C. Workers' Compensation Benefits

The Company is covered under statutory state workers' compensation laws. Employees who sustain work-related injuries must immediately notify their department supervisor. Upon being hired, Employee will be required to complete the Workers' Compensation Acknowledgment Form.

## D. Voluntary Training Policy

Hypower offers its employees a voluntary training program. Participation in the program is voluntary and designed to provide employees with training opportunities at no cost to the employee. Employees participating in the Voluntary Training Program will not be compensated for their time spent in the voluntary training program.

Voluntary training programs are those where: (1) attendance is outside the employee's regular working hours; (2) the employee does not perform productive work during the program; (3) attendance is voluntary; and (4) the program is not directly related to the employee's job.

Attendance is in fact voluntary. The Company does not require any employee to attend training offered through the Company's Voluntary Training Program. The employee will not be adversely affected if he/she does not attend the training.



**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y

Page **46** of 48
Rev. Date: 04/2022

Hernandez000053

The Voluntary Training Program's primary focus is to give the employee the opportunity to enhance his or her skills and prepare employee for advancement. During the Voluntary Training program, employees will not to perform any productive work on behalf of Hypower.

Page **47** of **48**
Rev. Date: 04/2022

**E M P L O Y E E   H A N D B O O K**
R E L A T I O N S H I P S - R E S U L T S - P R O F E S S I O N A L I S M -
C O N T I N U O U S   I M P R O V E M E N T - C O M M U N I T Y

Hernandez000054

### EMPLOYEE HANDBOOK ACKNOWLEDGMENT AND RECEIPT

I, _____ (employee name), acknowledge that, on the date indicated below, I received a copy of HYPOWER, LLC's Employee Handbook and that I read it, understood it, and agree to comply with it.

I further acknowledge that on the same date I received, read , understood, and agree to comply with HYPOWER, LLC's  Drug-Free Workplace Program and Policies regarding Substance Abuse and Screening for Substance Abuse.  I understand that I can have the entire program explained to me upon request to my Division Manager/Vice President.  I understand that under certain circumstances as a result of my performance or random selection, I will be required to submit to substance abuse screening.  I also understand that failure to comply with such a request or a positive result may lead to termination of employment.

Collectively, the HYPOWER, LLC's Employee Handbook, Employee's Safety Guide, Drug-Free Workplace Program and Policies regarding Substance Abuse and Screening for Substance Abuse are referred to herein as the "**Written Policies**".  I understand that HYPOWER, LLC has the maximum discretion permitted by law to interpret, administer, change, modify, or delete the rules, regulations, procedures, and benefits contained in the **Written Policies** at any time with or without prior notice. No statement or representation by a supervisor or manager or any other employee, whether oral or written, can supplement or modify the **Written Policies**. Changes can only be made if approved in writing by the President of HYPOWER, LLC. I also understand that any delay or failure by HYPOWER, LLC to enforce any rule, regulation, or procedure contained in the **Written Policies** will not constitute a waiver of HYPOWER, LLC's right to do so in the future.

**I ACKNOWLEDGE THAT NOTHING IN THE WRITTEN POLICIES NOR ANY OTHER POLICY, PRACTICE, COMMUNICATION (ORAL OR WRITTEN), PROCEDURE, OR BENEFIT IS INTENDED TO CREATE OR CONSTITUTE AN EXPRESS OR IMPLIED CONTRACT, GUARANTEE, PROMISE, OF EMPLOYMENT OR OF ANY OTHER TYPE.  I UNDERSTAND THAT MY EMPLOYMENT AT HYPOWER, LLC, IS AT WILL, MEANING IT MAYBE TERMINATED BY ME OR THE COMPANY FOR ANY REASON WITHOUT NOTICE, CAUSE, OR ANY SPECIFIC DISCIPLINARY PROCEDURES.**

Name (Please Print) _____

Signature_____

Date _____

THIS PAGE IS TO BE SIGNED AND WILL BE KEPT IN YOUR EMPLOYEE FILE.


**EMPLOYEE HANDBOOK**
RELATIONSHIPS·RESULTS·PROFESSIONALISM·
CONTINUOUS IMPROVEMENT·COMMUNITY

Page 48 of 48
Rev. Date: 04/2022

Hernandez000055

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24-CV-20207-MARTINEZ/SANCHEZ

GUSTAVO HERNANDEZ,

  Plaintiff,

vs.

HYPOWER, LLC,

  Defendant.

_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
FIRST SET OF INTERROGATORIES**

  Plaintiff, Gustavo Hernandez, responds to the Interrogatories served on him by Defendant, Hypower, LLC as follows:

1. State your name, address, date of birth, and, if you are answering for Plaintiff, your official position and/or relationship to Plaintiff.

  **ANSWER:**

- **Name: Gustavo Hernandez Fernandez.**
- **Address: 6240 SW 139th Ave, Miami, Florida, 33183.**
- **Date of Birth: January 9, 1978.**

2. List all jobs you have applied for since your separation from Hypower.

  **ANSWER:**

- **Meisner Electric;**
- **Solares Electric;**
- **Miami-Dade County;**
- **Miami-Dade Public School Board;**
- **CAP Government, Inc.;**

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884   FAX 305.230.4844
*www.fairlawattorney.com*

- **Jackson Health System;**
- **Various job listings through the International Brotherhood of Electrical Workers;**
- **Various job openings through staffing agencies including Quality Labor Management LLC and Carlton Staffing;**
- **Various job openings through Indeed.**

3.   List the names and addresses of all persons who are believed or known by you, your agents, or your attorneys to have any knowledge concerning any of the issues in this lawsuit and specify the subject matter about which each witness has knowledge.

   **ANSWER:**

- **Adam Johnson (General Superintendent): I believe that Mr. Johnson has knowledge of my employment with Hypower, the general business of Hypower, his/Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

- **Ivan Lopez (Project Manager of the MSC Project): Mr. Lopez would hold meetings at 6:30 a.m. every shift that I worked for Hypower at the MSC Project. Additionally, on one occassion, an electrician, Alexis Sosa, was expelled from my work group for not being able to arrive at work by 6:30 a.m., but Mr. Lopez did not object to Sosa's termination. I believe that Mr. Lopez has knowledge of my employment with Hypower, the general business of Hypower, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

- **Damiko Brenant (Assistant Project Manager): Mr. Brenant was obligated to begin working at 6:30 a.m. each shift like the electricians. I believe that Mr. Brenant has knowledge of my employment with Hypower, the general business of Hypower, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

2

- **Daniel Fisher (Electrical Foreman): Mr. Fisher is an American Electrical Foreman who was not obligated to comply with the same work standards as Cuban workers. I believe that Mr. Fisher has knowledge of my employment with Hypower, the general business of Hypower, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

- **Robert Weisberg (Electrical Superintendent): I spoke with Mr. Weisberg on the phone about Hypower's violations that were occurring during my employment, including discriminatory treatment and Hypower's failure to pay overtime wages. I believe that Mr. Weisberg has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

- **Mario Luaces (General Superintendant of Hypower): I spoke with Mr. Luaces on the phone about all the violations that were happening in the Project, including discriminatory treatment, Hypower's failure to pay overtime wages, and when one of the best electricians, Alexis Sosa, was fired from the MSC project for arriving "late" every day at 6:40 a.m. The excuse that Mr. Luaces gave to Mr. Sosa was that he had no more work for him. I believe that Mr. Luaces has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

- **Raidel Herrera (Electrical Foreman): I believe that Mr. Herrera has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

- **Darwin Infante (Electrical Foreman):  Mr. Infante and I were the first workers to arrive on the job each day before 6:00 a.m. I believe that Mr. Luaces has knowledge of my employment with Hypower, the general business of**

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884   FAX 305.230.4844
www.fairlawattorney.com

Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Adrian Mendez (Electrical Foreman):** I believe that Mr. Luaces has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Pedro Hormigo (Electrical Foreman):** I believe that Mr. Hormigo has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Carlos Calcines (Electrical Foreman):** Mr. Calcines requested not to be scheduled to work on the same project as Superintendant Raul Gonzalez because of Mr. Gonzalez's/Hypower's mistreatment toward Cuban workers. I believe that Mr. Calcines has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Henry Santamaria (Electrical Foreman):** I believe that Mr. Santamaria has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Alexis Sosa (Electrician):** Mr. Sosa worked under my supervision at the MSC project. Hypower fired Mr. Sosa for arriving "late" to work at 6:40 a.m., instead of arriving by 6:30 a.m. every shift. I believe that Mr. Sosa has

4

knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Erik Lino (Electrician):** I believe that Mr. Lino has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Pedro Arias (Electrician):** I believe that Mr. Arias has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Raudel Nieblas (Electrician):** I believe that Mr. Nieblas has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Humberto Figueroa (Electrician):** I believe that Mr. Figueroa has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Carlos Perez (Electrician):** I believe that Mr. Perez has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884   FAX 305.230.4844
www.fairlawattorney.com

Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Alfredo Lago (Electrician): I believe that Mr. Lago has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

- **Gregorio Macdonald (Electrician): I believe that Mr. Macdonald has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

- **Jorge Santos (Electrician): I believe that Mr. Santos has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

- **Luis Perez (Electrician): I believe that Mr. Perez has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

- **Jose Antonio Hidalgo (Electrician): I believe that Mr. Hidalgo has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

6

- **Nelson Ramirez (Electrician):** I believe that Mr. Ramirez has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Luis Manuel Gonzalez (Electrician):** I believe that Mr. Gonzalez has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Reydel Ramirez (Electrician):** I believe that Mr. Ramirez has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Francisco Santos (Electrician):** I believe that Mr. Santos has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Chalmers Duvernet (Electrician):** I believe that Mr. Duvernet has knowledge of my employment with Hypower, the general business of Hypower, Hypower's discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.

- **Travis Stratchan (Electrician):** I believe that Mr. Stratchan has knowledge of my employment with Hypower, the general business of Hypower, Hypower's

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884   FAX 305.230.4844
www.fairlawattorney.com

**discriminatory treatment toward me and other Hypower employees, the hours and schedules worked by me and other Hypower employees, and Hypower's policies and procedures as they related to payment, overtime wage payment, and other information relevant to the issues raised by the pleadings.**

4.  State if you have ever been a party, either a plaintiff or defendant, in a lawsuit other than the present matter, and if so, state whether you were the plaintiff or the defendant, the nature of the action, the date and court in which such suit was filed, and the final disposition of the action(s).

    **ANSWER: I have never been a party to another lawsuit.**

5.  Describe in detail all positions you held, duties and responsibilities you had, hours you worked, and wages you earned during your employment with Hypower.

    **ANSWER: I worked as a Foreman Electrician throughout my employment with Hypower. I was the head of a group of electricians ranging from 5 to 15 men depending on the amount of work we had at the time. My job duties included submitting daily timesheets through a tablet, daily reports about a safety job site, daily reports about each electrician's production, materials requests, drawings interpretations (plans), attending weekly meetings with the Superintendent, conducting electrical inspections in my work area with the Miami-Dade County inspectors, supervising electricians under my command, and explaining to them how they should do their work. I was paid an hourly rate of $32.00 from May 2022 to July 2022, $35.00 from August 2022 to February 2023, and $53.00 from February 2023 to January 2024.**

6.  As for your claim alleged in the Complaint that Hypower owes you overtime compensation, state with specificity the following:

    a.  All hours of overtime you claim you worked during your employment with Hypower;

    b.  The total amount of overtime wages you claim to be due for each workweek (please also explain your method of computing said wages and provide the calculations utilized);

8

   c.   The factual basis for your allegations that you are owed overtime wages, including, but not limited to, to whom or what you relied upon in formulating this position, whether you are in possession of or aware of any written support for these allegations, and other facts relied upon in making these allegations; and

   d.   In addition, identify and list all documentation that supports or tends to support your claim that you are owed overtime compensation and the hours of overtime worked without being compensated.

**ANSWER:**

   **a.  One hour of overtime for each shift that I worked throughout my employment with Hypower.**

   **b.  Unpaid Overtime Wages[1]:**      **$  24,445.20**

       **Liquidated Damages:**        **$  24,445.20**

       **Unpaid PTO:**           **$   3,406.40**

       **Total:**              **$ 52,296.80**

   **c.  I was required to come in at 6 a.m. but could not set a start time other than 7 a.m. The electricians were required to come in at 6:30 a.m., but I couldn't put another time on the tablet timesheet other than 7 a.m.**

   **d.  See all documents produced with our responses to the Requests for Production.**

7.    State the full name for the "direct supervisor at the Palmer Lakes project," you refer to in paragraphs 20(a)-(c) of the Complaint.

   **ANSWER:  Alcides Fleitas.**

---

[1] Please see Excel spreadsheet produced with Plaintiff's Rule 26 initial disclosures for calculations.

9

8.  State the full name for the "direct supervisor at the MSC project," you refer to in paragraphs 22(a)-(c) of the Complaint.

    **ANSWER: Raul Gonzalez.**

9.  Describe with specificity, including but not limited to when and how, your "direct supervisor" at Palmer Lakes and MSC directed you to arrive at the job site and begin work at 6:00 a.m. but not clock in until 7:00 a.m., as alleged in paragraphs 20(a) and 22(a) of the Complaint.

    **ANSWER:  During Hypower's weekly safety meetings, Raul Gonzalez and Ivan Lopez would remind Hypower's employees that electricians were required to arrive at work at 6:30 a.m., and foremen were required to arrive at work at 6:00 a.m. While I worked at the MSC project, Raul Gonzalez fired several electricians from the project because they lived too far from the project and often arrived at the project after 6:30 a.m., but always 15 or 20 minutes before 7:00 a.m. One of the best electricians I had on my work team (Alexis Sosa) was fired by Hypower because he arrived every day at 6:40 a.m.**

10. Describe in detail the factual basis for your claim that Hypower willfully and intentionally refused to pay you overtime wages, as alleged in paragraphs 25-26 of the Complaint.

    **ANSWER:  Throughout my employment with Hypower, Foremen (such as myself) and Electricians were not allowed to set a start time for their shift other than 7:00 a.m., although we began working earlier.**

11. Identify all complaints you made to Hypower regarding overtime compensation, including when each complaint was made, who the complaint was made to, and how the complaint was submitted (e.g., in writing, by phone, etc.).

    **ANSWER:  Beginning in approximately January of 2023, I began complaining in person to Raul Gonzalez and Raidel Herrera on a weekly basis that the electricians and I were not being paid for the hours we worked before 7:00 a.m. although we were required to work these hours. Several other electricians working under my supervision also complained to Raul Gonzalez and Raidel about not being paid for these hours including Humberto**

10

**Figueroa, Pedro Arias, Raudel Nieblas, Carlos Perez, Alexis Sosa, and Henry Santamaria.**

12.   Describe in detail the factual basis for your claim that as of January 4, 2024, you had accrued 80 hours of unused paid time off, and you were entitled to such paid time off, as alleged in paragraph 34-35 of the Complaint.

**ANSWER: According to Hypower's internal rules, all Foreman Electricians at Hypower are entitled to 80 hours of paid time off (PTO) per year. Per Hypower's employee handbook, Hypower is obligated to pay any unused PTO to its employees who leave the company for any reason, other than termination for cause or resignation. I did not resign from my position and was not terminated for any valid cause.**

13.   Describe in detail what agreement you allege Hypower breached with you, as alleged in paragraph 41 of the Complaint, as well as all facts you rely upon to support the allegation.

**ANSWER: Plaintiff objects to this request to the extent that the Complaint only contains 37 numbered paragraphs.**

14.   List the (a) name, (b) date of submission, (c) address of places of which Plaintiff sought employment with since January 1, 2023, as well as whether (d) an interview occurred and (e) an employment offer was made.

**ANSWER:  Please see Answer to Interrogatory No. 2 above. From January 4, 2024 until February 26, 2024, when I started working for CAP Government, Inc., I was only called for job interviews at Meisner Electric, Solares Electric, and CAP Government.**

15.   Describe in detail the amount(s) of damages you are claiming in this lawsuit, and how you quantify the total amount.

**ANSWER:  Please see Answer to Interrogatory No. 6 above.**

11

GUSTAVO HERNANDEZ

*Gustavo Hernandez*
Gustavo Hernandez (Sep 3, 2024 17:27 EDT)

STATE OF FLORIDA          :

                          : SS.

COUNTY OF DADE          :

      Before    me,    the    undersigned    authority    personally    appeared

Gustavo Hernandez who, after being duly sworn, states under oath that the foregoing

Answers to Interrogatories are true and correct.

      SWORN TO AND SUBSCRIBED before me this 3 day of September, 2024

and who is personally known by me or who produced Drivers License          as

identification.

_____
Signature Notary Public – State of Florida

Print Name: Steffany Sanguino

My Commission Expires: _____



STEFFANY SANGUINO
Notary Public-State of Florida
Commission # HH 196413
My Commission Expires
November 08, 2025

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884   FAX 305.230.4844
www.fairlawattorney.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served by email this 3rd day of September 2024, on Jillian Strasser, Esq. and Emma McCarthy, Esq., Cole, Scott & Kissane, P.A. 222 Lakeview Avenue, Suite 120, West Palm Beach, Florida 33401, jillian.strasser@csklegal.com, emma.mccarthy@csklegal.com, *Counsel for Defendant Hypower, LLC.*

<div align="right">

s/ Patrick Brooks LaRou
Brian H. Pollock, Esq.
Florida Bar No. 174742
brian@fairlawattorney.com
Patrick Brooks LaRou, Esq.
Florida Bar No. 1039018
brooks@fairlawattorney.com
FAIRLAW FIRM
135 Lorenzo Avenue, Suite 770
Coral Gables, Florida 33146
Telephone: (305) 230-4884
*Counsel for Plaintiff*

</div>

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884   FAX 305.230.4844
*www.fairlawattorney.com*

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 1:24-CV-20207-MARTINEZ/SANCHEZ


GUSTAVO HERNANDEZ,

    Plaintiff,

vs.

HYPOWER, LLC,

    Defendant.
_____/


DEPOSITION OF ADAM D. JOHNSON

TAKEN ON BEHALF OF THE PLAINTIFF

DECEMBER 4, 2024
9:37 A.M. TO 11:47 A.M.

ALL PARTIES APPEARED REMOTELY
PURSUANT TO
FLORIDA SUPREME COURT ORDER AOSC20-23


REPORTED BY:
LUCIANO ANTONINO, CER, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01                   APPEARANCES OF COUNSEL

02    ON BEHALF OF THE PLAINTIFF:

03         PATRICK BROOKS LAROU, ESQUIRE
           FAIR LAW FIRM
04         135 SAN LORENZO AVENUE, SUITE 770
           CORAL GABLES, FLORIDA 33146
05         (305) 230-4884
           BROOKS@FAIRLAWATTORNEY.COM
06         (REMOTELY VIA ZOOM)

07    ON BEHALF OF THE DEFENDANT:

08         JILLIAN STRASSER, ESQUIRE
           COLE, SCOTT & KISSANE, P.A.
09         222 LAKEVIEW AVENUE, SUITE 120,
           WEST PALM BEACH, FLORIDA 33401
10         (561) 383-9259
           JILLIAN.STRASSER@CSKLEGAL.COM
11         (REMOTELY VIA ZOOM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01                    INDEX OF EXAMINATION

02     WITNESS:  ADAM D. JOHNSON
                                              PAGE
03     DIRECT EXAMINATION
            BY PATRICK BROOKS LAROU, ESQUIRE      5
04
       CROSS EXAMINATION
05          BY JILLIAN STRASSER, ESQUIRE         67

06

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01                    INDEX OF EXHIBITS

02     EXHIBIT              DESCRIPTION                 PAGE

03     PLAINTIFF'S

04     EXHIBIT 1      HYPOWER - EMPLOYEE HANDBOOK         65

05     EXHIBIT 2      DEFENDANTS THIRD AMENDED ANSWER     65
                      AND AFFIRMATIVE DEFENSES
06

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01        VIDEOTAPED DEPOSITION OF ADAM D. JOHNSON

02                    DECEMBER 4, 2024

03   Thereupon:

04                    ADAM D. JOHNSON,

05           was called as a witness, and after having

06      been first duly  sworn, testified as follows:

07           THE COURT REPORTER:  We're now on record.

08           Today's date is December 4th, 2024 and the

09      time is approximately 09:37 A.M.

10           We are now on the videotape deposition of

11      Corporate Representative Adam Dante Johnson, Case

12      Number 124-CV-20207-Martinez/Sanchez in the matter

13      of Gustavo Hernandez v. Hypower, LLC, United States

14      District Court Southern District of Florida.

15           The Court Reporter is Luciano Antonino with

16      Universal Court Reporting.  Would Counsels, please

17      introduce themselves for the record?

18           MR. LAROU:  Good morning.  Brooks LaRou on

19      behalf of the Plaintiff, Gustavo Hernandez.

20           MS. STRASSER:  Good morning.  Jillian Strasser

21      on behalf of the Defendant, Hypower, LLC.

22           THE COURT REPORTER:  Thank you.  You may

23      proceed.

24                    DIRECT EXAMINATION

25   BY MR. LAROU:
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01        Q.   All right.  Good morning, Mr. Johnson.  As I
02   just stated my name is Brooks LaRou.  I represent
03   Gustavo Hernandez, Plaintiff in the pending lawsuit
04   filed against Hypower, LLC.
05             I'm going be the subject of the today's
06   deposition.  I know you just showed the Court Reporter a
07   moment ago your driver's license, but could you please
08   state for me your full name?
09        A.   Adam Dante Johnson.
10        Q.   And can you please spell, correct version of
11   your middle name for me?
12        A.   D-A-N-T-E.
13        Q.   Can you spell the middle name listed on your
14   Florida driver's license for me?
15        A.   D-O-N-T-E.
16        Q.   Thank you.  And Mr. Johnson, have you ever
17   been known by any other names other than Adam Dante
18   Johnson?
19        A.   No.
20        Q.   Have you ever had your deposition taken
21   before?
22        A.   Yes.
23        Q.   Okay.  So, before we begin and get into the
24   substantive questions, I just want to cover a couple
25   ground rules.
```



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01          First off, to ensure clarity of today's record

02   because the Court Reporter will be typing everything

03   that we're saying, please try to avoid any type of

04   nonverbal communication such as head shakes, head nods,

05   hand gestures.

06          And I believe Mr. Johnson I believe you were

07   just muted for a moment, just wanted to confirm that you

08   understood, please try to avoid any type of nonverbal

09   communication.

10       A.   Yes, I understand.

11       Q.   Thank you.  Another ground rule that I like to

12   cover before we begin is, I know it tends to be kind of

13   human nature to interject while we're speaking with one

14   another.

15          And I also, want to apologize because I know I

16   can sometimes be a slow speaker.  I'm from the South,

17   but please try to make sure that just one person is

18   speaking at a time and try to wait until I finish posing

19   my question before you respond.  Understood?

20       A.   Sure.

21       Q.   Thank you.  Last thing before we get started,

22   today's deposition could take up to seven hours.  I

23   don't anticipate that it will take nearly that long, but

24   if at any time during today's deposition you need to

25   take a break, just let me know.  The only caveat to that



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  is if I've asked you a question you must respond to that

02  question fully before we take the break.

03  Understood?

04      A.   Okay.

05      Q.   Great.  Mr. Johnson, have you taken any

06  medication that might affect your memory today?

07      A.   No.

08      Q.   And do you suffer any medical condition that

09  might affect your memory today?

10      A.   No.

11      Q.   Okay.  And do you understand that the oath

12  that you gave at the beginning of this deposition was

13  the same oath that you'd be required to take if you were

14  testifying at trial in this case in front of a Judge and

15  a Jury?

16      A.   Yes.

17      Q.   And do you understand that the oath you took

18  today requires that you testify truthfully under penalty

19  of perjury?

20      A.   Yes.

21      Q.   Did you prepare in any way for today's

22  deposition?

23      A.   Yes.

24      Q.   How did you prepare?

25      A.   Spoke with my Attorney this morning before we



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  -- before this call.

02      Q.   Okay.  And without telling me the content of

03  any of the conversations that you may have had with your

04  Attorney, about how long did you spend preparing while

05  meeting with your Attorney?

06      A.   About an hour and a half.

07      Q.   Did you review any documents in preparation

08  for today's deposition?

09      A.   Yes.

10      Q.   What documents were those?

11      A.   Documents that we provided in Gustavo's claim.

12      Q.   Did you review any documents in preparation

13  for today's deposition that were not provided in

14  response to Gustavo's claim?

15      A.   No.

16      Q.   Other than meeting with your Attorney this

17  morning for about an hour and a half and reviewing the

18  documents that have been produced in response to

19  Gustavo's claim, did you prepare in any other way for

20  today's deposition?

21      A.   No.

22      Q.   Okay.  Mr. Johnson, what's your highest level

23  of education?

24      A.   About 56 credits from the University.

25      Q.   What university was that?



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01      A.    Miami Dade.
02      Q.    Did you have a specific major that you were
03 working towards?
04      A.    No, general education.
05      Q.    Understood.  That's how I started off as well.
06 Do you currently hold any licenses or certifications?
07      A.    Yeah.  I'm a State of Florida electrical
08 contractor since 1999.
09      Q.    Any other licenses or certifications in
10 addition to the electrical contractor license?
11      A.    No.
12      Q.    Have you ever been charged with a crime?
13      A.    Charged, no.
14      Q.    Are you currently employed by Hypower?
15      A.    Yes.
16      Q.    In what capacity?
17      A.    Vice President of the electoral group.
18      Q.    How long have you held that position?
19      A.    Two years -- three years.
20      Q.    Have you held any other positions with
21 Hightower other than vice president?
22      A.    Yes.  Director of field operations and senior
23 project manager.
24      Q.    What position, did you start working in when
25 you were first hired by Hypower?
```



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01      A.    Project Manager.

02      Q.    So, about when were you first hired by Hypower

03  as a senior project manager?

04      A.    January of 2011.

05      Q.    And how long did you work in that capacity?

06      A.    Till 2018, I would say.

07      Q.    And is that when you began working as director

08  of field operations?

09      A.    Yes.

10      Q.    So, how long did you work as director of field

11  operations?

12      A.    Three years.

13      Q.    Okay.  Where were you employed before you

14  began working at Hypower?

15      A.    Company called Luzer Electric, L-U-Z-E-R

16  Electric.

17      Q.    What position did you hold there?

18      A.    I was a Board Member and at the time Chief

19  Estimator.

20      Q.    Sorry, I just had trouble understanding the

21  last word you said chief?

22      A.    Chief Estimator.  Board Member and Chief

23  Estimator.

24      Q.    Thank you.  Has Hypower ever employed Gustavo

25  Hernandez?



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01      A.   Yes.

02      Q.   **Can you please tell me his dates of employment**

03  **with Hypower?**

04      A.   I would've to refer back for exact dates, but

05  I believe it was May in 2022 till April or May of this

06  year somewhere like that.

07      Q.   **Okay.  Do you know if Mr. Hernandez**

08  **voluntarily resigned from his position with Hypower or**

09  **was he fired?**

10          MS. STRASSER:  Form.

11      A.   He was terminated.

12  BY MR. LAROU:

13      Q.   **What was the reason for Mr. Hernandez's**

14  **termination from Hypower?**

15      A.   Not following directions, insubordinate.

16      Q.   **Which directions did Mr. Hernandez failed to**

17  **follow?**

18      A.   He was -- the company was conducting the

19  project was conducting a safety meeting, and he wanted

20  to take the safety meeting into another direction his

21  own, you know, to complain about his supervisor.

22          And he was informed that this was not the

23  place for that and he was told that we're having a

24  safety meeting and he got belligerent, he was asked to

25  leave the site.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01   Q.   So, you just stated that Mr. Hernandez wanted
02   to complain about one of his supervisors at the safety
03   meeting.   Which supervisor was that?
04       A.   Raul Gonzalez.
05       Q.   Do you know what Mr. Hernandez was complaining
06   about with respect to Mr. Gonzalez?
07       A.   At the time during the meeting, no, I don't
08   know.   I wasn't there.
09       Q.   Is Hypower in possession of any type of
10   documentation of that incident, where Mr. Hernandez
11   allegedly became belligerent at a safety meeting?
12       A.   Documents, no not that I know of, no.
13       Q.   Can you tell me, any witnesses to that
14   incident?
15       A.   I know Ivan Lopez was there.   I would know
16   Damico Brendan was there.   I know Sean Levine was there.
17   I know Pedro Hormigo was there and that's all I can
18   know.
19           But I imagine it might have been the entire,
20   you know, like foreman group.   I'm not particularly
21   sure.
22           I just know those guys were there.
23           There was another guy Raydel Herrera.   But I
24   don't have the attendance, that's just what I know from
25   what I was told.



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01      Q.   But how was that issue raised to Hypower that

02   Mr. Hernandez was allegedly becoming belligerent during

03   safety meetings?

04      A.   Raised the Hypower, management was there at

05   the meeting and they took the action.

06      Q.   What specific individual or individuals from

07   management was at the meeting?

08      A.   Ivan Lopez, Sean Levine.

09      Q.   You said management was at the meeting and

10   they took action, who raised the issue to Hypower what

11   action was taken?

12      A.   The issue wasn't raised to Hypower, they had

13   an employee that wasn't following the instructions and

14   was asked to leave the site.

15      Q.   Do you know who asked Mr. Hernandez to leave

16   the site?

17      A.   Ivan Lopez.

18      Q.   Whose decision was it to terminate

19   Mr. Hernandez's employment?

20      A.   Ivan Lopez.

21      Q.   Did Ivan Lopez -- strike that.  Do you know if

22   Lopez's decision to terminate Mr. Hernandez had to be

23   approved by any other individuals from Hypower?

24      A.   No.  He has -- he can fire people,

25      Q.   Do you know if Ivan fired Mr. Hernandez right



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  then and there at the safety meeting?

02      A.   Yes.

03      Q.   Yes, you know, or yes, he fired him?

04      A.   Yes, he fired him.

05      Q.   Okay.  What position or positions is

06  Mr. Hernandez held with Hypower during the course of his

07  employment?

08      A.   He was a foreman.

09      Q.   Okay.  So, he was hired as a foreman, worked

10  as a foreman throughout his entire period of employment?

11      A.   Yes.

12      Q.   What specific projects did Mr. Hernandez work

13  on during his employment with Hypower?

14      A.   Palmer Lakes and MSC.

15      Q.   And when you say MSC, is that the cruise

16  terminal at the Port of Miami?

17      A.   Yes.

18      Q.   Okay.  Was Mr. Hernandez a full-time employee

19  with Hypower?

20      A.   Yes.

21      Q.   And was he full-time throughout the -- his

22  entire period of employment?

23      A.   Yes.

24      Q.   Okay.  Was Mr. Hernandez an hourly paid

25  employee?



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01        A.   Yes, he was.

02        Q.   Okay.  And was he paid hourly throughout his

03   entire period of employment with Hypower?

04        A.   Yes.

05        Q.   So, you just mentioned a moment ago,

06   Mr. Hernandez worked at two different projects for

07   Hypower, Palmer Lakes project and the MSC project.  Did

08   Mr. Hernandez hold the same job duties for each project?

09        A.   Yes.  He is a foreman.

10        Q.   Can you please tell me, the job duties that

11   Mr. Hernandez was responsible for?

12        A.   He'd be given a task by the superintendent.

13             He was supposed to plan it, gather the

14   material and run the whatever, crew he was given to

15   accomplish that task and the timeframe he was given.

16        Q.   So, first I want to discuss the Palmer Lakes

17   project.  Stated just a moment ago that Mr. Hernandez

18   was paid hourly, what was his hourly rate of pay for the

19   Palmer Lakes project?

20        A.   $32.

21        Q.   So, if Mr. Hernandez worked more than 40 hours

22   in a week, during his time working at the Palmer Lake

23   project, was he entitled to be paid time and a half?

24        A.   Yes.  As the law requires.

25        Q.   And if Mr. Hernandez were -- or I'm sorry,
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  what benefits did Mr. Hernandez receive while working

02  Palmer Lakes project?

03      A.   What benefits, I have no idea what he

04  personally signed up for as far as health insurance or

05  anything else.  Whatever, he signed up for he received.

06          But company offers healthcare, 401k and

07  everything else, I'm just not aware of whatever optional

08  deductions he took advantage of.

09      Q.   Understood.  What about paid time off?

10      A.   Yeah.  It's part of the PTO program that, you

11  know, spelled out in the handbook that they're provided

12  when they're -- when they start.

13      Q.   But you stated just a moment ago that if

14  Mr. Hernandez worked more than 40 hours in a week at the

15  Palmer Lakes project, he was entitled to be paid time

16  and a half as required by law.

17          So, is it your contention that Mr. Hernandez

18  was not exempt from the overtime requirement of the

19  FLSA?

20      A.   He is not an exempt employee.  He is an hourly

21  employee.

22      Q.   Okay.  Thank you.  Can you tell me the name -

23  - names of any individuals that supervise Mr. Hernandez

24  while working at the Palmer Lakes project?

25      A.   Alcides Fleitas and Robert Weisberg, Kieth



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  Werlau.

02      Q.    And the last individual you just named, could

03  you please spell the name for me?

04      A.    And I am stating Keith because he was a

05  superintendent who was also on that job, but whether he

06  had direct contact with Gustavo I would know, but it's

07  K-E-I-T-H W-E-R-L-A-U.

08      Q.    Okay.  Thank you.  What was Alcides Fleitas

09  title while working at the Palmer Lakes project with

10  Mr. Hernandez?

11      A.    Superintendent.

12      Q.    Okay.  And how about Robert?

13      A.    Robert was a QC manager.

14      Q.    And what about Keith what was his position

15  while working with --

16      A.    Assistant superintendent.

17      Q.    Okay.  Was Mr. Hernandez responsible for

18  supervising any employees while working at the Palmer

19  Lakes project?

20      A.    Yes, whoever was assigned to his crew.

21      Q.    Can you tell me, the names of any individuals

22  that Mr. Hernandez was responsible for supervising at

23  the Palmer Lakes project?

24      A.    I wouldn't.  I really wouldn't know that.

25            Changes on a daily basis, you know, it's



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01   nothing consistent, you know, be the same for two weeks
02   and change it's a moving target.
03        Q.   Can you tell me the job title or job titles of
04   any individuals that Mr. Hernandez was responsible for
05   supervising at the Palmer Lakes project?
06        A.   It could be electricians, mechanics, helpers.
07             MS. STRASSER:  Did you say helpers?
08             THE WITNESS:  Yeah.
09             MS. STRASSER:  What was the last one?  Okay.
10             THE WITNESS:  Yes, helpers.
11             THE COURT REPORTER:  Yes, excuse me.  Pardon
12        my interruption.  I was going to ask, would it be
13        possible if you could speak up a little more
14        Mr. Johnson, your microphone is a little muffled.
15             THE WITNESS:  Sure.
16             THE COURT REPORTER:  Thank you.  I really
17        appreciate that.
18   BY MR. LAROU:
19        Q.   Okay.  Mr. Johnson, can you kind of walk me
20   down the chain of command for Hypower employees working
21   at the Palmer Lakes project during Mr. Hernandez's
22   employment?
23        A.   Priorities would be set by the project manager
24   and superintendent, foreman would be giving a task and a
25   crew to go complete it and it was their responsibility
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  to go get the work done.

02      Q.   Got it.  So, as a foreman, Mr. Hernandez would

03  report to the project manager and the superintendent?

04      A.   To the superintendent.

05      Q.   And who would the superintendent report to?

06      A.   The project manager and me.

07      Q.   Okay.  And just to put names to this

08  management structure and to make sure I'm understanding

09  correctly.  Mr. Hernandez would report to the

10  superintendent Alcides Fleitas.  Alcides would report to

11  project manager.  Is that Robert Weisberg?

12      A.   No.

13      Q.   I know you said he was a QC manager, but who

14  -- so who was there a project manager at the Palmer

15  Lakes project?

16      A.   Yes.  Dan Sunday.

17      Q.   And then Dan would report to you.  Is that

18  correct?

19      A.   Everybody reported to me.

20      Q.   Okay.  During Mr. Hernandez time working at

21  the Palmer Lakes project was he required to work

22  specific hours?

23      A.   Yes.

24      Q.   What were those hours?

25      A.   07:00 to 03:30, our standard operating hours



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01   throughout the company for construction sites.

02        Q.   So, that's 07:00 A.M. until 03:30  P.M.?

03        A.   Yes.

04        Q.   Okay.  And is Mr. Hernandez required to take

05   any breaks during that time?

06        A.   Yeah.  Per the employee handbook there's 30

07   minutes for lunch, and typically there's a 15-minute

08   break in the mornings 9 o'clock or so that's the

09   standard that every job does it.

10        Q.   Was the 30-minute lunch paid or unpaid?

11        A.   Unpaid.

12        Q.   What about the 15-minute break?

13        A.   Unpaid.

14        Q.   You set that work schedule for the Palmer

15   Lakes project while Mr. Hernandez was working there.

16        A.   It's kind of company product -- it's industry

17   standard the hours are.

18        Q.   Who in the company determined those hours?

19        A.   It's the industry, the whole construction

20   industry standard start to 07:00 A.M. to 03:30, that's

21   normal working hours for construction.

22        Q.   But was there any individual at Hypower who

23   made the determination to abide by that industry

24   standard?

25        A.   I don't see how you would make a decision



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  otherwise, you're in the industry.

02       Q.   **Mr. Hernandez required to arrive to work at a**

03  **specific time?**

04       A.   He was required to start work at 7 o'clock.

05       Q.   **What time was he required to arrive to work?**

06       A.   Whatever time he needed to be there start at

07  07:00.

08       Q.   **If my math is correct, working 07:00 A.M.**

09            **until 03:30  P.M. Monday through Friday taking**

10  **a 30 minute paid lunch that's -- that comes out to 40**

11  **hours per week.**

12            **If an employee working -- if a Hypower**

13  **employee working at the Palmer Lakes project wanted to**

14  **work less than 40 hours, were they allowed to do so?**

15       A.   Yes.  If they needed to leave for

16  appointments, you know, obligations, they just told

17  their supervisor and they left, yes.

18       Q.   **Got it.  So, you said they were required to**

19  **obtain approval from their supervisor?**

20       A.   Yes.  More -- most likely it's not approval,

21  its notification, you know, life happens.

22       Q.   **Okay.  So, at the Palmer Lakes project would**

23  **Mr. Hernandez's supervisor have been Alcides Fleitas?**

24       A.   Yes.

25       Q.   **So, is there any requirement that**



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01 **Mr. Hernandez or other Hypower employees notify your**

02 **supervisor in writing, or was it just a verbal request?**

03     A.   They communicated all types of words, I mean

04 verbal; however, there's no requirement as long as you

05 communicate.

06     **Q.   Okay.  Hypower employee working at the Palmer**

07 **Lakes project wanted to work more than those set 40**

08 **hours.  Were they allowed to do so?**

09     A.   On their own decision, what are you asking?

10     **Q.   Either way, I mean, he --**

11     A.   No, they don't.  You know, stated hours are

12 from 07:00 to 03:30 unless otherwise stated that there

13 is overtime available and that the crew is working

14 overtime.

15     **Q.   Okay.  If a Hypower employee did work more**

16 **than 40 hours in a week is without permission from**

17 **supervisor, do you think they would still be entitled to**

18 **time and a half for those hours over 40?**

19        MS. STRASSER:  Form.  You can answer if you

20     understand.

21     A.   I mean if they report the time, yes.  I mean,

22 I guess they would be, but they don't report the time,

23 there's for Hypower to know that there's, you know, an

24 obligation.

25 BY MR. LAROU:



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01    Q.   So, just a moment ago you said that, you know,

02    typically an employee would not be allowed to work more

03    than 40 hours, and so it stated that overtime is

04    available.

05         Who would -- what individual would be

06    responsible for notifying Hypower employees at the

07    Palmer Lakes job site, that there was overtime

08    available?

09    A.   The superintendent each sets of work schedule,

10    project manager, the management team on site.

11         So, at Palmer Lakes in particular, there was a

12    whole bunch of overtime available and Gustavo didn't

13    work every hour that was available.

14         So, you know, if you pulled the records from

15    that job, there was some people working 58 hours every

16    week for months and he wouldn't be one of them.

17    Q.   And so, if I'm understanding correctly, I

18    guess I'll say this would notify the Hypower employees

19    if there was overtime available at the Palmer Lakes

20    project.  How would he notify those employees?

21    A.   You know, we -- the foreman meet, people meet

22    every single day, text message, e-mail, whatever.  I

23    mean, what -- however they communicated on site.

24    Q.   There wasn't kind of a set procedure --

25    A.   No.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01     **Q.  -- for notifying employees if there was**

02 **overtime available it was just however they happened to**

03 **communicate?**

04     A.   Pretty much.  Well, you know, a lot of times,

05 you know, after you have a safety meeting or whatever it

06 is a group meeting on site you tell them, "Hey, we're

07 working Saturday or working 10 hours a day moving

08 forward," whatever it is.  Who wants to work on

09 Saturday, you know, kind of thing.

10     **Q.  Got it.  So, it sounds like at the safety**

11 **meetings then it would be, you know, a common topic of**

12 **conversation to discuss that hours that employees were**

13 **working.  Is that right?**

14     A.   No.

15     MS. STRASSER:  Form.

16     A.   I would say no, it's not common.  It just

17 would have, it can happen.  Whenever there was a group

18 of people it might be a subject of conversation.

19 BY MR. LAROU:

20     **Q.  And at the Palmer Lakes project, were Hypower**

21 **employees required to obtain approval work overtime from**

22 **any individual other than Alcides Fleitas?**

23     A.   No.

24     **Q.  Did any employee of Hypower instruct Alcides**

25 **Fleitas to notify those employees that the Palmer Lakes**



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01    project of their required work hours?

02        A.    Yes.  If we needed to work overtime, either at

03    the general contractors or the owners request or we need

04    to work overtime that direction would come from me or

05    from Dan.

06        Q.    That Dan, I think you said his last name was

07    Sunday.  Is that it?

08        A.    Yeah.

09        Q.    What specific instructions did you give to

10    Alcides regarding work hours or employees at the Palmer

11    Lakes project?

12        A.    I can't specifically recall because it's, you

13    know, Palmer Lakes specifically because I probably had

14    20 jobs, 200 men, you know, specifically Palmer Lakes.

15            But normally it would be the general

16    contractors paying for overtime.  We're working four 10s

17    and an 8, something like that.  We're working four 10s

18    and two 8s kind of that's what we're doing.  That would

19    be the direction.

20            And Palmer Lakes was definitely one of those

21    sites where we were working Saturdays for a couple of

22    months to get the building open when the client wanted.

23        Q.    How would you notify Alcides of those work

24    hours on the Palmer Lakes project?

25        A.    Onsite, in-person.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01    Q.   Was there any specific individual employed by

02  Hypower that was responsible for notifying its employees

03  of the time that they were required to arrive to work?

04    A.   Repeat the question, I didn't hear it?

05    Q.   Sure.  So, were there any, specific Hypower

06  employee or employees responsible for notifying other

07  employees of the time that they were required to arrive

08  to work?

09    A.   No.  It's -- the standard is, you're ready you

10  are in your workplace at 07:00 A.M.  That's the

11  expectation.

12    Q.   How was that expectation set?

13    A.   It was set, you know, by letting everybody

14  know that you need to be in your workplace at 07:00 a.m.

15  start time at 07:00 A.M.

16    Q.   So, who specifically notified --

17    A.   The superintendent.

18    Q.   -- the Hypower employees at the Palmer Lakes

19  project, that they were required to be in their

20  workplace at 07:00 A.M.

21    A.   The superintendent, it is not just Palmer

22  Lakes it's every job site.

23    Q.   So, did the superintendent, I guess at the

24  Palmer Lakes project that would be Alcides, did any

25  individual instruct him to notify employees of the time



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  that they were required to arrive to work?

02      A.   Oh, again, its industry standards, you're job

03  start you start working at 7 o'clock, you work from

04  07:00 to 03:30 people when they're on-boarded and

05  they're told that's our start time.  This is our end

06  time standard operating procedure for eight hours a day,

07  unless told otherwise.

08      Q.   **During the time that Mr. Hernandez was working**

09  **at the Palmer Lakes project, who was responsible for**

10  **that on-boarding notifying employees of time they're**

11  **required to be at work?**

12          MS. STRASSER:   Form.

13      A.   Well, Mr. Hernandez's case, he came from a

14  staffing agency and knew the standard before he started

15  technically working directly for Hypower.  So, it was

16  known and understood and it's industry standard.

17  BY MR. LAROU:

18      Q.   **Okay.  So, it's your belief that Mr. Hernandez**

19  **was notified by the staffing company about what time he**

20  **was required to be at work?**

21      A.   What I'm explaining is it's construction

22  industry standard starts at 07:00 A.M. and ends at

23  03:30.  Those are the normal working hours for every

24  construction job in South Florida, unless otherwise

25  stated.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01     Q.   So, are Hypower employees just expected to

02  know that coming into the job?

03     A.   Every construction employee in South Florida

04  knows that the working hours are from 07:00 A.M. to

05  03:30 and when they're sent to a specific job, if

06  there's ever anything different, they're notified that.

07  So, like --

08     Q.   If --

09     A.   -- have a job that we're working at night, you

10  get the hours when you are -- when you're assigned to

11  that job or working from 09:00  P.M. till 6 o'clock in

12  the morning, whatever it is, whatever the hours are when

13  you're assigned there, you get the hours.

14     Q.   Let's say, for example, someone wants to get

15  their foot in the door and start working as an

16  electrician.  It's their first time working as an

17  electrician for Hypower.  How would they know the hours

18  that they're supposed to work?

19     A.   They would be told to report to the job and be

20  ready to work at 07:00 A.M. here's the person you report

21  to, and your working hours are from 07:00 to 03:30  P.M.

22     Q.   And they would be told that by the

23  superintendent?

24     A.   They would be told that by the person who on-

25  boarded or would've told him where to report.  So, as



**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01   I'm telling you, he started with the staffing company.

02   They would've given him that direction when he started.

03       Q.   Do you know the name of the staffing company

04   that Mr. Hernandez started working for before --

05       A.   Two of them.

06       Q.   -- working to Hypower?

07       A.   Two of them.

08       Q.   Did Hypower offer any incentives to the

09   superintendent of the Palmer Lake project to keep the

10   costs of paying employees below a certain level?

11           MS. STRASSER:   Form.   I think we objected to

12       this area of inquiry on our -- in our objections

13       that we served yesterday.

14   BY MR. LAROU:

15       Q.   You can answer.

16       A.   No.   Nobody would ever be directed to pay

17   anybody less than what they're entitled to.

18       Q.   I guess my question is more, so would Alcides

19   or any other superintendent at the Palmer Lakes project

20   receive a bonus if they kept labor costs below a certain

21   level?

22       A.   No.   That's not what their bonus is based on.

23       Q.   What is their bonus based on?

24       A.   Policy and procedure.

25       Q.   What policies and procedures would they have
```



**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  to follow to receive a bonus?

02       A.   The safety procedures.  First and foremost,

03  policies laid out by the handbook and procedures as far

04  as planning the work.

05       **Q.   Okay.  So, let's say, I'm working as a**

06  **superintendent at the Palmer Lakes project, put myself**

07  **in the shoes of Alcides Fleitas.  What specific goals**

08  **would I have to meet to make my bonus?**

09       A.   What do you mean make your bonus?  The bonus

10  pool here -- the bonuses here are pool here, they're not

11  individual job bonuses.  So, you know, everybody is a --

12  is evaluated as a whole and as their individual based on

13  your adherence to policy and, you know, overall

14  profitability of the company.

15            So there's, you know, based on what I'm

16  walking out there asking you what, you know, what your

17  -- are you meeting your expectations, so there's a whole

18  process here where the superintendents here rebuild the

19  job.  They create their own job budgets, they create the

20  hours based on quantities that they take out and they

21  lay out.

22            So, basically they build their own budgets and

23  they build their own plans, and then they just have to

24  go out there and execute it.  So, executing, you know,

25  as far as how well did you plan and how well did you



**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01  execute.
02      Q.   Got it.  So, the company's profitability or
03  the bottom line of Hypower was a factor in determining
04  whether superintendents would receive a bonus?
05      A.   No.  How well you plan your work.  Because
06  some jobs are more profitable than others, right.  And
07  you can only sell work for what somebody's willing to
08  pay.
09          So, it's not fair to sit here and look at a
10  job on an individual basis and say, this job made $10
11  million and this one made $100,000.  So, you put your
12  best person on your cheapest work, wouldn't you?
13      Q.   Right.  I understand.  I was just clarifying
14  because a moment ago in the response to my previous
15  question you said that, profitability of the company was
16  a factor in determining whether superintendents received
17  bonuses.
18      A.   Yeah.  Overall profitability of the company.
19      Q.   Got it.  Understood.  Thank you.  What about
20  for project managers, are project managers entitled to
21  any bonuses based on profitability of the company?
22      A.   Everybody is in the same bonus rule in the
23  division, all salaried employees.
24      Q.   They just the salaried employees not any of
25  the hourly employees?
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01      A.    Correct.

02      **Q.    Which job titles would that include at the**

03  **Palmer Lakes job looks like --**

04      A.    Project manager, superintendents, assistant

05  superintendents, all exempt employees.

06      **Q.    Did Hypower ever provide Mr. Hernandez with**

07  **instructions on where to park at the Palmer Lakes**

08  **project?**

09      A.    No.

10      **Q.    Was there a designated parking lot there at**

11  **the Palmer Lakes project?**

12      A.    No.

13      **Q.    Do you know how most employees would get to**

14  **work at the Palmer Lakes project?**

15      A.    I don't.

16      **Q.    Would you ever have to go to the Palmer Lakes**

17  **project to work within your capacity as vice president**

18  **of Hypower?**

19      A.    Yeah.  A couple of times a week.

20      **Q.    About every week?**

21      A.    A couple of times a week.

22      **Q.    Where would you park when you were going to**

23  **the Palmer Lakes project?**

24      A.    Wherever there is an open spot, kind of on the

25  curb site side up and down the streets that are around



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01   the project.

02       Q.   Would you park in a parking lot or on the

03   street?

04       A.   Wherever there was an open spot, the general

05   contractor rented a building, a warehouse next door.

06            So, that would be my first spot to see if I

07   could, get a spot in there because it wasn't really.

08            It was open for project managers or anybody

09   who came, they -- if they had a spot I would take it.

10   If not I parked on the street with everybody else.

11       Q.   Who was the general contractor for the Palmer

12   Lakes project?

13       A.   Americribe.

14       Q.   Can you spell that for me?

15       A.   I think it was, let's see.  I think it's

16   A-M-E-R-I-C-R-I-B-E.

17       Q.   During Mr. Hernandez's time working at the

18   Palmer Lakes project, did Hypower ever provide him with

19   instructions regarding how he was supposed to report the

20   hours he worked?

21       A.   Yeah.  I'm sure there is a daily sign-in

22   sheet.  That he actually filled out.

23       Q.   Was that sign-in sheet on a piece of paper?

24       A.   It's a fillable PDF in a software program we

25   use for document control called Procore.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01     Q.   So, I'm assuming if you're saying it's a

02   fillable PDF, I'm assuming Mr. Hernandez would fill that

03   out on computer or some type of electronic device?

04     A.   iPad.

05     Q.   On an iPad?

06     A.   Yeah.

07     Q.   And is that Mr. Hernandez's own iPad or one

08   provided by Hypower?

09     A.   Every foreman was provided an iPad and an

10   iPhone.

11     Q.   And I had a little bit of trouble hearing you.

12   I think you stated that there was a name of specific

13   software that he would fill out the time sheets through.

14   Can you tell me the name of that again?

15     A.   It is Procore.

16     Q.   Who instructed Mr. Hernandez how to report his

17   working hours?

18     A.   It would've been superintendent.

19     Q.   That's Alcides?

20     A.   Yes.

21     Q.   For the Palmer Lakes project?

22     A.   Yes.

23     Q.   When did Alcides tell Mr. Hernandez how to

24   report his working hours?

25     A.   Whenever he started reporting his own time, he



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  might have been placed with somebody else who might

02  have, you know, him reporting to another foreman when he

03  started.

04          So, whenever he needed would be shown how to

05  do it, he would've been shown.  It would've been day

06  one, I'm not sure.

07      **Q.   Is there any type of formal training process**

08  **for instructing Mr. Hernandez or other Hypower employees**

09  **in how to enter their time?**

10      A.   It's not entering your time, it's kind of

11  reporting it on a fillable PDF.  It's actually recorded

12  in another system, but it would've been the

13  superintendent who told them how to do it.

14      **Q.   Okay.**

15      A.   Because a lot of these sign-in sheets are

16  provided to the general contractors.  They want the

17  information for a head count and everything.  So, you

18  are -- you're providing your sign-in sheets to the

19  general contractor on who's in site?

20          We do that because just in case there's an

21  emergency in the day.  So, we try to get all of these to

22  some GCs require you to get this to them by 9 o'clock in

23  the morning.

24          So, if there's an emergency on site, you have

25  a floor fall and a wall fall over.  So, they know every



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  individual's accounted for if there's an emergency.

02  **Q.  Got it.  But I guess I'm more so asking, was**

03  **there formal process for notifying Mr. Hernandez or the**

04  **other Hypower employees of how to input their time?**

05  A.   No.  It's a fillable PDF, but there's no

06  formal training process to it.  So, you report here you

07  start at 07:00, you know, you start at 07:00.

08       So, you go and you check in with the person

09  you are reporting to and you say, I'm here and you go to

10  work, sign in and go.

11  **Q.  During Mr. Hernandez's time working at the**

12  **Palmer Lakes job site, did Hypower ever receive any**

13  **complaint from any of its employees working at that job**

14  **site that they weren't being paid overtime, when they**

15  **worked over 40 hours per week?**

16  A.   No.

17       MR. LAROU:  It's -- we've been going for about

18       an hour now, is it okay with both of you if we take

19       about a 15-minute break?

20       THE WITNESS:  15?

21       MS. STRASSER:  And the he --

22       THE WITNESS:  15 for what?

23       MR. LAROU:  Use the restroom and get some

24       water.  Take have a snack, whatever you want.

25       THE WITNESS:  I prefer five so that we can



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01        move this process up.

02             MR. LAROU:  Okay.  If you want to split the

03        difference and take 10?

04             THE WITNESS:  Sure.

05             THE COURT REPORTER:  Okay.

06             MR. LAROU:  Thanks.

07             THE COURT REPORTER:  You want me to go off the

08        record?

09             MS. STRASSER:  Yes.

10             MR. LAROU:  Yes, please.

11             THE COURT REPORTER:  Okay.  Thank you.

12             (Thereupon, a short discussion was held off

13        record.)

14             (Deposition resumed.)

15             THE COURT REPORTER:  All right.  We are back

16        on the record.  Thank you.

17   BY MR. LAROU:

18        Q.   Okay.  One more question about the Palmer

19   Lakes project before we move on to discussing the MSC

20   Cruise Terminal Project.

21             I believe you stated earlier Mr. Hernandez was

22   responsible for reporting his own hours while working

23   there at the project.  Was Mr. Hernandez responsible for

24   reporting the work hours of any other employees at the

25   Palmer Lakes project?
```



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01    A.   Yes.  The people who were working directly for

02  him or anybody else, Alcides told to sign them to check

03  into with them, as far as in the morning.

04    **Q.   And how would Mr. Hernandez report those**

05  **employees hours?**

06    A.   In the same timing sheet, he would report his

07  hours.

08    **Q.   With the sign-in sheet, he would fill out on**

09  **his iPad, using Procore?**

10    A.   Yeah.  Actually using a PDF, it's a fillable

11  PDF that was housed in Procore.

12         MS. STRASSER:  What was that last part, Adam?

13      I didn't hear what you said.

14         THE WITNESS:  It's a fillable PDF that's

15      housed in Procore.

16         MS. STRASSER:  Housed.  Got it.  Thank you.

17    A.   It's usually it's not a part of Procore.

18         It's a form that we work out of there.  That

19  used to be the same form when it was hard copies on the

20  job site, we just digitize it.

21  BY MR. LAROU:

22    **Q.   Thank you for clarifying.  So, I want to move**

23  **on and discuss the MSC Cruise Terminal Project.  What**

24  **was Mr. Hernandez's rate of pay while working with the**

25  **MSC project?**



**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01      A.   It would've been per the Miami-Dade

02  Responsible Wages Act.  That was within the calendar

03  year, whatever the county mandates it was 42 something

04  98 somewhere in there, plus fringes.

05      **Q.   And can you explain to me why the hourly rate**

06  **set for the Port Miami project, the MSC project was**

07  **governed by county mandates as opposed to the hourly**

08  **rate set by Hypower for the Palm Lakes project?**

09      A.   I assume, I really don't know the details of

10  that, but I assume there's county funding or county

11  property, I'm assuming that's on the port.

12      **Q.   And can you tell me what particular fringe**

13  **benefits Mr. Hernandez was entitled to receive while**

14  **working at the MSC project?**

15      A.   Well, so there's a dollar amount value for

16  fringes that are spelled out by the county responsible

17  wages.  So, what Hypower does is take that fringe a, and

18  put it into an investment account for that, and it's an

19  employee's name that they have access to that they

20  manage it's an option to be compliant with the system.

21      **Q.   So, was that like a retirement account?**

22      A.   Yes.

23      **Q.   If Mr. Hernandez worked more than 40 hours in**

24  **a week at the MSC project, was he entitled to be paid**

25  **time and a half?**



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01      A.    Yes.

02      Q.    And so, while he was working at the MSC

03   project he was not an exempt employee?

04      A.    He was never an exempt employee.

05      Q.    Okay.  So, other than the hourly rate set by

06   county mandates and those fringe benefits, can you tell

07   me if there were any other benefits that Mr. Hernandez

08   was entitled to receive while working at the MSC

09   project?

10      A.    Just whatever was, you know, in the employee

11   handbook and part of any other benefits packages with

12   every other employee, PTO, health insurance, you know,

13   vision, whatever else comes with the whole wanted

14   package.

15      Q.    Did Mr. Hernandez have any supervisors at the

16   MSC project?

17      A.    Yes, Raul Gonzalez.

18      Q.    And what was Mr. Gonzalez's job title while

19   Mr. Hernandez was working under his supervision at the

20   MSC project?

21      A.    Superintendent or senior superintendent.

22      Q.    Okay.  And so was Mr. Gonzalez, Gustavo

23   Hernandez's direct supervisor at the MSC project?

24      A.    Yes.

25      Q.    Okay.  Was there any individual responsible



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  for supervising Raul Gonzalez during the time that

02  Mr. Hernandez worked at the MSC project?

03      A.   Rui Reis was the first project manager, and

04  Ivan Lopez took that job over after Rui moved on to

05  another -- moved to Nevada and me of course.

06      Q.   So, I just want to make sure, I heard you

07  correctly was the name Rui Reis?

08      A.   Yes.

09      Q.   And what was his job title?

10      A.   Senior project manager.

11      Q.   You said his position was taken over by Ivan

12  Lopez?

13      A.   Correct.

14      Q.   And so, Ivan Lopez was working then as the

15  senior project manager after Rui left?

16      A.   Yes.

17      Q.   Do you know about when that change took place

18  when Mr. Lopez filled Mr. Rui's position?

19      A.   Not really.  I think it would've been August

20  of last year or something somewhere in there, August of

21  2023.

22      Q.   Okay.  And so, I just want to make sure I'm

23  understanding the chain of command here.  So,

24  Mr. Hernandez would report to Raul Gonzalez the

25  superintendent, correct?



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01       A.   Yes, or it could be working for another

02  foreman on site.  It all really depends on the task, but

03  yeah, everything Raul was the supervisor on site for

04  everything.

05       Q.   Okay.  And then Raul Gonzalez would report to

06  the project manager Rui Reis and then Ivan Lopez?

07       A.   Yes.

08       Q.   Okay.  And then --

09       A.   -- or to me.

10       Q.   Got it.  Thank you.  Is Ivan Lopez still

11  currently employed with Hypower?

12       A.   Yes.

13       Q.   And Raul Gonzalez as well?

14       A.   Yes.

15       Q.   I forgot to ask you earlier, is Dan Sunday

16  still employed by Hypower?

17       A.   No.  He is since retired last year.

18       Q.   And Alcides Fleitas is he still employed by

19  Hypower?

20       A.   No.

21       Q.   And Robert Weisberg, is he still employed by

22  Hypower?

23       A.   Yes, he is.

24       Q.   Last one, Kieth Werlau, is he still --

25       A.   Yes.  He still works for us.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01     Q.   Got it.  Thank you.  What employees was

02  Mr. Hernandez responsible for supervising at the MSC

03  project?

04     A.   I couldn't speak to that.

05     Q.   Do you know the job titles of the employees

06  that Mr. Hernandez would've been responsible for

07  supervising at the MSC project?

08     A.   The electricians, other foreman, depending on

09  the task, mechanics and helpers, apprentices.

10     Q.   I know you mentioned earlier that it was kind

11  of the industry standard for employees to work 07:00

12  a.m. until 03:30  P.M.  I just wanted to confirm, was

13  Mr. Hernandez required to work those same hours at the

14  MSC project?

15     A.   Yes.  Those were the hours of the job too.

16     Q.   Okay.  And was there any particular individual

17  responsible for setting those hours at the MSC project?

18     A.   No.

19     Q.   Was Mr. Hernandez required to arrive to work

20  at any specific time while working at the MSC project?

21     A.   He needed to be in his place of work at 07:00

22  a.m.

23     Q.   Again, you know, working 07:00 A.M. to 03:30

24  P.M. Monday through Friday with a 30-minute lunch break

25  that comes out to a 40 or a week.


**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01          **If a Hypower employee wanted to work less than**

02     **those 40 hours at the MSC job site, would they be**

03     **allowed to do so?**

04          A.    Yes.  As long same situation, as long as they

05     communicated that they needed to handle there something

06     else, yes who just needed to communicate.

07          **Q.    Who would they have to communicate that to?**

08          A.    Raul the direct supervisor, whoever they're

09     checking in with.  So, somebody who was reporting to a

10     foreman would say, "Hey, I need to leave at 2 o'clock

11     today and leave it at 2 o'clock or leave it at 2 o'clock

12     tomorrow.  I got to leave at, I got to I'll be here at

13     10 o'clock on Friday morning, I won't be here first

14     thing."  Communicating whatever situation there is.

15          **Q.    So, the -- if I'm understanding correctly,**

16     **Mr. Hernandez working as a foreman would have to**

17     **communicate that to Raul?**

18          A.    Raul wouldn't really need to know, I mean he,

19     it's not something you might come up in conversation,

20     but if somebody was going to say "Hey, I'm only, I'm

21     going to be here at 10 o'clock on Friday," you know,

22     when he got there, he would clock him in.

23          And then if somebody has a question, "Hey, he

24     had a doctor's appointment you get here till 10:00".

25          That's the way it would go.  It's not of



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  overly importance.

02      Q.   Got it.  So, it seems like it's kind of an

03  informal process for requesting that time off.  There's

04  not any kind of specific procedure for working less than

05  40 hours working less than the set work schedule?

06      A.   Correct.

07      Q.   Okay.  And were the electricians, mechanics or

08  helpers or any individuals that Mr. Hernandez was

09  supervising, would those individuals have to notify

10  Mr. Hernandez if they wanted to work less than the 40

11  hours?

12      A.   Yes.  He'd want to know.

13      Q.   But there was no kind of again, no kind of

14  formal procedure for taking that time off?

15      A.   No.  I mean you'd want to communicate with the

16  person that you're working because they're crews.

17          So, you notify the crew "Hey, I'm leaving

18  earlier, I'm coming in late a couple days from now."

19      Q.   And if Hypower employees at the MSC job site

20  wanted to work more than their 40 hours, were they

21  allowed to do so?

22      A.   If there was overtime available, yes.

23      Q.   How would they -- how would those Hypower

24  employees know if there was overtime available?

25      A.   They'd be notified by their supervisor.



**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01      Q.   How would they be notified?

02      A.   More than likely verbally.

03      Q.   So, there was no kind of, you know, standard

04 or formal procedure for notifying employees at the MSC

05 job site, if there were available overtime hours?

06           MS. STRASSER:   Form.

07      A.   No.

08 BY MR. LAROU:

09      Q.   If an employee working, if a Hypower employee

10 working at the MSC job site wanted to work more than 40

11 hours, were they required to obtain approval from any

12 particular individuals?

13      A.   Yes.

14      Q.   So, for Mr. Hernandez, who would he have been

15 required to obtain approval from?

16      A.   Well, that would've been Raul or the project

17 manager.

18      Q.   What about the employees working under

19 Mr. Hernandez, so the electricians, helpers,

20 apprentices, mechanics would -- who would they be

21 required to obtain approval from if they wanted to work

22 over time?

23      A.   One is kind of a, I don't know how you're --

24 it's kind of an odd way to put it.  There's either

25 overtime available or a job had a task requires



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  overtime, right.

02        So, this type of worked overtime at MSC, so he

03  could have been pulling wire, if you're pulling wire and

04  the eight hours is done and your wire isn't finished,

05  you stay late and you finish.

06        So, at any time they say "Hey guys, we need to

07  finish this it's probably going to take us another two

08  hours."  You would say, I need everybody on the crew to

09  stay and if somebody wanted to leave you get, you need

10  another person you'd find somebody else to say, the

11  other 30 guys go home, six guys stay below, behind

12  finish the task because you can't leave wire halfway

13  pulled.  You have to finish certain tasks in this

14  business, so that's what would happen.

15  **Q.   How often would that occur during the time**

16  **that Mr. Hernandez was working at the MSC project?**

17      A.   I couldn't speak to what -- I know that he

18  worked overtime at MSC.  I know he worked overtime at

19  Palmer Lakes.

20        What specific instance whether it was "Hey,

21  we're working -- the whole crew is working or your crew

22  was working, I couldn't speak to that," you know, that

23  can be analyzed from looking at the overall overtime

24  hours, worked on that whole project.

25        Was it open to everybody or was it open to



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01    specific task, you know, really depends on the thing.

02           Policy or standard procedures or working eight

03    hours a day, this is your rate of pay and this is where,

04    you know, the whole thing is, you know, we don't want

05    anybody because there's a law of diminishing return.

06           Once you start working overtime for weeks in a

07    row where your efficiency and everything drops, you

08    know, underperform quality of life and everything.  So,

09    it's not the goal to sit here and work endless overtime.

10        **Q.   Okay.  I think in your response you just**

11    **stated that Mr. Hernandez did work overtime during the**

12    **time he was working at the MSC project?**

13        A.   Yes.  That's what his employee records state.

14        **Q.   Do you know maximum amount of overtime that**

15    **Mr. Hernandez worked during the period of time that he**

16    **was working at the MSC project?**

17           MS. STRASSER:  Form.

18        A.   I don't, but it's in his, you know, his

19    exported payroll reports.

20    BY MR. LAROU:

21        **Q.   Do you know if Mr. Hernandez was paid time and**

22    **a half for that overtime that he worked while at the MSC**

23    **project?**

24        A.   I mean every employee that worked overtime got

25    time and a half company wide, every project.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01      **Q.   During Mr. Hernandez's time working at the MSC**

02   **project, was there any particular individual employed by**

03   **Hypower that was responsible for notifying Hypower**

04   **employees of the set work schedule?**

05      A.   The set work schedule was set the day he --

06   day one, when he went there.

07      **Q.   With Mr. Hernandez, he started at the Palmer**

08   **Lakes project then he --**

09      A.   When he was assigned --

10      **Q.   -- switch over to a different project at the**

11   **MSC terminal, how would he have known the set schedule**

12   **at that project?**

13      A.   When he was assigned to go to that project, he

14   was told that the working hours were from 07:00 to

15   03:30, and this is the person you're reporting to him

16   being provided all that information when he was

17   transferred with the address and everything else.

18      **Q.   Who told him that?**

19      A.   He -- the person he was working for probably

20   at Palmer Lakes told him to report over here provide

21   them the details, that's how we transfer people.

22      **Q.   So, that would've been Alcides Fleitas?**

23      A.   At that point it probably would've been Robert

24   or it could have been --

25      **Q.   Robert Weisberg?**



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01     A.   Yeah.

02     **Q.   Did any employee of Hypower instruct Robert to**

03 **tell Mr. Hernandez the set work schedule for the MSC**

04 **project?**

05     A.   Yeah.  It could have been me moving people

06 around telling and said Gustavo here started at 07:00

07 a.m. report here everything else.

08     **Q.   So, you're saying it could have been you, but**

09 **you don't remember specifically instructing Robert to**

10 **tell Mr. Hernandez that?**

11     A.   Not for a specific employee, no.

12     **Q.   Is there any specific Hypower employee**

13 **responsible for notifying the employees at the MSC**

14 **project at the time they were required to arrive to**

15 **work?**

16     A.   Nothing, from what I previously stated,

17 industry standards, company standards, superintendent.

18     **Q.   And did Hypower offer any incentives or**

19 **bonuses to superintendent at the MSC project related to**

20 **the company's profitability?**

21     A.   That project is still going on.  So, how

22 wouldn't he related to MSC?

23     **Q.   So, during the time that Mr. Hernandez was**

24 **working at the MSC project for Hypower, did Hypower**

25 **offer any incentives or bonuses to its superintendents**


**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  there at the MSC project to related to the company's

02  profitability?

03          MS. STRASSER:  I'm objecting, for the same

04      reasons we indicated in the objections we served on

05      all yesterday.  You can answer.

06      A.   Nothing specifically related to MNC, no.

07  BY MR. LAROU:

08      Q.   Related to the company's overall

09  profitability?

10      A.   Yes.  Every, you know, salary employee part of

11  their eligible for bonuses.

12      Q.   Do you agree that Hypower is more profitable

13  if it spends less money paying its employees?

14      A.   I don't agree.

15      Q.   Why not?

16      A.   Because I think happy employees are productive

17  employees.  I think we're the highest paying electrical

18  contractor in South Florida and payment is only part of

19  being added.

20      Q.   Did Hypower ever provide Mr. Hernandez with

21  instructions on where to park while he was working at

22  the MSC project?

23      A.   I think they provided them options on what was

24  available, yes.

25      Q.   What were those options?



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01     A.   The general contractor rented a parking lot

02 just off the board of Miami and Downtown Miami had a

03 number of buses that would bus people in and bring them

04 to the site, or they could park at the numerous parking

05 garages that are on the Port of Miami and get to the

06 site on their, you know, and get to the Port of Miami

07 that way.

08     **Q.  Do you know how Mr. Hernandez got to work or**

09 **where he would park?**

10     A.   I do not.

11     **Q.  You mentioned it was the general contractor**

12 **that rented parking lot Downtown.  What was the general**

13 **contractor for that MSC project or what is the general**

14 **contractor for the MSC Project?**

15     A.   Fincantieri of Florida.

16     **Q.  And would Fincantieri the general contract --**

17 **contractor provide the buses that would transport those**

18 **employees to the MSC job site?**

19     A.   Yes.  They provided everything.  Sorry, it's

20 Fincantieri Infrastructure of Florida.

21     **Q.  Thank you.**

22     MS. STRASSER:  Adam, do you want to spell

23     that?  Do you have it on hand --

24     THE WITNESS:  Sure.

25     MS. STRASSER:  -- for the Court Reporter has



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01       it on the record, and we don't have to go through

02       this later.

03            THE WITNESS:  Sure.  F-I-N-C-A-N-T-I-E-R-I

04       Infrastructure Florida, Inc.

05  BY MR. LAROU:

06       **Q.   So, just a moment ago you said that Hypower**

07  **employees working at the MSC project were provided with**

08  **options on where to park.  Who provided employees with**

09  **those options?**

10       A.   There was a, you know, the assistant project

11  managers anybody that was new to the site, there was,

12  you know, you had to have a port ID.  So, you know,

13  there was a whole process to come into this job for the

14  first time.  You needed some badging to be done and

15  everything else.

16            So, typically the assistant project manager

17  would e-mail the information, you know, wherever the

18  parking lot was, if they chose to do that, whatever the

19  garages were letting know that they could park in the

20  garages if they wanted to at their own expense.

21            And that they needed to meet them at a

22  specific location so they could go get a batch.  And at

23  times if somebody didn't have a, you know, safety

24  qualification that was needed, either lift, fall

25  protection or whatever.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01        Sometimes they'd have to come to the office

02   before they would be able to go to the job site to get

03   all that expedited in so that we met whatever the

04   project requirements were.

05        Q.   Okay.  Do you know if Fincantieri took -- kept

06   any records of the individuals employed by Hypower that

07   were taking the buses that are provided?

08        A.   I wouldn't know, no.

09        Q.   Did Hypower ever provide Mr. Hernandez with

10   instructions regarding how he was supposed to report the

11   hours he worked at the MSC project?

12        A.   He would've learned that at Palmer Lakes, it's

13   the same fillable PDF.

14        Q.   Got it.  So, the time reporting procedure at

15   the MSC project is the exact same as it was at the

16   Palmer Lakes project?

17        A.   In every single Hypower project, yes.

18        Q.   Okay.  During Mr. Hernandez's time working at

19   the MSC project, did Hypower ever receive any complaint

20   from any of his employees, working there that they were

21   not being paid over time for hours, they worked over 40

22   per week?

23        A.   No.  Not that I'm aware, no.

24        Q.   Has Hypower ever verified the hours reported

25   on Mr. Hernandez's time sheets?



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01     A.   Well, if there's ever a problem with anybody's

02  time that's reported because you got to remember these

03  are human beings reporting it.

04          Whatever the employee is or was they report it

05  to the superintendent and say, "Hey, I'm missing hours

06  or, you know, I doubt anybody would say they got too

07  many hours."

08          But, if they're missing hours they notify the

09  superintendent and then they notify the payroll lady and

10  those corrections are made.  There's actually a, you

11  know, a payroll discrepancy report that goes out every

12  week, kind of a naughty list.

13          If somebody has made a mistake with somebody's

14  payroll saying, "Hey because again, this is human error,

15  this is people's livelihood and it should be taken a

16  very high priority."

17          So, we call those people out specifically if

18  you've made an error or we've made several of them.

19          And if you've missed somebody's time or

20  whatever and, you know, you're on the list goes out

21  every week.

22     **Q.   Got it.  And so how is that payroll**

23  **discrepancy analysis conducted?**

24     A.   There's no analysis.  What it is the employee

25  gets his paycheck and says, I was paid 37 hours and



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  entitled to 40.  So, he was shorted three hours.  He

02  notifies the superintendent and the site people, you

03  know, yes, you shorted, you worked.

04          We owe you the hours, they goes back into

05  payroll and say, we owe them three hours paid charge it

06  to this cost code and pay them their money.

07      Q.  So, ultimately and I just want to make sure

08  I'm understanding correctly.  If a person ends up on

09  that list of individuals where there's a payroll

10  discrepancy --

11      A.  It's typically not the person that's on the

12  list, right.  So, they're not calling out the employee,

13  it's the actual person who obligation who was, like a

14  couple of weeks ago, I made the list because I forgot to

15  enter my own time for the week, you know, the payroll

16  lady knew I was here knew that I worked and she said,

17  "Hey, I got to put you on the list I see you didn't

18  report your own time."

19          So, that type of thing, so whoever the

20  supervisor and obligation is to report that time is the

21  one who makes the list.

22      Q.  How would that -- how would those supervisors

23  know whether there's a payroll discrepancy?

24      A.  They would be the one who is told and they're

25  the ones who have to report it to payroll.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01      Q.   Does Hypower have the access to any documents

02  or information that would allow it to determine the

03  dates and the times that Mr. Hernandez digitally

04  submitted his time sheets?

05      A.   No.

06          MS. STRASSER:  Form.  Well, I didn't hear what

07      the whole question, I'm sorry, Brooks.

08          MR. LAROU:  Yeah, no, that's okay.  I'll

09      repeat myself.

10  BY MR. LAROU:

11      Q.   So, does Hypower have access to any documents

12  or information that would allow it to determine the

13  dates and the times that Mr. Hernandez digitally

14  submitted his time sheets, so basically he maintain --

15          MS. STRASSER:  Signed or in -- signed or put

16      the hours in because I think those are two

17      different things.

18          MR. LAROU:  Let's -- I'll ask both.

19          MS. STRASSER:  It's okay.

20  BY MR. LAROU:

21      Q.   So, start with, you know, is there any way

22  that Hypower can determine the time that Mr. Hernandez

23  signature was affixed to his time sheets?

24      A.   Other than he put the time in himself that he

25  started and put the time that he finished and signed it.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  Both, he's a manual entry by him.  So, that's the only

02  thing we have is his signature that says, this is what I

03  did.

04  **Q.   Is there any way for Hypower to determine the**

05  **precise time -- moment in time --**

06  A.   I mean, is there any way for --

07  **Q.   -- that entry was made?**

08  A.   So, is there any way for us to verify what he

09  signed said was true to see if it's actually what

10  happened, is that what you're asking?  Did Gustavo tell

11  the truth when he signed that document, is that what

12  you're asking me?

13  **Q.   No.  My question is there any way that Hypower**

14  **can determine that the exact moment in time.**

15  A.   Other than the document --

16  **Q.   That his signature please Mr. Johnson, please**

17  **Let me finish my question.**

18  A.   I understand your question, it's just --

19  **Q.   Is there any -- no, just for clarity of the**

20  **record, please let me finish my question.  Is there any**

21  **way that Hypower can determine the moment in time that**

22  **Mr. Hernandez's signature was put on his time sheet?**

23  A.   Yes, because there is a time in, there's a

24  time out and there's a signature that says 7 o'clock.

25  That's what that is, so yes that's what it says.



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01     Q.   **Is there a way to --**

02          MS. STRASSER:  I think, I'm sorry Brooks, I

03     think what he's asking is whether or not you're

04     able to tell or the computer will tell you when he

05     signed his.  What he affixed his signature to the

06     document, forget the time entries.  He's talking

07     about the actual signature on the document.

08          THE WITNESS:  Are you --

09          MS. STRASSER:  Can you tell him when, what

10     date and what time that was signed?

11     A.   It is a fillable PDF, I perfectly understand

12     the question, but we're all adults here.  He has a

13     responsibility just like everybody else.

14          He signed his name as a man saying, this is

15     what I did and what I'm saying is, us as a corporation,

16     that's what we believe to be true.

17     BY MR. LAROU:

18     **Q.   Right.  But that's not my question, my**

19     **question is Hypower --**

20     A.   -- no, there isn't.

21     **Q.   There's no way that you can look into the**

22     **metadata and see the time that the signature was added**

23     **to the document.**

24     A.   No.

25     **Q.   In a possible way?**



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01    A.   No.  We have adults and we expect them to be

02  adult.

03    **Q.   Has Hypower attempted to view the times that**

04  **Mr. Hernandez's signatures were affixed to his time**

05  **sheets?**

06    A.   No.

07    **Q.   Can you explain to me Hypower paid time off**

08  **policy?**

09    A.   I'd have to refer back directly to the, you

10  know, the employee handbook.  But basically you get --

11  from your time of start you get PTO you formula request

12  it through a system, you know, whatever time you went

13  off, and it's approved by your immediate supervisor and

14  you get a formal approval handed back to you and you

15  have X amount of hours.

16       I think it's 40 for the first year after three

17  years it's 80 hours or two years something like that.

18       I mean I can open up the employee handbook, I

19  don't know it off the top of my head.

20    **Q.   What about Mr. Hernandez specifically, do you**

21  **know how much paid time off he was entitled to?**

22    A.   I think when he was terminated I think he had

23  80 hours of PTO.  This was at the turn of the New Year.

24    **Q.   Okay.  Would you agree that the amount of PTO**

25  **that Hypower employee is entitled to is governed by the**


**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  Hypower Employee handbook?

02      A.   Yes.

03      Q.   Are Hypower's employees bound by the terms of

04  the employee handbook as a condition of their

05  employment?

06      A.   They are.

07      Q.   Did Mr. Hernandez agree to abide by the terms

08  of Hypower's employee handbook as a condition of his

09  employment?

10      A.   Did he sign it?  I don't know, but its company

11  policy yes I'd say it's known yes.

12      Q.   Okay.  I think you stated just a moment ago,

13  at the time that Mr. Hernandez was terminated, he had 80

14  hours of accrued PTO?

15           Can you please tell me Hypower's opening

16  policy for PTO that has been accrued, but not used?

17      A.   So, if you don't use it by year's end it you

18  can formally request it to be rolled over, but your

19  immediate supervisor needs to or -- no, ultimately I

20  have to approve anybody's rollover and I've never

21  rejected anybody's rollover.

22           I encourage people to take their time off and

23  if, you know, otherwise, if you leave on your own accord

24  you'll get paid out whatever time you accrue, that's

25  pretty much it.



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01      Q.   So, if I'm understanding correctly, if a

02   Hypower employee leaves on their own, they can cash out

03   their PTO, if they're fired they're not entitled to that

04   PTO?

05      A.   Correct.

06      Q.   Does it matter, the reason for a person's

07   termination, whether they're entitled for to cash out

08   their PTO?

09      A.   I'd say no, as far as obligated to pay for the

10   PTO.

11      Q.   Who made the determination that Mr. Hernandez

12   was not entitled to receive the PTO that he had accrued,

13   but not used at the time he was terminated?

14      A.   The employee handbook and I.

15      Q.   How did you make that determination?

16      A.   According to the employee handbook, if you

17   were terminated for cause you were entitled to your PTO.

18      Q.   Almost to the end here, I promise I'll wrap

19   things up here soon.  Okay.  I am going to share my

20   screen with you for just a moment.  Mr. Johnson, are you

21   able to see my screen?

22      A.   I am.

23      Q.   Okay.  So, we've been discussing employee

24   Hypower's employee handbook that governs the PTO policy,

25   document that I'm sharing on my screen is Bates marked



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  Hypower 357 through 430.

02          And if you'd like, I can scroll through the

03  document in its entirety, but I'll represent to you this

04  is the employee handbook provided by -- provided to

05  Mr. Hernandez by Hypower in response to our discovery

06  requests.  Let's scroll through quickly.

07          Okay.  Zeroing in on the paid time off policy,

08  which begins on Page 53 of the employee handbook Bates

09  mark 411.  This document refers to Hypower's paid time

10  off policy.

11          I just wanted to clarify, is this the company

12  policy for Hypower that your contending governs, whether

13  an individual -- whether an employee is entitled to pay

14  time off?

15      A.   Yes.

16      Q.   And this is also the company policy that

17  governs whether an individual is entitled to be paid

18  their accrued PTO that they haven't used if they leave

19  the company voluntarily?

20      A.   Correct.

21      Q.   Thank you.

22          THE COURT REPORTER:  And sir did you want to

23      mark that as an Exhibit?

24          MR. LAROU:  Yes.  I'll mark that as Exhibit 1.

25      Thank you.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01          (Thereupon, Plaintiff's Exhibit 1 was entered

02      into the record.)

03          THE COURT REPORTER:  Okay.  Thank you.

04   BY MR. LAROU:

05      Q.  Just one more exhibit that I want to go

06   through with you and then I think that'll be it for me.

07          And I'll share my screen with you again.  So,

08   the document that I'm showing you is marked Defendant's

09   third amended answer in affirmative defenses.

10          (Thereupon, Plaintiff's Exhibit 2 was entered

11      into the record.)

12   BY MR. LAROU:

13      Q.  This is the operative answer in this lawsuit

14   responding to Gustavo Hernandez's complaint filed

15   against Hypower, LLC.  Real quickly so you can take a

16   look.

17          So, the affirmative Hypower, LLC's affirmative

18   defenses beginning here on Page 4 of the document, first

19   I want to focus on first affirmative defense listed here

20   that I'm highlighting on the screen, which states that

21   for its first affirmative defense.

22          Defendant states that Plaintiff's claims are

23   barred and that he was an exempt executive employee

24   under the FLSA during all material times and forth in

25   the complaint and thus not entitled to overtime under



UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01    FLSA.   Mr. Johnson, is that true?

02        A.   I would say it's not, I'm -- not true.

03        Q.   So, Mr. Hernandez was never an exempt

04    executive employee of Hypower.   That's correct?

05        A.   Correct.

06        Q.   Okay.   Now, I want to focus on the third

07    affirmative defense, which states that Defendant did not

08    willfully violate the FLSA Defendant acted in good faith

09    reliance upon and in conformity with official written

10    administrative recommendations, rulings, approvals,

11    administrative interpretations, practices, and or

12    enforcement policies and procedures of the U.S.

13    Department of Labor.

14            And so I want to ask you what particular

15    administrative recommendations, rulings, approvals,

16    interpretations, policies or procedures did Hypower rely

17    on in not paying or in its good faith belief that it

18    didn't violate the FLSA?

19        A.   That Gustavo and all employees have been paid

20    as company policy every hour that they worked for

21    Hypower that's company policy.   So, that's us operating

22    in good faith.

23        Q.   Okay.

24        A.   That was it.

25        Q.   Were there any particular documents, any



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01   particular recommendations, rulings, policies,

02   procedures that it relied on?

03        A.   Nothing that and other than the standards

04   that, you know, anything past 40 is overtime, whatever

05   your, you know, whatever your other policies are you

06   have to maintain them consistently for all employees.

07        Q.   Okay.  Now, scrolling down to Page 6 of the

08   document, Paragraph 9, Hypower's ninth affirmative

09   defense.

10             For this affirmative defense, Defendant states

11   that, it is entitled to a set off offset or recoupment

12   for overpayments made to Plaintiff throughout his

13   employment with Defendant.  Did Hypower ever overpay

14   Mr. Hernandez?

15        A.   I wouldn't think so, no.

16             MR. LAROU:  I don't think I have any further

17        questions.

18             THE WITNESS:  Okay.

19             MS. STRASSER:  I just have a one or two follow

20        up questions for you Mr. Johnson.

21                       CROSS EXAMINATION

22   BY MS. STRASSER:

23        Q.   Mr. LaRou was asking you about the time sheets

24   and I know we've kind of beat this to death, but I just

25   want to make sure I understand and that it's clear in
```



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01  the record.

02          Is it possible that an employee can input time

03  the day they worked?  Let's say I worked yesterday and

04  I'm working for Hypower as a foreman.

05          Is it possible that I could put my time into

06  the fillable PDF yesterday and then sign the document

07  today and submit it to my superintendent?

08      A.    Yes.

09      Q.    Okay.  It there's no requirement that the time

10  be submitted and signed on the same day, correct?

11      A.    No.

12      Q.    Okay.

13      A.    It's, you know, we wanted time recorded, you

14  know, daily, every other day so that we can report it

15  into the system as we report production and everything

16  else, so..

17      Q.    Okay.  But the signature doesn't necessarily

18  coincide with the date and time that the numbers were

19  entered in showing how many hours were worked each day?

20      A.    No.

21      Q.    Okay.  And for paid time off for PTO, I just

22  want to confirm that there is a policy that the company

23  abides by or requires its employees to abide by,

24  correct?

25      A.    Yes.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01     Q.   As far as requesting paid time off?

02     A.   Yes.  So, requesting paid time off is formally

03  done through the employee portal.  They request it, they

04  select their immediate supervisor and they send them

05  their request, I'm taking eight hours off I'm taking

06  four hours off.

07          Most people just take the whole, if they're

08  requesting it they take the whole time off.

09     Q.   Okay.

10     A.   There's even a request for unpaid time off, if

11  you need to take two weeks off to go out of the, you

12  know, you only got one week of vacation and you're going

13  to South America and you want to take three weeks off,

14  you're requesting unpaid time off.  So, there's a

15  process for that too, all within the same portal.

16     Q.   Okay.  One moment here.  I think you testified

17  earlier and I just want to confirm that Mr. Hernandez

18  was terminated for cause, correct?

19     A.   Correct.

20     Q.   And that was because he was insubordinate

21  during the safety meeting?

22     A.   Correct.

23     Q.   Okay.  And that was determined by?

24     A.   Ivan Lopez, that was --

25     Q.   Ivan Lopez, who was present during the safety



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

01   meeting?

02        A.   Correct.

03        Q.   Okay.  And that would substantiate or cause

04   the termination to be for cause, correct?

05        A.   Correct.

06        Q.   Okay.

07        A.   He wouldn't stop what he was, you know, saying

08   look, this isn't what that meeting is about, you're

09   standing have a problem, but whatever this is what we're

10   here for.

11        Q.   Okay.  And the handbook is clear that a

12   termination for cause means that an employee is not

13   going to be paid out their accrued PTO, correct?

14        A.   Correct.

15        Q.   That is in the handbook, right?

16        A.   Correct.

17        Q.   Okay.  And the handbook that Mr. LaRou showed

18   you earlier was the handbook that was provided to

19   Mr. Hernandez at the time of his employment, at the time

20   he was on-boarded, as you mentioned it earlier?

21        A.   Correct.

22             MS. STRASSER:  Okay.  I don't have anything

23        further.  Thank you.

24             MR. LAROU:  Nothing on my end either, I think

25        we're all set.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01              THE COURT REPORTER:  Okay.  Perfect.

02              MS. STRASSER:  And we'll --

03              THE COURT REPORTER:  And I just want to

04        clarify for the record, Mr. LaRou, you did mark the

05        Defendant's Third Amended Answer and Affirmative

06        Defenses as Exhibit 2, right?

07              MR. LAROU:  Correct, yes.  That'll be Exhibit

08        2.

09              THE COURT REPORTER:  Okay.  Perfect.

10              MS. STRASSER:  And we'll read please.

11              (Deposition concluded at 11:47 a.m.)

12              (Reading and signing of the deposition by the

13        witness has been reserved.)

14

15

16

17

18

19

20

21

22

23

24

25
```



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01              CERTIFICATE OF REPORTER

02    STATE OF FLORIDA

03    COUNTY OF BROWARD

04

05        I, LUCIANO ANTONINO, Court Reporter and Notary

06    Public for the State of Florida, do hereby certify that

07    I was authorized to and did digitally report and

08    transcribe the foregoing proceedings, and that the

09    transcript is a true and complete record of my notes.

10

11        I further certify that I am not a relative,

      employee, attorney or counsel of any of the parties,

12
      nor am I a relative or employee of any of the parties'

13
      attorneys or counsel connected with the action, nor am

14
      I financially interested in the action.

15

16        Witness my hand this 5th day of February, 2025.

17

18

19

20    _____

21    LUCIANO ANTONINO, CER, COURT REPORTER
      NOTARY PUBLIC, STATE OF FLORIDA
22

23

24

25
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01              CERTIFICATE OF OATH

02   STATE OF FLORIDA

03   COUNTY OF BROWARD

04

05        I, LUCIANO ANTONINO, the undersigned authority,

06   certify that ADAM D. JOHNSON, appeared before me

07   remotely pursuant to Florida Supreme Court Order

08   AOSC20-23 and was duly sworn on the 4th day of

09   December, 2024.

10

11           Witness my hand this 5th day of February, 2025.

12

13

14   _____
     LUCIANO ANTONINO, CER, COURT REPORTER
15   NOTARY PUBLIC, STATE OF FLORIDA
     Commission No.:  HH 499586
16   Commission Exp:  03/04/28

17

18

19

20

21

22

23

24

25
```



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
01   DATE:        February 5, 2025
     TO:          ADAM D. JOHNSON
02   C/O          JILLIAN STRASSER, ESQUIRE
                  COLE, SCOTT & KISSANE, P.A.
03                222 LAKEVIEW AVENUE, SUITE 120
                  WEST PALM BEACH, FLORIDA 33401
04
     IN RE:    Gustavo Hernandez v. Hypower, LLC
05
     CASE NO: 24-CV-20207-MARTINEZ/SANCHEZ
06
     Dear MR. JOHNSON
07
          Please take notice that on the 4th day of
08   December, 2024, you gave your deposition in the
     above-referenced matter.  At that time, you did not
09   waive signature.  It is now necessary that you sign
     your deposition.  You may do so by contacting your own
10   attorney or the attorney who took your deposition and
     make an appointment to do so at their office.  You may
11   also contact our office at the below number, Monday -
     Friday, 9:00 AM - 5:00 PM, for further information and
12   assistance.

13        If you do not read and sign your deposition within
     thirty (30) days, the original, which has already been
14   forwarded to the ordering attorney, may be filed with
     the Clerk of the Court.
15
          If you wish to waive your signature, sign your
16   name in the blank at the bottom of this letter and
     promptly return it to us.
17
     Very truly yours,
18
     LUCIANO ANTONINO, CER, Court Reporter
19   Universal Court Reporting
     (954)712-2600
20
     I do hereby waive my signature.
21

22   _____
     ADAM D. JOHNSON
23   CC: VIA TRANSCRIPT:      PATRICK BROOKS LAROU, ESQUIRE
                              JILLIAN STRASSER, ESQUIRE
24

25
```



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Gustavo Hernandez vs Hypower, LLC
Johnson, Adam on 12/04/2024

```
 1   Errata Sheet

 2

 3   NAME OF CASE: Gustavo Hernandez vs Hypower, LLC

 4   DATE OF DEPOSITION: 12/04/2024

 5   NAME OF WITNESS: Adam Johnson

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                        _____
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

# EXHIBIT G

## Termination Form

| Employee Name | Today's Date | Spectrum Employee ID |
|---|---|---|
| Hernandez, Gustavo | 01/05/2024 | 2091 |

| Hire Date | Last Day Worked | Last Position Worked |
|---|---|---|
| 08/08/2022 | 01/04/2024 | Foreman 3 |

**Is Termination Voluntary?** ○ Yes ● No  
**Was Employee Terminated For Cause?** ● Yes ○ No  
**Did Employee Quit?** ○ Yes ● No  
**Eligible for Rehire?** ○ Yes ● No

**Provide Reason**  
Gustavo was terminated for sending an email saying if Raul Gonzalez wasn't leaving MSC that he would wouldn't work with Raul Gonzalez.

**Notes**

**Checkoff all Hypower property needs to be collected at the time of Termination**

☐ Badges     ☐ Camera     ☐ Car Keys     ☑ Cellular Phone  
☐ Company Tools     ☐ Company Vehicle     ☐ Credit Card (AMEX)     ☐ Credit Card (Comdata)  
☐ Credit Card (HD)     ☐ Gas Cards     ☐ Gate Opener     ☑ Ipad  
☐ Laptop Computer     ☐ Office/Co. Key/Fobs     ☐ Toll Cards/E-Pass

**For Administrative use only:**

| Management Authorization | | |
|---|---|---|
| Approved By | Status | Comments |
| Adam Johnson | Approved | |
| Kathy Weissman | Pending | |

# EXHIBIT H

## Kathy Weissman

**From:** Adam Johnson
**Sent:** Friday, January 05, 2024 1:04 PM
**To:** Kathy Weissman
**Subject:** RE: Gustavo Hernandez

No PTO pay out.

**Adam Johnson** | Vice President – Electrical Construction

Hypower

Direct: 954-917-1425

Cell:   954-410-7041

5913 NW 31ˢᵗ Ave.

Ft. Lauderdale, FL 33309

**From:** Kathy Weissman <kweissman@HYPOWERINC.COM>
**Sent:** Friday, January 5, 2024 12:44 PM
**To:** Adam Johnson <AJohnson@HYPOWERINC.COM>
**Subject:** Gustavo Hernandez

Hi Adam,

Gustavo Hernandez called me this morning advising he was let  go yesterday and wanted to be paid out his 80 PTO hours for this year.

I advised him I do not have an exit form yet and it depends if he was let go due to cause.

I just got the exit form and it is with cause, please confirm no PTO pay out per policy as he will be calling me back.

**Kathy Weissman I** Payroll Manager
Hypower Headquarters
Main: 888-978-9300
Direct: 954-917-1408
Cell: 954-658-2314
Fax: 954-337-0390
kweissman@hypowerinc.com

5913 NW 31ˢᵗ Ave.
Fort Lauderdale, FL 33309

HYPOWER_0335